# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALICE WALKER and                           :
GERALD H.E. WALKER,                        :
                                           :
        Plaintiffs,                :
                                           :
    v.                                    :    C.A. No. 06-366 JJF
                                           :
CITY OF WILMINGTON, CITY OF                :
WILMINGTON POLICE DEPARTMENT,              :
OFFICER SHAWN GORDON,                      :
OFFICER MICHAEL BALLARD, and               :
OFFICER KAREN BUHRMAN,_____:
                                           :
        Defendants.                :


## DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants

DATE: August 31, 2007

**TABLE OF CONTENTS**

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.      WALKER'S MENTAL HEALTH CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.      WALKER'S INVOLUNTARY MENTAL HEALTH COMMITMENT . . . . . . . . . . . 3

       C.      OFFICER BUHRMAN'S ATTEMPT TO TRANSPORT WALKER . . . . . . . . . . . . . 3

       D.      THE BACK-UP OFFICERS' ATTEMPT TO TRANSPORT WALKER . . . . . . . . . . 4

       E.      SERGEANT KANE'S INVESTIGATION OF THE USE OF FORCE . . . . . . . . . . . . 6

ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       I.      PLAINTIFFS' HAVE FAILED TO ESTABLISH *MONELL* LIABILITY OF THE CITY BECAUSE THE POLICE DEPARTMENT HAS AN OFFICIAL POLICY AGAINST EXCESSIVE USE OF FORCE, AND THIS POLICY HAS BEEN CONSISTENTLY ENFORCED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            A.      THE CITY'S FORMAL POLICY ON USE OF FORCE . . . . . . . . . . . . . . . . . 8

               1.      PERMISSIBLE USE OF FORCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

               2.      POLICY AGAINST EXCESSIVE USE OF FORCE . . . . . . . . . . . . . 9

            B.      THE CITY'S INTERNAL PRACTICE OF INVESTIGATING USES OF FORCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       II.      DEFENDANT BUHRMAN IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE SHE DID NOT USE ANY FORCE WHATSOEVER, LET ALONE EXCESS FORCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            A.      OFFICER BUHRMAN DID NOT VIOLATE AN ACTUAL CONSTITUTIONAL RIGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            B.      THERE IS NO "CLEARLY ESTABLISHED" RIGHT TO BE FREE OF A POLICE OFFICER'S DE MINIMIS CONTACT WHEN RESISTING A LAWFUL ARREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       III.     PLAINTIFFS CANNOT RECOVER PUNITIVE DAMAGES AGAINST THE CITY 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF CITATIONS

## Cases

*Beckwith v. Sherwood,* 2001 U.S. Dist. LEXIS 24079 (E.D.Pa. Oct. 11, 2001) . . . . . . . . . . . . . . . . . . 15

*Canton v. Harris*, 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 12

*Clark v. Condon*, 2002 U.S. Dist. LEXIS 17831 (D.Del. Sept. 20, 2002) . . . . . . . . . . . . . . . . . . . . . . 14

*Donohue v. Gavin*, 280 F.3d 371 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Graham v. Connor*, 490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ingraham v. Wright*, 430 U.S. 651(1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Johnson v. Glick*, 481 F.2d 1028 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mellot v. Heemer*, 161 F.3d 117 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

*Nardini v. Hackett*, 2001 U.S. Dist. LEXIS 15896 (E.D.Pa. Sep. 19, 2001) . . . . . . . . . . . . . . . . . . . . 15

*Saucier v. Katz*, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Constitutional Provisions

U.S. Const., Amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 13

## Federal Statutes

42 <u>U.S.C.</u> § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## NATURE AND STAGE OF PROCEEDINGS

This is a Section 1983 claim alleging that Defendants, the City of Wilmington and three of its police officers, used excessive force when transporting Plaintiff, Gerald E.H. Walker ("Walker"), from Connections CSP ("Connections") to the Delaware Psychiatric Center ("the DPC") on July 11, 2005. Discovery included depositions of the three police officers, their supervising sergeant who investigated the use of force, Walker's spouse, and a Connections employee, Joanne McGowan, who witnessed the interaction between Walker and the officers. Defendants also disclosed more than nine-thousand pages of files on investigations of use of force by Wilmington police officers from 2001 until the filing of this lawsuit. (A518-10321)[1]

Plaintiffs identified another eyewitness, Gabe Hufford, a Connections employee. (A2) Although Plaintiffs' Rule 26 disclosures included a sworn statement given by Hufford prior to the filing of this lawsuit, Defendants were not given the opportunity to depose Hufford. Plaintiffs did not make Hufford available for a deposition, and Defendant's subpoena for Hufford's deposition was returned *non est* because he is now deployed in the military with his home base in Texas. (A6-9)

Walker has been declared legally incompetent, which prevented him from being deposed and which will prevent him from testifying at trial. (A10-11) Walker has been involuntarily committed to the DPC since July of 2005. (McGowan A48)

This lawsuit alleges that two of the three City police officers used excessive force when transporting Walker, while the third officer stood by and watched. (Pltfs' Cmpl. ¶36 & 42) Plaintiffs also assert a *Monell* claim alleging that the City failed to train and supervise its officers in their use of force. (Pltfs' Cmpl. ¶47)

This is Defendants' Opening Brief in support of their Motion for Summary Judgment on (I) the *Monell* claim against the City, (II) Defendant Karen Buhrman's entitlement to qualified immunity, and (III) Plaintiffs' claim of punitive damages against the City.

---

[1]Throughout this Opening Brief, references to the Appendix filed under seal will be cited as "A_". Deposition transcripts will be cited by the deponent's last name and the corresponding page in the Appendix.

## <u>SUMMARY OF ARGUMENTS</u>

_____1.    Plaintiffs have not established *Monell* liability against the City because the Wilmington

Police Department has a formal policy against excessive use of force, and the City's internal practice is to

exhaustively investigate each use of force and impose discipline for any force that exceeds the City's policy.

2.    Defendant Buhrman is entitled to qualified immunity because she did not use any force

whatsoever on Plaintiff, let alone excessive force.

_____3.    Defendant City of Wilmington is not subject to punitive damages for Section 1983 claims.

## STATEMENT OF FACTS

This case arises from three Wilmington police officers' attempts to transport Plaintiff, Gerald H.E. Walker ("Walker"), to Delaware Psychiatric Center ("the DPC"), in response to a police call from the staff at Connections, an outpatient mental health facility.

### A.    Walker's Mental Health Condition

Walker has been diagnosed as a paranoid schizophrenic. (Walker A14-16)  On July 11, 2005, Walker's wife brought him to Connections, because she was concerned that Walker might molest his granddaughter. (Walker A21-22)  According to Walker's wife, Walker asked if it "would be a good idea if he had sex with their granddaughter." (Walker A21-22) In light of his mental health history, Walker's behavior prompted his wife to take him to Connections for evaluation by Dr. Gerald Mehalik, a psychiatrist. (McGowan A48) Joanne McGowan ("McGowan"), a nurse at Connections, also participated in that evaluation. (McGowan A48) Based on that evaluation, Dr. Mehalik told Walker that he would be committed to a psychiatric hospital.  (McGowan A48) Walker immediately said he would not go to the hospital. (McGowan A48)

### B.    Walker's Involuntary Mental Health Commitment

Dr. Mehalik prepared the commitment papers for Walker. (McGowan A48) The staff at Connections attempted to transport Walker to the DPC, but he refused to go willingly. (McGowan A48)  Although the staff at Connections is trained to deal with mentally ill patients, Walker was too much for the Connections staff to handle. According to McGowan, "[they] notified the police because [they] knew [Walker] was not going to get into a Connections vehicle to go back to the hospital[.]" (McGowan A49-50)

### C.    Officer Buhrman's Attempt To Transport Walker

Officer Karen Buhrman ("Buhrman") was the first to respond to the police call for Walker's transport. (Pltfs' Cmpl. ¶15)  She arrived at Connections and introduced herself to a staff member, Gabe Hufford ("Hufford"). (Buhrman A154)  Hufford advised Buhrman that Walker had been committed to the

DPC, and Hufford presented a copy of the commitment papers.  (Buhrman A154-155) Hufford then directed Buhrman to Walker, who was sitting in the waiting area.  (Buhrman A155)  Buhrman sat down next to Walker and explained that he would be transported to the hospital, and that it was police policy to handcuff anyone who is transported in a police vehicle.  (Buhrman A155) Walker told Buhrman that he refused to go to the hospital.  (Buhrman A155)

According to McGowan,  Buhrman "was really good with him . . . [s]he talked with him . . . she was there for a good bit of time, fifteen, twenty minutes."  (McGowan A51) McGowan also described Buhrman's actions as follows:

> I thought she was very caring.  She was very nice.  She was very cordial.  They were smiling.  You know, she tried everything, you know, jokingly to try to get him to go, you know, come on, come ride with me, she was just very good.  She was good.

> (McGowan A51)

Despite Buhrman's efforts, Walker still refused to go with her to the DPC.  Buhrman then conferred with Hufford and asked whether Walker would fight any attempt to handcuff him.  (Buhrman A158) Hufford told Buhrman that Walker would indeed fight.  (Buhrman A158) In light of this warning, Buhrman asked Hufford for more background on Walker.  (Buhrman A159) Hufford then explained that Walker's wife brought him to Connections out of concern that he might sexually molest their granddaughter.  (Buhrman A159)  Because Walker was significantly bigger than Buhrman, she called for back-up assistance based on Hufford's warning that Walker would fight any attempt to transport him. (Buhrman A158)

D.    The Back-Up Officers' Attempt to Transport Walker

While waiting for back-up assistance, Buhrman remained in the waiting area as Walker repeatedly rose from his chair and sat back down.  (Buhrman A163) Within a few minutes, Officers Shawn Gordon ("Gordon") and Michael Ballard ("Ballard") arrived to assist Buhrman with transporting Walker.  (Buhrman A165) Connections staff again warned  that Walker would be difficult to transport.  (Ballard A347) Ballard approached Walker and explained to him that the officers would be taking him to the hospital.  (Buhrman

-4-

A167; Ballard A324)   Walker replied that he was not going with them to the hospital.  (Buhrman A167; Ballard A330)

Ballard and Gordon repeatedly told Walker that he had no choice but to go with them to the hospital. (Gordon A224) Walker responded: "I'm not going anywhere.  You have to make me go."  (Ballard A343) After another five minutes of repeatedly ordering Walker to go with them, Gordon and Ballard each grabbed one of Walker's arms to be handcuffed.  (Buhrman A172; Gordon A224)   As they grabbed his arms, Walker tensely folded them across his chest.  (Gordon A224) Gordon then lifted one of Walker's legs, which tripped Walker to the ground.  (Gordon A236)

Walker landed on his back and pulled Ballard down with him in the middle of an open doorway. (Gordon A225; Ballard A332) When Walker landed, both of his arms were wrapped around Ballard's head in a "bear-hug" position.  (Gordon A225: Ballard A332 & 357) Ballard tried to break free from Walker's grip.  (Gordon A225; Ballard A332) When Ballard could not break free, he "head-butted" Walker.  (Gordon A225; Ballard A332 & 359-360) Walker still would not release his grip, and so Gordon struck Walker in the stomach to force him to release Ballard.  (Gordon A225) Walker still would not release his grip on Ballard, and so Gordon punched Walker in the face (left cheek).  (Gordon A226, 241 & 243) Ballard also struck Walker in the chest with his right fist, in an effort to break free from Walker's grip.  (Ballard A365-366) Walker still would not release his grip on Ballard.  (Gordon A226)

Gordon then warned Walker that he would use pepper spray if Walker did not release his grip on Ballard.  (Gordon A226; Ballard A366-367) Walker ignored Gordon's command and held his grip on Ballard. (Gordon 33) Gordon then sprayed Walker.  (Gordon A226 & 247) Ballard also sprayed Walker, which caused Walker released his right arm.  (Gordon A226; Ballard A368)  As Walker released his right arm, Gordon put a handcuff on Walker's right wrist. (Gordon A226; Ballard A368)  Ballard cuffed the left arm with a separate pair of handcuffs.  (Gordon A226; Ballard A370) The officers then rolled Walker onto his stomach and linked the two sets of handcuffs together behind Walker's back.  (Gordon A226) Finally, the

officers lifted Walker to his feet and escorted him to the squad car.  (Gordon A227)

Because they used pepper spray on Walker, Gordon and Ballard took him to Wilmington Hospital before ultimately taking him to the DPC.  (Gordon A226-227) They also contacted their supervisor, Sergeant Tom Kane ("Kane"), to advise him that force was used on Walker.  (Gordon A227)

Walker's handcuffs were removed while the medical staff examined him at Wilmington Hospital. (Gordon A258) Walker was promptly released from Wilmington Hospital after the doctor examined him and found no injuries.  (Gordon A256)    Ballard and Gordon handcuffed Walker and transported him from Wilmington Hospital to DPC without incident.  (Gordon A258) When they arrived at DPC, Walker's handcuffs were removed and he was released to DPC staff.  (Gordon A260)

E.    Sergeant Kane's Investigation of the Use of Force

Before Walker was released from Wilmington Hospital, Kane came to the hospital to investigate the use of force.  (Kane A430) Gordon and Ballard were monitoring Walker while he was still in their custody. (Kane A430) Kane questioned them about the use of force.  (Kane A435)  Because Gordon was the more senior officer, he relayed to Kane the encounter with Walker.  (Kane A435) Ballard's neck was injured from Walker's "bear hug", and so Kane also gathered some information on Ballard's injury.  (Kane A436)

Kane then questioned Walker about the incident.  (Kane A438) Walker told Kane that he had not wanted to go to the hospital, and that he was held down and punched in the face.  (Kane A439)

Next, Kane went back to Connections to interview anyone who witnessed the incident. (Kane A441) When Kane arrived at Connections, he asked to speak to Hufford, the staff person who called the police to transport Walker.  (Kane A441) Kane asked Hufford what happened when the officers transported Walker. (Kane A443) Hufford told Kane that the officers were trying to handcuff Walker but his hands were underneath his body.  (Kane A444) Hufford did not identify any other eyewitnesses, nor did he volunteer any further information to Kane.

Before completing his investigation of the use of force, Kane waited for Gordon and Ballard to write

their report of the incident.  (Kane A446) When Gordon eventually completed his narrative report, Kane reviewed it, along with a separate narrative report prepared by Buhrman.  (Kane A448)  Kane ultimately concluded that the officers' use of force was not excessive based on Walker's active resistance.  (Kane A447 &451)  Kane then passed his conclusions onto his immediate supervisor, Lt. Elmer Harris (whom Plaintiffs declined to depose even though he was identified in the Rule 26 disclosures).  (Kane A454) Regrettably, after an exhaustive search, Kane is unable to locate his written report of his investigation.  (Kane A457) However, Kane did testify in his deposition as to the contents of that missing report.  (Kane A456-458)

On August 9, 2005, Walker had to undergo a craniotomy for a subdural hemotoma.  By this time, Walker had been involuntarily committed to the Delaware Psychiatric Center since July 11.  Although Walker was promptly released from Wilmington Hospital on July 11 after he was examined by a physician, Plaintiffs contend that the craniotomy is somehow connected to that July 11 incident at Connections.

## ARGUMENT

**I.  PLAINTIFFS FAILED TO ESTABLISH *MONELL* LIABILITY AGAINST THE CITY BECAUSE THE POLICE DEPARTMENT HAS AN OFFICIAL POLICY AGAINST EXCESSIVE USE OF FORCE AND THIS POLICY HAS BEEN CONSISTENTLY ENFORCED.**

Even if Gordon's and/or Ballard's actions constitute excessive force (which they do not), that alone is not sufficient to establish the City's liability under Section 1983. The City is not subject to respondeat superior liability for its officers' constitutional violations (even if proven). *See Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). The *Monell* Court held that "a municipality can only be liable under Section 1983 when the execution of a municipality's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* at 694-95. Plaintiffs' substantial burden of proof for *Monell* liability is succinctly set forth in *City of Oklahoma v. Tuttle*, 471 U.S. 808 (U.S. 1985):

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker. Otherwise, the existence of the unconstitutional policy, and its origin, must be separately proved.
>
> *Id.* at 823.

The *Tuttle* Court also held that a court cannot infer a "policy" of inadequate training based on a single incident of police misconduct. *Id.* at 823.

### A.    THE CITY'S FORMAL POLICY ON USE OF FORCE

#### 1.    Permissible Use of Force

The City has a formal policy on use of force that meets Fourth Amendment standards of reasonableness, as defined in *Graham v. O'Connor*, 490 U.S. 386, 394 (1989). That policy set forth in Wilmington Police Officer's Manual Directive 6.7(IV),[2] which states:

---

[2] The Wilmington Police Officer's Manual refers to the Wilmington police department's bound compilation of various directives addressing all aspects of Wilmington police officers' duties, ranging from proper execution of police procedure to promotional and other personnel benefits. The City's official policy on permissible

> The use of force should follow a prescribed continuum: physical presence, verbal warning, verbal command, hands-on control, hands-on counter measures. Intermediate weapon (which includes the choice of a chemical weapon, Asp baton), and finally, if necessary, the use of deadly force.
>
> However, members should be mindful that the force needed to control an incident may not fall on the prescribed continuum sequentially in all circumstances. Therefore, members should use their discretion to quickly and safely apply the necessary level of force to meet the situations involving arrest, safety of citizens or officer self-defense. (A477)

The *Graham* Court explained that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." The above-quoted text of Directive 6.7(IV) replicates the calculus of reasonable use of force defined by *Graham*, and therefore, it is not an unconstitutional policy that can establish *Monell* liability. (A477)

2.    <u>Policy Against Excessive Use of Force</u>

The City also has a formal policy that prohibits any excessive use of force, which is set forth in Directive 7.9(A):

> The use of physical force shall be restricted to the circumstances specified by Law (Title 11, Section 467)[3] when necessary to accomplish a police task successfully.
>
> 1.    Unnecessary Force resulting in "serious physical injury" as defined in Title 11, Section 222 will result in disciplinary action as specified for a class A violation.
>
> 2.    Unnecessary Force will result in disciplinary action as specified for a Class "C" violation.
>
> (A490-491)

Chapter IIX of the Wilmington Police Officer's Manual sets forth the City's policy on administration of discipline for police officers who violate any internal police directives, including Directive 7.9, which prohibits excessive use of force. (A492-517) A violation of Directive 7.9 is categorized as a Class "C"

---

use of force, and attendant penalties for failure to adhere to this policy, are included in the Wilmington Police Officer's Manual as Directives 6.7 and 7.9.

[3] 11 <u>Del.C.</u> § 467(a)(1) authorizes a law enforcement officer to use force when he/she is "making an arrest or assisting in making an arrest and believes that such force is immediately necessary to effect the arrest."

violation, which is punishable by up to ten days of suspension for the first offense. (A495)  The disciplinary provisions of Chapter IIX assure that police officers are held accountable to the City's formal policy against excessive use of force.

   B.       THE CITY'S INTERNAL PRACTICE OF INVESTIGATING USES OF FORCE

Because the City's use of force policy is well within the *Graham* calculus, as stated and as applied, Plaintiffs cannot establish *Monell* liability by citing any perceived excess in Gordon's or Ballard's use of force.  Nor can Plaintiffs establish *Monell* liability by citing any perceived deficiencies in Kane's investigation of that use of force.  As the *Tuttle* Court explained, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the policy and the constitutional deprivation." *Tuttle*, 471 U.S. at 823.  Plaintiffs cannot meet this burden because the City has a well-documented practice of consistently enforcing its policy against excessive use of force. ( A571-10331) Defendants disclosed during discovery over nine thousand documents of investigative files for uses of force from 2001 to 2006, which confirms that the City has a consistent practice of thoroughly investigating each use of force and imposing discipline when force is excessive.

Although Walker never filed a complaint with the WPD against the officers who transported him, he now alleges that the City failed to investigate the level of force used against him.  Kane explained that internal investigations of use of force are initiated either by self-reporting (by the officer who used force) or when the victim of the force files a complaint.  Other than Gordon's self-reporting of the force used  on Walker, neither Walker nor his guardian filed a complaint with the internal affairs division.  Yet, Walker's *Monell* theory is that the City failed to investigate a complaint that was never filed.

Kane interviewed Hufford, the person who contacted the police when Walker refused to be transported by Connections staff.  Kane asked Hufford about the incident, and he gave Hufford ample opportunity to disclose any information that would be relevant to Kane's investigation.  Hufford did not

-10-

disclose any other eyewitnesses to Kane.  Hufford only told Kane that Walker refused to go with the police

and they forced his arms to be handcuffed.  (Kane A444)  Based on Hufford's eyewitness account, there was

only so much that Kane could investigate.

Beyond interviewing Hufford and the officers involved, the City could not investigate Walker's

allegations if he never filed a complaint.  Though there was another eyewitness (Joann McGowan), Kane

could not interview her if Hufford never identified her and she never came forward on her own.

The seminal case applying *Monell* to claims of failure to train/supervise is *Canton v. Harris*, 489

U.S. 378 (1989), which held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice

by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under §

1983." *Id.* at 391. Plaintiffs' *Monell* claim is belied by the discovery record in this case which confirms that

the City's police department has a thorough and systematic practice of internally investigating its police

officers' uses of force.  In response to Plaintiffs' discovery request, Defendants disclosed over nine thousand

documents of internal investigations of uses of force from 2001 to 2006.  (A517-10331) The sheer volume

of documents confirms the internal policy of thoroughly investigating each and every use of force, no matter

how minor.  Even if the investigation of Walker's claim is deemed inadequate (despite the fact that he never

even lodged a complaint), that is not enough to establish *Monell* liability.  According to *Tuttle*, Plaintiffs can

only satisfy *Monell* by proving that the City lacks an internal policy and custom of thoroughly investigating

all uses of force and imposing discipline when warranted.  *See Tuttle*, 471 U.S. at 823.

Among the nine thousand documents of use of force investigations disclosed in discovery, there are

multiple reports in which officers were disciplined for using excessive force.  For example, a 2005

investigation of HB's use of force resulted in a thirty-day suspension and a year of probation.[4]  (A864-8663)

---

[4]For purposes of confidentiality, "HB" refers to the police officer from the investigative files at pages A_ to A_ in the Appendix that was filed under seal.

More recently, an investigation of TM's use of force resulted in a suspension of sixty-two days.[5] (A9320)

In HB's case, he struck an arrestee in the abdomen with his fist. (A9320-9449) Unlike Walker, the arrestee in HB's case filed a formal complaint with the police department's internal affairs division. (A9320-9449) In response to that complaint, an internal affairs officer conducted a detailed investigation and lodged formal internal charges against HB. (A9320-9449) An internal affairs hearing was held, and HB was found guilty of violating the City's formal policy against excessive use of force. (A9320-9449) To penalize and deter this conduct, HB was suspended for thirty days and placed on disciplinary probation for one year. (A9320-9449)

TM's case is another illustrative example of the City's internal practice of enforcing its official policy against excessive use of force. (A1640-1730 & 9320-9449) TM's case arose when he struck a prisoner in the head with his fist. (A1640-1730 & 9320-9449) Although the prisoner did not lodge a formal complaint with the police department's internal affairs division, there was a surveillance video of TM's actions. (A1640-1730 & 9320-9449) That video prompted the internal affairs division to formally charge TM with violating Directive 7.9, the City's formal policy against excessive use of force. (A1640-1730 & 9320-9449) As with HB, an internal affairs hearing was held and TM was found guilty of violating the City's use of force policy stated in Directive 7.9. (A1640-1730 & 9320-9449) To penalize and deter TM's conduct, TM was suspended for sixty-two days. (A1640-1730 & 9320-9449)

These are two of the many documented examples of the City's strict practice of investigating all uses of forces and penalizing police officers who violate the City's policy against excessive force. A law enforcement officer's job entails some degree of force when apprehending arrestees who refused to submit to arrest. Therefore, not every use of force by a Wilmington police officer will necessarily result in discipline. However, nine thousand pages of investigatory files confirms that the City has an internal practice

---

[5]For purposes of confidentiality, "TM" refers to the police officer from the investigative files at pages A_ to A_ in the Appendix that was filed under seal.

and policy of investigating all uses of force. This well-documented internal practice precludes Plaintiffs from meeting their *Monell* burden, as applied in *Tuttle*, to adduce "considerably more proof than the single incident . . . to establish both the requisite fault on the part of the municipality and the causal connection between the policy and the constitutional deprivation." *Tuttle*, 471 U.S. at 823. Consequently, Plaintiffs' *Monell* claim against the City in Count III must fail as a matter of law.

## II.    OFFICER BUHRMAN IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE SHE DID NOT USE ANY FORCE WHATSOEVER, LET ALONE EXCESSIVE FORCE

Officer Buhrman is entitled to qualified immunity from Plaintiffs' claim of excessive force because she used no force whatsoever, let alone excessive force. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). According to *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the analysis of qualified immunity is two-fold:

(A.) whether Plaintiffs have identified a violation of an actual constitutional right, and if so,

(B.) whether that right is clearly established.

When a government official asserts a qualified immunity defense, the plaintiff bears the initial burden of demonstrating a violation of a clearly established constitutional right. *See Donohue v. Gavin*, 280 F.3d 371, 378 (3d Cir. 2002). For the reasons below, Walker cannot meet this burden with regard to Officer Buhrman.

### A.    OFFICER BUHRMAN DID NOT VIOLATE AN ACTUAL CONSTITUTIONAL RIGHT

A complaint of excessive force "invok[es] the protections of the Fourth Amendment, which guarantees citizens the right ' to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Plaintiffs' Complaint does not allege that Officer Buhrman used excessive force (or any force whatsoever) on Walker. Count II of the Complaint only alleges that Buhrman stood by and watched as Gordon and Ballard struggled with Walker. (Pltfs' Compl. ¶42)

-13-

To establish an actual violation of the Fourth Amendment based on excessive force, a plaintiff must prove that the use of force is not "objectively reasonable". *See Mellot v. Heemer*, 161 F.3d 117, 122 (3d Cir. 1998). The objective reasonableness of a police officer's use of force must be based on "the facts and circumstances confronting them, without regard to the underlying intent or motivation." *Graham*, 490 U.S. at 457. The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Mellot*, 161 F.3d at 122. Buhrman's only physical contact with Walker was when she covered his legs after Gordon and Ballard restrained him (Walker continued to kick his legs as Ballard and Gordon held him down). (Buhrman A170-171) Though Buhrman covered Walker's legs, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Johnson v. Glick*, 481 F.2d 1028, 1033 (3d Cir. 1973). Therefore, Buhrman's limited contact with Walker does not establish an actual violation of the Fourth Amendment or any other constitutional right.

## B.    THERE IS NO "CLEARLY ESTABLISHED" RIGHT TO BE FREE OF A POLICE OFFICER'S DE MINIMIS CONTACT WHEN RESISTING A LAWFUL ARREST

There is no clearly established right to be free from a police officer's de minimis physical contact, particularly when resisting a lawful arrest. "The degree of force is dictated by the suspect's behavior." *See Clark v. Condon*, 2002 U.S. Dist. LEXIS 17831, *7 (D.Del. Sept. 20, 2002). In this case, Walker's behavior dictated the need for some degree of force. A psychiatrist at Connections made the medical decision that Walker had to be involuntarily committed to the DPC. Despite their training and expertise in dealing with mentally ill patients, the professional staff at Connections could not convince Walker to go to the hospital with them. Instead, those trained mental health professionals needed to call the police for assistance. Although McGowan (the nurse at Connections) now contends that Walker was calm and non-violent, the decision to call the police speaks volumes about Walker's behavior toward Connections staff. It confirms that Walker's behavior was out of control. "[Courts] must also keep in mind that a threat that may seem

-14-

insignificant . . . in the security of [a court's] chambers may appear more substantial to a reasonable officer whose own life or safety is at stake." *See Mellot*, 161 F.3d at 122.

Buhrman's only physical contact with Walker was to cover his legs to keep him from kicking anyone. This is de minimus contact that cannot overcome qualified immunity. There is no liability for her alleged failure to prevent other officers from using force. Buhrman did everything possible to avoid the need to use any force with Walker. According to McGowan, Buhrman "was really good with [Walker] . . . [s]he talked with him . . . she was there for a good bit of time, fifteen, twenty minutes." (McGowan A151) McGowan further described Buhrman's interaction with Walker:

> I thought she was very caring. She was very nice. She was very cordial. They were smiling. You know, she tried everything, you know, jokingly to try to get him to go, you know, come on, come ride with me, she was just very good. She was good.
>
> (McGowan A151)

In light of this description, Buhrman's actions were well within the bounds of qualified immunity.

When Walker still refused to be transported to DPC, despite Buhrman's efforts to talk with him for twenty minutes, she had no choice but to call for back-up assistance. When Gordon and Ballard arrived for back-up assistance, Burhman had already spent twenty minutes trying to convince Walker to go to the DPC (in addition to the time that Connections staff spent with Walker before giving up and calling the police).

Even after Gordon and Ballard restrained Walker's upper body, Walker still persisted in kicking his legs. (Buhrman A149) Buhrman placed her body over Walker's legs to keep him from kicking. (Buhrman A170-171) Yet, Walker was so strong that he lifted Buhrman's entire body with his legs. (Buhrman A170-171) This de minimis contact with Walker is not enough to overcome Buhrman's entitlement to qualified immunity. *See Ingraham v. Wright*, 430 U.S. 651, 674 (1977)("There is, of course, a de minimis level of imposition with which the Constitution is not concerned."); *Nardini v. Hackett*, 2001 U.S. Dist. LEXIS 15896, *17 (E.D.Pa. Sep. 19, 2001)("Generally, the use of force must arise above the de minimis level in order for a constitutional claim to arise.); *Beckwith v. Sherwood,* 2001 U.S. Dist. LEXIS 24079, *12 (E.D.Pa.

Oct. 11, 2001)(granting qualified immunity for use of force that is de minimis). Based on these authorities,

Walker had no clearly established constitutional right to be free of Buhrman's de minimis physical contact

as he actively resisted a lawful arrest by two other police officers.

**III.     PLAINTIFFS CANNOT RECOVER PUNITIVE DAMAGES AGAINST THE CITY**

Although Plaintiffs' Complaint seeks punitive damages against the City (Pltfs' ¶55 (f)), there is ample authority to confirm that punitive damages may not be recovered against a municipality for Section 1983 liability.  *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981)("[W]e hold that a municipality is immune from punitive damages under 42 U. S. C. § 1983.").

-17-

## <u>CONCLUSION</u>

For the foregoing reasons, the City is entitled to summary judgment on the *Monell* claim set forth in Count III, and Defendant Buhrman is entitled to qualified immunity for the excessive force claim set forth in Count II. The *Monell* claim fails because Plaintiffs have not established an official policy or custom of excessive force that would violate the Fourth Amendment. The excessive force claim against Defendant Buhrman is barred by qualified immunity because Buhrman used no force whatsoever, let alone excessive force. In either event, the City is immune from punitive damages for Section 1983 claims.

CITY OF WILMINGTON LAW DEPARTMENT

_/s/ Alex J. Mili_
Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Date: August 31, 2007          Attorney for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ALICE WALKER and                      :
GERALD H.E. WALKER,                   :
                                      :
            Plaintiffs,               :
                                      :
      v.                              :     C.A. No. 06-366 JJF
                                      :
CITY OF WILMINGTON, CITY OF           :
WILMINGTON POLICE DEPARTMENT,  :     JURY TRIAL DEMANDED
OFFICER SHAWN GORDON,                 :
OFFICER MICHAEL BALLARD, and          :
OFFICER KAREN BUHRMAN,_____:
                                      :
            Defendants.               :

**CERTIFICATE OF SERVICE**

I, Alex J. Mili, Jr., Esquire, hereby certify that on this 31st day of August, 2007, I filed the

Defendants' Opening Brief in Support of Their Motion for Summary Judgment with the Clerk of

Court using CM/ECF which will send notification of such filing(s) that this document is available

for viewing and downloading from CM/ECF to the following:

> Roger D. Landon, Esquire
> Murphy, Spadaro & Landon
> 1011 Centre Road, Suite 210
> Wilmington, DE 19805


> /s/ Alex J. Mili, Jr._____
> Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
> Assistant City Solicitor
> City of Wilmington Law Department
> Louis L. Redding City/County Building
> 800 N. French Street, 9th Floor
> Wilmington, DE 19801
> (302) 576-2175
> Attorney for Defendants