### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALICE WALKER and | : | |
| GERALD H.E. WALKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 06-366 JJF |
| | : | |
| CITY OF WILMINGTON, CITY OF | : | |
| WILMINGTON POLICE DEPARTMENT, | : | |
| OFFICER SHAWN GORDON, | : | |
| OFFICER MICHAEL BALLARD, and | : | |
| OFFICER KAREN BUHRMAN, | : | |
| | : | |
| Defendants. | : | |

### APPENDIX TO DEFENDANTS' OPENING BRIEF
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### VOL. I


Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants

DATE: August 31, 2007

TABLE OF CONTENTS

Volume I

Plaintiffs' Initial Disclosures ........................................................... A-1

United States District Court Subpoena issued to Gabe Hufford ............................... A-6

Non-Est return for Hufford Subpoena ...................................................... A-9

Guardianship Orders for Gerald H.E. Walker ............................................... A-10

Deposition Transcript for Alice Walker .................................................. A-12

Deposition Transcript for Joanne McGowan ............................................... A-39

Deposition Transcript for Karen Buhrman ................................................ A-97

Deposition Transcript for Shawn Gordon ................................................ A-194

Volume II

Deposition Transcript for Michael Ballard .............................................. A-270

Deposition Transcript for Thomas Kane .................................................. A-393

Wilmington Police Department, White Book Directive 6.7 ................................. A-476

Wilmington Police Department, White Book Directive 7.9 ................................. A-490

Wilmington Police Department, White Book Chapter IIX ................................... A-492

Use of Force Reports for 2001 - 2006 (filed Under Seal) ................................ A-518

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person, | \| | CIVIL ACTION |
| | \| | |
| Plaintiff, | \| | |
| | \| | |
| v. | \| | No. 06-366 JJF |
| | \| | |
| CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER KAREN BUHRMAN individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT, | \| | JURY TRIAL DEMANDED |
| | \| | |
| Defendants. | \| | |

## PLAINTIFF'S INITIAL DISCLOSURES

Plaintiff Alice Walker makes these initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) and

D. Del. LR. 16.2, based on the information reasonably available to her at this time.

### A. Individuals Likely to Have Discoverable Information That Plaintiff May Use to Support Her Claims

       Mrs. Alice Walker
       513 W. 26th Street
       Wilmington, DE 19802

       Mrs. Walker is likely to have information concerning the effect the police officers' use of excessive force had on her and Gerald H.E. Walker.

Joanne Magowan

A-1

138686

515 Delaware Avenue
Elkton, MD 21921

Gabriel Hufford
1704 Green Lane
Arden, DE 19810

Mrs. Magowan and Mr. Hufford are likely to have information concerning the police officers' use of excessive force in transferring Mr. Walker from Connections to the Delaware Psychiatric Center.

In addition, plaintiff states that one or more representatives of Christiana Hospital 501 W. 14th Street Wilmington, DE 19899, the Rockford Center 100 Rockford Drive, Newark, DE 19713, St. Francis Hospital- Family Practice, 7th and Clayton Streets, Wilmington, DE 19801, David Raskin, M.D., 19C Trolley Square, Wilmington, DE 19806 and the Delaware Psychiatric Center, 1901 North Dupont Highway New Castle, DE 19720 are likely to have discoverable information regarding Mr. Walker's medical history and plaintiff's damages claim.

## B. Documents that Plaintiff May Use to Support Her Claims

Statements under oath of Joanne Magowan and Gabriel Hufford given on February 10, 2006.

Mr. Walker's medical records from Christiana Hospital and the Delaware Psychiatric Hospital.

## C. Computation of Damages

Plaintiff seeks damages in an amount to compensate plaintiff for her pain and suffering caused by the police officers' use of excessive force in transferring Gerald Walker from Connections to the Delaware Psychiatric Center. Plaintiff also seeks an award of punitive damages and attorneys' fees.

## D. Insurance Agreements That May Be Liable to Satisfy a Judgment

At this time, plaintiff is unaware of any insurance agreements that may be available to satisfy a judgment.

*** A-2

Plaintiff reserves the right to supplement or amend these disclosures as appropriate.

138686 2

Respectfully submitted,

MURPHY SPADARO & LANDON

/s/ Philip T. Edwards
Roger D. Landon, 2460
Philip T. Edwards, 4393
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for plaintiff

January 12, 2007

A-3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person, | \| | CIVIL ACTION |
| Plaintiff, | \| | |
| v. | \| | No. 06-366 JJF |
| CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER KAREN BUHRMAN individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT, | \| | JURY TRIAL DEMANDED |
| Defendants. | \| | |

## **CERTIFICATE OF SERVICE**

I, Philip T. Edwards, Esq., do hereby certify that on this 12th day of January, 2007 a copy of the foregoing PLAINTIFF'S INITIAL DISCLOSURES was e-filed and served upon the following individual(s):

Alex J. Mili, Jr., Esq.
City of Wilmington Law Department
City/County Building, 9th Floor
800 North French Street
Wilmington, DE 19801

A-4

138686                                    4

MURPHY SPADARO & LANDON

/s/ Philip T. Edwards
Roger D. Landon, 2460
Philip T. Edwards, 4393
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for plaintiff

A-5

AO 88 (11/91) Subpoena in a Civil Case

# United States District Court

## FOR THE DISTRICT OF DELAWARE

Alice Walker and Gerald H. E. Walker,

|  |  |
|---|---|
| **Plaintiffs,** | **SUBPOENA IN A CIVIL CASE** |
| **V.** | **CASE NUMBER: 06-366 (JJF)** |

The City of Wilmington, City of Wilmington Police Department
Officer Shawn Gordon, Officer Michael Ballard
and Officer Karen Buhrman,

        **Defendants.**

TO:    Gabe Hufford
        2306 Cherry Lane
        Wilmington, DE 19810

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM: |
|---|---|
|  | DATE AND TIME: |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Louis L. Redding City/County Building, 800 N. French Street, 9th floor Wilmington, DE 19801 | August 20, 2007 - 10:00 a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

A-6

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b) (6).

ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)     DATE

_alxn m_ , SENIOR ASSISTANT CITY SOLICITOR     8/7/07

ISSUING OFFICER'S NAME , ADDRESS AND PHONE NUMBER

ALEX J. MILI, SENIOR ASSISTANT CITY SOLICITOR, 800 N. FRENCH STREET, 9TH FLOOR, WILMINGTON, DE 19801 (302) 576-2175

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

SUBPOENA.USD

AO 88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |
| SERVED ON (PRINT NAME) | MANNER OF SERVICE | |
| SERVED ON (PRINT NAME) | TITLE | |

## DELCARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
              DATE

_____
SIGNATURE OF SERVER

_____
ADDRESSS OF SERVER

A-7

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include but is not limited to, lost earnings and a reasonable attorney's fee.
(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to

produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party servicing the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall

quash or modify the subpoena if it

      (i) fails to allow reasonable time for compliance

      (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in per-

son, except that, subject to the provisions of clause (c)(3)(b)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

      (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

      (iv) subjects a person to undue burden.

(B)  If a subpoena

      (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

      (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

      (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

      (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

      (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | 8/12/07 | 2306 CHERRY LN  WILMINGTON, DE |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | NON-EST |
| **GABE HUFFORD** | **ACCEPTED BY** IN ARMY RESERVES STATIONED IN TEXAS |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| **KEVIN S. DUNN** | **PROCESS SERVER** |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on     8/12/07
                DATE

SIGNATURE OF SERVER

**BRANDYWINE PROCESS SERVERS, LTD.**
**P.O. BOX 1360**
**WILMINGTON, DE 19899-1360**
**302-475-2600**

---

## Rule 45, Federal Rules of Civil Procedure, Parts C & D-

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the partyor attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need notappearin person atthe place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materialsorof the premises. If objection is made, the partyserving the subpoenashall not be entitled to inspectand copymaterials; or inspectthe premises except pursuaitto an order of the court by which the subpoena was issued. If objection has been made, the parlyserving the subpoena may, upon notice to the person commanded to produce, move at any time for an orderto compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court bywhich asubpoenawas issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(h) requires a person who is not a party or an officer ofa partyto travel to a place more than 1 00 miles from the place where that person resides, is employed or regularly transacts business in person, except that,

subject to the provisions of clause (c)(3)(B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matterand no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 1 00 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows asubstantial need forthe testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are keptin the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged orsubjectto protection astrial preparation materials, the claim shall be made expresslyand shall be supported bya description of the natureof the documents, communications, orthings not produced that is sufficienttoenable the demanding party to contest the claim.

A-9

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY

08 JAN 27 PM 4:20

|                                          |   |                          |
|------------------------------------------|---|--------------------------|
| In the Matter of:                        | \| | NCC RIC                  |
| Gerald H.E. Walker                       | \| | C.M.#: 12369-NC          |
| AN ALLEGED DISABLED PERSON               | \| |                          |
|                                          | \| |                          |

### FINAL ORDER FOR APPOINTMENT OF GUARDIAN OF THE PERSON

WHEREAS, a hearing on the matter ("the Hearing") was held on January 27, 2006.

WHEREAS, Petitioner, Alice Walker is the wife of Gerald H.E. Walker (hereafter "the disabled person"), and the disabled person's other relative(s) has/have waived notice and consented to or has received notice through certified mail on the appointment of Alice Walker as Guardian of the Person of the disabled person; and

WHEREAS, Gary Alderson, Esquire, the previously appointed attorney ad litem for the disabled person, has personally served at least ten days before the date of the hearing and has rendered his report; and

WHEREAS, the Court has reviewed the Petition, considered the medical report and the statements made at the hearing, and finds that Gerald H.E. Walker suffers from mental and physical disability, and is unable to properly manage and care for his Person and, that in consequence thereof, is in danger of dissipating or losing such property, becoming the victim of designing persons.

NOW THEREFORE, it is ordered that:

1. Alice Walker is hereby appointed Guardian of Person of Gerald H.E. Walker subject to the applicable law and Rules of the Court relating to the care and management of disabled persons pursuant to 12 Del.C. Section 3922.

A-10

128054

*(and serve upon interested persons)*

2. Guardian to file a status report with the Register in Chancery in six months from the anniversary date of the appointment of the guardian informing of the current mailing address of both the disabled person and the guardian, current medical statement from the attending physician setting forth the current mental health status of the ward, whether the ward has been permitted to reside at the residence located at 513 W. 26th Street, Wilmington, DE 19802 and addressing the need for a continued guardianship. If the ward has not been permitted to reside at the residence located at 513 W. 26th Street, the status report shall state the reasons for such action by the Guardian.

3. The Guardian is authorized to pay the following costs of these proceedings:

A. $ _55.00_ to the Register in Chancery;

B. $ _400.00_ to Gary Alderson, Esquire, for his services as the attorney ad litem for the disabled person.

The Honorable Vice Chancellor Donald F. Parsons, Jr.

_1/30/2006_

CERTIFIED
AS A TRUE COPY
ATTEST
REGISTER IN CHANCERY
By

A-11

128054

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALICE WALKER and GERALD H. E.          )
WALKER,                                )
                                       )
            Plaintiffs,                )
                                       )   Civil Action
       vs.                             )   No. 06-366 JJF
                                       )
CITY OF WILMINGTON, CITY OF            )
WILMINGTON POLICE DEPARTMENT,          )
OFFICER SHAWN GORDON, OFFICER          )
MICHAEL BALLARD, and OFFICER KAREN     )
BUHRMAN,                               )
                                       )
            Defendants                 )

            Deposition of ALICE WALKER taken pursuant to
notice at the law offices of the City of Wilmington Law
Department, City/County Building, 9th Floor, 800 N. French
Street, Wilmington, Delaware, beginning at 10:05 a.m., on
Wednesday, June 27, 2007, before Allen S. Blank, Registered
Merit Reporter and Notary Public.


APPEARANCES:

        PHILIP T. EDWARDS, ESQUIRE
        MURPHY & LANDON
        1101 Centre Road
        Wilmington, DE 19805

            For - Plaintiffs

        ALEX J. MILI, JR., ESQUIRE
        CITY OF WILMINGTON LAW DEPARTMENT
        City/County Building, 9th Floor
        800 N. French Street
        Wilmington, DE 19801

            For - Defendants

                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

                                              A-12



**WILCOX & FETZER LTD.**
Registered Professional Reporters



ALICE WALKER

2

```
 1
 2                    ALICE WALKER,
 3           the deponent herein, having first been
 4           duly sworn on oath, was examined and
 5           testified as follows:
 6                      EXAMINATION
 7    BY MR. MILI:
 8      Q    Mrs. Walker, we have been introduced a moment ago.
 9    I'm here to ask you some questions about the lawsuit that
10    you have filed on your husband's behalf against the City of
11    Wilmington and three police officers.
12           I'm going to start off with asking you some
13    background information.  How long have you and Mr. Gerald
14    Walker been married?
15      A    Twenty-one years.
16      Q    Do you and Mr. Walker have any children together?
17      A    No.
18      Q    What's your highest level of education?
19      A    7th.
20      Q    7th grade?
21      A    Um-hmm.
22      Q    And what do you do for a living?
23      A    What did I do?
24      Q    Yes.
```

A-13



ALICE WALKER

3

1    A    I was a cook.

2    Q    What were the dates when you were a cook?  Years.

3  Not months and days.

4    A    Okay.  I was a cook for ten years at West Center

5  City Day Care Center.  And I was a cook and a floor monitor

6  for the state, Ferris School for Boys, for I think ten

7  years.  I'm not sure.

8    Q    Are you currently employed?

9    A    No, I'm not.

10    Q    How long has it been since you were employed?

11    A    Just about probably seven years.

12    Q    What's your primary source of income?

13    A    I'm on Social Security with my husband.

14    Q    How long has it been since your husband has been

15  employed?

16    A    How long has he not -- has he not been employed?

17    Q    How long has it been since he has been employed?

18    A    He was employed for 20 years before the illness.

19    Q    And when did he cease to be employed?

20    A    '89.

21    Q    You said before the illness.  What illness?

22    A    His paranoia.

23    Q    When did that start?

24    A    I think in '89 when he came out of work.

ALICE WALKER

4

1    Q    How did that start?

2    A    Roughly, I couldn't tell you.  Because I don't know.

3    Q    When you started noticing problems with the

4    paranoia?

5    A    We was married in '86.  So probably in -- probably

6    '88.  He got sick.

7    Q    Was he ever institutionalized or committed?

8    A    Yes.

9    Q    When?

10   A    I don't remember all the dates.

11   Q    I'm not going to hold you to an exact date.  Just

12   give me the approximate years.

13   A    I could come up prior.  But back, probably '89.  I

14   can't think of all of the dates.

15   Q    That's fine.  Do your best.

16   A    I know in '94.  It's been an on thing.  Like one

17   month, he'll get sick, he'll have to go for evaluation.  But

18   I can't remember all of the dates.  I didn't write them all

19   down but I don't remember all of them.  But I know he has

20   been hospitalized.

21   Q    Okay.  At some point, was he formally diagnosed by a

22   doctor with having a mental health issue?

23   A    Yes.

24   Q    Which doctor?



A-15

ALICE WALKER

5

1    A    Dr. DeHart.

2    Q    And when was this diagnosis made?

3    A    I think in '89.  In '89.  He came out of work in

4    '89.

5    Q    What was his specific diagnosis?

6    A    Paranoia.

7    Q    Was he eventually diagnosed with schizophrenia?

8    A    Yes.

9    Q    When?

10    A    I'm not sure.

11    Q    By whom?

12    A    Probably by Dr., if I'm not mistaken, Alator.

13    Q    I know you said you don't know when he was diagnosed

14    with schizophrenia.  Do you know if it was before 2004?

15    A    Yes.  Um-hmm.

16    Q    Do you know if it was before 2000?

17    A    Yes.

18    Q    Do you know if it was before 1997?  Can you

19    appreciate what I'm doing?  I'm trying to narrow it down.

20    A    I'm not sure.

21    Q    So you know it was before 2000 but you're not sure

22    how soon before 2000?

23    A    No.  In '89.  I know he was diagnosed as

24    schizophrenia in '89.

A-16

ALICE WALKER

6

1    Q    Okay.   That's when he was diagnosed with

2    schizophrenia, in '89?

3    A    Yes.

4    Q    Okay.   Is that the reason why he was no longer able

5    to work after '89?

6    A    Yes.

7    Q    Was he treated at the Rockford Center at some point?

8    A    Yes.

9    Q    When?

10   A    The dates, I can't recall.

11   Q    What is the Rockford Center?

12   A    The Rockford Center is an institution for the

13   evaluation where you freely sign in of your own will.   You

14   can sign your own self in.   If you can sign your own self

15   in, you can go to Rockford Center.

16   Q    Did Mr. Walker sign himself into Rockford Center?

17   A    At some time, yes.

18   Q    Did you ever have to sign him into Rockford Center?

19   A    I think so, yes.

20   Q    What did the Rockford Center do for Mr. Walker?

21   A    Evaluate him, stabilize him by medication.

22   Q    Do you know what medication?

23   A    Not all the medication, no.

24   Q    Some of the medication?

A-17

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

ALICE WALKER

7

```
1    A    Haldol.  Probably some Cogentin.  But I'm not sure.

2    Q    At some point, he was treated at Connections?

3    A    Yes.

4    Q    When?

5    A    Well, he was a patient at Connections.

6    Q    When?

7    A    That was his -- he has been with Connections for I

8  guess probably three or four years or something.

9    Q    That's going back to 2003.  Is that when he would

10  have started treating with Connections?

11   A    I don't know if it was 2003 for exact but I know it

12  was 2003, 2004, 2005.  Well, that was his mental health

13  doctor.  So that's where he went for his paranoia.

14   Q    Who was the doctor?

15   A    I know his name but it's just so hard of the

16  doctors.  I don't remember right offhand because I'm not

17  dealing with him right now.  So I'm not too familiar with

18  the names if he hasn't been there for a while.  So I'm not

19  too familiar with the doctors' names but I do know the

20  doctor.

21   Q    Did Mr. Walker have a driver's license?

22   A    Yes.  But they expired.  He didn't drive.

23   Q    When did it expire?

24   A    He probably hasn't had his license in probably five
```

A-18

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

ALICE WALKER

8

1    years.

2    Q    2001?

3    A    I'm not sure.  He hasn't been driving at all.

4    Q    Since what year, approximately?

5    A    At least seven, eight years.  I have been driving.

6    He hasn't been driving.

7    Q    Were you the one that would drive him to

8    Connections?

9    A    Yes.  Or they would come pick him up.

10   Q    How often, if you can give me an interval, how often

11   did Mr. Walker have to visit Connections, say between 2003

12   and 2005?  What I'm asking is weekly, monthly, sporadically?

13   A    Probably monthly.  But they came out to see him

14   to -- probably once a month.  Once a month.  I would take

15   him there once a month for checkup or medication.

16   Q    Checkup or medication for what?

17   A    For his paranoia.

18   Q    Did his paranoia get progressively worse during

19   those two years?

20   A    In a sense.

21   Q    How so?

22   A    He wouldn't want to be around nobody.  He would be

23   by hisself.  He liked to be by hisself.  He wouldn't like

24   interact with nobody.

A-19



WILCOX & FETZER LTD.
Registered Professional Reporters

ALICE WALKER

9

1    Q    Is this prior to July of 2005?

2    A    Yeah, he was always a home body.  He didn't want to

3  go out.

4    Q    And do you believe that was due to mental health

5  issues that he had?

6    A    Yeah.  Because he was like a loaner.  He was just

7  like a family man.  He didn't want to -- he didn't want to

8  be around other people.

9    Q    In July of 2005, did his mental health issues get to

10  a certain point that you sought some more intervention from

11  Connections?

12    A    Yes.

13    Q    And what happened around July of '05?

14    A    Well, he had had a dream.  He said he had a dream.

15  And he went in the baby's room.  She is our granddaughter.

16  But my granddaughter.  But he is by marriage.  He went in

17  her room.  When he went in her room -- he got up to go to

18  the bathroom.  So it was a long period in between he went to

19  the bathroom.  So I went to the bathroom.  I went to the

20  hallway to see if he was in the bathroom but he was in the

21  baby's room on his knees by her bed.  And I asked him why

22  was he in there.  And he said he had a dream.  So I said,

23  okay, what kind of dream did you have?  He said he couldn't

24  tell me the dream.  So I said, all right, come on, let's go

ALICE WALKER

10

1    back to bed.  I asked him the dream.  He still wouldn't tell

2    me.

3              So I guess two days later, he woke me up in the

4    morning, 6:00 o'clock in the morning.  And he said, I got

5    something to ask you but I don't think you agree with it.  I

6    said, well, honey, I said, you always ask me questions, we

7    always agree on things, you know.  So he said, but you won't

8    agree with me on this.  I said, well, what is it?

9              He said, can I go with Kevonia.  I said, what

10   did you say?  He said, can I go with Kevonia?  I said, what

11   do you mean can you go with Kevonia?  He said, can I go with

12   her?  I said, go with her where, to school or where?  He

13   said, no.

14             I said, okay, let's go back to sleep and we'll

15   wake up in the morning and then you tell me.

16             So when I got up -- I got up and I got the baby

17   dressed and I told her, I said, go downstairs and wait for

18   me and then when I tell you to come upstairs, you come

19   upstairs.  But we were going to go out.

20             So I got up, fed him and she was outside

21   waiting for me in the car.  I fed him, gave him his

22   medication.  And he was sitting in the front room and I

23   said, what did you mean when you said, can you go with

24   Kevonia?  He said, can I go with Kevonia?  I said, what do

ALICE WALKER

11

1    you mean?  He said, if I go with Kevonia, she will have a

2    baby and she won't want for anything.  I said, what are you

3    talking about?

4            He said, well, can't nobody stop me.  I said,

5    well you can't go with Kevonia.

6            So I said, okay.  Then that's when I went to

7    Connections.

8    Q    Okay.  Can you explain to me what is meant by going

9    with Kevonia?

10   A    He wanted to have sex with Kevonia and have a baby

11   by Kevonia.

12   Q    Kevonia is the baby that you're referring to?

13   A    Yes.  Um-hmm.

14   Q    And how old was she at the time?

15   A    I think she was about probably ten.

16   Q    And she is your granddaughter?

17   A    Um-hmm.

18   Q    Who are her parents?

19   A    Michelle Roberts and Kevin Price.

20   Q    Did Kevonia live with you personally at that time?

21   A    Yes.

22   Q    Is there a reason why she wasn't living with her

23   parents?

24   A    I had her since she was five days old.



ALICE WALKER

12

1    Q    This conversation that you just told me about with

2   Mr. Walker, how soon did that occur before he was taken to

3   Connections again?

4    A    It was the same day.

5    Q    Was it July 11, 2005?

6    A    Yes.  They came.  I was there.  I went to

7   Connections and I stayed at Connections and they went to the

8   house and picked him up.  So when they came back, they told

9   me, he said the same thing.  He told them the same thing he

10  told me.

11   Q    You went to Connections by yourself on July 11,

12  2005?

13   A    Yes.  Me and Kevonia.

14   Q    And you reported this incident to --

15   A    Connections.

16   Q    Where was Mr. Walker by this time?

17   A    He was home.

18   Q    How did he eventually get to Connections?

19   A    They went to pick him up.

20   Q    Who went to pick him up?

21   A    I'm not sure.  It had to be probably Gabe and -- I'm

22  not sure.  Somebody else.  I don't know.

23   Q    At some point, was a decision made to have

24  Mr. Walker involuntarily committed to the state hospital?

**W&F**

A-23

**WILCOX & FETZER LTD.**
Registered Professional Reporters

ALICE WALKER

13

1    A    Yes.  They wanted to take him -- I talked to the

2    doctor.  He talked to the doctor.  And then it was suggested

3    that he be taken back down to state hospital.

4    Q    Who made that suggestion?

5    A    The doctor.

6    Q    Which doctor?

7    A    I can't remember.  What is his name?  Dr. --

8    Q    That's fine.  I'm not going to make you sit here all

9    day.

10    A    I know him when I see him.

11    Q    Were you still at Connections at this time when this

12    decision was made?

13    A    Yes.

14    Q    Where in the building were you at that time?

15    A    In the lobby.

16    Q    Where was Mr. Walker?

17    A    I'm not sure if he was in the doctor's office or the

18    sitting room.  I'm not sure.  Okay.  This is the sitting

19    room.  The doctor's office is here.  And I don't know if he

20    was in the doctor's room or in the lobby.  Because Gabe

21    said -- told me that I could leave and that he would call me

22    when they took him back down to the state hospital.

23    Q    And after Gabe said can you leave, did you, in fact,

24    leave?



ALICE WALKER

14

1    A    I didn't want to.  He said, yeah, you can leave.

2  And then he said, I'll call you when they took him down to

3  the state hospital.

4    Q    And at some point, he was transported to the state

5  hospital, right?

6    A    Yes.

7    Q    Do you know by whom?

8    A    No.  But they said that, when I -- after, when I

9  found out about it, they said the police took him down.

10    Q    Who said?

11    A    Gabe and Ms. Joanne.

12    Q    When did they tell you the police took him down?

13    A    Well, they didn't call me that day.  I went to see

14  him.  Because they didn't call me.  So when I went to see

15  him, when I seen him, he was -- he was mad.  He was upset.

16  His eye was red.  His arms was -- his wrist and stuff was

17  red.  I mean he was really upset.  And I asked him what

18  happened.  And he said the police beat him up.

19    Q    And did you believe him when he --

20    A    Yes, I believed him.

21    Q    How soon after July 11th did you have this

22  conversation with him?

23    A    After July 11th?                        A-25

24    Q    My original question was, when did you have this

ALICE WALKER

15

1   conversation with him?

2     A    The next day when I went to go see him.

3     Q    It was on July 12th that he told you that the

4   police -- well, what did he tell you?

5     A    The 12th or the 13th.  That the police beat him up.

6     Q    What did he say the police did to him?

7     A    He just said they beat him up and they hit him.  I

8   didn't want to really go through it more until afterward

9   because when I seen him, it was just -- he was mad at me,

10  too.  So it was just like I said, okay, I'll just find out

11  when I go back to Connections and ask Connections.

12    Q    Did he have bruises on his head?

13    A    I don't know if he had bruises on his head.  But

14  when I seen his face, it was swollen and his eye was -- I

15  mean his eye was real red.  His eye was really bleeding at

16  first.  So I didn't even want to look at him.  I said, I'm

17  going to go find out.

18    Q    Did he have any cuts on his face or on his head?

19    A    I just don't remember.  Because his face was

20  swollen.  And his eye was black and red.  I didn't stay that

21  long because I didn't want him to see me cry.

22    Q    And you said somebody wanted to go to find out.

23  What did you do to find out?

24    A    I went to Connections.



ALICE WALKER

16

1    Q    And who did you go talk to?

2    A    Gabriel and Joanne.

3    Q    What did you ask them?

4    A    What happened to him.

5    Q    What did they tell you?

6    A    They said that the police beat him up.  They said

7    that it didn't make sense what they did to him.

8    Q    What did they tell you they did to him?

9    A    They didn't tell me everything.  They just said that

10    it didn't make sense what they did to him.  And they said, I

11    know you're not going to let that go.

12    Q    Now, you said that Connections had taken Mr. Walker

13    to and from Connections before, before July 11, 2005?

14    A    Yes.

15    Q    How often?

16    A    Well, it was a thing they was trying to get him into

17    a program down there that he would come out so he wouldn't

18    stay in the house so he could just get some outing.

19    Q    Did Mr. Walker always go willingly with the

20    Connections staff?

21    A    Yeah.  For the most part, yes, he did.

22    Q    You say for the most part.  Was there ever an

23    instance where he didn't go willingly?

24    A    No.  It's just like if he said he didn't want to go,



ALICE WALKER

17

1    they didn't take him because he wasn't no threat to nobody

2    or nothing.  So they didn't take him.  They just left him

3    home.

4       Q    When they did take him, is it because Mr. Walker

5    didn't want to go?

6       A    If he wasn't -- it's like if he wasn't a threat or

7    he didn't do anything, they would want him to go out for

8    lunch or something like that and see if they could go into

9    a -- they have a program there where he could go.

10      Q    Now, when the staff at Connections told you that if

11   something wasn't right about the way Mr. Walker was

12   transported, did you in turn report this to the Wilmington

13   Police Department?

14      A    No.

15      Q    Do you know why you didn't report it?

16      A    Because I just said -- I just said I'll just consult

17   the lawyer just to find out what happened.

18      Q    But did you want someone, a higher ranking person

19   above these officers, to perhaps investigate the matter?

20      A    Well, I figured that if I found a lawyer, that he

21   would do that for me.

22      Q    Were those your instructions, that you wanted

23   someone to --

24      A    No, nobody instructed me to do anything.  I did it

ALICE WALKER

18

1    because I wanted to do it.  I wanted to know what happened,

2    why was he looking like that and why was he beat up like

3    that by the police.

4    Q    Were your instructions to have someone investigate

5    this matter, the transport?

6              MR.  EDWARDS:  Objection.  Are you talking

7    about --

8              THE WITNESS:  No.

9              MR.  EDWARDS:  Questions that she may have

10   posed to her lawyer?

11             MR. MILI:  I'm not sure.  I'm asking what her

12   instructions were.

13             MR.  EDWARDS:  Any conversation that you may

14   have had with me or I may have had with you is privileged

15   and I don't want you to answer those questions.  If you can

16   answer his question, go ahead.

17             MR. MILI:  Let me make that clear.

18   BY MR. MILI:

19   Q    I don't want you to get into anything that you may

20   have discussed with the attorneys.  I just want to know what

21   your objective was about having someone investigate this

22   matter, this allegation about police officers, about how

23   they handled the transport of your husband?

24   A    What are you saying?

A-29

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

ALICE WALKER

19

1    Q    Did you want someone to investigate, someone in the

2    police department, to investigate the way your husband was

3    transported?

4    A    Yeah, I wanted for them to investigate.  Yes, I did.

5    Q    Who did you want to investigate?

6    A    That's why I consulted a lawyer.

7    Q    Okay.  Do you know if Mr. Walker was transported to

8    Christiana Hospital after being taken from Connections on

9    July 11th but before being taken to the state hospital?

10   A    Yes, he did say they took him to the hospital.

11   Q    Do you know if any doctor evaluated him?

12   A    Well, he had to be evaluated before he got taken

13   down to the state hospital.  Because he has high blood

14   pressure and sugar.  He has to be evaluated before he goes

15   to the state hospital.

16   Q    Do you know what, if anything, doctors may have

17   found with Mr. Walker when they evaluated him on July 11th?

18   I'm talking about before he went to the state hospital.

19   A    No.

20   Q    Have you looked at any emergency room reports from

21   the Christiana Hospital for July 11th, 2005?  Again, I'm

22   talking about before Mr. Walker would have gone to the state

23   hospital.

24   A    No, they weren't sent to me.

A-30

ALICE WALKER

20

1    Q    So the first time you saw Mr. Walker again was I

2    guess you said July 12th or the 13th?

3    A    Yes.

4    Q    But you're not sure which date?

5    A    No.

6    Q    Where was Mr. Walker at this point?

7    A    Down at the state hospital.

8    Q    Aside from the swollen face, did you notice anything

9    else wrong with him?

10   A    No.  Because I didn't want to look at him.  Because

11   his face looked bad when I seen him and his hands did, too.

12   Q    Did he have any other complaints to you about his

13   overall health at that time?

14   A    After the time I went to see him, different times I

15   went to see him, he was talking about he had a headache.

16   And I told the -- I told the staff he was complaining about

17   headaches.

18   Q    How often -- I guess starting with July 13th, how

19   often would you have visited Mr. Walker at the state

20   hospital?

21   A    What did you say?

22   Q    How often after July 13th did you visit Mr. Walker

23   at the state hospital?

24   A    Probably twice a week, on the weekends.



ALICE WALKER

21

1    Q    Twice a week and on the weekends?

2    A    Yeah, twice a week and on the weekends.  Twice

3   through the week.  Like Monday through Friday.  And then on

4   the weekends.  Because I wasn't doing nothing on the

5   weekends.

6    Q    At some point, did Mr. Walker have to have an

7   operation?

8    A    Yes.

9    Q    What operation, if you know?

10   A    He had a hematoma on the brain.

11   Q    Do you know when this was diagnosed?

12   A    Yes.  One particular day, I went there to take him

13  some food.  And when I took him the food, I asked them, did

14  he eat.  And they said, no, he didn't want to go down to the

15  dining area.

16          So they brought the food up to him.  So when

17  they called him and he came to me, he was coming up the

18  hall, like limping like he couldn't walk with his hands like

19  he had a stroke.  And I said, asked them, what was wrong

20  with him.  And I said, it looked like he had a stroke.  He

21  said, he didn't have no stroke.  I said, look at him, he

22  can't even walk.

23          When he came up to the desk, he held onto the

24  desk.  If he didn't hold onto the desk, he would have fell.

ALICE WALKER

22

1          I said, okay, you all have to call to the

2     doctor to take him to the hospital.

3          So at that time, he had peed hisself.  He

4     didn't even know he peed hisself.

5          So they called the doctor.  The doctor said,

6     clean him up and he'll come back.  Because he had another

7     patient.  And when he came back, the doctor noticed that he

8     was -- he was weak on the right side.  So that's when they

9     took him to the hospital.

10    Q   I guess my original question was, when did this

11    happen?

12    A   I'm not quite sure of the date.

13    Q   How about the month?

14    A   It wasn't in a month's time.  It wasn't even a

15    month's time.

16    Q   Was it less than a month?

17    A   Yes, less than a month.

18    Q   Was it into August of '05?

19    A   I'm not sure.  I'm not sure of the date.

20    Q   All right.  You say it was less than a month.  Was

21    it more than three weeks?

22    A   A little less than three weeks.

23    Q   Less than three weeks?

24    A   About -- I don't know.  About 15 days.  I'm not

ALICE WALKER

23

1   sure.

2           MR.   EDWARDS:   She said she doesn't know the

3   date about eight times.

4           MR. MILI:   I'm just trying to pin it down to

5   find out how soon after the July 11th incident.

6   BY MR. MILI:

7   Q    Do you believe that this operation had something to

8   do with the way Mr. Walker was transported on July 11th?

9   A    It had to.   Because there wasn't nothing wrong with

10  his head.   He didn't fall.   I didn't see him fall.

11  Q    He didn't fall between July 11th and the time that

12  he had this operation?

13  A    From the time I took him to the hospital, he didn't

14  fall while he was with me.   He didn't hit his head.   So I

15  don't know.

16  Q    Okay.   If you'll forgive me, I have to get a little

17  bit personal with you in the next group of questions.

18  Because one of the claims that was made was a loss of

19  consortium claim?

20          What kind of marital relations did you have

21  with Mr. Walker prior to July 11th, 2005.

22  A    Our relationship was fine.   We had a good

23  relationship.

24  Q    I mean with physical intimacy.



WILCOX & FETZER LTD.
Registered Professional Reporters

ALICE WALKER

24

1    A    Well, we was -- we loved each other.  We loved each

2  other.  We held each other.  We caressed each other.

3    Q    Was that it?

4    A    Not as much as normal.

5    Q    I'm talking about before July of 2005.  Is that when

6  you say, the phrase you used, not as much as normal?

7    A    Yeah.

8    Q    Is Mr. Walker currently institutionalized?

9    A   Yes.

10    Q    How long has he been institutionalized in his most

11  recent institutionalization?

12    A   You mean now?

13    Q    Yeah.  I know you have said earlier that

14  sporadically off and on he had been institutionalized?

15    A    Right.

16    Q    And you're telling me now he is currently

17  institutionalized.  How long has he been where he is now?

18    A    Almost three years.

19    Q    Since summer of '04?

20    A    No, he has been there since -- since the operation,

21  he has been there.

22    Q    Okay.  So we are talking about since summer of '05,

23  then, right?

24    A    (Indicates yes.)

A-35



ALICE WALKER

25

1    Q    Okay.  Do you know why he remains institutionalized?

2    A    No, not some.  But for the most part.  Now he won't

3    take his medication.

4    Q    His medication for what?

5    A    For his high blood pressure, paranoia.

6    Q    Do you know if his current institutionalization has

7    anything to do with the craniotomy that he had in the summer

8    of '05?

9    A    I'm not sure.  I think so but I don't know.  You'll

10   have to ask the doctor because I don't know.

11   Q    Okay.  That's fine.

12               I think we might be done.  Let me just go over

13   a few things.

14               MR. MILI:  I think we are done.  Thanks for

15   coming today.

16               Mr. Edwards has the right and the opportunity

17   to supplement the record if he so chooses.

18               MR. EDWARDS:  We'll waive reading.

19               (Deposition concluded at 10:42 a.m.)

20

21

22

23

24

A-36

26

1

2                    I N D E X

3   DEPONENT:   Alice Walker                    PAGE

4       Examination by Mr. Mili                    2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                          A-37

24



WILCOX & FETZER LTD.
Registered Professional Reporters

```
1   State of Delaware)
                     )
2   New Castle County)

3               CERTIFICATE OF REPORTER

4           I, Allen S. Blank, Registered Merit Reporter and
5   Notary Public, do hereby certify that there came before me
    on the 27th day of June, 2007, the deponent herein, ALICE
6   WALKER, who was duly sworn by me and thereafter examined by
    counsel for the respective parties; that the questions asked
7   of said deponent and the answers given were taken down by me
    in Stenotype notes and thereafter transcribed by use of
8   computer-aided transcription and computer printer under my
    direction.
9
            I further certify that the foregoing is a true and
10  correct transcript of the testimony given at said
    examination of said witness.
11
            I further certify that reading and signing of the
12  deposition were waived by the deponent and counsel.

13          I further certify that I am not counsel, attorney,
    or relative of either party, or otherwise interested in the
14  event of this suit.

15
16
17          Allen S. Blank, RMR

18          Certification No. 103-RPR

19          (Expires January 31, 2008)

20

21  DATED:  June 30, 2007

22

23

24
```







**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-38



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE



ALICE WALKER, individually      )
and as guardian of              )
her husband, GERALD H.E.        )
WALKER, an incompetent person,  )
                                )
            Plaintiff,           )
                                )   Civil Action
v.                              )   No. 06-366 JJF
                                )
CITY OF WILMINGTON; CITY OF     )
WILMINGTON POLICE DEPARTMENT;   )
OFFICER SHAWN GORDON,           )
individually and as agent of    )
the CITY OF WILMINGTON POLICE   )
DEPARTMENT; OFFICER MICHAEL     )
BALLARD, individually and as    )
agent of the CITY OF            )
WILMINGTON POLICE DEPARTMENT,   )
OFFICER KAREN BUHRMAN,          )
individually and as agent of    )
the CITY OF WILMINGTON POLICE   )
DEPARTMENT,                     )
                                )
            Defendants.          )


        Deposition of JOANNE MAGOWAN, taken
pursuant to notice at the law offices of
Murphy, Spadaro & Landon, 1011 Centre Road, Suite
210, Wilmington, Delaware, beginning at 10:00 a.m.,
on Tuesday, May 2, 2007, before Dale C. Hawkins,
Registered Merit Reporter and Notary Public.

A-39

APPEARANCES:

                ROGER D. LANDON, ESQ.
                PHILIP EDWARDS, ESQ.
                MURPHY, SPADARO & LANDON
                 1011 Centre Road, Suite 210
                 Wilmington, Delaware   19805
                 for the Plaintiff


                ALEX J. MILI, JR., ESQ.
                CITY OF WILMINGTON LAW DEPARTMENT
                 800 North French Street
                 City/County Building, 9th Floor
                 Wilmington, Delaware   19801
                 for the Defendants




ALSO PRESENT:

                Officer Shawn Gordon








                                              A-40

3

```
 1                    JOANNE MAGOWAN,

 2              the deponent herein, having first

 3              been duly sworn on oath, was

 4              examined and testified as follows:

 5                    MR. LANDON:  Make a note of

 6        everybody who is here on the record.

 7   BY MR. LANDON:

 8              Q.   Can you state your full name,

 9        please?

10              A.   Joanne Magowan.

11              Q.   And where do you live?

12              A.   515 Delaware Avenue, Elkton,

13        Maryland.

14              Q.   And by whom are you employed?

15              A.   Connections.

16              Q.   How long have you been employed by

17        Connections?

18              A.   Three years.

19              Q.   With did you start there?

20              A.   June of '04.

21              Q.   What's your title there?

22              A.   I'm a registered nurse and a

23        program director.
                                          A-41
24              Q.   And what do your job duties
```

```
 1    entail?

 2              A.   I oversee about 130 mentally ill

 3    clients in the State of Delaware, along with

 4    eleven employees.  And what we do is we maintain

 5    the mentally ill in the community, make sure

 6    they stay safe, out of trouble, keep medicated,

 7    and they have all their needs met.

 8              Q.   Where is the facility physically

 9    located?

10              A.   500 West 10th Street, in

11    Wilmington.

12              Q.   Was there an employee working at

13    Connections in July of '05 by the name of Gariel

14    Hufford?

15              A.   Yes.

16              Q.   Do you know where he works now?

17              A.   I have no idea.

18              Q.   Do you know when he left

19    Connections?

20              A.   February of this year.

21              Q.   Do you know why he left his job

22    there?

23              A.   No.                          A-42

24              Q.   Do you know if he is in the
```

1    military, by any chance?

2          A.   I heard something about National

3    Guard.

4          Q.   Okay.  Did you witness an incident

5    involving a Gerald Walker that occurred at

6    Connections on July 11 of 2005?

7          A.   Yes.

8          Q.   Did you provide a statement under

9    oath that actually occurred here in this law

10   office on February 10, 2006 in connection with

11   what you witnessed in that incident?

12         A.   Yes.

13         Q.   Is this a -- I'm going to hand a

14   copy of the transcript from that statement.

15   Would you take a look at it and confirm that

16   that is, in fact, a transcript of the statement

17   that you gave on that date?

18         A.   (Witness reviewing transcript.)

19   Yes.

20              MR. LANDON:  Could we have that

21   marked as Exhibit 1 to this deposition, please.

22              (Magowan Deposition Exhibit No. 1

23   was marked for identification.)

24   BY MR. LANDON:

A-43

```
 1              Q.   Have you had a chance to review a
 2    copy of this statement under oath before coming
 3    in here today to give this deposition?
 4              A.   Yes.
 5              Q.   When did you review it?
 6              A.   Most recently?  I reviewed it
 7    several times, but last night.
 8              Q.   Did you read the entire statement?
 9              A.   Yes.
10              Q.   Is there anything in that
11    statement that does not appear to be accurate as
12    far as your recollection is concerned at this
13    time?
14              A.   It appears accurate.
15              Q.   Okay.  Is there anything about the
16    incident that you recall in terms of specifics
17    that's not referenced in this statement under
18    oath, Exhibit Number 1?
19              A.   No.
20              Q.   Would it be fair to say -- well,
21    strike that.
22              How would you characterize the
23    level of force that you observed the officers
24    using on Mr. Walker at that time?
```

A-44

7

```
1              A.    Strong.
2              Q.    Had you ever observed anything
3       like that in your life before that day?
4              A.    Well, not from a police officer.
5       I have seen fights on the street, different
6       things, but nothing like that, no.
7              Q.    Can you tell us when you -- what
8       your first recollection is of the issue
9       involving Mr. Walker on that particular day, in
10      other words, what was your personal involvement
11      with why Mr. Walker was there at Connections
12      that day?
13             A.    I had talked with his wife first
14      thing in the morning.  He lived at home with his
15      family.  The wife had some concerns about his
16      psychiatric health.  He was having some
17      delusions that the family thought were putting
18      them at risk.  So I had case managers go out to
19      his home, pick him up, bring him in for us to
20      evaluate, talk with and decide what the next
21      step would be.  And we had a suspicion it would
22      be hospitalization, but we had to make the
23      assessment ourselves.  So Gerald came into the
24      building and we assessed him.
```

A-45

```
 1              Q.   So Connections people, people

 2       actually left the Connections facility and went

 3       to his home?

 4              A.   Yes.

 5              Q.   And were able to get him

 6       voluntarily to come with them to Connections?

 7              A.   Yes.

 8              Q.   Was there any police involvement

 9       with that process?

10              A.   Uh-uh.  No.

11              Q.   Did he come along as far as you

12       know willingly from his home to the Connections

13       facility?

14              A.   Uh-huh.  Yes.  He knew there

15       wasn't something right and he wanted to talk

16       with the doc about it.

17              Q.   And had you had professional

18       dealings with Mr. Walker prior to that date?

19              A.   Yes.

20              Q.   Had he ever exhibited any

21       tendencies towards physical violence with you or

22       toward you or toward anyone else at Connections?

23              A.   No.

24              Q.   Had anyone at Connections during
```

A-46

```
 1        the time that you worked there prior to July 11,

 2        '05 to your knowledge ever recommended or

 3        suggested or made arrangements for him to be

 4        transported to the Delaware State Hospital?

 5              A.    Prior to that?

 6              Q.    Yes.

 7              A.    I think he had been hospitalized

 8        before that.  Without looking at the chart, I

 9        don't know if the police had to take him to the

10        hospital or if he went willingly, I can't

11        remember.

12              Q.    Is there a chart at Connections

13        today pertaining to Mr. Walker?

14              A.    There should be.

15              Q.    And in general what sorts of

16        things would be in that chart?

17              A.    All of his medical, follow-up

18        appointments, labs, physician's orders, medicine

19        sheets, psych assessments, daily encounters with

20        case managers, monthly progress notes, quarterly

21        supervision notes, past history, information

22        from the state, previous hospitalizations.

23              Q.    Can you tell us what you can

24        recall about that day from the time that
```

A-47

1     Mr. Walker was transported from his home to

2     Connections by Connections people until the

3     first officer arrived?

4          A.   Okay.  He came in.  He came in and

5     sat down with the doctor and myself.  I don't

6     recall if Gabe Hufford was in with the meeting

7     with the doctor.

8          Q.   Who was the doctor?

9          A.   Dr. Mehlick, Gerald Mehlick.  They

10    talked.  And it was apparent that he would have

11    to go back to the hospital.  Gerald immediately

12    said he really didn't want to go.

13          Q.   Were you in the meeting with

14    Dr. Mehlick?

15          A.   Uh-huh.  Yes.                          A-48

16          Q.   Okay.  All right.  Continue.

17          A.   So once we met with him, we asked

18    him to go sit out in our sitting area and we

19    would decide what to do.  He knew he was going

20    to the hospital, it was just a matter of how.

21          Dr. Mehlick did whatever the

22    paperwork is to get him into the hospital.  We

23    notified the police because Gerald we knew was

24    not going to get into a Connections vehicle to

```
1      go back to the hospital, so we called the police

2      and then the first police officer came.

3                Q.   And who was the first police

4      officer that arrived?

5                A.   It was a female police officer.

6                Q.   Did you ever know her name?

7                A.   Uh-uh.

8                Q.   No?

9                A.   I mean, not off the top -- I --

10               Q.   Okay.  Tell me what happened when

11     the female police officer arrived?

12               A.   She came and we introduced her to

13     Gerald.  They talked.  They sat down together.

14     Gerald told her he wasn't going to the hospital.

15     She was really good with him.  She talked with

16     him, tried to get him to come.  She was there

17     for a good bit of time, fifteen, twenty minutes.

18               And then she wound up calling to

19     get some assistance to get him to the hospital.

20     But the whole time they were just talking back

21     and forth and he was sitting calmly in a chair.

22               Q.   Were you physically present during

23     that entire time frame which you described as

24     being fifteen or twenty minutes?
```

A-49

1          A.    Maybe not the whole time.  I could

2     have been running in and out of the med room or

3     running back with the doc, but for the most part

4     my office is right there, so I'm pretty much

5     right in that area.

6          Q.    Were you in earshot the entire

7     time?

8          A.    For the most part, yes.

9          Q.    In other words, did you hear what

10    was going on, if anything?

11         A.    Uh-huh.

12         Q.    Yes?

A-50

13         A.    Yes.

14         Q.    At any point during those fifteen

15    or twenty minutes when the female officer was

16    talking with Gerald Walker, did Mr. Walker

17    either physically or verbally exhibit any

18    violent aggressive or threatening tendencies?

19         A.    No.  And he never even made an

20    attempt to leave the floor.  He just was very

21    calm.

22         Q.    Was he sitting, standing, pacing,

23    a combination of all three, what was he actually

24    physically doing during that time frame?

1          A.   What I remember most he was

2     sitting up against a knee wall.  There is a

3     chair and he was just sitting there for most of

4     the time.  The officer kind of rotated between

5     sitting next to him, standing next to him,

6     sitting across from him.  He may have stood up a

7     couple of times, but never left the area.

8          Q.   How would you describe the tenor

9     of the female officer's comments and statements

10    to Mr. Walker during that time frame?

11         A.   I thought she was very caring.

12    She was very nice.  She was very cordial.  They

13    were smiling.  You know, she tried everything,

14    you know, jokingly to try to get him to go, you

15    know, come on, come ride with me, she just was

16    very good.  She was good.

17         Q.   What happened next?  Did you

18    actually hear her call for help?

19         A.   Uh-huh.                    A-51

20         Q.   And tell us about that, what did

21    you hear?

22         A.   What I just remember was that she

23    put a call through and said he doesn't want to

24    go to the hospital, I can't get him in the car,

14

1    you know, can you send somebody over.  And that

2    was it.  I mean, it wasn't an urgent -- I mean,

3    I think it probably took about ten minutes or so

4    after she made the call before anybody came.

5            Q.   During those --

6            A.   So it wasn't urgent.

7            Q.   And during those ten minutes after

8    she made the call, but before anybody arrived,

9    what was going on then?

10           A.   Just the same, we were all just

11   kind of sitting there just waiting for the

12   officers to come and it was just very calm, we

13   were just sitting there.

14           Q.   What happened next?

15           A.   Two officers came, two male

16   officers.  They talked with the female officer.

17           Q.   Can you describe what the male

18   officers looked like?

19           A.   I just remember one was black, one

20   was white.                                    A-52

21           Q.   Officer Shawn Gordon is sitting

22   here with us.  Do you recognize him as being one

23   of the officers that was there?

24           A.   I don't recognize him as being one

```
 1        of the officers.  I mean, I just know one was

 2        black, one was white.

 3                  Q.   Okay.

 4                  A.   They came and I think at that

 5        time -- I mean, at some point Gerald stood up,

 6        and I don't know if it's when the male officers

 7        came, but he stood up and he walked around

 8        behind where his chair was.

 9                  Q.   Gerald did?

10                  A.   Gerald did.

11                  Q.   Okay.

12                  A.   The two officers were talking with

13        the female officer, and then at some point one

14        officer got on one side of Gerald and the other

15        on the other side.  And Gerald was --

16                  Q.   Was Gerald standing or sitting?

17                  A.   He was standing, what I remember

18        him standing and he had his arms across his

19        chest.

20                  Q.   You're demonstrating right now

21        with your arms crossed across your chest with

22        your -- each hand on the opposite upper arm area

23        just above the elbow; correct?

24                  A.   Yes.
```

A-53

1    Q.  Okay.

2    A.  And he just kept telling the

3    officers he wasn't going to the hospital.  I

4    mean, that's all he kept mumbling, I'm not going

5    to the hospital.

6    Q.  Do you recall Gerald Walker saying

7    anything to the officers other than I'm not

8    going to the hospital?

9    A.  Uh-uh.

10    Q.  No?  No?  You have to say yes or

11    no for the court reporter.

12    A.  I'm sorry.  No.  But then I don't

13    remember like any of the verbal interactions, I

14    just know Gerald was just adamant that he was

15    not going to the hospital.

16    Q.  Did Gerald say anything that you

17    would construe as a threat to the officers,

18    threatening to do anything or use any physical

19    force or anything of that nature?

20    A.  Not that I can remember.

21    Q.  Did Gerald remain in the body

22    posture that you described earlier with his

23    hands crossed against his chest?

24    A.  Yes.

A-54

1    Q.    The entire time that the officers

2    were speaking with him?

3        A.    Yes.

4        Q.    How would you describe the tenor

5    of the officer's speech toward Gerald Walker?

6        A.    I think the two officers were

7    trying to get him to uncross his arms, asking

8    him to uncross his arms.  And Gerald wouldn't

9    uncross his arms and Gerald himself was just

10   focused, I mean, just looking straight ahead,

11   arms crossed, there was no way he was going to

12   uncross his arms.

13       Q.    And what happened next?

14       A.    Well, at that point both officers

15   were on either side, I mean, it was apparent

16   Gerald was not uncrossing his arms.  One officer

17   looked at the other officer and then they took

18   him down to the ground.

19       Q.    How did they do that?

A-55

20       A.    I don't know what they did with

21   their feet, but I just know just watching from

22   the upper body just what I saw, they just kind

23   of grabbed him and took him down.  That would be

24   like on, it would have been Gerald's left side

1    towards the left, and they took him down in like

2    a little hallway.

3         Q.   How much time did the two male

4    officers spend trying to talk to Gerald to

5    convince him to go with them before they, as you

6    said, took him down?

7         A.   Not much time.  I mean, I can't

8    give you minutes.  I can't tell you how many --

9    but it wasn't nearly the amount of time that the

10   female officer took with him.

11        Q.   Where was the female officer when

12   the two male officers took Gerald down?

13        A.   She was -- because I'm facing

14   Gerald, she's over on my left-hand side kind of

15   facing me.  She was off to the side.  She wasn't

16   right there with him, she was off to the side.

17        Q.   Could you give us an estimate of

18   how far away in feet or yards she was away from

19   the officers and Gerald?

20        A.   More than six or eight feet.  I

21   mean, she wasn't right with them, she was

22   further away from them.

23        Q.   How close to the officers and

24   Gerald were you when they took him down?

A-56

1          A.    Probably about six, seven feet.

2          Q.    Prior to the time that the

3     officers took him down, did he ever release his

4     arms from the position that you have described

5     that they were in?

6          A.    No.  No.  Because when he landed

7     on the floor, he was still -- his arms were

8     underneath of him now still crossed.

9          Q.    When he landed on the floor, what

10    part of his body landed on the floor first?

11         A.    I don't know which part landed

12    first because the wall was blocking that part.

13    But once he got down, Gabe and I walked around,

14    there is another little wall, we walked around

15    the wall to kind of get a look at him because

16    all we could see was kind of like his upper body

17    and his head.  So I don't know.  I don't know.

18    I couldn't say.

19         Q.    When you walked around the wall

20    and saw him, what position was his body in?

21         A.    He was I think kind of on his          A-57

22    right side moving to flatten himself underneath

23    his arms.

24         Q.    Could you tell what position his

1    arms were in?

2              A.    They were still crossed.

3              Q.    Still in the same position?

4              A.    Oh, yeah, he had them in the same

5    position, both officers were trying to -- on

6    each side trying to pull the arms apart.

7              Q.    Had Gerald Walker ever made any

8    aggressive physical movements or any movements

9    whatsoever toward either of the two male

10   officers before they took him down?

11             A.    Not that I saw, no.

12             Q.    Well, you say not that I saw.  You

13   were right there.

14             A.    I'm right there, I didn't see.

15             Q.    That's what I want to know.

16             A.    I didn't see any physical

17   movement.

18             Q.    Did he make any physical movement

19   toward them at all?

20             A.    No, he just stood straight, tall.

21             Q.    If he had, would you have seen

22   it --

A-58

23             A.    I would have seen it.

24             Q.    -- being that you were six feet

1    away?

2              A.   I would have seen it.

3              Q.   Okay.  What did you see next after

4    you came -- you and Gabe came around the wall

5    and saw Gerald on the floor as you've described?

6              A.   We saw both -- or I saw both

7    officers trying to pull his arms out from

8    underneath of him.  And he wouldn't budge.  And

9    Gerald was still saying, "I'm not going to the

10   hospital."

11              Then the next thing you know --

12   now, I can't tell you which officer it was,

13   because it was random back and forth, but they

14   just started punching him in the head, head,

15   upper body, and just started punching him.

16              Q.   Was it just one officer doing the

17   punching or was it both?

18              A.   It was both.                    A-59

19              Q.   Were they punching with their --

20   what were they punching?

21              A.   Hands, their fists, they were just

22   punching and punching, and in between still

23   trying to pull his arms apart.

24              Q.   What part of Gerald's body were

22

```
 1      the officers punching, you said with their

 2      closed fists?

 3              A.    Yeah.

 4              Q.    What part of his body?

 5              A.    His head, like the back of his

 6      head, because his head was down, the side of his

 7      head.

 8              Q.    Can you describe, can you give us

 9      a description of the degree of force or how

10      vigorously they were doing what you've just

11      described?

12              A.    It was fast.  I mean, it was just

13      punch, punch, you know, one would still be

14      punching, one is still trying to pull the arms,

15      then they're punching, the other one is pulling.

16      It was just a repetitive, nonstop.  And Gerald

17      the whole time is saying, "I'm not going to the

18      hospital."

19              Q.    Did these appear to be light

20      punches like you were joking around with

21      somebody?

22              A.    No.  Because his head was banging

23      on the floor with each one.

24              Q.    I'm trying to get you to use some
```

A-60

```
 1      descriptive language to give this thing some
 2      life so I can understand what you're watching.
 3              A.   It was brutal.  It was, you know,
 4      each force punch, it's a man hitting another man
 5      in the head.  With each connection, you could
 6      hear his head banging back on the floor.  It got
 7      to the point where I had to turn -- I had to
 8      look away, because we didn't know what to do.
 9                  I mean, they're beating this guy
10      in the head, they're yelling at him, Gerald is
11      crying, his arms are still together, he's not
12      going to give up, he's not going to unfold his
13      arms, and they were trying to push and pull him
14      in between the punches trying to get the arms
15      out and it's not working.  And it just was
16      unnecessary.  I don't know what that was all
17      about.  I have never seen that before.  I don't
18      know what they thought they were going to solve
19      by beating him in the head.  I have no idea.
20              Q.   Did it ever occur to you to get in
21      the middle of it and try to break it up?
22              A.   No.  I mean, initially, I mean,
23      Gabe and I looked at each other, they have guns,
24      I mean first instinct is you want to jump in and
```

A-61

1    do something, but there is nothing you can do.

2    No, we had no choice but to stand there and

3    watch that.

4            Q.    What did the female -- what was

5    the female officer doing while you were

6    observing these officers beating this man in the

7    head?

8                    MR. MILI:   Objection to form.

9                    MR. EDWARDS:   Go ahead, you can

10   answer.

11                   THE WITNESS:   Looking at Gerald, I

12   don't even know where she was at that point, if

13   she was still over -- we have like a medicine

14   room off to the side.   I don't know where she

15   was.   I mean, these two officers were down

16   there, Gabe and I are just so many feet from

17   where this is happening, I don't know.   I

18   mean...

19   BY MR. LANDON:

20           Q.    Let me ask you this, was she

21   involved in the physical, what you were

22   observing was physically happening?

23           A.    No, not at all.

                                                A-62

24           Q.    All right.   So if she had

1    testified under oath that she was on the legs of

2    Gerald Walker while the two white -- while the

3    two male officers were up trying to get his

4    arms, that's not what you saw?

5           A.    The way the room was positioned,

6    there is a wall, and when they brought Gerald

7    down, his head and upper body is in a doorway,

8    and his legs I suppose were going out over this

9    way.  If the female police officer said she was

10   down there the way the wall was, I couldn't tell

11   whether she was there or not.  I wasn't looking

12   for the female police officer.  Our focus was at

13   that point Gerald is getting his head beat in,

14   that's what my focus was, so I don't know what

15   anybody else in the room is doing.

16          Q.    All right.  What's your best

17   recollection as to how many times the officers

18   punched him in the head?

19          A.    I would say more than ten times.

20   I couldn't tell you how many.

21          Q.    What did you see happen next,

22   what's the next thing that you remember

23   happening?                              A-63

24          A.    Well, the one officer, I don't

1     know which one.  I mean, you can see they're not

2     getting anywhere with this and one pulled a can

3     of mace and sprayed him point blank in the face

4     with the mace.

5              At that point -- at that point I

6     don't know if it was immediately after, Gerald

7     now his face is kind of oozing, there is all

8     kinds of fluids all over the place, and one of

9     his arms came out and they were actually able to

10     get one of the arms, so pretty much after he was

11     maced it was pretty much it, they were able to

12     get both of the arms, they were able to cuff him

13     and stand him back up.

14              Q.   Okay.  How did they get him to

15     stand up?

A-64

16              A.   You know, I keep trying to replay

17     that back in my mind.  I remember them grabbing

18     his one arm, getting it cuffed, grabbing the

19     other, I think they -- I don't know, I can't

20     remember if they both got on either side and

21     kind of pulled him up from inside that doorway.

22              Q.   In your statement you said there

23     was blood on the floor after this incident and

24     you had to clean it up.  Is that accurate?

27

```
 1              A.   Yes.

 2              Q.   Or somebody had to clean it up?

 3              A.   Somebody had to clean it up.

 4              Q.   Do you know where Gerald was -- do

 5      you know where the blood came from?

 6              A.   I don't know.

 7              Q.   Do you know whether it came from

 8      Gerald or one of the officers?

 9              A.   I don't know.  I would be

10      surprised if it came from the officers.  But I

11      know Gerald -- it probably came from Gerald.  I

12      mean, he was pretty beaten by that point.

13              Q.   What's the next thing that

14      happened after they got Gerald to his feet?

15              A.   They took him off the floor and

16      took him to the hospital.  I don't think and I

17      can't remember if I followed the officers down

18      stairs to watch them put him in the car, I can't

19      remember that.

20              Q.   Did anyone from the Wilmington

21      Police Department contact you either in person

22      or by phone after this incident to interview you

23      as to what you had seen?

24              A.   Not to my knowledge.
```
A-65

 1          Q.    Okay.   Do you know whether anyone

 2    from the Wilmington Police Department

 3    interviewed Gabriel Hufford after this incident

 4    to ask him what he had seen?

 5          A.    Not to my knowledge.

 6          Q.    Is this the only incident of this

 7    nature that has occurred at Connections since

 8    you've been there?

 9          A.    No.   I think there was another

10    incident that happened right around the same

11    time as this one.   I wasn't present for that, I

12    was on vacation, I believe.

13          Q.    Do you know who the client or

14    patient was that was involved in that one?

15          A.    No.

16          Q.    If I told you the name Richard

17    Anders, does that ring a bell to you?

18          A.    Yeah, he's an ICM client.

19          Q.    After this incident occurred, did

20    you ever have occasion to make a decision as to

21    whether or not to call the City of Wilmington

22    Police Department to assist with transporting a

23    patient?

24          A.    I'm always apprehensive witl

1    calling Wilmington Police to come.

2            Q.   Why?

3            A.   Well, after that situation, I

4    mean, we do everything in our power to try and

5    take a client to the hospital ourselves, you

6    know, unless they are adamant, but because of

7    that incident, it was very nerve racking.

8                 We didn't know what would happen,

9    would they be understanding, would they talk

10   with him or her or whoever it was that would

11   need to go to the hospital, would this happen

12   again.  If a client did get verbally

13   threatening, what would happen at that point.

14   So you know, we were very apprehensive.

15               MR. LANDON:  All right.  Thank

16   you.  Mr. Mili may have some questions for you.

17   BY MR. MILI:

18               Q.   You said earlier this morning we

19   knew he was not getting into the Connections

20   vehicle, referring to Mr. Walker.  How did you

21   know that?

22               A.   Because he said he wasn't going to

23   the hospital.

24               Q.   Why not just take him into the

30

1    vehicle anyway?

2         A.    Dealing with this type client, you

3    always have to be on guard that you listen to

4    what they say.  And him saying he's not going to

5    the hospital, we could get him out on 13, he

6    could attempt to jump out of the vehicle.

7         All of our clients know the routes

8    to the hospitals, they know the route to DPC,

9    they know the route to Meadowood, they know the

10   route to Rockford, we try to be upfront with

11   them, this is where you're going, try to get

12   them to understand this is where you're going,

13   and if there is any risk that he could jump out

14   of a vehicle, we won't put them in a vehicle.

15        He was fine coming to Connections,

16   he wanted to see the doctor, but not going to

17   the hospital.

18        Q.    Well, if the concern is he might

19   jump out of the vehicle, why not put one

20   Connections' employee on each side of him in the

21   vehicle, put him in the middle?

22        A.    We typically don't do that for

23   safety reasons.  We have to think about not only

24   ourselves, but the community themselves.  We

A-68

31

```
 1          don't risk, we just don't take that risk.
 2                  Q.   What kind of risk is it?
 3                  A.   What, a client jumping out of a
 4          vehicle on 95.
 5                  Q.   If you have someone on each side
 6          of him, what was the risk of him doing that?
 7                  A.   If you have enough staff to have
 8          one person on each side and a third person
 9          driving, you don't take that risk.
10                  Q.   But you said earlier that
11          Mr. Walker had not been violent up until this
12          point?
13                  A.   No, he had not been violent.
14                  Q.   I guess the question is then what
15          gave you some concern that he might try to jump
16          out of a vehicle?
17                  A.   Most of our clients when it comes
18          to going to the hospital, we never take the risk
19          of what's going on in their minds, what could
20          they possibly do.  Some clients will get in a
21          vehicle.  He would not get in a vehicle.  And we
22          listen to them.
23                  Q.   Do you call the police department
24          each and every time a patient says he doesn't
```

A-69

1    want to be transported?

2          A.    For the most part.  If we can't

3    use our skills to get them to go, then yes, we

4    do.

5          Q.    You have trained mental health

6    professionals at Connections?

7          A.    Uh-huh.

8          Q.    What do they do to try to get

9    someone transported to the hospital before

10    calling the police, what, if anything?

11          A.    We use all different types of

12    deescalation techniques.  We use medicines if

13    possible.  The psychiatrists, if they make a

14    decision that someone is going to the hospital

15    and going to the hospital against their will,

16    which is different than someone wanting to go to

17    the hospital, if we're committing them against

18    their will, then we take different factors into

19    consideration.                              A-70

20              The interesting thing with the

21    police is they can handcuff someone to go into a

22    vehicle which decreases a lot of risk to

23    everyone.  We can't do that.  We cannot

24    physically lay a hand on any of our clients.

33

```
 1            Q.   Did you think it would be
 2   necessary to handcuff Mr. Walker?
 3            A.   Mr. Walker would not leave the
 4   building, and for the most part we can't -- he
 5   would have had to have sat in that building for
 6   two, three, four days, we can't put hands on.
 7            Q.   Why can't you?
 8            A.   That's assault.
 9            Q.   He's your patient; right?
10            A.   We cannot put any hands on our
11   patients in an outpatient setting, it's assault.
12            Q.   You have to call the police to
13   transport other patients besides Mr. Walker?
14            A.   Uh-huh.
15            Q.   Can you give me some of their
16   names?
17            A.   I don't think I can.
18            Q.   Why not?                    A-71
19            A.   Because I think that's a breach of
20   confidentiality with our clients.  I would have
21   to ask Connections' lawyers if we can do that.
22            Q.   You can't ask them because they're
23   not your attorneys.  You're refusing to answer?
24            A.   I'm not refusing to answer, it's
```

```
 1        just I don't think I can give the names of any

 2        clients that we have at Connections.

 3                Q.    Okay.  We'll take it up later.

 4                      Does someone from Connections call

 5        the police each and every time a patient with

 6        schizophrenia is being transported?

 7                A.    No.

 8                Q.    What's the dividing line, when do

 9        you call, when do you not call with a

10        schizophrenia patient?

11                A.    I don't know what you're asking

12        me, because I don't know if you want to

13        differentiate a schizophrenic from a bipolar

14        rather than the individual and what is going on

15        individually with an individual client.

16                Q.    Okay.  Tell me the difference

17        between schizophrenic and bipolar?          A-72

18                A.    There is a huge difference between

19        what they hear, what they see, what their

20        diagnosis, how they're treated, so I really

21        don't know what you're asking.

22                Q.    I asked you about schizophrenic

23        patients and you explained there is a difference

24        between schizophrenic and bipolar.  Tell me why
```

```
 1        that makes a difference with regard to the

 2        question that I asked you?

 3                A.   Well, what I'm trying to

 4        understand is individually we don't look at a

 5        diagnosis as far as how a client is treated to

 6        go to the hospital or whatever the situation is.

 7        So to specifically say how we handle a

 8        schizophrenic client, schizophrenia, there is

 9        many different versions, every client presents

10        differently with schizophrenia, that's why I

11        don't know what you're asking me.

12                     If an individual comes into our

13        building and needs to be hospitalized against

14        their will, the diagnosis doesn't matter what it

15        is.

16                Q.   That was my question.  So if it's

17        against the person's will, is that your answer?

18                A.   If it's against a person's will

19        and they are not willing to go to the hospital.

20                Q.   What criteria do you or

21        Connections staff use to determine whether the

22        person is unwilling to go to the hospital?

23                A.   For the most part when they say

24        I'm not going, I'm not going, you can't make me
```

A-73

```
 1        go, I'm not getting in the car.  They take off

 2        running out of the building.

 3              Q.   When the police are called, do you

 4        tell the patient in advance prior to the police

 5        arriving that the police are going to come and

 6        transport you to the hospital?

 7              A.   It depends on who the client is

 8        and what the situation is.  Some clients yes,

 9        some clients no.  The police may show up, it's a

10        total surprise, and off they go.

11              Q.   For the clients that the answer is

12        no, why do you not want to tell those clients?

13              A.   A couple of different reasons.

14        One, the response time, it could take from the

15        time that we -- we could have an agitated client

16        that we're working with trying to keep them

17        calm, it may take two hours for the police to

18        come, it could take ten minutes.  And we

19        sometimes can't tell them because if they take

20        off into the community and they're a danger, now

21        the police have to go run around the community

22        and look for them.

23              Q.   When you say they're a danger,

24        what kind of a danger?
```

A-74

```
1              A.   It could be a multitude of things.
2        They could be delusional thinking people are out
3        to get them, they have to get others before
4        they -- it could be they're suicidal, there is
5        not one specific reason, there could be lots of
6        different reasons.
7              Q.   Do you know if Mr. Walker was told
8        in advance that the police were on their way to
9        transport him?
10             A.   Mr. Walker was told in advance.
11             Q.   What was his response?
12             A.   I'm not going to go to the
13       hospital.  He was very good with the female
14       officer, he sat with her, he understood where he
15       was going, it wasn't a surprise, because if I'm
16       correct, I mean the female officer said other
17       officers were coming, and he was fine with that.
18             Q.   Take a look at that statement that
19       Mr. Landon gave you.  I want to ask you some
20       questions about what's in it.  Take a look at
21       page 14, lines 13 and 14.              A-75
22                  You made a statement you said, "We
23       transported him ourselves previous times."
24                  Can you tell me who specifically
```

1    transported him?

2          A.   What, case manager wise or from

3    our facility?

4          Q.   Yes.

5          A.   Without the chart, I have no idea.

6          Q.   On July 5th, 2005, or July 11th,

7    or whatever the date of this incident was, did

8    you prior to calling the police ask anyone from

9    Connections to try to transport him?

10          A.   I don't believe so.

11          Q.   Why not?

12          A.   From our facility to the hospital?

13          Q.   Yes.

14          A.   I think because the doctor had

15    decided that he would not be -- it would not be

16    appropriate for him to be transported by us.

17    The doctor makes the ultimate decision how they

18    go to the hospital.

19          Q.   Which doctor was this, again?

20          A.   Dr. Mehlick.

21          Q.   Can you spell it, please, if you

22    know how to?

23          A.   M-E-H-L-I-C-K.          A-76

24          Q.   Go back to page six of the

39

```
 1    statement, lines 18 to 23.  You say, "We --

 2    obviously referring to Connections -- "had a

 3    report from his wife that she was feeling a

 4    little nervous about having Gerald in the house.

 5    There were a couple of different situations that

 6    had taken place the night before."

 7              What situations had taken place

 8    the night before?

 9              A.   How much am I allowed to say about

10    his --

11              Q.   You're obligated to answer my

12    questions.

13              MR. LANDON:  Well, wait a minute.

14              THE WITNESS:  Wait a second.  I

15    just want to know what am I actually allowed to

16    say about what his psychiatric -- I mean, I'm

17    unsure what I'm allowed to say about what's in

18    the chart.                         A-77

19              MR. LANDON:  Let me interject

20    something here.  We're lawyers on both sides of

21    the lawsuit.  We don't represent you.  We can't

22    give you legal advice or answer legal questions.

23    I mean, if --

24              THE WITNESS:  I may have to ask
```

1    Connections' lawyers to find out.  I don't know

2    what I'm allowed to tell you.

3  BY MR. MILI:

4          Q.   Do you want to continue this

5    deposition at another time with the Connections'

6    lawyers present?

7          A.   Maybe that would be a good idea

8    because I don't know what I'm allowed to tell

9    you out of the chart only because I know as a

10   nurse, I can't even show you the chart without a

11   lawyer.  I don't know.

12         Q.   Okay.  I'll tell you what, I'll

13   skip those questions related to that kind of

14   stuff for today on the understanding, if

15   Mr. Landon will agree with me, that we'll

16   continue this deposition at another time and you

17   can arrange to have counsel present, or if we

18   can I guess file a protective order of some sort

19   with the Court to give us I guess clearance to

20   go into this material.  I guess I can appreciate

21   your concern about --

22         A.   I don't know what I can tell you.

23         Q.   Okay.

24         A.   I don't know what Connections

A-78

41

```
 1    would, since they own the chart, I don't know.

 2              Q.  So you don't want to tell me what

 3    happened the night before?

 4              A.  I don't know -- because I didn't

 5    go into specifics here.  I may have to ask the

 6    Connections' lawyer.

 7              Q.  Is it something really bad that

 8    you don't want anybody to know about?

 9              A.  No.  I mean, his wife could

10    probably tell you because I think she can, but I

11    don't know what I can tell you from the chart.

12    I really don't know.

13              Q.  Okay.

14              A.  I would have no problem telling

15    you if I was allowed to tell you, but I'm just

16    thinking that it's a person's medical chart, I

17    don't know what I can tell you about what's in a

18    medical chart.  As a nurse, I don't want to lose

19    my license of saying something I shouldn't be

20    saying.                              A-79

21              Q.  He's filed a lawsuit, so he's

22    waived some of these protections to his privacy

23    in this case.

24              A.  I can call the vice-president and
```

42

1    ask them.

2                    MR. MILI:  I think it would be --

3    and Roger, tell me what you think, if you want

4    to continue it another time or do you want her

5    to do that, get it over with today if we can do

6    that?

7                    MR. LANDON:  First of all I think

8    it's irrelevant.  Second of all, what you are

9    trying to find out you can find out through

10   deposing the plaintiff in the case which you

11   haven't done, so I think frankly you're wasting

12   time trying to develop that information through

13   this witness.  And I don't see that it harms

14   your discovery abilities to wait and get this

15   information from us, because we can tell you.

16                   MR. MILI:  Okay.  We'll side step

17   this line of questioning for now, but I do

18   reserve the right to continue this deposition if

19   I have any trouble getting this information from

20   other sources.  But let's move on.

21   BY MR. MILI:                             A-80

22             Q.   Let's go on to page seven of this

23   statement.  The line starts with, "My boss and I

24   through the doctor determined that it would not

43

```
 1        be a good idea to put Gerald in one of the
 2        Connections' vehicles because he did not want to
 3        go."
 4                    You gave me the name of the doctor
 5        earlier.  What was the name of the boss that you
 6        were talking about?
 7               A.   That would be Gabe Hufford.
 8               Q.   That was your boss?
 9               A.   Uh-huh.
10               Q.   And tell me the conversation that
11        the three of you had that led you or whoever
12        made the final decision to come to this decision
13        that he wasn't going to be transported in any
14        Connections' vehicle?
15               A.   After meeting with the
16        psychiatrist and with Gerald and with myself and
17        then bringing Gabe in to once against assess the
18        situation and find out what is going to be the
19        safest for the client and for our staff to go to
20        the hospital, that's when the decision was made
21        that we wouldn't be able.  Like I said, we can't
22        put hands on, we cannot physically touch
23        someone, take them out the door, take them down
24        a set of steps and take them out to a vehicle,
```

A-81

1    we can't touch them.  If they're refusing to go,

2    then we have to go one step further.

3              Q.   You said we can't touch them, we

4    can't put hands on?

5              A.   Right.

6              Q.   Why do you think touching them or

7    putting hands on would be necessary?

8              A.   Because he sat in the chair,

9    refused to get out of the chair with his arms

10   crossed and said he was not going to the

11   hospital.  That was his theme for the morning.

12   That was it.  He had been to the hospital

13   numerous times and did not want to go back.

14             Q.   When the police came, did you

15   think it would be necessary for them to put

16   hands on?                          A-82

17             A.   In all honestly I was pretty

18   surprised that he didn't just give in and just

19   go right to the hospital.  Most of our clients

20   will take one look at an officer and ask to be

21   cuffed in the front.  That's typically what our

22   clients do.  I was really surprised that he held

23   fast and said he wasn't going to the hospital.

24             Q.   I guess the question was, or if I

45

```
 1        could ask the court reporter to read the

 2        question back to her.

 3                    (The reporter read back as

 4        instructed.)

 5                    THE WITNESS:  No.

 6   BY MR. MILI:

 7             Q.   You didn't.

 8             A.   I didn't.  I honestly thought he

 9        would go with the officers.

10             Q.   Did he refuse to go with the

11        officers?

12             A.   Yeah.  Just as I said before, he

13        stood up, put his hands across his chest and

14        said, "I'm not going to the hospital."

15             Q.   At that point did you think it

16        would be necessary for the officers to go hands

17        on?
                                            A-83
18             A.   I don't know at that point what

19        was going to be -- I mean, I'm not in any -- I

20        have no idea of what was going to happen.

21             Q.   I'm asking you, you mentioned

22        earlier about the problem with not transporting

23        him in the Connections' vehicle is you couldn't

24        use hands on?
```

46

```
 1          A.   Right.

 2          Q.   Now I'm asking you, when the

 3    police are here, if he's still refusing, do you

 4    think it's necessary for the police to use hands

 5    on?

 6          MR. LANDON:  Are you asking her if

 7    she thinks so now or what was in her mind then,

 8    because what she thinks now is not relevant in

 9    any way, shape or form.  What she thought then

10    may or may not be relevant.  If you're asking

11    then, I'm not objecting.

12          Q.   I thought the question was clear.

13          At the time did you think hands on

14    was necessary?

15          A.   At the time for that specific

16    situation, no.  No, I don't.

17          Q.   So if he has his hands crossed and

18    says I'm not going to go, then the police should

19    not -- you felt that the police should not have

20    touched him?

21          A.   If you're asking me what I thought

22    back then, it's kind of hard in retrospect to

23    take a look, but for the most part, most

24    people -- like I'll go back to that first
```

A-84

```
 1     officer who spent a lot of time talking with

 2     him, these two officers did not talk to him.  So

 3     initially right then and there at the moment

 4     that they put hands on, at that very moment I

 5     was incredibly shocked that they acted so

 6     quickly.  And that's my answer.

 7              Q.   Okay.  You didn't answer my

 8     question.

 9              A.   That's not -- typically --

10              Q.   You said the female officer spoke

11     to him for a while; right?

12              A.   Yes.

13              Q.   How long?                    A-85

14              A.   I would think from the time that

15     she got there until the officers came, to me it

16     seemed like she was there fifteen, twenty

17     minutes with him.

18              Q.   And at the end of those fifteen or

19     twenty minutes, did he willingly go with her?

20              A.   Uh-uh.  No.  But he was not --

21     they were joking, they were laughing, he was

22     very calm.  He just was not going to go.

23              Q.   How long do you feel the officers,

24     either the female or any of the officers, should
```

```
 1      have continued talking with him before finally

 2      putting their hands on him?

 3                      MR. LANDON:  Objection.

 4                      THE WITNESS:  I can't give a time.

 5      I have no idea.  I suppose through our training,

 6      and I can't speak for the police, but usually

 7      you spend as much time as you can to hopefully

 8      get a positive nonviolent result.

 9                      And at that moment, at that time,

10      if you want to ask me how I felt at that time,

11      it was I don't think that they spent enough time

12      trying to coerce him to go.  They may not have

13      had the time to do that?

14              Q.   How much time would have been

15      enough time?

16              A.   I have no idea.              A-86

17              Q.   Did you have your eyes on

18      Mr. Walker from the entire time that the male

19      officers arrived until the time that they put

20      him into the squad car?

21              A.   I can't say the entire time.

22              Q.   How much time did you not have

23      your eyes on him?

24              A.   I can't say whether I didn't have
```

49

```
 1      my eyes on him.  In other words, you're asking

 2      me a black and white question.  I'm walking

 3      around, I'm moving, I mean, I am not staring at

 4      him the whole entire time because that's

 5      unreasonable.  I was right there in that area

 6      the entire time.

 7              Q.  That was my question.

 8              A.  But my eyes were not on him the

 9      entire time.

10              Q.  What else were you doing at the

11      time?

12              A.  Talking with Gabe, talking with

13      the female officer, popping in to the doc's

14      office to let him know what's going on.

15              Q.  How many times did you go into the

16      doctor's office?                      A-87

17              A.  I probably popped my head in maybe

18      once or twice.

19              Q.  How far is his office from this

20      doorway where the officers were with Mr. Walker?

21              A.  It's in the same area.  It would

22      be like a doorway off of a room like this.

23              Q.  Now, in several places in your

24      statement you said that Mr. Walker did not want
```

50

```
 1    to go to the psychiatric hospital.  If he didn't

 2    want to go, why not just let him go home?

 3           A.   He was committed.

 4           Q.   You said also that he was not

 5    violent up until the point that the police were

 6    called.

 7                MR. EDWARDS:  Objection.  Form.

 8           Q.   Did you say that?

 9           A.   Are you asking me has he ever been

10    violent or not?

11           Q.   Let me ask you that first.  Has he

12    ever been violent?

13           A.   I only knew him from the time that

14    I started working with him, and never any

15    violence or anything else like that in the time

16    that I knew him.

17                That day was there any violence?

18           Q.   Right.

19           A.   No.

20           Q.   Do you have a private office or

21    workstation at the West Street branch of

22    Connections?

23           A.   Are you asking me do I work at the

24    500 West 10th Street?
```

A-88

```
 1              Q.   I know you work there.  Do you

 2     have an office, a cubicle?

 3              A.   I have an office.

 4              Q.   Where is that located?

 5              A.   Right in the same area where all

 6     this took place.  My office looks rights out on

 7     to it.

 8              Q.   How many feet away, if you know?

 9              A.   My office.  If this was the

10     office, my door would be right here.  I don't

11     know how big the space is.

12              Q.   How did you -- I guess how did you

13     come to this hallway where this incident took

14     place, were you summoned there by someone, how

15     did you come there?
                                                A-89
16              A.   No, I was there in the work --

17     well, I don't know what kind of area you call

18     it, a day area where the clients usually sit in.

19     From the time we brought Gerald in, saw the

20     doctor to him sitting out there, either Gabe or

21     myself were out there with him the whole entire

22     time, and that -- it's an open area, it's not

23     enclosed, it's a wide open area.

24              Q.   Did you see Mr. Walker wrap his
```

1    arms around the African-American male police

2    officer?

3                        MR. LANDON:  Objection.  You can

4    answer.

5                        THE WITNESS:  I can answer?

6                        MR. LANDON:  Yes, sure.

7                        THE WITNESS:  I don't know what

8    that means.

9                        No.

10           Q.   Earlier someone asked you how many

11   times -- Mr. Landon asked you earlier today how

12   many times you saw the officers punch

13   Mr. Walker, and you said, I think your answer

14   was more than ten.  I would ask you to look at

15   page 11 of your statement, lines 11 and 12.

16   When Mr. Edwards was questioning you in this

17   statement, he asked you that same question in

18   that statement, you said eight or nine times.

19   Is that statement under oath not accurate?          A-90

20           A.   Well, I mean, eight, nine, ten, I

21   mean, it could even have been many more than

22   that.  If you're asking was I counting every

23   punch, I know it was much more than five or six.

24   I mean, it was a very repetitive.  If you were

53

```
1     going to ask -- I can't give you exactly -- I
2     was not counting every single punch.  Every
3     single punch that connected kind of hurt on the
4     inside of each one of us that watched it, so I
5     can't tell you how many times.
6               Q.   After this incident and after the
7     police transported Mr. Walker, did you discuss
8     this incident with Gabe?
9               A.   Yeah, immediately after.
10              Q.   What -- immediately after, how
11    soon after?
12              A.   Probably, you know, I guess as
13    soon as Gerald left.  I can't recall if I went
14    down to, you know, watch him get into the car, I
15    can't recall what happened after that, but I'm
16    sure sometime very shortly after because he and
17    I were, I don't know if you want to use the word
18    traumatized, but we had to process what
19    happened.  It was terrible.                    A-91
20              Q.   After that day, after July 11th,
21    did you and Gabe ever discuss this incident
22    again?
23              A.   I'm sure we probably did.  I mean,
24    I'm sure we probably did.
```

1          Q.   Did Gabe Hufford ever tell you

2     that a sergeant from the police department came

3     to Connections to question him about this

4     incident?

5          A.   No, not to my -- I don't know

6     anything about it.

7          Q.   You said earlier that you felt the

8     use of force was strong, I believe the word you

9     used.  Did you feel the use of force was

10    something that should have been reported to the

11    police department, a supervisor or someone

12    higher up than these officers?

13         A.   Uh-huh.                          A-92

14         Q.   Did you, in fact, report it to the

15    --

16         A.   I didn't report -- I reported it

17    -- of course Gabe was right there, he reported

18    it to his boss.  And I don't know what happened

19    after that.

20         Q.   Who is his boss?

21         A.   Chris Divani.

22         Q.   But you never reported it to I

23    guess the police department's internal affairs

24    division or anything like that?

55

1        A.   I personally never have, no.

2        Q.   When you passed this information

3    on to Chris Divani, is this a man or a woman?

4        A.   That's a man.

5        Q.   Was it a hope that Chris Divani

6    would report it to the police department?

7        A.   No, I had no hopes of anything.  I

8    mean, it's just a proper procedural report.

9    Whenever the police are in the building, we have

10   to report up the chain of command that the

11   police were in, so it was just normal reporting.

12       Q.   How did you come to give this

13   transcribed statement?  I guess the question is

14   how did you know that this law firm was

15   representing Mr. Walker in this incident?

16       A.   I suppose I was notified by the

17   law firm.  I don't know exactly.  I can't

18   remember if it was through a letter to come in

19   to give this report.  I can't remember how.  I

20   got to look through my desk and look at all the

21   letters that I receive.  I can't remember.  I

22   would assume that I was sent something for us to

23   contact.

                                        A-93

24       Q.   And prior to giving this written

1    statement, did you have any other conversations

2    with this law firm?

3              A.   I don't believe so, no.  This is

4    the second time I have ever been here.

5              Q.   You mentioned about a report being

6    a routine practice when I asked you about

7    reporting it to Chris Divani.  Is that a written

8    report?

9              A.   No, it was probably just a verbal

10   report.

11             Q.   Is Mr. Divani obligated to fill

12   out some kind of report when he gets this kind

13   of information from you?                    A-94

14             A.   You would have to ask him.  I

15   don't know how he reports to the CEO.  I don't

16   know how he does that.

17             Q.   I'm asking you if you know as far

18   as Connections' internal policy, is that a

19   policy of Connections?

20             A.   I don't know.

21             MR. MILI:  Can you give us one

22   second so I can talk to him outside?

23             (A brief recess was taken.)

24             MR. MILI:  We're done for today.

57

```
 1          Thank you for your time.
 2                    MR. LANDON:  I don't have anything
 3     further.
 4                    You have the right to read your
 5     transcript, correct any errors that there might
 6     be either in the transcription or substantive
 7     testimony.
 8                    THE WITNESS:  Will someone send it
 9     to me?
10                    MR. LANDON:  Or you can waive that
11     right and just rely upon the court reporter,
12     it's up to you, either way.
13                    THE WITNESS:  It doesn't matter
14     one way or the other.
15                    MR. LANDON:  You just have to let
16     him know whether you waive the right, we can
17     send a copy.
18                    THE WITNESS:  I waive my right.
19                    (Deposition ended at 11:06 a.m.)
20
21                                        A-95
22
23
24
```

```
 1      State of Delaware    )
                             )
 2      New Castle County    )

 3

 4              CERTIFICATE OF REPORTER

 5

 6          I, Dale C. Hawkins, Registered
        Merit Reporter and Notary Public, do hereby
        certify that there came before me on the 2nd day
 7      of May, 2007, the deponent herein, JOANNE
        MAGOWAN, who was duly sworn by me and thereafter
 8      examined by counsel for the respective parties;
        that the questions asked of said deponent and
 9      the answers given were taken down by me in
        Stenotype notes and thereafter transcribed by
10      use of computer-aided transcription and computer
        printer under my direction.

11

12          I further certify that the
        foregoing is a true and correct transcript of
        the testimony given at said examination of said
13      witness.

14          I further certify that I am not
        counsel, attorney, or relative of either party,
15      or otherwise interested in the event of this
        suit.

16

17

18                  _____
                          Dale C. Hawkins, RMR
19                        Cert No. 112-RPR

20

21

22      DATED: May 10, 2007                    A-96

23

24
```

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

COPY

ALICE WALKER, individually        )
and as guardian of                )
her husband, GERALD H.E.          )
WALKER, an incompetent person,    )
                                  )
          Plaintiff,              )
                                  )   Civil Action
v.                                )   No. 06-366 JJF
                                  )
CITY OF WILMINGTON; CITY OF       )
WILMINGTON POLICE DEPARTMENT;     )
OFFICER SHAWN GORDON,             )
individually and as agent of      )
the CITY OF WILMINGTON POLICE     )
DEPARTMENT; OFFICER MICHAEL       )
BALLARD, individually and as      )
agent of the CITY OF              )
WILMINGTON POLICE DEPARTMENT,     )
OFFICER KAREN BUHRMAN,            )
individually and as agent of      )
the CITY OF WILMINGTON POLICE     )
DEPARTMENT,                       )
                                  )
          Defendants.             )


          Deposition of KAREN MARIE BUHRMAN,
taken pursuant to notice at the law offices of
Murphy, Spadaro & Landon, 1011 Centre Road, Suite
210, Wilmington, Delaware, beginning at 10:00 a.m.,
on Tuesday, October 3, 2006, before Dale C. Hawkins,
Registered Merit Reporter and Notary Public.

A-97

APPEARANCES:

        ROGER D. LANDON, ESQ.
        PHILIP EDWARDS, ESQ.
        MURPHY, SPADARO & LANDON
         1011 Centre Road, Suite 210
         Wilmington, Delaware  19805
         for the Plaintiff


        ALEX J. MILI, JR., ESQ.
        CITY OF WILMINGTON LAW DEPARTMENT
         800 North French Street
         City/County Building, 9th Floor
         Wilmington, Delaware  19801
         for the Defendants

A-98

```
 1                    (Buhrman Deposition Exhibit Nos. 1, 2,

 2    3 and 4 were marked for identification.)

 3                    KAREN MARIE BUHRMAN,

 4               the deponent herein, having first

 5               been duly sworn on oath, was

 6               examined and testified as follows:

 7    BY MR. LANDON:

 8          Q.   Ms. Buhrman, can you tell me your

 9    date of birth, please?

10          A.   12/24/64.

11          Q.   And by whom are you employed?

12          A.   City of Wilmington.

13          Q.   In what capacity?

14          A.   As a police officer.

15          Q.   How long have you been so

16    employed?

17          A.   Just shy of twenty years.

18          Q.   Have you been with the Wilmington

19    Police Department the entire time?

20          A.   Yes.                            A-99

21          Q.   What's your current rank?

22          A.   Master corporal.

23          Q.   How long have you held that rank?

24          A.   Approximately three years.
```

4

```
 1            Q.   What do your current job duties
 2    entail?
 3            A.   I am currently assigned to the
 4    Evidence Detection Unit which is crime scene
 5    collection at major crime scenes and various
 6    other crime scenes.
 7            Q.   Let me do this, why don't we start
 8    with twenty years ago and work forward.  I just
 9    want an overview of the various positions that
10    you have held with the Wilmington Police
11    Department over that time?
12            A.   Okay.
13            Q.   Let's even start before that with
14    education.  Did you graduate from high school
15    somewhere?
16            A.   Yes.
17            Q.   Are where did you graduate?
18            A.   St. Marks High School.
19            Q.   What year?
20            A.   1982.
21            Q.   Do you have any education, formal
22    education beyond high school?
23            A.   Yes.                      A-100
24            Q.   What education do you have beyond
```

```
1        high school?

2                A.    Associates degree.

3                Q.    From where?

4                A.    Delaware Technical & Community

5        College.

6                Q.    And was that degree in any

7        particular subject area?

8                A.    Criminal justice.

9                Q.    When did you get that degree?

10               A.    I believe it was December of 1985.

11               Q.    Were you employed anywhere while

12       you were obtaining that degree?

13               A.    City of Wilmington.

14               Q.    And twenty years ago would take us

15       to roughly 1986?

16               A.    Correct.

17               Q.    In what capacity were you employed

18       by the City of Wilmington while you were at Del

19       Tech?

20               A.    Police officer.            A-101

21               Q.    Okay.  If you got that degree in

22       December of '85, then you must be over twenty

23       years with the department?

24               A.    Oh, I'm sorry.  When did I get
```

1    that?  I'm sorry.  December of 1995, I do

2    believe it was.

3                Q.   Is when you got your degree?

4                A.   I do believe.

5                Q.   So was that a part-time degree?  I

6    mean, you were in school as a part-time student

7    obtaining that degree while you were employed as

8    a police officer?

9                A.   That's correct.

10               Q.   All right.  When did you start

11    that process?

12               A.   It took me approximately five

13    years to get that degree.

14               Q.   So you started approximately 1990?

15               A.   Approximately.

16               Q.   Is that night school basically?

17               A.   For the most part.

18               Q.   When did you start with Wilmington

19    Police Department, '85 or '86?

                                                          A-102

20               A.   '86.

21               Q.   Do you have any employment between

22    high school in '82 and Wilmington Police

23    Department in '86?

24               A.   I'm sorry?

```
1              Q.   Were you employed anywhere between
2         '82 and '86?
3              A.   Yes.
4              Q.   Where?
5              A.   I was employed by Milcroft Nursing
6         Home, and another nursing home part-time I can't
7         recall what the name of that -- my mom was just
8         in there.  I can't recall what that other
9         nursing home was.  And I was also just prior to
10        being employed by Wilmington Police, I was a
11        security guard for First State Security Agency.
12        And I did do part-time temp at a post office.
13             Q.   What did you do at the nursing
14        homes?
15             A.   I was a dietary aide.
16             Q.   Did you have any particular
17        training in that field before obtaining those
18        jobs?
19             A.   No.                          A-103
20             Q.   So on-the-job training?
21             A.   Yes.
22             Q.   And then when did you -- when are
23        you employed as a security guard at First State
24        Security Agency?
```

1           A.    Up until -- it was probably

2    approximately three months prior to becoming a

3    police officer and then I went right from that

4    to being a police officer, into the academy.

5           Q.    All right.  So that was a brief

6    job that lasted about three months?

7           A.    Correct.

8           Q.    Did you obtain any training prior

9    to obtaining that job in the security area, or

10   security guard training?

11          A.    No.

12          Q.    Did you obtain any type of

13   security guard license?

14          A.    Not that I recollect.

15          Q.    When you obtained the job with the

16   Wilmington Police Department, is that when they

17   sent to you the police academy?

18          A.    That's correct.

19          Q.    Is that the Delaware State Police

20   Academy?

21          A.    No.

22          Q.    What is it?                        A-104

23          A.    We have our own police academy.

24   It's City of Wilmington Police Academy.  At that

```
 1        time our police academy was at Delaware

 2        Technical & Community College in Stanton.

 3               Q.   And that would have been in the

 4        1986 time frame?

 5               A.   October of 1986.

 6               Q.   So you never attended the Delaware

 7        State Police Academy?

 8               A.   No.

 9               Q.   Tell me about the Delaware State

10        Police Academy, what type of training did you

11        obtain there?  How long a period of time were

12        you there?

13               A.   I didn't attend the Delaware State

14        Police Academy.

15               Q.   I'm sorry.  The City of Wilmington

16        Police Academy.  I misspoke.

17               A.   That's okay.  I was there

18        approximately six months.  We -- are you asking

19        me what we did basically on a daily basis?

20               Q.   Well, first of all, you just told

21        me you were there approximately six months.  As

22        far as you know was that the normal time for a

23        new recruit to the Wilmington Police Department

24        to spend at the Wilmington Police Academy?
```

A-105

1          A.   No.   Our class, they were doing a

2     -- at that time they were trying a new thing

3     where we would go out on the street for two

4     weeks at a time during the academy, we would go

5     through some of the academy, and then we went

6     out on the street for two weeks and rode along

7     with police officers on the street.   And then we

8     went back into the academy, and I believe we did

9     another two-week time frame on the street with

10    officers as a ride along.   And then we went back

11    and graduated, and then we went back on the

12    street.

13          Q.   You believe that whole process,

14    though, took about six months?

15          A.   That's correct.   Yes, I believe we

16    graduated sometime in April of '87.

17          Q.   Do you recall how much time during

18    the six months was spent in the two-week ride

19    along sessions?

                                          A-106
20          A.   I'm sorry?

21          Q.   Do you remember how much time

22    during the six months was spent in the two-week

23    ride along with the officers on the street

24    sessions?

1          A.   Two weeks.

2              Q.   You just told me that you rode in

3      the cars with officers for about two weeks at a

4      time and then you would go back into the academy

5      to do classroom work for some period of time and

6      then back out on the street.  How much time did

7      you spend on the streets as opposed to the

8      classroom?

9          A.   Approximately two weeks.

10             Q.   During the whole six months?

11             A.   I'm pretty -- I'm not exactly

12     sure.  I do believe it was one week for one

13     period of time and then another week for another

14     period of time.

15             Q.   Okay.  So you basically spent

16     five-and-a-half months in the classroom and two

17     weeks out on the street?

18         A.   I do believe so.

19             Q.   Okay.  What, if any training did

20     you receive during your time at the Wilmington

21     Police Academy in dealing with mentally ill

22     citizens?

23         A.   I don't recall.                A-107

24             Q.   Did you receive any training at

1    all that you can remember in that regard?

2            A.    I really don't recall.  It was

3    twenty years ago.

4            Q.    Were you given written materials

5    or textbooks or anything in writing to take home

6    to study while you were in the Wilmington Police

7    Academy?

8            A.    Yes.                              A-108

9            Q.    Did you save any of those

10   materials?

11           A.    Yes, we have our white book that

12   we were -- those are our policies and procedures

13   and we have those all the time.

14           Q.    Other than the -- what did you

15   call it, a road book?

16           A.    White book.

17           Q.    Do you still have the white book

18   that you were given back in 1986?

19           A.    Yes, with updated directives.

20           Q.    Do you have any written materials

21   other than the white book with the updated

22   written directives that you were given back in

23   '86 when you were in the academy?

24           A.    I don't know.

1        Q.   How big is the white book?

2        A.   It's a manual.  It's a binder, and

3    a plastic binder, and it's pretty thick.

4        Q.   Two or three inches thick?

5        A.   Eight chapters.  At least two or

6    three inches thick.

7        Q.   Is that something that you keep on

8    your person when you are out on patrol?

9        A.   I have it available.  I do not

10   keep it on my person.

11       Q.   The updates that you are given,

12   are they identified by date so that if one were

13   to look in the white book, one could conclude

14   when the updates became part of the book?

15       A.   Yes.                              A-109

16       Q.   Is there any information in that

17   white book currently that deals with how police

18   officers are supposed to deal with and interact

19   with mentally ill citizens that they come into

20   contact with during the course of their duties?

21       A.   There is a section that states

22   about dealing with commitments to the Delaware

23   State Hospital, I do believe.

24       Q.   When was the last time you looked

14

```
 1    at that section of the white book?
 2              A.   Yesterday.
 3              Q.   Was that in connection with
 4    preparing for today's deposition?
 5              A.   Yes.
 6              Q.   Prior to yesterday, when was the
 7    last time before that that you looked at that
 8    section of the white book?
 9              A.   A long time ago.
10              Q.   Was it more than -- was it some
11    time prior to July 11, 2005?
12              A.   Yes.
13              Q.   Do you remember how --
14    approximately when the last time that you looked
15    at that section of the white book?
16              A.   Approximately two to three years
17    ago.
18              Q.   Do you remember the context of the
19    situation that led you to look at that section
20    of the white book then, do you remember why you
21    were looking at it?
22              A.   Testing.
23              Q.   Testing?
24              A.   Testing for the promotional test.
```

A-110

15

1           Q.   After graduating from the academy,

2      I take it at that time you were officially a

3      Wilmington police officer?

4           A.   That's correct.

5           Q.   And what was your first rank?

6           A.   At that time we didn't have ranks.

7      I was a police officer.

8           Q.   Tell me, give me an overview of

9      your job history and the types of positions that

10     you have held in the Wilmington Police

11     Department since 1986?

12          A.   Started as patrol officer on the

13     street, worked with a field training officer,

14     was assigned to a couple of different people

15     during the course of my probationary period

16     which is eighteen months.

17              After that, I did approximately

18     three years in Patrol Division. I went to the

19     Mounted Division, which is on horse, did that

20     for approximately two years. They disbanded

21     that in I believe it was '92. Went back to

22     patrol for approximately a year. Went to

23     Drug/Organized Crime and Vice Division for

24     approximately a year. Went back to Patrol.          A-111

1    Went to the Criminal Investigations Division in

2    19 -- approximately 1998, I believe.  Spent

3    approximately three years there.  Went back to

4    patrol.  And most recently I am in the Evidence

5    Detection Unit and I went there last year,

6    October 31st of 2005.

7         Q.   Does the Wilmington Police

8    Department require its officers to take any

9    formal life training once they have completed

10   the police academy, in other words, either on an

11   annual or semiannual basis?

12        A.   Formal meaning?

13        Q.   Any type of training, ongoing

14   training?

15        A.   Yes.                          A-112

16        Q.   Tell me about that, what's

17   required?

18        A.   I am not certain of the exact

19   training that we have -- the amount of training

20   that we have to have.  There is -- I believe

21   it's a federal standard that we have to complete

22   to keep our certification as police officers.

23   It's throughout the course of a year and there

24   are certain blocks set aside for those training

1    times, and that goes all through our Human

2    Resources Department.

3          Q.   So how does that work, does

4    somebody tell you what you need to do and then

5    you can go and do it?

6          A.   Yes.

7          Q.   You don't need to keep track of it

8    yourself?

9          A.   No.                          A-113

10         Q.   And that's somebody in human

11   resources that says hey, it's time for you to

12   get so many hours of whatever type of training

13   it is that you have to go get and then you just

14   go do it?

15         A.   In the Patrol Division, the way

16   that their schedule works, and I was in patrol

17   division for the last -- prior to this past

18   year, the last five years, on their short day

19   work, they have a five, four, five day work

20   week, three days off, four day work week three

21   days off, five day work week.  When their day

22   comes around on a four day work week that fifth

23   day is their training day, it's a

24   four-and-a-half hour block and whatever has been

1    prescheduled for that training, then the

2    officers attend training on that -- that's their

3    fifth day of day work for training. So on their

4    four day day work.

5         Q.    And does that training generally

6    take place at a particular location?

7         A.    Yes.

8         Q.    Where?                                A-114

9         A.    It's either at the police station,

10   we have had it at the range, we have had

11   shooting to do our shoots. So it's either --

12   those are the two places I have ever been is at

13   the police station or at the range.

14        Q.    So through the course of a year,

15   can you give me an idea as to how much time you

16   personally have spent getting this required

17   ongoing training? Maybe do it by month, is it

18   half a day every month or, you know, a week

19   every six months?

20        A.    I don't think it's every month. I

21   would say at least six times in a year. I'm

22   really not certain of exactly how much training.

23        Q.    Your best estimate is probably at

24   least six times during the year?

1          A.    At least six times per year.

2          Q.    Is that usually for a full day?

3          A.    No, that's -- unless it's -- no,

4     it's usually four-and-a-half hours.

5          Q.    And has that training schedule or

6     amount of training been fairly consistent over

7     your entire career at Wilmington Police

8     Department or has it changed over time?  In

9     other words, are the officers getting more hours

10    of training per year now than they were ten

11    years ago or less or about the same?

12         A.    I would say more because of the

13    way that the schedule changes.  We have changed

14    our working hours, we have changed our shifts

15    over the course of my twenty years.  And I don't

16    recall the training as much back when I first

17    started as I do now as they have actual formal

18    training now.

A-115

19         Q.    What do you recall actual formal

20    training being implemented?

21         A.    What specific -- I'm sorry, what?

22         Q.    Maybe I didn't understand what you

23    just told me.  I thought you just told me that

24    you don't recall there being actual formal

1    training implemented early on in your career the

2    way it is now?

3            A.    Correct.

4            Q.    What did you mean by that?

5            A.    The training that we have now that

6    we have set aside, the four-and-a-half hour

7    blocks, I don't recall that occurring when I

8    first came on.

9            Q.    Okay.

10           A.    It could have, I just don't recall

11   that occurring.

12           Q.    What's your best recollection of

13   when that started to occur?

14           A.    I don't have a best recollection.

15   Honestly, I don't know.

16           Q.    You told me in terms of what this

17   training entails, you talked about going to the

18   range and I guess training or trying to keep up

19   your shooting skills; correct?

20           A.    Correct.                    A-116

21           Q.    All right.  What else, other than

22   the range, what other types of training do you

23   get?

24           A.    We have had incidents or training

1        on protocols as far as -- well, okay, first aid,

2        we have had training on first aid, CPR training,

3        certification.   In thinking about prior to

4        coming here and thinking about it, I do recall

5        that we had some mental health professionals

6        come in and speak to us about dealing with

7        mentally ill people.   Protocol on filling out

8        our infectious diseases or how we are to -- I'm

9        not sure how to say it.   If something were to

10       happen during the course of our duty and we get

11       possibly infected by a diseased person, how we

12       are supposed to handle that.

13                    I mean, as far as -- I just can't

14       recall all the training that we go through.

15               Q.   Well, you mentioned you have a

16       recollection of mental health professionals

17       coming in to speak to you about how to deal with

18       mentally ill people?

19               A.   Yes.

A-117

20               Q.   Has that happened on more than one

21       occasion or just one occasion that you remember?

22               A.   I don't recall.   I know that it

23       happened definitely the one time I recall, the

24       recent one.

1          Q.    Recently, like how recently?

2          A.    I believe it was definitely within

3    the last two years.

4          Q.    Do you recall whether it was

5    before or after July 11, 2005?

6          A.    I'm not good with dates or times,

7    honestly.  I'm not certain.

8          Q.    Do you recall who spoke to you?

9          A.    No.

10          Q.    Do you recall whether it was more

11    than one -- you said mental health

12    professionals, I don't know whether you meant --

13    do you mean that there was more than one mental

14    health professional that spoke?

15          A.    Yes.

16          Q.    Was this in a session that lasted

17    four, four-and-a-half hours?

18          A.    I don't recall exactly how long it

19    lasted.

20          Q.    Where did it occur?          A-118

21          A.    At the police station in our

22    conference room.

23          Q.    Were you given any written

24    materials in conjunction with that section?

1        A.    I don't recall if they actually

2    handed out handouts.  I know they gave us their

3    cards, resources, et cetera, but as far as

4    written materials, I don't recall.

5        Q.    What specific training was

6    provided to you in the course of that training

7    session?

8        A.    Identifying different mental

9    health issues, how persons may act or certain

10   persons with certain mental illnesses, how they

11   might act or react, the resources that are

12   available to us.  And just informing us of all

13   the various mental illnesses.

14       Q.    Prior to July 11 of 2005, were you

15   ever trained by the Wilmington Police Department

16   in how to deal with a mentally ill citizen who

17   was supposed to be transported to a Delaware

18   psychiatric hospital that didn't want to go?

19       A.    Not that I recollect.

20       Q.    Were you ever given any training

21   by the Wilmington Police Department prior to

22   July 11, 2005 about how to perform an

23   involuntary commitment of someone who was

24   mentally ill?

A-119

```
 1              A.   Did you ask me if I've had

 2    training on that?

 3              Q.   Yes.

 4              A.   Not that I can recall.

 5              Q.   Were you provided in this --

 6    either in this training session that you recall

 7    with the mental health professionals that came

 8    to speak to you, or in any other training

 9    session with specific information about what the

10    diagnosis of paranoid schizophrenia is?

11              A.   I'm sorry, I got distracted.  What

12    was --

13              Q.   Were you ever provided by the

14    Wilmington Police Department with any training

15    prior to July 11, 2005 as to what the diagnosis

16    of paranoid schizophrenia means, or what a

17    patient diagnosed with that condition might act

18    like?

19              A.   I believe so.              A-120

20              Q.   Okay.  What training were you

21    provided?

22              A.   Specifically, I can't recollect

23    what specific training I have had on that.  I

24    know it's been -- I have heard of it before and
```

1    dealt with it before, and I'm sure that we have

2    had training prior to about just besides the

3    training I just mentioned, I'm sure we have had

4    training along the course of my career for

5    mental illnesses, but specifically I can't

6    recall exactly when or what or any of that right

7    now.

8            Q.    Right now can you recall any

9    instruction that you were given about how you as

10   a police officer should approach, talk to, deal

11   with, persuade a mentally ill patient diagnosed

12   with paranoid schizophrenia?

13           A.    And we're speaking specifically on

14   training, just training, not on my actual

15   dealings?

16           Q.    Right.                          *A-121*

17           A.    I can't recollect exactly.

18           Q.    What do you personally know about

19   paranoid schizophrenics and how they behave?

20           A.    That they can become violent, that

21   they need medication.  That they can be fine one

22   minute and immediately turn aggressive.

23           Q.    How long have you known these

24   things?

1          A.    Throughout the course of my career

2    I have dealt with mentally ill persons on the

3    street, various mentally ill persons.  I have

4    seen paranoid persons who I have been told have

5    been diagnosed as paranoid schizophrenia.

6          Q.    What's the basis of your knowledge

7    that paranoid schizophrenias can become violent,

8    how do you know that?

9          A.    I have been told.

10          Q.    By whom?

11          A.    I believe it was during the course

12    of a training that we were informed of that.

13    I'm trying to think if I've ever personally

14    witnessed, and at this point in time I can't

15    recollect exactly that.

16          Q.    You can't recall ever witnessing

17    someone who was diagnosed with paranoid

18    schizophrenia becoming violent?

19          A.    I do recall an incident, but I'm

20    not -- I don't recall what that person's

21    diagnosis was.  The person was violent.

22          Q.    Tell me about that, what do you

23    recall?

24          A.    We were called to the area of

A-122

1    Third and Van Buren, there was a house -- not

2    Van Buren, it might have been Franklin, anyway,

3    it was on the west side and Spanish family, and

4    they -- the mother was reporting that her son

5    had -- and for lack of better terminology right

6    now -- went off, and the house was -- they just

7    had thrown things all over the house. I believe

8    he was not there at that point in time. She

9    said he had not been taking his medication. I

10   know that at some point in time during the

11   course of that day we did have a -- we did have

12   to take control of him and get him to a

13   facility. But he was very cautious about people

14   out on the street and yelling and ranting, and

15   did not want to be near us, the police.

16           Q.    How did you find out what his

17   diagnosis was?

18           A.    It was from his mother. I didn't

19   have any professional diagnosis, just except

20   from his mother.

21           Q.    And what did she tell you?

22           A.    That he was paranoid

23   schizophrenia.

24           Q.    When was that?                A-123

1          A.    That was again, I am not good with

2    times.  This was going back years ago.  Specific

3    time, I do not recall.

4          Q.   What training, if any, have you

5    gotten either in the police academy or on the

6    job as a Wilmington police officer about the

7    proper use of force when dealing with citizens?

8          A.    What training?

9          Q.    Right.

10          A.    That's another one you have your

11    training, we do hands-on training.  And every

12    time we have a new piece of equipment, we have

13    to be trained on that prior to getting it.  Use

14    of force we always -- I believe that that's

15    always one of the training -- just like

16    qualifying with our firearms, I believe that use

17    of force is one of our yearly training.

18          Q.    What are you trained with respect

19    to the proper use of force?

20          A.    I'm sorry?

21          Q.    What training do you receive

22    regarding the proper use of force?  Tell me what

23    they actually train you to do when you're using

24    force?

```
 1              A.   The levels of our use of force,

 2     how our continuum goes with our use of force.

 3              Q.   Yes.

 4              A.   That's what our training is.

 5              Q.   Why don't you tell me what that

 6     is?

 7              A.   The continuum of use of force?

 8              Q.   Yes.

 9              A.   It's our physical presence.  It's

10     verbal warning, verbal commands, hands-on

11     control, hands-on counter measures, and then a

12     weapon, intermediate weapon, which would be an

13     asp, chemical spray, and then if necessary use

14     of deadly force.  I have it here if you need it.

15              Q.   You have it in writing?

16              A.   I have it from our white book.

17              Q.   Can I take a look at what you have

18     brought with you.

19              MR. LANDON:  Can we have this

20     marked as the next exhibit.

21              (Buhrman Deposition Exhibit No. 5

22     was marked for identification.)

23     BY MR. LANDON:

24              Q.   Buhrman Exhibit Number 5 is a page
```

1    out of your white book that we discussed

2    earlier, and this page discusses the use of

3    force continuum?

4              A.   Correct.

5              Q.   In a situation where the

6    Wilmington Police Department is called to

7    transport a mentally ill paranoid schizophrenic

8    patient to the Delaware Psychiatric Hospital and

9    the patient is not exhibiting any aggressive

10   tendencies and not making any verbal threats,

11   but simply is refusing to go, what level of

12   force does this continuum authorize a Wilmington

13   police officer to use in that circumstance?

14             A.   I would say that given the verbal

15   warning, that the person will go with us, then

16   it will become the verbal demand, and then hands

17   on.

18             Q.   And what does hands on?

19             A.   Hands on means you physically take

20   ahold of that person and put their hands behind

21   their back and put handcuffs on them.

22             Q.   Does it involve beating them in

23   the head with handcuffs?

24             A.   No.

1          Q.   Does it involve punching them in

2     the face?

3          A.   No.

4          Q.   Does it permit macing the mentally

5     ill person?

6          A.   No.

7          Q.   Does it authorize any actual force

8     other than what you have described to me?

9          A.   That's on a passive person.  Now

10    if you're talking about they're getting

11    resisting, then it goes to another level.

12         Q.   All right.  Let's change the

13    hypothetical.  Let's now say that the officer

14    attempts to get the person's arm behind their

15    back to handcuff them and the person resist and

16    doesn't let the arm go behind the back, does

17    that authorize an increased level of force under

18    this continuum?

19         A.   Yes.

20         Q.   What level is authorized at that

21    point?

22         A.   Any level of force that is

23    necessary to get that person into custody.

24         Q.   Give me some examples of what

32

1    might be authorized under that specific

2    hypothetical?

3            A.    That they are just not putting

4    their hands behind their back complying?  That

5    force which is necessary to get their hand

6    behind their back to handcuff them.

7            Q.    Give me some examples of what

8    could be done there at that point?

9            A.    Physically taking ahold of them,

10   putting their hands behind their back, taking

11   them to the ground if need be to get their hands

12   behind their back.  They are in custody and are

13   going to be transported.  We are authorized to

14   -- we have an obligation to take that person and

15   they have to be handcuffed for our safety and

16   their own safety, and whatever force is

17   necessary to do that.

18           Q.    You said taking them to the ground

19   if necessary.  How would you go about doing

20   that?

21           A.    Whatever means, whatever means is

22   available.

23           Q.    Give me some examples.

24           A.    Putting a foot behind their leg to

```
 1      take them down to the ground.  I mean, I'm a
 2      small person, I'm not going to pick somebody up
 3      and throw them to the ground, I'm going to try
 4      to trip them and take them down to the ground,
 5      or twist their arm to try to -- with our come
 6      along things and try to get their hand behind
 7      their back.
 8              Q.   But tripping them and taking them
 9      to the ground by tripping them would be okay
10      under that continuum?
11              A.   If need be to get them to be
12      handcuffed, yes.
13              Q.   Well, let me ask you, let's say
14      you have two officers attempting to get this
15      person to comply with the directive to be
16      handcuffed and now this person is standing there
17      refuses by simply holding the arms out in front
18      of him, not letting the officers get the arms
19      behind him to handcuff him, would those officers
20      be permitted to each take one arm and then one
21      of them trip him and slam him face first into
22      the ground?
23              A.   The way that you're asking that --
24              Q.   I'm asking it that way because you
```

1    just told me whatever force is necessary to do

2    it, I'm trying to get you to explain to me in

3    that situation, what do you think, what sort of

4    force do you think is necessary to do that that

5    would be authorized by your policy?

6         A.    We are not -- we are trained to

7    use the force that is necessary to effect an

8    arrest.  A person who is committed to the

9    Delaware State Hospital or any other mental

10   health facility that we have to transport has to

11   be handcuffed per our departmental policy for

12   our safety as well as that person's.

13        We are obligated once we are

14   called by whatever agency is calling us to

15   transport that person.  If a person is

16   resisting, we have the ability, we can use our

17   discretion as to what force is necessary to put

18   that person into custody.  We don't want to hurt

19   the person, we are trying to protect that person

20   as well as ourselves.

21        Q.    Back to my example, can one

22   officer grab each arm on each side of him and

23   then trip him and force him to go face first

24   into the floor?

1          A.    Would that be acceptable?

2          Q.    Yes.

3          A.    Just based on what you just said,

4     I would have to say no.

5          Q.    Can you think of any circumstance

6     where that would be acceptable?

7          A.    If a person is actively fighting

8     us, we can't control how people go to the

9     ground.

10         Q.    So if the person is actively

11    fighting you, and under that scenario, you

12    believe an appropriate use of force would be

13    tripping and sending him face first to the

14    ground?

15         A.    Yes.

16         Q.    Okay.  Now, once the person is

17    face first on the ground, still refuses to put

18    the arms behind his back, let's say his arms are

19    underneath of his body now, now tell me how the

20    officer gets his -- gets the person's arms

21    behind his back and what amount of force he can

22    use to do that?

23         A.    As much physical force as it takes

24    to pull their arms from underneath their body to

1    get them handcuffed.

2            Q.    So they can use as much force as

3    they need to to put their arms out?

4            A.    Well, of course you can't use

5    deadly force, that's not the -- but they can use

6    the amount of force necessary to get their hands

7    from underneath of them.

8            Q.    Would that include doing such

9    things as beating the person in the back of the

10    head with fists?

11            A.    Beating?

12            Q.    Yes.    Punching in the head with

13    fists?

14            A.    Punching if necessary.

15            Q.    That would be okay under that

16    scenario?

17            A.    To try and get that person into

18    custody, yes.

19            Q.    Whipping them in the back of the

20    head repeatedly with handcuffs, would that be

21    acceptable use of force?

22            A.    Whipping?

23            Q.    Yes.

24            A.    What's whipping?

37

1        Q.    You don't know what that is?

2        A.    Whipping with handcuffs?

3        Q.    Yes.

4        A.    No, I have never seen that.

5        Q.    You hold a handcuff with one hand

6    and you sling it into somebody's head and the

7    other handcuff on the other side of the chain

8    hits them in the head?

9        A.    I have never witnessed that.

10        Q.    You have never witnessed that?

11        A.    No.    I wouldn't -- from your

12    scenario, somebody on their face down with their

13    hands under their head and somebody whipping

14    their handcuffs across somebody's head, that

15    scenario does not sound that that would be

16    appropriate.

17        Q.    Okay.    I didn't think so, but at

18    first I thought you agreed that that -- I

19    thought you -- strike that.

20              I thought your original answer was

21    that that would be appropriate.    Are you saying

22    that was not your answer?

23        A.    Yes, I am saying that that is not

24    my answer, right.

1          Q.    All right.  Beating in the head

2    would be okay with a fist, but not with

3    handcuffs, that's your answer?

4          A.    Correct.

5          Q.    What training, if any, have you

6    been given by the Wilmington Police Department

7    either through the academy or through your

8    career during these ongoing training sessions

9    about what you are to do as an officer if you

10   see another police officer using what you

11   believe to be excessive force against an

12   individual?

13         A.    I can't recall specific training.

14   Yeah, I don't recall specific training on that

15   particular section.

16         Q.    In your career as a Wilmington

17   police officer, have you ever had a situation

18   arise where you witnessed another officer using

19   what you believed to be excessive force against

20   an individual?

21         A.    No.

22         Q.    Are you aware of any other officer

23   in the Wilmington Police Department during your

24   entire career who was accused by another

1    Wilmington police officer or another police

2    officer whether it be New Castle County or the

3    state police or a federal officer of using

4    excessive force against an individual?

5           A.   Am I aware of an incident where

6    that occurred?

7           Q.   Yes.

8           A.   Yes.

9           Q.   How many such incidents of that

10   sort are you aware of?

11          A.   Two.

12          Q.   Tell me about those two, what do

13   you know about them?

14          A.   It's been years for one.  I

15   believe there was an officer fired for that.  I

16   don't recall all the specific circumstances, but

17   I -- yeah, that was one.  And then another one,

18   I thought I had two.  I can only think of that

19   one that comes to mind right now.

20          Q.   When was that incident?

21          A.   Again, I am horrible with times.

22          Q.   Was it after the year 2000 or

23   before the year 2000?  I mean, was it early in

24   your career, fairly recently?

```
 1              A.   It wasn't fairly recently.  I
 2     believe -- I think it was before 2000.
 3              Q.   Do you remember the officer's name
 4     who was fired?
 5              A.   Brian something.
 6              Q.   I'm sorry, what?
 7              A.   Brian something.
 8              Q.   Did you have personal knowledge of
 9     it, or was it just something that you heard
10     about?
11              A.   It was talk.
12              Q.   Do you remember what the
13     circumstance -- alleged circumstances were?
14              A.   That the -- that there was a
15     handcuffed individual in the back of the police
16     car and something about he beat the guy while he
17     was handcuffed in the back of the police car.
18              Q.   Do you remember how you --
19              A.   Brian Gail I think was his name.
20     I think, I don't know.
21              Q.   Do you know whether another
22     officer witnessed it?
23              A.   From what I understand, yes.  I
24     think that's the whole circumstances behind it
```

41

```
1    is that the officer reported that.

2         Q.   Do you know who that officer was

3    that reported it?

4         A.   I believe it was a female.  I

5    don't recall who it was.

6         Q.   As a Wilmington police officer, if

7    you do witness another police officer using what

8    you consider to be excessive force, are you

9    required to report that to somebody?

10        A.   Yes, I would report that to my

11   supervisor.

12        Q.   And I guess based on what you

13   heard happen to this other individual, you are

14   aware that that might result in that officer

15   being fired, depending on what happens?

16        A.   Yes.  Yes.

17        Q.   Have you ever reported to your

18   supervisor that you thought someone else was

19   using excessive force on the job?

20        A.   No.

21             MR. MILI:  If I can interrupt.  We

22   have been going for about an hour.  Can I check

23   with the deponent and see if she needs a break

24   or anything?
```

1                    MR. LANDON:  Do you need a break?

2                    THE WITNESS:  Yeah, I might as

3        well take a break.

4                    MR. LANDON:  Okay.  Let's take a

5        break.

6                    (A brief recess was taken.)

7                    MR. LANDON:  We took a little

8        break and Alex has just indicated that the Brian

9        Gail incident was 1991.

10                   MR. MILI:  That's correct.

11       BY MR. LANDON:

12                   Q.   I'm going to switch gears and talk

13       about the date of July 11, 2005 at Connections.

14       Do you know what Connections is?

15                   A.   It's an outpatient mental health

16       facility.

17                   Q.   And prior to July 11 of 2005, what

18       was your general understanding as to what they

19       did there?

20                   A.   That they have -- that they treat

21       on an outpatient level mentally ill persons, and

22       they have contact with the Rockford Center,

23       Delaware Psychiatric Center, there is another

24       one, Meadowood.  I don't know if they deal with

1    the juveniles, the Terry Center.  But that they

2    have contact with those, and if a person needed

3    to be admitted into those, one of those

4    facilities that they could contact them and they

5    can authorize to have them committed into those

6    facilities.

7            Q.    Where is the Connections center

8    located?

9            A.    The one I'm familiar with is on I

10   believe it's on 11th -- 10th.  500 West 10th

11   Street.  And I just referred to my report

12   because I wasn't exactly certain.

13           Q.   Let me just back up for a minute.

14   In preparation for today's deposition, did you

15   -- I take it you probably met with the city's

16   attorney, Mr. Mili who is sitting here with you

17   today?

18           A.   Yes.

19           Q.   I don't know what you talked

20   about.  I'm not entitled to that information,

21   but in terms of documents that you looked at,

22   did you look at any documents to prepare for

23   your deposition today?

24           A.   Yes.

44

1        Q.    What did you look at?

2        A.    My report.  I don't know what this

3    is, my complaint.

4        Q.    The amended complaint that was

5    filed in the matter?

6        A.    An original complaint that didn't

7    have names in it, and then this one.

8        Q.    Okay.

9        A.    And I went to the use of force

10    continuum, in our white book just to refresh on

11    things.

12        Q.    Did you look at anything else in

13    the white book other than the continuum of use

14    of force that we've already marked as Exhibit 5?

15        A.    I glanced at the directive

16    entitled commitments to the -- I don't know if

17    it's the Delaware State Hospital or Delaware

18    Psychiatric Center.  I don't know how it's

19    written in our white book, but I glanced at

20    that.

21        Q.    Did you make a photocopy of that

22    page that you glanced at?

23        A.    No.

24        Q.    Did you bring your white book with

1    you today, by chance?

2            A.   No.

3            Q.   I'm going to show you what we have

4    premarked as Deposition Exhibit Number 1 which

5    I'll represent to you was an answer that was

6    filed on your behalf and on behalf of the City

7    and Mr. Gordon and Mr. Ballard.

8            A.   I have a copy if that's acceptable

9    to use that one.

10           Q.   That's fine.  That's the same

11   document that I have marked.  Did you look at

12   that before today?

13           A.   No.

14           Q.   Do you know if you ever saw that

15   before it was filed as of record in the case?

16           A.   No.

17           Q.   Did you speak with anybody from

18   the city solicitors office before -- after the

19   original complaint was filed but before that

20   answer was filed?

21           A.   Did I speak with anybody in the

22   city solicitor's office?

23           Q.   Yes.

24           A.   Before this was filed?

1          Q.   Yes.

2          A.   I don't know.  I don't know when

3     this was filed.

4          Q.   I can tell you that.  It was filed

5     on August 4 of 2006.

6          A.   I met with Mr. Mili.  I'm not sure

7     of the exact date on when that was.

8          Q.   Okay.

9               MR. MILI:  And again, any

10    discussions you had with me are not on the

11    record and the other attorney is not privy to

12    it.

13         Q.   When was the first time that you

14    saw the answer, Buhrman Exhibit Number 1, was

15    that today?

16         A.   Today.

17         Q.   You probably haven't had a chance

18    to match it up with the complaint and review it

19    in conjunction with the amended complaint, have

20    you?

21         A.   No.

22         Q.   Prior to doing the review of the

23    documents that you just described in preparation

24    for the deposition today, did you have an

1    independent recollection of the events of July

2    11, 2005 that occurred at Connections?

3         A.   Yes.

4         Q.   Did the review of the report in

5    particular change any of your recollections of

6    what happened or help you remember better what

7    happened?

8         A.   Yes, it clarified my recollection.

9         Q.   Okay.  Is there anything in -- and

10   you're looking -- what document are you looking

11   at?

12        A.   I'm looking at my report that I

13   filed on the next day, my report date is the

14   12th of July.

15        Q.   Could you look at the document,

16   the two-page document that I have premarked as

17   Buhrman Exhibit Number 3 and confirm that that

18   is the document which you're talking about,

19   which was your report that was done on 7/12/05?

20        A.   Yes.

21        Q.   Okay.  Did you review what I have

22   premarked as Buhrman Exhibit Number 2 which

23   appears to be a report done by Corporal Gordon

24   dated 7/11/05, it's a two-page document?

1          A.    Have I reviewed this?

2          Q.    Yes.

3          A.    No.

4          Q.    You have never reviewed it?

5          A.    No.

6          Q.    What about what I have marked as

7    Buhrman Exhibit Number 4, which is a two-page

8    report dated 2/7/06 by Corporal Gordon.  Have

9    you ever seen that document before?

10         A.    I didn't look at these as you

11   handed these to me.  I haven't read anybody

12   else's report, that's all I can say.

13         Q.    Have you spoken with either

14   Officer Gordon or Officer Ballard after the

15   lawsuit was filed about the incident that

16   occurred at Connections involving Mr. Walker?

17         A.    Yes.

18         Q.    How many times -- have you spoken

19   to both gentlemen about it?

20         A.    Yes.

21         Q.    How many times have you spoken to

22   them about it?

23         A.    Officer Gordon, probably once.

24   Officer Ballard, I believe that was two times.

49

```
 1              Q.   Okay.  Have you discussed -- what
 2      have you discussed with them?  Start with
 3      Gordon, what have you discussed with Officer
 4      Gordon about the incident since the lawsuit was
 5      filed?
 6              A.   That we were facing a lawsuit
 7      relative to the Connections incident.  And that
 8      -- that we didn't feel there was justification
 9      for that.
10              Q.   Anything other than that?
11              A.   No.
12              Q.   Neither you nor he felt there was
13      any justification for the lawsuit, is that what
14      you're saying?
15              A.   Correct.
16              Q.   What about, what did you discuss
17      with Officer Ballard?
18              A.   Officer Ballard is the one that
19      notified me, it was in the paper, and he called
20      me and started reading immediately what was in
21      the paper.  And he asked me if I recalled that
22      incident, and I said no, I don't know what
23      you're talking about.  And then he said
24      Connections, and I go, yes, I remember
```

1    Connections.  And he goes, that was our

2    incident.  I said, no, I didn't think it was,

3    because there was things that appeared to have

4    been said that happened that didn't happen.  And

5    I said that's not our incident.  And he said --

6    I can't recall exactly what he said to that, but

7    he informed me that that was our incident, and

8    so that was how I found out about this whole

9    thing.

10         Q.   Did you have a similar

11   conversation with him, similar to what you had

12   with Officer Gordon about it not being

13   justified?

14         A.   That we felt it was not justified,

15   yes.

16         Q.   Okay.  Officer Ballard told you

17   that?

18         A.   I don't know if -- know if either

19   officer -- I know I said that.  I don't know if

20   they specifically said that.

21         Q.   Prior to July 11 of 2005, had you

22   ever responded to Connections as a police

23   officer to assist in taking a mentally ill

24   person to one of the various hospitals?

51

```
 1              A.   I don't think I had.

 2              Q.   Do you know whether either Officer

 3    Gordon or Officer Ballard had ever done so prior

 4    to that date?

 5              A.   I don't know.

 6              Q.   Do you know of any other officer

 7    in the Wilmington Police Department who had ever

 8    done so prior to that date?

 9              A.   I don't know.

10              Q.   Did you know any of the employees

11    of Connections as of July 11 of 0 five?

12              A.   You mean prior to that date?

13              Q.   Yes.

14              A.   No.

15              Q.   Tell me how you came to be there,

16    how did that happen?

17              A.   I was dispatched.  I was our wagon

18    officer which means I have a van and I'm a

19    transport unit.  And I was sent there to -- it

20    wasn't exactly clear what I was going to do.  I

21    was transporting a subject to the CDC.  I was

22    not familiar with that term.  And I asked what

23    that was.  And the radio supervisor couldn't

24    provide me that information and she attempted to
```

52

1     call Connections personnel back to find out

2     exactly what I was transporting a person, or

3     where I was transporting a person to.  And she

4     wasn't available to contact them.

5          Q.   This supplemental report that you

6     wrote, Exhibit Number 3, you wrote this on

7     7/12/05?

8          A.   Yes, the next day.

9          Q.   Would this be a standard procedure

10    for an incident like this for you to write up a

11    report of this nature?

12         A.   Yes, it can be.

13         Q.   Would there be situations -- well,

14    what was it about this situation that caused you

15    to write up a report or made you believe that

16    you needed to write up a report?

17         A.   Any use of force requires a

18    report.  If I had actually transported the

19    person to the psychiatric center, I would be

20    required to fill out a miscellaneous report to

21    state that I did that transport.

22         Q.   You didn't use any force that day

23    on Mr. Walker, did you?

24         A.   Yes.

1          Q.   What force did you use?

2          A.   I restrained his legs.

3          Q.   So any use of force requires a

4    Wilmington police officer to write up a report?

5          A.   Yes.

6          Q.   And we have Corporal Gordon's

7    report and we have your report.  I have not

8    received anything from Officer Ballard.  Do you

9    know if he wrote up a report?

10          A.   No, I don't know.

11          Q.   But your understanding of the

12   policy is he would have been required to write

13   up a report?

14          A.   Well, no, under that circumstance,

15   if Gordon wrote a report, he could cover his and

16   Ballard's actions.  They're working together,

17   they're partners, they can cover each other's

18   actions.  I'm not sure if a departmental

19   information report had to be filled out by

20   Ballard, I'm not certain of that.  If he didn't

21   write a report, then Officer Gordon covered his

22   actions in his report.

23          Q.   Is a DI report something other

24   than the types of reports that we have been

1    looking at that have been marked as 3, 4 and 2

2    to your deposition?

3              A.   Yes, the departmental information

4    report is different.

5              Q.   What is that?

6              A.   It's always addressed to the

7    chief.  It's used in a multitude of situations,

8    request of transfer, request for new equipment,

9    request for new uniforms.  It's used generally a

10   lot of times in many different instances, like I

11   said, it's always addressed to the chief,

12   request for transfers.

13             Q.   Did you write up any DI report?

14             A.   Departmental information report?

15             Q.   With respect to this incident?

16             A.   No.

17             Q.   Do you know if any were written up

18   by anyone?

19             A.   No, I don't know.

20             Q.   Why in your investigative

21   narrative do you relay the testimony that you

22   just gave about the radio supervisor giving you

23   some information and then you saying you didn't

24   know what that meant?

1          A.    I'm sorry?

2          Q.    About where the person was

3    supposed to be transported to?

4          A.    I wasn't familiar with what the

5    CDC was and I didn't know where I was taking

6    this person.

7          Q.    Why is any of that included in

8    your narrative?  Why did you feel that was for

9    you to include in your narrative?

10         A.    I'm pretty thorough about writing

11   reports and I just always preface reports.

12         Q.    You're pretty thorough in writing

13   your reports, does that mean that you try to put

14   in every detail of every fact that you feel is

15   important?

16         A.    That's convenient, I just wanted

17   to state that I didn't know where that was.

18         Q.    Tell me what happened when you got

19   there to the Connections?

20         A.    I responded upstairs.  I don't

21   recall what floor it was on.  And there was --

22   Mr. Walker was seated in a chair against the

23   wall.  You walk up through a hallway and into

24   like an open office area.  There is a half wall

56

1    dividing I guess the offices kind of.  And where

2    I was, there was a hallway and there was a few

3    rooms in the area.

4             Q.    Okay.  You saw Mr. Walker sitting

5    in a chair up against a wall when you got there?

6             A.    I saw a subject sitting there.

7             Q.    Describe what he looked like for

8    me?

9             A.    He was an African-American male.

10   He had little hair, if any hair.  I don't recall

11   exactly.  He was stocky build, and I don't

12   recall how he was dressed.

13            Q.    Do you recall anything about his

14   approximate age, how old he appeared to be?

15            A.    He was an older gentleman.

16   Approximate age I would say in his fifties,

17   maybe.

18            Q.    Was anyone else present in the

19   room where he was?

20            A.    There was.  There was a white male

21   and there was a woman.  I believe she was a

22   white female.  She was in and around.  I didn't

23   deal with her specifically.  I just dealt with

24   the white male.

57

```
 1              Q.   The white male as far as you knew
 2    was an employee of Connections?
 3              A.   Yes.  He's the one that approached
 4    me when I came in.
 5              Q.   The white female as far as you
 6    know, she was also an employee?
 7              A.   As far as I know.
 8              Q.   This white male, do you know his
 9    name?
10              A.   Well, according to my report, it
11    was Gabe.
12              Q.   I take it you had never met him
13    before?
14              A.   No.
15              Q.   Did he tell you what his position
16    was there at the facility?
17              A.   I just wrote in my report a
18    representative from Connections.  No, he did
19    not.  I don't know that I asked.
20              Q.   Did he tell you his name was Gabe
21    or did you see a name tag, how did you know his
22    name was Gabe?
23              A.   I don't recall seeing a name tag.
24    I'm sure we introduced ourselves to each other.
```

```
 1              Q.   All right.  Without looking at
 2      your report for this question, tell me what he
 3      told you, if you can, do you remember what he
 4      told you?
 5              A.   That this gentleman was going to
 6      be transported to the Delaware -- I guess I
 7      didn't understand what the CDC was.  And maybe I
 8      asked him where this gentleman was going to.
 9      And he said the Delaware Psychiatric Center, and
10      I said okay, Delaware State Hospital and he said
11      yes.  And that he had commitment papers for him
12      to respond there.
13              Q.   Okay.  Do you remember him saying
14      anything else to you other than what you just
15      told me he said to you?
16              A.   Not at that point.
17              Q.   Just take me through it one step
18      at a time.  What did you do next?  What did you
19      say next?  What happened in time sequence?
20              A.   Responded upstairs, introduced
21      myself, he introduced himself.  I questioned him
22      about the CDC.  He said well, he's committed
23      to -- he has commitment papers to the Delaware
24      Psychiatric Center.  I don't know if it was at
```

1    that point in time that he told me the history

2    of Mr. Walker.  I don't think it was at that

3    time that he told me about his history.  I went

4    over to Mr. Walker, I explained to him that he

5    was going to have to go with me to go to the

6    hospital, and that it was our policy for him to

7    be handcuffed.

8             Q.  Was Gabe still in your presence

9    when you were having this conversation with

10   Mr. Walker?

11            A.  Yes.

12                So I said to Mr. Walker, well, you

13   have to go talk to a doctor and you have to come

14   with me and it is our policy.  And he said no,

15   he didn't want to go.  And he wasn't going to go

16   to the hospital.

17            Q.  Did you have your uniform on?

18            A.  Yes.  It's different than the one

19   I have today.

20            Q.  But it was a uniform that any

21   reasonable person could look at and tell that

22   you were a Wilmington police officer?

23            A.  Yes.

24            Q.  Did you identify yourself as such

60

1    to him, to Mr. Walker?

2              A.   I don't recall.

3              Q.   Were you wearing a gun, a gun

4    belt?

5              A.   Yes.

6              Q.   Did you have a badge on your

7    uniform?

8              A.   Yes, and a name plate.  A little

9    different than this uniform.  It's more formal.

10   This is my uniform now because of the area I

11   work in.

12             Q.   Before you said your first words

13   to Mr. Walker, had Gabe given you any

14   information about what his mental illness was or

15   what his diagnosis was, or what his problem was

16   for lack of a better term?

17             A.   As I stated earlier, I don't

18   recall at that time or prior to me talking to

19   Mr. Walker had he informed me of that.

20             Q.   But being there and knowing now

21   through learning from Gabe that he was supposed

22   to be committed to the Delaware Psychiatric

23   Hospital, what was your understanding generally

24   of the mental health status of the person you

1    were about to deal with?

2            A.   Oh, he told me.  Gabe informed me

3    of the -- of what his mental status was.

4            Q.   Okay.  And what did he tell you

5    about that?

6            A.   That he -- his wife had brought

7    him in, and that he was having issues of pacing

8    at nighttime, and that his wife was fearful that

9    his -- they have a granddaughter living with

10   them, and that Mr. Walker was standing outside

11   her bedroom, and Mrs. Walker was concerned that

12   he had expressed that he -- he had expressed

13   that he was going to do something to her.  So

14   Mrs. Walker was concerned that he was going to

15   do something to their granddaughter, so she

16   brought him to Connections.

17           Q.   And I may be confused here, but

18   when did Gabe relay this information that you

19   have just described to you?

20           A.   After I spoke to Mr. Walker and

21   said that I needed to take him to the hospital,

22   that he needed to go with me to the hospital.

23   And after I asked him, or told him that he

24   needed to go to the hospital with me and he said

1    no, and I asked him again and explained to him

2    that he needed to go with me.  He said no.  I

3    went back to Gabe and I said will he fight me,

4    and he said oh, yeah, he will fight you.

5            Q.   Was this in the -- in that same

6    sitting area where Mr. Walker was sitting, in

7    other words, were you both within earshot of

8    Mr. Walker, was he within earshot of you when

9    you were having this conversation with Gabe?

10           A.   Yes, it was an open area.

11           Q.   All right.

12           A.   The only thing that was dividing

13   the I guess desks, office area, was a half wall

14   the length of the room.  And Mr. Walker was

15   seated in the chair and I stepped over to where

16   Gabe was.  Could he hear me?  I don't know.  I

17   tried to speak lowly to Gabe.

18           Q.   You specifically asked Gabe

19   whether Mr. Walker would fight you?

20           A.   Yes.

21           Q.   You used those words?

22           A.   Yes.

23           Q.   And Gabe said in response what?

24           A.   Oh, yes, he will fight you.

1          Q.    Did Gabe give you any information

2     about what Mrs. Walker was afraid Mr. Walker was

3     going to do to the granddaughter?

4          A.    Yes.

5          Q.    What did he tell you?

6          A.    It was -- the problem was that of

7     a sexual nature, that she was afraid that he was

8     going to try something sexually with the

9     granddaughter.  This all came about, because at

10    that point after I asked him will he fight me,

11    he said oh, yes, he'll fight you.  I said okay,

12    now I need more history of why am I taking him

13    and what's the potential here for violence, et

14    cetera.

15         Q.    And did you have that discussion

16    with Gabe, did you ask those questions that you

17    just said, what's the history of violence, or

18    did you simply say will he fight me?

19         A.    I simply said will he fight me and

20    he responded oh, yes, he will fight you.

21         Q.    Was there any more conversation

22    about whether or not he might fight you or was

23    violent or anything along those lines?

24         A.    No, I wanted for my own -- my

1    thought process was I need to know more of what

2    I am facing here, what type of mentally ill

3    person I'm dealing with now.  And the potential

4    for violence.  If he's telling me he's going to

5    fight me, I want to know.

6                Q.   All right.  So what do you do

7    next?

8                A.   I got on another channel and asked

9    for another unit to respond because obviously

10    that wasn't relayed or asked prior to this

11    transport occurring.  I told them that I needed

12    another unit because he was refusing to go with

13    me.

14                Q.   What would you have done if Gabe

15    had not said to you he will fight you?  What if

16    he had said to you no, I don't think he will

17    fight you, what would you have done?  Would you

18    have still asked for backup?

19                A.   Perchance, just for my own safety

20    and his own safety, yes.

21                Q.   Okay.  How long did it take the

22    other officers to arrive?

23                A.   I don't know, quite a bit of time,

24    because it was pretty busy on the street.

1          Q.   By quite a bit of time, can you

2     give me your best estimate?  I mean, is it five

3     or six minutes, are we talking about an

4     hour-and-a-half or what?

5          A.   No, not that quite long either.  I

6     would -- my best estimate, fifteen to thirty

7     minutes.

8          Q.   What did you do during the time

9     that you were waiting for backup?

10         A.   Well, Gabe and I had our

11    discussion.  And I basically stood at the

12    doorway where I entered into, there was no door

13    there, it was just -- it had been a doorway.  I

14    stood there.  That was the only exit that

15    Mr. Walker could go out that I was aware of.

16    And that's its.  I stood there and talked with

17    Gabe.  I don't recall exactly -- we had that

18    conversation and I don't know if we started

19    talking about anything else.

20         Q.   Did you and Gabe stay in

21    Mr. Walker's presence the entire time that you

22    were waiting for the other officers to arrive?

23         A.   Yes.

24         Q.   Did this other white female that

1    you saw, was she anywhere around during the time

2    that you were waiting?

3         A.   I didn't pay attention to her.  I

4    know a person went from one room to another.  I

5    believe it was a white female.

6         Q.   Did you see any other employees

7    the entire time you were there other than the

8    white female and Gabe?

9         A.   In that area?  No.

10        Q.   Did Mr. Walker ever attempt to

11   leave while you were waiting for backup to

12   arrive during however long it was you were

13   waiting?

14        A.   He didn't attempt to leave.

15        Q.   Did he say anything to you or have

16   any conversation with you during that time

17   frame?

18        A.   No, he didn't do that.

19        Q.   Did he ever act aggressively

20   toward you in any way during that time frame?

21        A.   He made me nervous.

22        Q.   How did he make you nervous?  What

23   did he do that made you nervous?

24        A.   He started -- he was sitting in

1    his chair and he would abruptly get up real fast

2    and walk to the wall, and then come back and sit

3    down.  And he did that several times.  That's

4    why I stepped, I may not have been in that

5    doorway prior to that, but I moved according to

6    that, it was intimidating.  He was getting up

7    appropriately and walking and then sitting back

8    down.

9             Q.   Was he walking toward you when he

10    was doing that?

11            A.   No.

12            Q.   Walking away from you?

13            A.   No.

14            Q.   Okay.  What other option do we

15    have?

16            A.   I was facing him this way, and he

17    was walking this way, so perpendicular.

18            Q.   Okay.  All right.  Did you have

19    any discussion with Gabe about that behavior

20    that Mr. Walker was exhibiting?

21            A.   No.  No, not that I recall.

22            Q.   Did you tell him that you were

23    nervous or that that was making you anxious or

24    nervous?

1          A.    Yes.   Not that I recall.

2          Q.    Was Mr. Walker saying anything

3    when he was walking and then coming back to his

4    chair and sitting back down?

5          A.    No.

6          Q.    When he stood up, could you make a

7    guesstimate as to about how tall he was?

8          A.    Five-nine, ten, maybe, five-ten,

9    maybe.

10          Q.    And what about weight,

11    guesstimate?

12          A.    250 to 300 pounds.

13          Q.    And what was your height and

14    weight at the time of the incident?

15          A.    My height is still the same.   I

16    was five four-and-three quarters and

17    approximately 155, 160.

18          Q.    Do you have any recollection of

19    what conversation, if any, occurred between you

20    and Gabe during the time that you were waiting

21    for the backup police officers to arrive?

22          A.    As far as I recall, really the

23    only conversation that we engaged in was that

24    particular -- about Mrs. Walker's concerns of

1    what was occurring with her husband.  I don't

2    recall if I was told that he actually was

3    diagnosed with paranoid schizophrenia.  But he

4    told me of the incidents that were occurring.  I

5    don't recall exactly what other conversation

6    took place.

7         Q.   Did Gabe make any attempts to

8    persuade Mr. Walker to go with you?

9         A.   Not that I recall.  And after

10   Mr. Walker, after some time was passing and

11   Mr. Walker had done those actions, I called the

12   radio room to see how long there was going to be

13   a unit and they asked me if I was okay and

14   everything, I said yes, I'm fine and whatnot,

15   but that, you know, it was taking quite a bit of

16   time.  That's the only reason I say fifteen to

17   twenty minutes.

18        Q.   All right.  Tell me what happened

19   when Officers Ballard and Gordon showed up?

20        A.   They came in the same way that I

21   did, or from the same doorway that I did.

22        Q.   Were they both in uniform, too?

23        A.   Yes.  And I explained to them that

24   Mr. Walker had commitment papers to Delaware

```
1        Psychiatric Center and I had gone over to him

2        and asked him to go with me, he said he wasn't

3        going to go with me.  And I explained to them

4        that, you know, told him that he was going to

5        have to be handcuffed, and he said he's not

6        going with me and he didn't want to go to the

7        hospital.

8                Q.   So you had this conversation with

9        the two officers?

10               A.   Yes.

11               Q.   Was that within Mr. Walker's

12       presence?

13               A.   Yes, we were all right there, yes.

14               Q.   Was Gabe still there?

15               A.   Yes.

16               Q.   What about the white female

17       employee?

18               A.   I didn't pay much attention to her

19       the whole time.  I mean, I know I saw a person

20       walk at one point.  I don't know what happened

21       to her at any other time.

22               Q.   All right.  One of the responding

23       officers is a white male and the other is

24       African-American male; correct?
```

1          A.    Yes.

2          Q.    Which is which?

3          A.    Officer Gordon is a white male and

4     Officer Ballard is African-American.

5          Q.    Thank you.

6                Tell me what happens next?

7          A.    I explained to them his actions

8     that he started to do that abrupt standing up,

9     walking to the wall, coming back over and

10    sitting down, abrupt standing up, walking to the

11    wall, coming back, an explained that to them.

12    And at that point, they said okay, I believe I

13    had the commitment papers in my hand, and I held

14    on to them.

15                And then Officer Ballard

16    approached Mr. Walker and explained to him the

17    same thing, that, you know, we have to take you

18    to the hospital, you know, we would like you to

19    come with us.  He said no, I'm not going with

20    you.  I don't want to go to the hospital.  Just

21    that back and forth, Ballard trying to convince

22    him to go with us.  And him stating that no, he

23    wasn't going to go with us.

24          Q.    Was he sitting or standing during

```
 1        this conversation, that is Mr. Walker?

 2              A.   Sitting.

 3              Q.   And Officers Ballard, Gordon and

 4        you, were you all hanging around him?

 5              A.   No, Ballard was the only one next

 6        to him.  Gordon and I were not near him.

 7              Q.   But you could hear what was being

 8        said back and forth?

 9              A.   Yes.

10              Q.   During that conversation between

11        Mr. Walker and Mr. Ballard, did Mr. Walker ever

12        threaten Officer Ballard?

13              A.   Not that I heard.

14              Q.   Okay.  Did he ever say anything

15        other than no, I'm not going?

16              A.   Well, there was more conversation.

17              Q.   Okay.  Tell me what more

18        conversation there was?

19              A.   At some point, Officer Ballard

20        said to Mr. Walker, you have to go with us, you

21        have paperwork.  And he said, you know, we can

22        do this the hard way or we can do this the easy

23        way.  And Mr. Walker said we're going to do it

24        the hard way.
```

1          Q.   Did Officer Ballard or Officer

2    Gordon try to employ or enlist Gabe to help them

3    convince Mr. Walker to go with them?

4          A.   I don't recall if they did.  I

5    didn't see that.

6          Q.   What happened after Mr. Walker

7    said well, we're going to have to do this the

8    hard way?

9          A.   I'm not certain of it, what time.

10   I mean, I do believe that Officer Ballard

11   continued to try to ask him to go instead of

12   trying the hard way.  At some point Officer

13   Gordon said well, you know, we don't have all

14   day.  He didn't say that.  He didn't say that.

15   I guess he felt that we had given him ample time

16   to try -- to comply with us.  And he stepped

17   over to where Officer Ballard was next to

18   Mr. Walker.

19         Q.   How much time did Mr. Ballard,

20   Officer Ballard spend talking to Mr. Walker and

21   trying to get him to go with them, from the time

22   Officer Ballard got there until what you just

23   described with Officer Gordon walking over there

24   with them?

1          A.   I'm not good -- I mean, I can't

2    sit here and say -- to me it's ample time.  It's

3    at least five minutes.

4          Q.   Okay.  Now, Officer Gordon walks

5    over to Officer Ballard and Mr. Walker?

6          A.   Yes.

7          Q.   Take it from there, what happens

8    next?  And let me ask you this before you answer

9    that question.  Do you have -- because it seems

10   like you're having difficulty -- it seems like

11   you're trying to do your best to recall, you

12   know, the specifics, this break down moment by

13   moment, but it also appears that you're having

14   some difficulty relating it to me in terms of,

15   you know, you're pausing, you're thinking, it

16   appears that you're thinking and then you're

17   responding to my question.

18          My question is:  Do you have a

19   clear recollection of what happened from this

20   point or is it hazy?

21          A.   From this point forward, no.  I

22   only -- I don't know what I did.  I can't attest

23   to what -- I know some of what was said as far

24   as Officer Ballard, and Mr. Walker's response.

75

1    As far as what actually transpired, what Officer

2    Gordon did, what Officer Ballard did, I don't

3    know specifically.  I know that Mr. Walker was

4    on the floor, I know that everybody was on the

5    floor, Mr. Walker's legs were moving.  I put my

6    body weight on his legs to prevent him from

7    kicking or trying to do any -- cause any injury

8    to anybody else, prevent him from getting up,

9    being able to get up.

10            He was moving me while I was on

11    his legs.  He was moving me.  He was able to

12    lift me partially.  I know at some point as the

13    struggle ensued, Officer Gordon, his leg came

14    towards me.  And I went, I ducked down, and I

15    said do whatever you got to do.  I was still on

16    his legs, on Mr. Walker's legs.  And I said

17    don't worry about me, kick me, and I was just

18    holding down Mr. Walker's legs.

19            Q.   Let's back up.  You have Officer

20    Ballard talking to Mr. Walker, you sense that

21    it's been ample time and now Gordon walks over

22    to join Officer Ballard and Mr. Walker.  What

23    did you see happen next?

24            A.   Mr. Walker stood up at some point.

1    He was standing.  They were all standing there.

2    Officer Ballard was on one side, Officer Gordon

3    was on the other side.  Officer -- I can't

4    attest to what they actually did, all I can say

5    is -- I believe that they grabbed ahold of his

6    arms to pull them behind his back.  And at some

7    point they all went down on the ground.

8            Q.   Why do you say you can't attest to

9    what they actually did?

10           A.   Because I don't -- I don't

11   remember if I -- I know they put their hands on

12   him.  I know they physically grabbed him.  And

13   I'm just trying to recollect if that was to go

14   like this, to pull his arms, and he tensed up,

15   he wasn't letting them move him.

16           Q.   Did you see that happen?

17           A.   Yes.

18           Q.   You saw one officer grab one arm

19   and the other officer grab the other arm?

20           A.   As I can recollect, yes, that's

21   what happened.  They each were on either side

22   and they were pulling his hands, and he was --

23   he was resisting their pulling him, pulling his

24   hands.

```
 1                    Q.   Did either of the officers at that

 2         point ask you to handcuff him?

 3                    A.   No.  They have each got ahold of

 4         one arm so that he can't move either arm.

 5                    Q.   They weren't in a position to be

 6         handcuffed.

 7                    A.   He could have gotten the handcuffs

 8         on one of his arms.  That is a dangerous

 9         situation.

10                    Q.   Why?

11                    A.   Because the handcuff could become

12         lose and become a weapon towards one of us.

13                    Q.   Did anybody ask you to do that?

14                    A.   No.

15                    Q.   How big are these other two

16         officers whom I have not yet met?

17                    A.   Officer Gordon is on the shorter

18         side, but he's stocky.  Officer Ballard is at

19         least six foot.  Officer Gordon I would say is

20         five-six to five-seven.  But he's a stocky guy.

21                    Q.   Both strong, fit, relatively young

22         men?

23                    A.   Yes.

24                    Q.   How did Mr. Walker -- you said he
```

1    ended up on the floor, everybody ended up on the

2    floor?

3              A.   Yes.

4              Q.   How did that happen?

5              A.   I'm not exactly sure.

6              Q.   Did you see it happen?

7              A.   The reason why I'm not exactly

8    sure is because there is a lot of movement as

9    this is going on and I don't know exactly how he

10   got on the floor.  And the problem I'm having is

11   I know what I have been told by the other

12   officers, but I don't know what I --

13             Q.   I just want to know what you saw?

14             A.   That Gordon had ahold of him and

15   they went down to the ground.  I don't know how

16   that actually happened.  They were standing, and

17   then they were on the ground.

18             Q.   And where were they within this

19   room or this waiting area when that happened?

20             A.   Well, as I stated, there is the

21   doorway entrance over here and then there is an

22   opening to go behind the desks and then there

23   was a half wall.  And there was a break in that

24   half wall where there was another kind of

1      doorway.  I don't think that there was a door

2      there, it was just an open doorway, like a

3      passway to pass between this break in the wall

4      and the offices, and in that open doorway.

5          Q.   Okay.  When Mr. Walker ended up on

6      the floor, did he hit any walls, the half wall

7      or any other wall on the way down?

8          A.   Not that I saw.

9          Q.   Did you see his body actually hit

10     the floor?

11         A.   In all the confusion, I can't say

12     that I actually saw his body hit the -- I know

13     everybody went down.

14         Q.   Did he go down face first?

15         A.   I don't -- I can't say whether he

16     went down face first.

17         Q.   You just don't remember or you

18     didn't see it?

19         A.   Like I said, there was a lot of

20     confusion, everybody went down together.  Whose

21     head hit where, whose body hit floor first, who

22     hit what, I don't know.  All three of them went

23     down together.

24         Q.   Once they all ended up on the

1  floor, who was on top?

2      A.   They were all level.  Mr. Walker

3  was in the middle, Officer Ballard was over here

4  and Officer Gordon was over here.  They were all

5  on the ground level.  I can't say that anybody

6  was on top.

7      Q.   Were they all on the ground level,

8  were they all face down or face up or a

9  combination of both, or were they on their

10  sides?  How would you describe it?

11      A.   I think Mr. -- I don't know.  I

12  don't know.  Officer Ballard I think was on his

13  side, and Mr. Walker was face down, and Officer

14  Gordon, I am not sure, he may have been also

15  face down.

16      Q.   In your report, Exhibit 3, you

17  indicated there at the bottom in your narrative

18  that you said as Officer Gordon took hold of

19  Mr. Walker's arm/hand, he immediately tensed up

20  and pulled his arm in close to his body.  Do you

21  remember that?

22      A.   Yeah, he did make an action when

23  he was grabbed ahold of, he did make an action

24  to tense up and pull towards his body.

1      Q.   All right.  And it says at this

2   point Mr. Walker was taken to the floor by

3   Officers Ballard and Gordon.  Do you see where

4   I'm reading?

5      A.   Yes.

6      Q.   You describe how they all ended up

7   on the floor, but you weren't sure how.  It

8   sounds like to me the day you wrote this, the

9   day after the incident, it was your impression

10  that the officers took him to the floor somehow.

11  Did something cause him to go down?

12     A.   Yes.

13     Q.   Just sitting here today, you can't

14  tell me what it was that they did that took him

15  to the floor to use your words?

16     A.   Right.  I wasn't involved in it,

17  they were the ones, that's why I wrote, they

18  took him to the floor.  I don't know how they

19  did it.

20     Q.   You also mention just in the

21  bottom of the paragraph just above that, for

22  further details relative to Officers Ballard and

23  Gordon's actions, refer to the original report

24  under this case number.

1          A.    Yeah.

2          Q.    Do you see that?

3          A.    Yeah.

4          Q.    You told me earlier that you have

5    never read the other reports; correct?

6          A.    Yes.

7          Q.    And I take it that means you had

8    not read their report or reports before you

9    wrote this report?

10         A.    Correct.

11         Q.    Correct?

12         A.    Correct.

13         Q.    So you are just deferring to the

14   other officers' report of whatever they put in

15   their report, you were willing to go with

16   that --

17         A.    Correct.

18         Q.    -- in terms of describing the

19   incident?

20         A.    I can't tell you what they did.

21         Q.    But you were there and saw what

22   they did.

23         A.    There was a lot of confusion.  I

24   witnessed what I told you I witnessed.

83

1          Q.    Okay.   I mean, did it occur to you

2     that they might not report accurately what

3     happened and that maybe you needed to review

4     what they said to see whether or not they were

5     telling the truth?

6          A.    No.

7          Q.    So without ever reading what they

8     wrote, you were content to say in your report,

9     I'm just going to go with whatever they say?

10         A.    No, I covered my actions in my

11    report.   I don't need to cover their actions,

12    they can cover their own actions.

13         Q.    All right.   What do you remember

14    happening to get back to the sequence of events

15    after all three men are on the floor, what

16    happened next as best you can recall?  You're on

17    his legs?

18         A.    I'm on his legs and I am holding

19    his legs down.   He is still able to move me

20    while being on his legs.   I'm trying to do the

21    best that I can from preventing him --

22         Q.    Sorry.   What part of his legs were

23    you on, from the knee down to the foot?

24         A.    I believe I was on the knee down.

1          Q.   Were his knees down on the floor?

2          A.   Yes.  But he was still able to

3     move.

4          Q.   So he's on his stomach now, he's

5     on his front side?

6          A.   Yes.

7          Q.   Is he face down?

8          A.   Yes.

9          Q.   You're on the bottom of his legs

10    behind his knees?

11         A.   Yes.

12         Q.   With your upper body?

13         A.   My whole body.

14         Q.   Your whole body.

15              The other two officers are up at

16    the top of his body?

17         A.   Yeah, Ballard's legs, Officer

18    Ballard's legs were down here, Gordon, I'm not

19    -- he was this way, too, but like I said, at

20    some point Gordon, Officer Gordon tried to -- I

21    don't know what was going on, but he was trying

22    to flip his leg or do something, and he hit me.

23    And I said don't worry about it, and I ducked

24    down further to avoid being in his way.

1     Q.  And could you see what Officers

2   Ballard and Gordon were doing at that point with

3   their arms?

4     A.  I don't recall exactly, there was

5   tussling going on, and I don't recall exactly

6   what they were doing.

7     Q.  Did you see either one of those

8   officers punch Mr. Walker in the back of his

9   head with his fist or his hand?

10     A.  Officer Gordon at one point did

11   strike him, strike Mr. Walker somewhere in the

12   upper body.  I don't know if it was in the head,

13   the back of the neck, the shoulders or what, he

14   did punch him.

15     Q.  With his --

16     A.  Bare hand.

17     Q.  With his bare hand?

18     A.  With his fist.

19     Q.  With his right fist?

20     A.  I don't know which fist it was.

21     Q.  You were showing me the right

22   fist.

23     A.  I'm sorry, I just said a fist.  I

24   don't know which hand it was.

A-181

1          Q.    You saw him punch him one time?

2          A.    I know it was more than one time.

3    I don't know how many times.

4          Q.    Do you know if it was as many as

5    eight or nine times?

6          A.    I wouldn't be comfortable saying

7    that many times, but he did punch him.

8          Q.    Was it possible it could be that

9    many times?

10          A.    It could be possible.

11          Q.    What about Officer Ballard, did

12    you see Officer Ballard strike Mr. Walker with

13    either of his hands and fists?

14          A.    No.

15          Q.    Did you see either officer strike

16    Mr. Walker with handcuffs?

17          A.    No.

18          Q.    Did you see either officer use or

19    attempt to use handcuffs in any way during the

20    struggle?

21          A.    Just to handcuff him.  Once they

22    had him, his hands behind his back, they were

23    able to handcuff him.

24          Q.    Okay.  How long did it take for

```
 1      the officers to be able to do that, to handcuff

 2      him?

 3                    A.    Minutes.

 4                    Q.    Minutes?

 5                    A.    Minutes.

 6                    Q.    Was Gabe present during this

 7      event?

 8                    A.    I didn't pay attention to where he

 9      was.  I don't know where he was.

10                    Q.    If he were to say that he

11      witnessed the entire event, would you have any

12      reason to dispute that?

13                    A.    If he were to say that?

14                    Q.    Yes.

15                    A.    I wouldn't have any reason to

16      dispute that.

17                    Q.    What about the white female that

18      you had seen walking in and out, did she witness

19      this event?

20                    A.    No.  I didn't pay attention to

21      people.

22                    Q.    If she were to testify under oath

23      that she witnessed this entire event, would you

24      have any reason to dispute that?
```

1              A.    No.

2                    Q.    If Gabe and/or the white female

3        that you saw working at Connections were to

4        testify that they witnessed the officers

5        repeatedly beating Mr. Walker in the back of the

6        his head with a fist and beating him in the back

7        of the head repeatedly with a pair of handcuffs,

8        would you have any reason to dispute that?

9              A.    Yes.

10                   Q.    Did either of the officers use any

11       mace on Mr. Walker?

12             A.    I, from recollection I believe

13       that's why he went to the hospital was because

14       they used our pepper spray finally, and our

15       protocol is to take them to the hospital and

16       have their face washed.

17                   Q.    Is that your understanding as to

18       why he was taken to the hospital because of the

19       pepper spray?

20             A.    Yes.

21                   Q.    For no other reason than that?

22             A.    Correct.

23                   Q.    Do you recall which officer used

24       pepper spray?

1          A.   No, I don't.

2          Q.   Was pepper spray used before or

3    after Mr. Walker was handcuffed?

4          A.   Before.

5          Q.   Was Mr. Walker saying anything

6    during this event?

7          A.   Not that I recall.

8          Q.   Were the officers saying anything

9    to him, the other two officers, or you, saying

10   anything to Mr. Walker during the event?

11         A.   There was something being said.  I

12   don't recall what.  And I don't know if it was

13   directed towards Mr. Walker or towards each

14   other, like that they were trying to tell one

15   what the other was going to do.  I don't recall

16   exactly.  There was talk, but I don't know what

17   it was.

18         Q.   After Mr. Walker was handcuffed,

19   what happened next?  Did he continue to struggle

20   at that point?

21         A.   No, he was brought on his feet and

22   then escorted out.

23         Q.   When he was brought to his feet,

24   did you have an opportunity to observe his face?

1          A.   We were all kind of shaken up.

2    Did I observe his face?  I don't know that I

3    actually looked right at his face.

4          Q.   Did you notice whether there was

5    any blood on the floor or in the vicinity of

6    where this event occurred?

7          A.   I didn't observe any blood

8    anywhere in the vicinity.

9          Q.   Did you observe any other body

10   fluids on the floor where the incident had

11   occurred?

12         A.   Well, pepper spray is going to

13   cause your -- you start tearing up and mucus

14   membranes to release.  But I couldn't recall if

15   Mr. Walker -- the pepper spray, the way it

16   disseminates out -- I think everybody was kind

17   of coughing a little bit.  I think Gordon,

18   Ballard and Mr. Walker were all trying to, you

19   know, trying to clear their --

20         Q.   After Mr. Walker got to his feet,

21   what happened?

22         A.   They escorted him out of the

23   building and down to their police car and put

24   him in the back seat and took him to the

```
 1    hospital.

 2                    MR. MILI:  If I can interrupt you,

 3    we have gone another full hour.  I want to check

 4    with the witness and see if she needs a break.

 5                    MR. LANDON:  I'm almost down.  If

 6    you need a break, that's fine, but I'm almost

 7    down.

 8            A.    No, I'm fine then.

 9    BY MR. LANDON:

10            Q.    Did you accompany the other

11    officers and Mr. Walker to the hospital or not?

12            A.    No.

13            Q.    Do you know what hospital they

14    took him to?

15            A.    Can I refer to my report?

16            Q.    Sure.  It says Wilmington

17    Hospital.  Is that where you took him?

18            A.    Yes.

19            Q.    Is that where they took him?

20            A.    Yes.

21            Q.    Did you have any further dealings

22    with Mr. Walker after the other officers took

23    him from Connections to the hospital?

24            A.    No.
```

A-187

1         Q.   Did you have any conversations

2    with either of the other two officers either

3    later that day or the next day before their --

4    before Corporal Gordon wrote his report?

5         A.   I don't recall.  I may have asked

6    how everybody was.  Yes, I did, because Ballard,

7    Officer Ballard was injured during that.  And I

8    wanted to ask how Officer Ballard was as well as

9    what happened to Officer Gordon and Mr. Walker,

10   make sure everybody was okay.

11        Q.   Did you ever see Mr. Walker during

12   the -- I'll call it a scuffle for lack of a more

13   descriptive term, during the event or the

14   scuffle that occurred inside of Connections, did

15   you ever see Mr. Walker wrap his arms around

16   either of the other officer's heads in a bear

17   hug type fashion?

18        A.   Not that I can recall, no.

19        Q.   Did you ever see either of the

20   officers head butt Mr. Walker in the head with

21   their head?

22        A.   No.

23        Q.   Did you hear other of the officers

24   warn Mr. Walker that they were about to use

1    pepper spray on him if he didn't comply?

2              A.   Like I stated, there was talk and

3    I'm not sure exactly what that -- what that talk

4    was.

5              Q.   Do you know whether Mr. Walker was

6    ever charged with a crime as a result of this

7    incident?

8              A.   I don't -- no, I don't know.  If I

9    look at my report right now, I can see that he

10   was charged with offensive touching.  Well,

11   that's what this report is.

12             Q.   Have you been the subject of any

13   disciplinary action while employed by the

14   Wilmington Police Department for any reason?

15             MR. MILI:   Before you answer that,

16   for the record we object to this line of

17   questioning under the Law Enforcement Officers

18   Bill of Rights.  You can answer it, but your

19   answer shouldn't for the record be deemed a

20   waiver of any rights under the Law Enforcement

21   Officers Bill of Rights?

22             A.   Yes.

23             Q.   Can you tell me how many times?

24             A.   Three.

A-189

1            Q.    Okay.    Have any of those occasions

2      dealt with any allegation of the use of

3      excessive force?

4            A.    No.

5            Q.    Have any of those disciplinary

6      actions resulted from any allegations of failure

7      to report other officers uses of excessive force

8      or alleged uses of excessive force?

9            A.    No.

10            Q.    Have any of those instances dealt

11      with the manner in which you may have handled

12      the transportation of a mentally ill patient to

13      a hospital?

14            A.    No.

15            Q.    Have any of those instances

16      involved the manner in which you dealt with a

17      mentally ill individual under any circumstance?

18            A.    No.

19            MR. LANDON:    All right.    Thank you

20      very much.

21            MR. MILI:    You have the choice to

22      either read the transcript once it's finished

23      and sign it or if you trust him to take

24      everything down accurately, you can waive

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697    FAX (302) 658-8418

1    reading and signing.

2              What that means is when the

3    transcript -- if you want to read the

4    transcript, you won't be able to change your

5    answers, but if you see a typo, for instance if

6    you said car and he wrote down cat, you can make

7    note of something like that.  So it's up to you,

8    whatever you want to do, if you trust him or if

9    you want to read it, that's up to you.

10             THE WITNESS:  What do you suggest?

11             MR. MILI:  Go ahead and read it.

12   Let her read and sign.

13             (Deposition ended at 12:27 p.m.)

14

15

16

17

18

19

20

21

22

23

24

96

1

2

3

4

5

6

7

8          REPLACE THIS PAGE

9

10

11         WITH THE ERRATA SHEET

12

13

14         AFTER IT HAS BEEN

15

16

17         COMPLETED AND SIGNED

18

19

20         BY THE DEPONENT.

21

22

23

24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

1    State of Delaware    )
                          )
2    New Castle County    )

3

4

### CERTIFICATE OF REPORTER

5

6        I, Dale C. Hawkins, Registered Merit
Reporter and Notary Public, do hereby certify that
7  there came before me on the 3rd day of October, 2006,
the deponent herein, KAREN MARIE BUHRMAN, who was
8  duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked
9  of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter
10 transcribed by use of computer-aided transcription
and computer printer under my direction.

11

         I further certify that the foregoing is a
12 true and correct transcript of the testimony given at
said examination of said witness.

13

         I further certify that I am not counsel,
14 attorney, or relative of either party, or otherwise
interested in the event of this suit.

15

16

17  _____
          Dale C. Hawkins, RMR
18        Cert No. 112-RPR

19

20

21 DATED:  _____

22

23

24

                                        A-193

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -



ALICE WALKER, individually :
and as guardian of her      :
husband, GERALD H. E.       :
WALKER, an incompetent      :
person,                     :

       Plaintiff,        : No. 06-366 JJF
                 :
     v.                    :
                 :
CITY OF WILMINGTON; CITY OF: JURY TRIAL DEMANDED
WILMINGTON POLICE           :
DEPARTMENT; OFFICER SHAWN    :
GORDON, individually and as:
agent of the CITY OF        :
WILMINGTON POLICE           :
DEPARTMENT; OFFICER MICHAEL :
BALLARD, individually and   :
as agent of the CITY OF     :
WILMINGTON POLICE           :
DEPARTMENT; OFFICER KAREN    :
BUHRMAN, individually and   :
as agent of the CITY OF     :
WILMINGTON POLICE           :
DEPARTMENT,                  :
                 :
       Defendants.       :

- - -

      Deposition of **OFFICER SHAWN GORDON,** taken
pursuant to notice, before CAROL DiSERAFINO,
Professional Reporter and Notary Public, duly
authorized to administer oaths, on **TUESDAY, JANUARY 9,
2007, at 10:03 a.m.,** held at the offices of Murphy
Spadaro & Landon, 1011 Centre Road, Suite 210,
Wilmington, Delaware.  There being present:

A-194

2

A P P E A R A N C E S:

    ROGER D. LANDON, ESQ.
    PHILIP T. EDWARDS, ESQ.
     MURPHY SPADARO & LANDON
    1011 Centre Road, Ste. 210
    Wilmington, Delaware  19805
     on behalf of Plaintiff


    ALEX J. MILI, JR., ESQ.
     CITY OF WILMINGTON LAW DEPARTMENT
    City/County Building, 9th Fl.
    800 North French Street
    Wilmington, Delaware  19801
     on behalf of Defendants

A-195

3

## INDEX TO TESTIMONY

DEPOSITION OF:                                    PAGE

**OFFICER SHAWN GORDON**

     Direct by Mr. Landon                           4

- - -

A-196

4

1               **OFFICER SHAWN GORDON**, being first

2          duly sworn/affirmed according to law, was

3          examined and testified as follows:

4                              -  -  -

5    BY MR. LANDON:

6          Q.      State your full name, please.

7          A.      Shawn, S-H-A-W-N, Gordon, G-O-R-D-O-N.

8          Q.      Your date of birth?

9          A.      June 2nd, 1971.

10         Q.      By whom are you currently employed?

11         A.      Wilmington Police Department.

12         Q.      In what capacity?

13         A.      Patrolman.

14         Q.      How long have you been employed by the

15   Wilmington Police Department?

16         A.      Ten years.

17         Q.      What did you do before that?

18         A.      Corrections.

19         Q.      Where?

20         A.      Pennsylvania.  Bucks County.

21         Q.      How long?

22         A.      Little over six months.

23         Q.      Were you an officer in a prison

24   somewhere?

A-197

Officer Gordon - Direct                    5

1        A.    Yes.

2        Q.    What did you do before that?

3        A.    College.

4        Q.    Where did you go to college?

5        A.    Penn State.

6        Q.    Did you get a degree?

7        A.    Uh-huh.  Yes.

8        Q.    What was your degree in?

9        A.    Bachelor of Science, criminal justice.

10       Q.    What year was that?

11       A.    '94 or '93.  Somewhere around there.

12       Q.    How tall are you?

13       A.    Five-nine.

14       Q.    What's your weight?

15       A.    228.

16       Q.    Was that about the same weight in July

17   of '05?

18       A.    Yes.

19       Q.    Have you ever had your deposition taken

20   before?

21       A.    No.

22       Q.    Have you ever been sued before?

23       A.    No.

24       Q.    Have you ever been the subject of any

1    disciplinary action by the City of Wilmington Police

2    Department in connection with excessive force

3    allegations?

4           A.      No.

5           Q.      Did you do anything to prepare for your

6    deposition today?

7                   MR. MILI:   Before you answer, he's

8    instructed not to answer any questions about

9    conversations you've had with the attorney from the

10   City Solicitor's Office.

11   BY MR. LANDON:

12          Q.      I'm not entitled to inquire into any

13   privileged communications that you've had with the

14   City Solicitor's Office, but I am entitled to know

15   what, if any, preparation in general you did for

16   today.

17          A.      Other than talking to Mr. Mili, just

18   reading the report.

19          Q.      Okay.  Which report did you read?

20          A.      Mine.

21          Q.      Can I take a look at that.

22                  This is the report that you authored on

23   7/11/05 concerning the Walker incident; correct?

24          A.      Yes.

A-199

Officer Gordon - Direct                    7

1          Q.      Did you review any other documents other
2     than this two-page report?

3          A.      No.

4          Q.      Have you at any time before today
5     reviewed any deposition transcripts of any other
6     parties or witnesses in the Walker case?

7          A.      No.

8          Q.      Have you at any time before today,
9     whether or not it was in preparation for this
10    deposition, have you reviewed any other documents that
11    have any bearing on the Walker lawsuit?

12         A.      No.

13         Q.      Prior to today but after the lawsuit was
14    filed have you had any conversations with Karen
15    Buhrman about the allegations in the lawsuit, the
16    Walker lawsuit?

17         A.      Yes.

18         Q.      On how many occasions have you had
19    discussions with her about the lawsuit?

20         A.      Maybe twice.

21         Q.      Do you recall when?

22         A.      No.

23         Q.      What was the substance of those
24    conversations?

A-200

1        A.      Just talking about the incident.

2        Q.      Did she approach you or did you approach

3    her or how did it come up?

4        A.      We bumped into each other in the back

5    hallway.  She asked if I had given my deposition and I

6    said no, I have not.  She said she gave hers and just

7    started talking about the incident.

8        Q.      Did she relate to you -- she said she

9    had already given her deposition at that time?

10       A.      Yes.

11       Q.      Did she relate to you what she said in

12   her deposition about what happened?

13       A.      Other than just talking about the

14   incident.  Nothing -- I mean --

15       Q.      Did she bring forward to your attention

16   any information at either of these two times when she

17   talked to you about the incident that was new or

18   different from any information that you either had or

19   recalled about how the incident had happened?

20       A.      No.

21       Q.      Did she and you have any disagreements

22   when you spoke on these two occasions about any of the

23   facts that you two collectively recalled about the

24   incident?

A-201

```
1          A.      No.

2          Q.      Do you remember any of the specifics

3   about what you actually talked about in terms of what

4   actual facts you and she talked about regarding the

5   incident?

6          A.      Just what she remembered and just what I

7   remembered.

8          Q.      Did she remember anything in addition to

9   what you remembered?

10         A.      Not that I recall.  No.

11         Q.      Did she remember anything that you

12  didn't remember?

13         A.      No.

14         Q.      Can you tell me sitting here today what

15  she actually told you she remembered?

16         A.      Just what she wrote in her report and

17  what I basically wrote in my report about the

18  incident.

19         Q.      Did you ever read her report?

20         A.      Back in July of 2005.

21         Q.      Okay.  Did you read her report after you

22  wrote your report?

23         A.      No.

24                 After I wrote my report?  Yeah.  Back i.
```

1    2005.

2            Q.      So your report was already written when

3    you read her report.

4            A.      Mine was already written.

5            Q.      Did you go back and change your report

6    in any respect after reading her report?

7            A.      No.

8            Q.      Did you read -- strike that.

9                    When was the last time you spoke to

10   Karen Buhrman about what happened in the Walker

11   incident in July of '05?   In other words, how recently

12   did you talk to her the last time, if you recall?

13           A.      Several months ago.   I don't remember

14   exactly when it was.

15           Q.      What about Michael Ballard?   Same

16   questions about Michael Ballard.

17                   Have you spoken to Michael Ballard since

18   the lawsuit was filed before today about what happened

19   on July 11, '05?

20           A.      Just recalling the event, the events

21   that happened.

22           Q.      How many times have you spoken to him

23   since the lawsuit was filed about the incident?

24           A.      Maybe three times.

A-203

```
 1            Q.      And when was the last time you spoke to
 2   him?
 3            A.      I don't remember.  Several months ago.
 4            Q.      Did you talk to him after he gave his
 5   deposition in this case?
 6            A.      Yes.  I don't remember exactly how far
 7   after, but it was sometime after his.
 8            Q.      And when you talked to him sometime
 9   after he gave his deposition in the case, did you talk
10   about the actual incident itself, the Walker incident?
11            A.      Just about what we remembered about it
12   and what transpired.
13            Q.      Did he give you any comments about
14   anything at all about his deposition and what he said
15   or what he was asked?
16            A.      Just some little things had come up
17   during his deposition about some incidents.  That was
18   pretty much about it.
19            Q.      About incidents other than the Walker
20   incident?
21            A.      Yes.
22            Q.      What can you tell me that he told you
23   about that?
24            A.      Just talked about some story that he
```

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697    Fax (302) 658-8418

1    heard about what happened in the locker room.

2                  MR. MILI:  For the record, he's

3    referring to you asked about Shawn punching the locker

4    and the other locker falling down.

5                  MR. LANDON:  For the record, I didn't

6    ask that.  He volunteered that information, because I

7    didn't know it.

8    BY MR. LANDON:

9         Q.     But is that what you're talking about?

10        A.     Yes.

11        Q.     All right.  Can you tell me about that

12   incident.  Did it happen?

13        A.      It was just a very heated argument

14   between myself and other officers and it was two

15   free-standing lockers.  They were not bolted together.

16   They were not bolted to the floor.

17        Q.      You got mad with another officer and

18   punched a locker that wasn't bolted down?

19        A.     Shoved a locker.

20        Q.     When did that happen?

21        A.      That was a long time ago.  I don't

22   remember exactly when.

23        Q.      Did Officer Ballard talk to you about

24   the content of your report in this case, the Walker

1    case?

2          A.      No.

3          Q.      Did he mention anything to you about

4    certain information that he testified to that wasn't

5    in your report, by any chance?

6          A.      As far as I know, no.

7          Q.      Why do you write reports like the report

8    that you have in front of you?  What's the purpose of

9    that?

10         A.      Just documentation of what went on, what

11   transpired.

12         Q.      And why -- sounds like a stupid

13   question, but I need to know from you why you need to

14   document what goes on in an event.

15         A.      So that it's on record.  It's an

16   official document.  It's basically recordkeeping.

17         Q.      Sometimes lawsuits and/or criminal

18   prosecutions result as a result of incidents that

19   you're involved in.  True?

20         A.      Correct.

21         Q.      And you need the report to go back to so

22   that you have documentation of what actually happened.

23         A.      Correct.

24         Q.      At least your version of what actually

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697    Fax (302) 658-8418

1    happened.

2            A.      Yes.

3            Q.      And would it be a fair statement that

4    it's important to put all of the most important, most

5    relevant information in those reports concerning the

6    incident?

7            A.      Yes.

8            Q.      And in an excessive force or in a claim

9    that eventually results in an excessive force claim,

10    it's important to have documentation of precisely why

11    force was used and what force was used; correct?

12            A.      Yes.

13            Q.      And that's something that you, I take

14    it, were trained to do before you became a Wilmington

15    police officer during your training period.  I guess

16    technically after you became an officer but while you

17    were being trained.  Fair statement?

18            A.      Yes.  We do report writing in the

19    Academy and we do this (pointing to report) on a daily

20    basis.

21            Q.      And I take it in the ten years that

22    you've been a police officer -- I wouldn't want to

23    guess, but why don't you tell me.  Give me your best

24    estimate about how many reports like this you've

1   written.

2           A.      In ten years?  Thousands.

3           Q.      Right.

4                   When did you write this report?

5           A.      I wrote it on July 11, 2005, 10:21 in

6   the morning.  This report was approved by my

7   supervisor the following day at 10 o'clock; 10:06.

8           Q.      Well, you're looking at the original

9   Occurrence Date and Time of 7/11/05, 10:21; correct?

10          A.      Yes.

11          Q.      Is that when the incident happened or

12  when you wrote your report?

13          A.      As far as I can tell that was the date

14  of the incident.

15          Q.      Is there any information on this report

16  that actually indicates when you wrote it?

17          A.      The reported Date and Time.

18          Q.      Where?

19          A.      The very top.  Um, Page 1, Reported Date

20  and Time, Monday, July 11, 2005, 10:21.

21          Q.      Are you reading in the block that says

22  Original Occurrence Dates and Times?

23          A.      (No response).

24          Q.      Let me look at your report.

1          A.      Next block over is the same.

2          Q.      I'm sorry.  I'm looking at the wrong

3    report.  My mistake.

4                  Would you look at these two reports and

5    confirm for me that what I've got marked at the top as

6    Burhman No. 2 is a copy of the document that you

7    brought with you today.

8          A.      It's the same one I have.

9          Q.      Okay.  Thank you.

10                 In the block at the very top of the page

11   on the lefthand corner next to the block that says

12   Page 1, it says Report Date, 7/11/05; correct?

13         A.      7/11/2005.

14         Q.      And then in the block underneath of

15   those two blocks it says Reported Date and Time,

16   Monday, 7/11/2005, 10:21; correct?

17         A.      Yeah.  Reported Date, 7/11/2005.

18         Q.      Does that block generally refer to the

19   time that the incident was reported to the police

20   department?

21         A.      The second block?

22         Q.      Yes.

23         A.      Yes.

24         Q.      Okay.  So if we look at that block then,

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1    this incident was reported to the Wilmington Police

2    Department at 10:21 a.m. on 7/11/05; correct?

3            A.        Approximately.  Yes.

4            Q.        All right.  And then the block all the

5    way on the right says Occurred Monday, 7/11/2005,

6    10:21, meaning that's roughly when the incident

7    occurred.

8            A.        Correct.

9            Q.        All right.  Where does it say on this

10   report what time or -- what time --

11                     I see where it says the date 7/11/05,

12   but does it say anywhere on the report what time you

13   wrote the report?  I mean, obviously you didn't write

14   the report until after the event occurred; right?

15           A.        Sometime after that "report" (sic).

16           Q.        Right.  Did you write --

17           A.        The same day.

18           Q.        And the event at least took 15 minutes,

19   didn't it?

20           A.        Yes.

21           Q.        Took a couple of hours in fact, because

22   you had to transport the guy to two hospitals

23   afterward.

24           A.        Transported to one, transported him to

1    another.

2         Q.    Did you write the report after all of

3    that stuff was done?

4         A.    Mm-hmm.  Yes.

5         Q.    Okay.  My question is, do you know when?

6    Was it later that afternoon?  That evening?  Right

7    after you were finished with him?  Do you remember?

8         A.    When we were finished with him, he was

9    no longer in our custody, the report was written.

10        Q.    Do you write that on a laptop somewhere

11   wherever you happen to be?

12        A.    Yes.  In my car.

13        Q.    All right.  And was Officer Ballard

14   physically in your presence when you were writing this

15   report on your laptop?

16        A.    In the hospital.

17        Q.    He was in the hospital.  Being treated?

18        A.    Yes.

19        Q.    Okay.  So you weren't sitting next to

20   him somewhere writing the report?

21        A.    I eventually did come into the same room

22   he was in to finish up some last-minute things.  I had

23   the computer with me.

24        Q.    Did he review your narrative, your

1    investigative narrative, in this report --

2            A.    I don't recall.

3            Q.    -- at about the time that you wrote it?

4            A.    I don't recall.

5            Q.    Would it have been your usual practice

6    to have your partner at the time review an

7    investigative narrative and report such as this?

8            A.    Usually.  Yes.

9            Q.    You just can't recall in this instance

10   whether he did or didn't.

11           A.    Correct.

12           Q.    Reading the report, your report, in

13   preparation for today, when did you do that?  Was that

14   today or was that yesterday or last week?

15           A.    Today.

16           Q.    Today?  All right.

17                 Did reading the report refresh your

18   recollection about this incident in any respects?

19           A.    A little bit better than in the past.

20   Yes.

21           Q.    Do you have any recollection of any

22   details of this incident that are not included in this

23   particular report?

24           A.    No.  What I have in here is the way I

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1    recall it.

2         Q.    Okay.  And are you satisfied that -- I

3    want to make sure we're clear on this.  Are you saying

4    that your entire recollection of the details of how

5    this incident happened are or is contained within the

6    investigative narrative of your report?

7         A.    Yes.

8         Q.    Okay.  Let me shift gears a little bit.

9    In the time that you've been employed by the

10   Wilmington Police Department up to and including

11   July 11 of '05, were you ever provided with any

12   training as to how to deal with mentally-handicapped

13   individuals in terms of transporting them to a

14   psychiatric facility?

15        A.    Our policy is anybody going into the

16   back of our car has to be secured.  Connections calls

17   us to transport somebody, we have to do the transport.

18        Q.    Okay.  I appreciate that answer.  I'm

19   not sure whether or not it answers my question though.

20             What I'm trying to get at is, in the

21   time that you've been employed by the Wilmington

22   Police Department, has the Department provided you

23   with any training as to how, other than what you've

24   just told me, as to how to go about transporting

1    mentally-handicapped individuals from one facility to

2    another other than that they have to be handcuffed and

3    put in the back of the car?

4          A.    What are you trying to get at?  I

5    don't --

6          Q.    Have you ever taken -- have they ever

7    given you any seminars, any hands-on training, any

8    book training, any on-the-job training about how you

9    as a Wilmington police officer are supposed to go

10   about the task of transporting a mentally-handicapped

11   individual from one facility to another?

12         A.    You put them in handcuffs and you place

13   them in the vehicle.

14         Q.    That's all you've been told?

15         A.    I mean, I don't -- I mean, there's no --

16   they have to be secured in the car.  As far as dealing

17   with mentally-handicapped individuals, there was

18   topics in the Academy class dealing with what to

19   expect from, you know, mentally-handicapped persons.

20   That's pretty much about it.  I don't recall any

21   ongoing training with it.

22         Q.    Well, what do you recall about your

23   Academy training in that regard?

24         A.    We go there.  They have to be

1   transported.  We have to transport them.  They have to

2   be secured.

3        Q.     Were you given any training about what

4   it means to be diagnosed as paranoid schizophrenic?

5        A.     In my experience it was somebody dealing

6   with that type of mental illness, that they're

7   paranoid about things.  Their perception of what we

8   feel is reality is different from ours.  They feel

9   they're being followed by people.  I mean, other than

10  that, I don't know too much about it.

11       Q.     Did they give you any training as to any

12  special techniques that you might think about using

13  when trying to persuade someone with that sort of a

14  mental disorder to allow themselves to be handcuffed

15  and transported?

16       A.     You put the handcuffs on 'em, you put

17  'em in the car.

18       Q.     Well, obviously your approach didn't

19  work very well in this case, did it?

20            MR. MILI:  Objection to form.

21  BY MR. LANDON:

22       Q.     You can answer it.

23       A.     I'm sorry?

24       Q.     Your approach in this particular case

1    didn't work very well, did it?

2         A.    Well, we told him what we have to do

3    several times.  He kept saying, "I'm not going

4    anywhere."  We kept telling him this is what we have

5    to do.  We have no choice.  "You have to go.  We have

6    to put you in handcuffs."  Even a sane person who

7    doesn't want to go anywhere is gonna do the same

8    thing.  "I'm not going anywhere."  You have to go

9    hands-on at some point in time.

10        Q.    Were you given any training by the

11   Wilmington Police Department along the lines that you

12   have to treat somebody with a known mental disorder

13   any differently than someone without a known mental

14   disorder in terms of trying to transport them from one

15   facility to another involuntarily?

16        A.    We responded there.  We were told he had

17   to be transported to another facility.  We advised

18   Mr. Walker that we had to do that and we had to

19   handcuff him.  This is the way it has to be done.  We

20   told him that.  I don't know any way other to

21   sugarcoat something like that.  "You have to be

22   transported.  We have to handcuff you."

23        Q.    What experience, if any, did you have

24   transporting mentally ill people from one facility to

A-216

1    another prior to July 11 of '05?

2         A.      Connections calls us on a regular basis

3    to transport people.  I can't recall the number of

4    times I've gone to Connections to transport people

5    from that facility to another facility.

6              I've transported people from their

7    houses that had mental health issues, from their

8    residences, to be evaluated at Wilmington Hospital,

9    and the same thing.  "We have to go to the hospital.

10   You have to talk to somebody.  We have to put you in

11   our car.  We have to handcuff you."

12        Q.      Can you give me an estimate as to how

13   many times you've done that in your career prior to

14   July 11, '05?  Are we talking half a dozen? ... or a

15   hundred? ... or something in between?

16        A.      Probably hundreds.  We deal with this on

17   a regular basis in our line of work.

18        Q.      Okay.  Is it something that you do as

19   often as at least once a week?

20        A.      I recall Officer Ballard and myself in a

21   matter of one week having to deal, on a five-day

22   shift, every day of that shift we were called to deal

23   with somebody with mental health issues and we had to

24   transport those subjects from their houses to

1   Wilmington Hospital to be evaluated and then from

2   Wilmington Hospital to other facilities.

3           Q.      Okay.  And in general would the steps

4   that you would follow in doing that be what you've

5   described earlier?  You'd tell the person they're

6   gonna have to be handcuffed?

7           A.      Yes.

8           Q.      And then --

9           A.      "We have to go to the hospital.  You've

10  gotta be transported somewhere else.  You have to be

11  handcuffed in our car."

12          Q.      Up until July 11 of '05 had you ever had

13  a situation where physical force became necessary in

14  completing your task of transporting someone?

15          A.      In a situation like that?

16          Q.      Yes.

17          A.      I don't recall any other time I had.

18          Q.      Who was your immediate superior on

19  July 11, '05?

20          A.      Sergeant Kane.

21          Q.      And what's the purpose of Sergeant Kane

22  reviewing your report and signing off on it?

23          A.      In a situation like this he was also the

24  Sergeant that responded out to do the use-of-force

1    investigation, meaning he comes out, talks to us about

2    what happened, talks to the defendant or whoever, the

3    person we have in our custody, talks to him, goes back

4    out to where the incident occurred, talks to people

5    out there as to what happened.  He reviews our report,

6    that it's accurate with what he was able to find, and

7    he usually writes a separate report saying this is

8    what happened, this is who I talked to.

9         Q.    Do you know if he wrote a separate

10   report in this case after doing his use-of-force

11   investigation?

12        A.    As far as I know he should have.  Yes.

13        Q.    Have you ever seen it?

14        A.    No.

15        Q.    Do you recall Sergeant Kane actually

16   talking to you about what happened in this instance?

17        A.    I recall him coming out to the hospital,

18   we explained to him what went on, he went into the

19   room with Mr. Walker and had a conversation with him.

20   What came of that I don't know.

21        Q.    Which hospital are we talking about?

22        A.    Wilmington.

23        Q.    Did Sergeant Kane talk to you and

24   Officer Ballard?

A-219

Officer Gordon - Direct                 27

1          A.      Yes.

2          Q.      Did he talk to you separately or

3    together?

4          A.      Separately.

5          Q.      Were you present when Sergeant Kane

6    talked to Mr. Walker?

7          A.      Outside the room.  The door was shut.

8          Q.      Did you hear what he was saying?

9          A.      Nope.

10         Q.      Do you know how much time he spent with

11   Mr. Walker?

12         A.      I don't recall.

13         Q.      Did Sergeant Kane ever talk to you about

14   what Mr. Walker told him?

15         A.      No.

16         Q.      Did Sergeant Kane ever talk to you about

17   what Officer Ballard may have told him?

18         A.      No.

19         Q.      Do you know whether Sergeant Kane talked

20   to Officer Buhrman in conjunction with his

21   use-of-force investigation?

22         A.      He would have during the course of that.

23   I don't know when he talked to her.

24         Q.      Do you know whether Sergeant Kane went

Hawkins Reporting Servi__
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1  back to Connections to talk to anyone there?

2          A.      That is procedure.  I don't know who he

3  talked to back there.

4          Q.      Did any individuals who were present at

5  Connections either as employees or patients or others

6  witness what happened between you, Officer Ballard,

7  Officer Buhrman and Mr. Walker?

8          A.      Yes.  There were people present.

9          Q.      Do you know who they were?

10         A.      No.

11         Q.      Can you describe generally what they

12  looked like?

13         A.      I don't even recall who exactly was

14  there.

15         Q.      Do you recall how many people witnessed

16  what happened?

17         A.      No.

18         Q.      Do you typically receive a copy of the

19  use-of-force investigation report that you say

20  typically is created after a use-of-force

21  investigation is done?

22         A.      Depends on the supervisor.  I've worked

23  for many different sergeants.  Some sergeants do do

24  that, give you a copy of what they wrote; other

1   supervisors don't.  I don't recall Sergeant Kane.

2   That was the normal practice of his.

3          Q.     Had you already completed your written

4   report when Sergeant Kane talked to you?

5          A.     No.

6          Q.     Do you recall precisely what you told

7   Sergeant Kane about what happened?

8          A.     What I have in the report.

9          Q.     Did he talk to you before he talked to

10  Mr. Walker?

11         A.     I believe so.

12         Q.     Did he talk to Officer Ballard before he

13  talked to Mr. Walker?

14         A.     I believe so.

15         Q.     Did he talk to you again after he talked

16  to Mr. Walker?

17         A.     Not about the incident.

18         Q.     Do you recall him telling you that he

19  was gonna go back over to Connections and talk to

20  whomever he could find over there?

21         A.     I believe so.  He made a comment that he

22  was going back over there.  It's usually the way it

23  works.

24         Q.     Okay.  Have you been back to Connection

1  to do any other transport tasks since 7/11/05?

2          A.      No.   I was transferred to a different

3  unit and that's not part of our -- we're not regularly

4  on the streets.

5          Q.      How long were you and Officer Ballard

6  partners after 7/11/05?

7          A.      Till that December when I was

8  transferred.

9          Q.      And where were you transferred to?

10         A.      Community Policing.

11         Q.      Which means what?  What do you do?

12         A.      I'm a direct contact for a specific

13  neighborhood.  Deal with any type of community issues

14  that reside in that particular area.

15         Q.      What neighborhood is that now?

16         A.      14th patrol district.

17         Q.      Which is where?

18         A.      North of the Brandywine River, west of

19  Market.

20         Q.      Without looking at the document that you

21  have in front of you there, why don't you tell me your

22  best recollection of the events of 7/11/05 involving

23  Mr. Walker from your first involvement until you write

24  your report.

A-223

1           A.      We responded to Connections.  Officer

2     Buhrman was already there.  She relays to us that

3     Mr. Walker needs to be transported to another facility

4     and he does not want to go.

5                   My partner and I approach Mr. Walker and

6     advise him of what we have to do, what needs to be

7     done.  Mr. Walker's response is, "I didn't do

8     anything.  I'm not going anywhere."

9                   Tried to talk to him several times.

10    "Let's just get this -- you have to go.  We have to

11    take you.  We have to put you in handcuffs."  You

12    know, "Let's just make this as easy as we possibly

13    can."

14                  "I'm not going anywhere.  You're gonna

15    have to make me go."  That verbal exchange went on for

16    couple minutes, at which point my partner and I made

17    the decision well, we're gonna have to try to go

18    hands-on and try to force this subject in handcuffs.

19                  Once we did that, he tensed up, kinda

20    pulls away from us and tells us again, "I didn't do

21    anything."

22                  My instinct was well, I'm gonna get him

23    to the ground.  Rather than get into a standing brawl

24    with this subject, we're gonna get him to the ground.

1          Take him to the ground.  We fell into an

2   open doorway area.  I was down around his legs at this

3   point and kinda got up.  He was on his back.  Officer

4   Ballard was directly on top of him face to face.

5          Both of Mr. Walker's arms were around

6   Officer Ballard's head, kind of like he bear-hugged

7   Officer Ballard's head.

8          Officer Ballard is trying to pull his

9   head away from Mr. Walker.  As he's doing this he's

10  not getting free.  He kinda head-butts Mr. Walker.  I

11  don't recall the exact number of times.  Mr. Walker is

12  still not letting go.  The way we were positioned, I

13  gave Mr. Walker a couple strikes to the stomach area,

14  punched him in the stomach to let go, move my

15  partner's head, just roll over, put your hands behind

16  your back.  Mr. Walker didn't want to comply.

17         Officer Ballard gets his head free.

18  We're struggling with Mr. Walker to try to get him

19  rolled over.  This is going on.  I'm kinda positioning

20  myself more next to my partner so I can get a better

21  hold of Mr. Walker's hands.

22         The whole time we're telling him, you

23  know, to stop fighting with us.  Just roll over.  Put

24  your hands behind your back.  He's yelling back at us

1  that he didn't do anything.  "Let me go."

2               I was a little closer up Mr. Walker's

3  body.  I gave a punch to his face, tried to get his

4  attention, get ahold of an arm as best I can.  That's

5  not working.

6               At that point I decide I'm gonna use

7  pepper spray.  Hopefully that will, you know, stun him

8  enough so we can get him secure somehow.

9               I tell him to stop fighting with us.

10 "Just give us your hands or I'm gonna spray you."  He

11 doesn't comply.  I spray him.  That didn't make him

12 comply.

13              Officer Ballard did some pressure point

14 hold along his jaw.  That kinda stunned him enough

15 that I got ahold of one hand and got a handcuff on

16 him.  I basically just secured that arm as best I

17 could, trying to roll him over.  Officer Ballard got a

18 handcuff on the other hand.  We got him rolled over.

19 We handcuffed our handcuffs together.  We picked

20 Mr. Walker up, transported him to the hospital to be

21 treated for the pepper spray exposure and any other

22 injuries he may have received.

23              Advised our supervisor what went on,

24 which was Sergeant Kane.  He came out, did his

1    investigation.  Mr. Walker was treated at Wilmington

2    Hospital; was released from Wilmington Hospital.

3    Transported Mr. Walker to Delaware Psychiatric Center

4    and he was turned over there.

5           Q.     I take it you had never met Mr. Walker

6    before that day?

7           A.     (Witness moves head from side to side).

8           Q.     Correct?

9           A.     Correct.  Don't know him.

10          Q.     I take it you've never seen him since

11   that day, have you?

12          A.     No.

13          Q.     I take it you don't know what injuries

14   he sustained as a result of that incident, do you?

15          A.     I do not.

16          Q.     Would it surprise you to know that he

17   had to have a hole drilled in his head to relieve

18   pressure on his brain as a result of a subdural

19   hematoma sustained in that incident?

20          A.     We took him to the hospital.

21          Q.     At any time before you had Mr. Walker on

22   the ground did he physically use any force or attempt

23   to use any force against either you or the other two

24   officers that were there?

A-227

1          A.      He was not compliant with any commands

2  to stop resisting us, stop pulling away from us and

3  place your hands behind your back.

4          Q.      Okay.  I understand your answer, but did

5  he use any aggressive force toward either you or

6  either of the other two officers at any time before

7  you decided to take him to the ground or to the floor?

8          A.      Tensed up and pulled away from us.

9          Q.      Tense up and pulled away.

10         A.      He didn't want to be arrested.  He

11 didn't want to be put in handcuffs.

12         Q.      You described the verbal exchange that

13 occurred between you, Officer Ballard and Mr. Walker

14 before you decided to take him to the floor.

15         A.      Yes.

16         Q.      And you said that that in your

17 estimation went on for a couple of minutes.

18                 Can you give me any better handle on the

19 amount of time that you spent trying to talk to him

20 before you decided to get physical?  Are we talking

21 one or two minutes?  Are we talking ten or fifteen

22 minutes?

23         A.      Couple minutes.

24         Q.      A couple to me is two.  Are you saying

Hawkins Reporting Serv___
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980_
(302) 658-6697    Fax (302) 658-8418

1   about two minutes?

2           A.      I don't know the exact time.  How long

3   is enough time to make somebody who does not want to

4   go anywhere long enough?

5           Q.      But it sounds to me like you sized up

6   the situation fairly quickly and were fairly confident

7   within a reasonably short amount of time, couple of

8   minutes to use your words, that he was not gonna go

9   without some force on your part.

10          A.      With the information that I had at the

11  time with one officer being dispatched to take that

12  call on her own.  As far as I know, when she got

13  there, she tried the same thing.  Mr. Walker did not

14  want to go.  Due to his size she backed off, called

15  for another unit.

16          Q.      What can you tell me about his size?

17  How tall was he?

18          A.      Taller than Officer Ballard at the time.

19  Officer Ballard, six-foot-something-plus?  I don't

20  know exactly how tall Officer Ballard is, but he's

21  over six foot.  He was a little bit taller than

22  Officer Ballard.

23          Q.      What would you estimate his weight was?

24          A.      I don't know.  Maybe 240?

1        Q.       And what about his age, approximate age?

2        A.       Maybe early fifties?

3        Q.       When you were talking to him, did he

4   seem non-sensical in his manner of communicating or

5   did he seem to be fairly normal as far as you could

6   tell?

7        A.       The only response he gave us as far as I

8   could tell, he seemed normal. "I didn't do anything.

9   I'm not going anywhere." Period.

10        Q.       Do you remember him saying anything else

11   other than those general types of things during this

12   verbal exchange?

13        A.       That's it. The whole time that's all he

14   said: "I'm not going anywhere."

15        Q.       Did anybody explain to him why it was

16   that people wanted him to be transported to the

17   hospital?

18        A.       I don't know. That's usually

19   Connections' job. I mean, they're -- as far as I

20   know, they should have explained to him this is what

21   we have to do.

22        Q.       Was anybody from Connections trying to

23   assist or explain anything to Mr. Walker while you and

24   Officer Ballard were talking to him?

A-230

1          A.      They just stood there.  I recall people

2     just standing there.

3          Q.      Did you talk to any of the Connections

4     folks to try to enlist their help in persuading

5     Mr. Walker to go?

6          A.      We did not.

7          Q.      Where was Officer Buhrman while you and

8     Officer Ballard were having the verbal exchange with

9     Mr. Walker?

10         A.      Pretty much behind us.  I don't know how

11    far behind us, but she was right there.

12         Q.      Did she ever get involved in the

13    physical I'll call it altercation between you, Walker

14    and Ballard?

15         A.      When we were struggling with him on the

16    ground I recall her laying on his legs.

17         Q.      Initially I thought you said that you

18    were sort of down on his legs.

19         A.      I moved up.

20         Q.      And when did she enter the picture and

21    get on his legs?

22         A.      Probably -- as far as I know right after

23    I moved up.

24         Q.      Did you have any sort of electrical stun

1    gun?

2          A.      Didn't have it at the time.

3          Q.      No?  Looking back in hindsight had you

4    had one would you have used it?

5          A.      Yes.

6          Q.      And do they generally render people

7    unable to resist physically for at least some period

8    of time?

9          A.      When a tazer is utilized, it overrides

10   the electrical impulse to your muscles.  You lose

11   control of those muscles.  Everything contracts.

12   Muscles -- where the darts are, everything between

13   those two darts or probes is affected and everything

14   just contracts up.  The normal "ride" that we call it,

15   when somebody is under the influence of that, is five

16   seconds.  During that time other officers can go

17   hands-on to be ready to secure him.  Once the five

18   seconds is over the person's fine.  The person can get

19   up, fight, do whatever, get up, run if they want to.

20          My experience with it since I got it

21   sometime after this incident is that it usually gets

22   people's attention.  After that first five-second

23   "ride" most people are okay, I'm done.  Put my hands

24   behind my back.  Handcuff me.  I don't want to

1    experience that again.

2         Q.    The tazer equipment, that was just not

3    offered to you at the time?

4         A.    It was not offered to me at the time.

5    It was not offered to anybody at the time.

6         Q.    When was it first employed by the

7    Department by the officers on the street, patrol

8    officers?

9         A.    I believe it was issued to us October of

10   2005 and that was -- sometime around there was the

11   first use of it.

12        Q.    I want to go back and ask you a couple

13   of more questions about what you told me about the

14   sequence of events and what happened.

15             After the verbal exchange, I was trying

16   to take down your testimony as best I could, you

17   talked about your partner and you making a

18   determination that you were gonna need to go hands-on.

19   I take it you mean Officer Ballard.

20        A.    Yes.

21        Q.    Did you have a conversation with him or

22   was that sort of a --

23             Was there any discussion between the two

24   of you about going hands-on?

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

Officer Gordon - Direct                    41

1          A.      No.  We just kinda looked at each other

2    and just kinda gave, like, an eye contact, gonna have

3    to try to go hands-on with this guy.  It was a

4    non-verbal cue between the two of us.

5          Q.      All right.  And in your mind at that

6    point what were you thinking you were going to do?

7    When you say we were gonna go hands-on, what did you

8    think the two of you were going to do at that point?

9          A.      I was gonna grab one arm, he was gonna

10   grab the other arm and pull his arms behind his back,

11   just handcuff him.

12         Q.      And were you both --

13                 Where were you and Officer Ballard and

14   Mr. Walker in relation to one another?  In other

15   words, were you behind him?  In front of him?  Off to

16   one side?

17         A.      We were both kind of standing in front

18   of him kind of offset from him a little bit, so

19   neither one of us were directly in front of him.

20         Q.      Do you recall which side you were on?

21         A.      I don't recall.

22         Q.      Do you recall --

23                 Did you go for one of his arms?

24         A.      Yes.

A-234

Officer Gordon - Direct                                    42

1          Q.     Do you remember which arm?

2          A.     I don't recall which arm.

3          Q.     Did Officer Ballard go for the other arm

4    at the same time?  Did you both go for one arm at the

5    same time?

6          A.     I went for one arm; he went for another

7    arm.

8          Q.     And did you actually physically grab

9    Mr. Walker's arm?  Were you able to get ahold of his

10   arm?

11         A.     I know a got ahold of an arm, which he

12   pulled away from me, and actually I might have grabbed

13   that arm first because the way it seemed to me,

14   Mr. Walker pulled away from me and basically came face

15   to face with Officer Ballard.  I mean, not much of a

16   turn, but kinda like (indicating).

17         Q.     While you were attempting to grab his

18   arm and he was pulling his arm away, was Officer

19   Ballard attempting to grab his other arm?

20         A.     I believe so.

21         Q.     Did he get ahold of his other arm?

22         A.     I don't recall if he did or not.

23         Q.     All right.  I think you testified that

24   your next instinct was to take Walker to the ground.

1         A.    Yes.

2         Q.    I'm imagining that all of this is

3    happening within a matter of seconds.  There's not a

4    lot of time elapsing here; am I right about that?

5         A.    There's not a lot of time elapsing.

6         Q.    So after you and Ballard are attempting

7    to get his arms and he's pulling away, am I right that

8    instantaneously now you decide to do something to try

9    to take him to the floor?

10        A.    Yes.

11        Q.    And what do you do?

12        A.    Going back to wrestling basically.  Grab

13   that one leg, started to pick that leg up and tripped

14   him to the ground.

15        Q.    Okay.  Do you remember which of his

16   legs?

17        A.    I don't recall which of his legs it was.

18        Q.    Were you able to grab his leg and get

19   his foot off the ground though?

20        A.    Yes.

21        Q.    And what was Ballard doing while you

22   were doing that?

23        A.    I don't recall exactly.  All I remember

24   is once we hit the ground, Walker fell to his back,

1    Ballard fell completely on top of him.  I looked up.

2    Mr. Walker's arms were wrapped completely around

3    Officer Ballard's head.

4              Q.       From the moment that you -- stepping

5    back again, from the moment that you and Officer

6    Ballard looked at each other and you both sort of had

7    that look and you made the determination that you were

8    gonna go hands-on till the time that Walker was on the

9    floor, how much time elapsed?  Couple seconds?

10             A.       Couple seconds.

11             Q.       Okay.  So as soon as you try to grab his

12   arm and he pulls away, then you go down, you grab his

13   leg, lift it up and now he's on his back on the floor?

14             A.       Correct.

15             Q.       And it's not till he's on the floor that

16   you notice for the first time that now he's got his,

17   Walker that is, has his arms around Officer Ballard in

18   a bear-hug fashion?

19             A.       Correct.

20             Q.       Around his torso, or his head, or both?

21             A.       His head.  Both arms are around his

22   head.

23             Q.       Do you see where Officer Ballard's arms

24   are at that point?

A-237

1        A.        The way it looked is when Officer

2   Ballard was trying to pull his head away from him, it

3   was almost as though his hands were on his shoulders

4   or right next to his shoulders and Ballard was trying

5   to pull his head away from Walker's grip.

6        Q.        So did it appear to you that Officer

7   Ballard's arms were actually on Walker's shoulders or

8   his hands were on his shoulders?

9        A.        Either on his shoulders or right next to

10  his shoulders.  I couldn't tell.

11       Q.        And did it appear to you that Walker's

12  arms were outside of Ballard's arms and grabbing

13  Ballard around the head, holding his head down toward

14  him?

15       A.        Like this (indicating), and Ballard's

16  hands were up, kinda like up over here (indicating)

17  somewhere.  I don't know if they were -- like I said,

18  I don't know if they were on his shoulders or on the

19  floor.  I don't know.

20       Q.        What I'm trying to get at here is

21  whether or not you noticed, and if you did you did and

22  if you didn't you didn't, but I want to know whether

23  you could see if Walker's arms were up underneath of

24  Ballard's arms and wrapped around his back or whether

```
 1  alternatively, whether they were overtop of Ballard's

 2  shoulders and around his neck.  Do you understand what

 3  I'm saying?

 4       A.      The way it looked to me is Walker's arms

 5  were around his head.  Both arms were up around his

 6  head.  So Ballard was trying to push himself away.  He

 7  had two arms basically on the back of his head,

 8  pulling him down, as Ballard is trying to push the

 9  other way.  I don't remember whose arms were above

10  whose or where exactly Ballard's hands were.  All I

11  could see is two arms up around the back of his head.

12       Q.      In other words, if I'm Walker and I'm

13  lying on the ground and I've got Ballard on top of me

14  and I'm able to get my hands around the back of his

15  head, are my arms above Ballard's shoulders around the

16  back of his head or underneath of his arms and somehow

17  twisted over the back of his head?

18       A.      The way it looked to me and the way I

19  recall it was two arms up around his head.  I don't

20  know how Ballard had his arms positioned.  All I know

21  is he was trying to push himself up somehow.

22       Q.      You understand what I'm trying to ask

23  you; right?

24       A.      What are you trying to ask me?
```

Hawkins Reporting Servic_
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1              MR. MILI:  You've asked it twice and

2    he's answered it twice.

3              MR. LANDON:  I don't know if he

4    understands.

5    BY MR. LANDON:

6         Q.    I'm saying if I'm Walker and I'm on the

7    ground, do I have Ballard like this (indicating) with

8    my arms above his shoulders, or like this

9    (indicating)?

10        A.    The first way.

11        Q.    The first one, with Walker's arms on the

12   top of Ballard's shoulders with the hands wrapped

13   around the back of his head.

14        A.    Yes.

15        Q.    Thank you.

16              And it's in that position that Ballard,

17   Officer Ballard, is attempting to break free and in

18   doing so head-butts Mr. Walker; correct?

19        A.    Yes.

20        Q.    And do you know how many times he did

21   that?

22        A.    I don't know.

23        Q.    You did see him do it at least one time?

24        A.    Yes.

A-240

1          Q.      Sort of a forehead to forehead type

2    contact?

3          A.      Yes.

4          Q.      I think you told me in the sequence of

5    events the next thing you did was punch Walker in the

6    stomach to try to get him to roll over; is that right?

7          A.      That, and as I did that I told him "Let

8    go of my partner's head.  Stop fighting with us."

9    Gave him one ... two ... shots.  I don't remember how

10   many.

11         Q.      With your right hand?

12         A.      Yes.

13         Q.      Are you righthanded?

14         A.      I'm righthanded.

15         Q.      You hit him at least once and maybe two

16   times.  Is that what you're saying?

17         A.      Yes.

18         Q.      Is there any possibility in your mind

19   that you hit him more than two times in the stomach?

20         A.      Could be.

21         Q.      What's the most number of times that you

22   possibly hit him in the stomach?

23         A.      I don't know.

24         Q.      Could it be as many as ten?

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697    Fax (302) 658-8418

1          A.      No.

2          Q.      How did you expect Mr. Walker to roll

3    over onto his stomach when 200-some pound Officer

4    Ballard is laying on top of him at that point?

5          A.      Like I said, at that point, too, I also

6    wanted him to let go of Officer Ballard's head.  Once

7    he let go of Officer Ballard's head, I'm hoping that

8    he complies with us.

9          Q.      Why didn't you grab his arm and try

10   to --

11         A.      At that point in time I wasn't close

12   enough up to grab at his arm.  I didn't feel I was

13   close enough to grab at his arm.

14         Q.      So you were close enough to punch him in

15   the stomach but not close enough to grab his arm which

16   was around the back of Officer Ballard's head.

17         A.      And I'm kind of striking like this

18   (indicating), up above my head.

19         Q.      Ballard was then able to break free of

20   Mr. Walker's grip?

21         A.      Eventually the grip was either let go or

22   Officer Ballard got free from the grip.

23         Q.      Did you see Officer Ballard in the

24   course of breaking free from the grip strike any blow

1    to any part of Mr. Walker?

2           A.    I don't recall.

3           Q.    You were then able to move upward.  And

4    you testified you hit Walker in the face.

5           A.    Yes.

6           Q.    With your right arm?  Right hand?  Right

7    fist?

8           A.    Right hand.

9           Q.    Is that a closed-fist hit?

10          A.    I believe so.

11          Q.    Knuckles to the face type thing?

12          A.    I believe so.

13          Q.    Did you injure yourself at all in this?

14          A.    No.

15          Q.    How many times did you punch him in the

16   face with your closed fist?

17          A.    Once or twice.

18          Q.    What part of the face did you make

19   contact with?

20          A.    Cheek.

21          Q.    Do you recall which side of his cheek,

22   which side of his face?

23          A.    (Indicating).

24          Q.    Left side?

A-243

1          A.      Yes.

2          Q.      Was his head still -- was he still on

3    his back and his head on the floor as you were doing

4    that?

5          A.      Still on his back, yes, head on the

6    floor.

7          Q.      Was the floor a carpeted floor?  Wooden

8    floor?  Tile floor?

9          A.      I don't remember.

10         Q.      Did you hit him as hard as you could hit

11   him in the face when you punched him in the face?

12         A.      I couldn't because of how close quarters

13   it was.

14         Q.      As hard as you could probably punch a

15   person, did you punch him 50 percent as hard as you

16   could?  Seventy-five percent?  Ninety percent?

17         A.      I couldn't get a full punch in.

18         Q.      Can you give me an estimate as to what

19   percentage a full punch you could get in force-wise?

20         A.      Wasn't a full punch.  I don't know.

21         Q.      Why couldn't you get a full punch?

22         A.      Because of the close proximity of the

23   way we were positioned.  I mean, we were inside a

24   doorway, so I couldn't haul off and -- which was not

1   my intention to begin with anyway.

2        Q.      All right.  And Officer Ballard had

3   actually broken free from Walker's bear-hug grip when

4   you were punching him in the face; is that right?

5        A.      I believe at that time he was freed

6   already and we were trying to get ahold of his hands.

7   Kept pulling his hands away from us.

8        Q.      Did he ever throw a punch at anyone

9   during the entire episode?  Mr. Walker that is.

10       A.      He was trying to pull his hands away

11  from us.

12       Q.      That's not throwing a punch, is it?

13       A.      No.

14       Q.      Did he ever try to throw a punch during

15  the entire episode?

16       A.      I don't recall.

17              MR. MILI:  We've been going for about an

18  hour, whatever.  You want to continue on whatever

19  topic you're on and wait for a clean break?  But I

20  think it's about time for a break.

21              MR. LANDON:  You need a break?

22              MR. MILI:  I do.

23              MR. LANDON:  We'll take a break.

24              MR. MILI:  Do you want to finish the

Hawkins Reporting Se_____
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1    topic?

2                    MR. LANDON:   No.   We'll take a break

3    here.

4                    (Brief break taken).

5    BY MR. LANDON:

6            Q.    Do you recall what Officer Ballard was

7    doing specifically when you were punching Mr. Walker

8    in the face with your fist?

9            A.    No, I do not.

10           Q.    The next thing that I think you decided

11   to do was to threaten Mr. Walker that you were gonna

12   use pepper spray.

13           A.    I told him, "You need to comply with us.

14   You need to stop pulling away from us.   We gotta

15   handcuff you or I'm gonna spray you."

16           Q.    Okay.  Did he respond in any way

17   verbally to that warning?

18           A.    I don't recall.

19           Q.    How much time did you give him to comply

20   with your warning before you actually sprayed him?

21           A.    I don't recall.

22           Q.    And where did you spray him?

23           A.    The face.

24           Q.    What part of the face did you hit?

```
 1          A.    Not really sure.  Might have been, like,
 2   his mouth I think actually.
 3          Q.    Was he still on his back at the time you
 4   sprayed him?
 5          A.    He was still on his back.
 6          Q.    How many times did you spray him?
 7          A.    Once.
 8          Q.    What did he do after you sprayed him?
 9          A.    Still kept pulling away from us.  Of
10   course this time now he was coughing because of being
11   sprayed.
12          Q.    What was Officer Ballard doing at the
13   moment that you were spraying Mr. Walker in the face?
14          A.    I don't remember exactly what he was
15   doing.
16          Q.    You said at some point you saw Officer
17   Ballard doing some sort of pressure point on
18   Mr. Walker's jaw?
19          A.    Somewhere around there.  Yeah.
20          Q.    Was that after you sprayed him?
21          A.    Yes.
22          Q.    Can you describe what Officer Ballard
23   was doing?
24          A.    I don't recall exactly.  I don't even
```

Officer Gordon - Direct                    55

1    really know.

2         Q.     Did you at any time strike Mr. Walker

3    with anything other than your right fist?

4         A.     No.

5         Q.     Did you ever see Officer Ballard strike

6    Mr. Walker with either of his fists?

7         A.     I believe he did.  I don't know how many

8    times, because he actually accidentally struck me

9    during this whole altercation.

10        Q.     Describe how that happened.

11        A.     He -- all I remember was just catching a

12   back hand to the face myself from him.  Kinda just

13   real quickly looked at him and he looked at me and I

14   said, "I'm all right.  Let's just get this guy

15   handcuffed."

16        Q.     So are you saying that in the process of

17   Officer Ballard trying to pull his fist back to throw

18   a punch he actually hit you on the backswing in the

19   face?

20        A.     Yeah.

21        Q.     Did he complete his punch after that?

22        A.     I don't really know.

23        Q.     Did Officer Ballard ever strike

24   Mr. Walker with anything other than his fist or hand?

Hawkins Reporting Ser____
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980_
(302) 658-6697    Fax (302) 658-8418

1        A.      As far as I know, no.

2        Q.      Nobody was doing any striking of

3   Mr. Walker with handcuffs?

4        A.      Absolutely not.  If we did we would have

5   talked about it and talked about why we had to do

6   that.

7        Q.      What do you mean by that last comment,

8   you would have talked about it.

9        A.      Well, depending on the situation that

10  you could possibly be involved with, I've known of

11  officers that have used radios, struck people with

12  radios because they were in the middle of a fight,

13  hands were, other than the officer's, were on the gun.

14  That was the only thing the officer had in his hand,

15  was his radio, trying to call in a foot chase and the

16  officer went Kerplow! with the radio.  He documented

17  striking the defendant in that incident with the radio

18  and why he did so.  And if I'm gonna use equipment,

19  I'm gonna document why I used equipment, like the

20  pepper spray.

21       Q.      All right.  You were armed with a

22  firearm?

23       A.      Yes.

24       Q.      And Officer Ballard was as well?

1           A.     Yes.

2           Q.     Did Mr. Walker at any time during this

3    altercation attempt to get his hand or hands on either

4    your firearm or Officer Ballard's firearm?

5           A.     No.

6           Q.     What other equipment did you have on

7    your person at the time other than the pepper spray

8    and a firearm?

9           A.     Asp.

10          Q.     And where do you personally carry your

11   asp?

12          A.     At that incident it would have been

13   behind my gun.

14          Q.     Did Officer Ballard have an asp as well?

15          A.     Yes.

16          Q.     At any time did Mr. Walker attempt to

17   get his hand or hands on either your asp or Officer

18   Ballard's asp?

19          A.     No.

20          Q.     At any time during the entire

21   altercation did Mr. Walker ever attempt to strike you

22   or Officer Ballard with one or both of his hands or

23   fists?

24          A.     He was pulling his hands away from us.

Officer Gordon - Direct                                    58

1          Q.      And when you say "he was pulling his

2   hands away from us," was he doing that in an attempt

3   to use them to strike you or just trying to get away

4   from you?

5          A.      He didn't want to be handcuffed.   He

6   didn't want to go anywhere.

7          Q.      Do you recall who got a handcuff on

8   Mr. Walker first, either you or Officer Ballard?

9          A.      I believe it was me.

10         Q.      Do you recall which arm?

11         A.      I believe it was his left.

12         Q.      Was he still on his back at that point?

13         A.      At that point he was still on his back.

14   Once I got the handcuffs, I got him up onto his side,

15   Officer Ballard was able to get his other hand

16   handcuffed and we were able to roll him over onto his

17   stomach and we linked both of our handcuffs together.

18         Q.      Behind his back?

19         A.      Yes.

20         Q.      Did you see any blood?

21         A.      No.

22         Q.      Did you see any other bodily fluids on

23   the floor?

24         A.      No.

                                              A-251

1          Q.     When someone is sprayed in the face with

2    pepper spray, what typically happens to their sinuses

3    and their bodily fluids and the sinuses?

4          A.     They do open up.  Pepper spray is orange

5    in color.

6          Q.     Do you know whether the -- strike that.

7                 We talked earlier about the fact that

8    there were some employees of Connections that were

9    there at the facility when you and Officer Ballard

10   arrived there; correct?

11         A.     Yes.

12         Q.     I don't remember what you said.  You

13   don't remember what they looked like, who they were?

14         A.     I don't know how many, who they were.

15         Q.     Do you remember that there were still

16   people from Connections there once you were able to

17   handcuff Mr. Walker?

18         A.     I believe so.  Yes.

19         Q.     Same people that were there the whole

20   time?

21         A.     I believe so.  Yes.

22         Q.     So there were people there that

23   witnessed precisely what was going on that day that

24   were not connected with the Wilmington Police

1    Department; correct?

2          A.    Yes.

3          Q.    Have you ever talked to those people

4    about what they saw?

5          A.    No.  Sergeant Kane would have.

6          Q.    I'm sorry?

7          A.    Sergeant Kane would have.

8          Q.    Have you ever -- prior to July 11 of '05

9    have you had any bad experiences with any of the

10   employees of Connections such that they might have a

11   reason not to like you or to say something not true

12   about you or --

13         A.    No.

14         Q.    Never had any beef with anybody there?

15         A.    No.

16         Q.    What about since July 11 of '05?

17         A.    I haven't been back there.

18         Q.    After you got the handcuffs on

19   Mr. Walker -- he's now laying on his stomach for the

20   first time during this whole altercation; correct?

21         A.    Yes.

22         Q.    And how long was he actually on the

23   ground on his stomach before you were able to get him

24   up to walk out of there?

A-253

Officer Gordon - Direct                                          61

1          A.      Couple seconds?

2          Q.      And how long did the whole altercation

3    from the time that you first attempted to grab his arm

4    until you got him up to walk out, how long did all of

5    that take?

6          A.      Maybe a minute?  Two minutes?

7          Q.      And so your recollection of events, if

8    it's correct, then Mr. Walker was on the ground for a

9    minute or two on his back and then for just a matter

10   of a couple of seconds on his stomach, handcuffed, and

11   then picked up or got up.

12         A.      Yes.

13         Q.      Did he get up under his own power?

14         A.      No.  We helped him up.

15         Q.      Once you helped him up did he say

16   anything to you at that point?

17         A.      I don't recall.

18         Q.      To back up for a second, when he

19   initially went to the ground for the first time onto

20   his back, was he able to get his arms out at all to

21   break his fall when he was falling backwards?

22         A.      I don't know.

23         Q.      Don't know?

24         A.      Don't know.

                                                    A-254

1          Q.      And do you know whether he grabbed

2    Officer Ballard around the head before he fell to the

3    ground or after he hit the ground?

4          A.      I don't know.  First time I saw it, like

5    I said, was after we were already on the ground.

6          Q.      When Mr. Walker hit the ground, back

7    first, did his head hit the floor?

8          A.      I don't know.

9          Q.      Was Mr. Walker compliant with you and

10   Officer Ballard once you got him up on his feet and

11   had him handcuffed?  In other words, from that point,

12   forward, did he do what you asked him to do?

13         A.      For the most part, yes.

14         Q.      And what did you ask him to do?  Walk

15   outside and go down to your car?

16         A.      Yeah.

17         Q.      And he did it?

18         A.      Yes.

19         Q.      You got him in the backseat, kept the

20   handcuffs on him?

21         A.      Yes.

22         Q.      Transported him to Wilmington Hospital?

23         A.      Yes.

24         Q.      Couldn't have taken more than a couple

Hawkins Reporting Servic
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

Officer Gordon - Direct                           63

1    of minutes; right?

2         A.      Connections is 500 block of West 10th.

3    The hospital is 14th and Washington.

4         Q.      Did you take him into the emergency

5    room?

6         A.      Yes.

7         Q.      Do you recall how long he was seen there

8    before you guys took him to the psychiatric hospital?

9         A.      I don't recall exactly how long.

10        Q.      Did you have to sit with him in the

11   emergency room for a while until he was seen?

12        A.      I believe they got us into a room pretty

13   quickly there.  I don't know how long we were in that

14   room for.

15        Q.      Just out of curiosity, do the hospitals

16   generally in the emergency room see people who are

17   escorted by the police a little bit quicker than maybe

18   they see others?

19        A.      It depends on the situation.  They

20   don't -- we're not seated in the rest area, the normal

21   waiting room, with the general public.  If there's a

22   room available, they try to get us to a room

23   relatively quickly.  Sometimes from there it's a

24   waiting game because they want to deal with other

1    people first, you know, and then just come back to us

2    when then can.

3          Q.     But they kind of segregate you from the

4    other folks --

5          A.     As best they can.

6          Q.     -- the general public?

7          Did any of Mr. Walker's friends or

8    relatives come to the emergency room when he was

9    there?

10         A.     I don't recall any friends or relatives

11   coming.  No.

12         Q.     Did you by any chance, you or your

13   partner, notify any of his family members of what was

14   going on while he was in the emergency room?

15         A.     No.  It's not normal procedure for us.

16         Q.     Okay.  After he was seen in the

17   emergency room was he compliant with you and Officer

18   Ballard in terms of getting in your patrol car and

19   getting down to the Delaware Psychiatric Hospital?

20         A.     Yes.

21         Q.     Did he give you any hassle about that at

22   all?

23         A.     No.

24         Q.     Did he talk to you at all during that

1   time?

2          A.      No.

3          Q.      Once you got him to the Delaware

4   Psychiatric Hospital, did you hand him off to people

5   there essentially as soon as you got there?

6          A.      Pretty much.  They were ready to take

7   him back.  We uncuffed him, they did what they had to

8   do, took him back, we left.

9          Q.      Was he handcuffed the entire time that

10  he was at Wilmington Hospital or did you release the

11  handcuffs so that the medical people could tend to

12  him?

13         A.      There was a point where we did take the

14  handcuffs off, I believe, afterwards, to put back on.

15         Q.      When you took them off, did you keep him

16  in your presence while the handcuffs were off?

17         A.      Yes.

18         Q.      So while the doctors or nurses or

19  whoever was examining him without handcuffs on, you

20  were present in the room?

21         A.      Standing at the doorway.  Yes.

22         Q.      Standing at the doorway.  What, right

23  outside the room?

24         A.      Right outside the room, looking in,

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1  'cause usually what we'll do is we'll actually have

2  one hand cuffed to the bed.  I don't remember if

3  that's what we did with him or not.  I'm gonna say we

4  did.  That's normally what we do do.

5        Q.    Okay.  So he was on some kind of a

6  rolling bed or stretcher or something?

7        A.    I believe so.

8        Q.    I think you told me earlier when Officer

9  Kane would have interviewed Mr. Walker at Wilmington

10  Hospital he would have done it behind closed doors.

11        A.    Normally that's what the supervisors do

12  just to try to create that air of the officer that you

13  were involved in this incident with is not here, so

14  speak freely.

15        Q.    So this paranoid schizophrenic person,

16  if that's what his diagnosis is, was in there being

17  interviewed by Officer Kane by himself basically?

18        A.    Basically.

19        Q.    Yeah.  Now you --

20              When you're transporting him out of

21  Wilmington Hospital to Delaware Psychiatric Hospital,

22  he's handcuffed again?

23        A.    Correct.

24        Q.    You get him to Delaware Psychiatric

Officer Gordon - Direct                    67

1    Hospital, you take the cuffs off and turn him over to

2    the folks there?

3         A.      Eventually.  We had the handcuffs on him

4    for a few minutes until they were ready for him.

5         Q.      Basically you just stayed there and

6    waited with him, handcuffed, until they said okay,

7    we're ready to take him?

8         A.      Yes.

9         Q.      Then you take the cuffs off and he goes

10   voluntarily with those folks.

11        A.      He went with them.

12        Q.      And you don't recall him saying anything

13   to you or Officer Ballard from the time that you

14   transported him from -- well, from the time you left

15   Wilmington Hospital until you dropped him off?

16        A.      No.  I don't recall him saying anything.

17        Q.      Do you recall what he physically --

18   strike that.

19               Do you recall whether he appeared to

20   have any physical injuries at any time after your

21   altercation with him at Connections?

22        A.      No.

23        Q.      In other words, any cuts?  Scratches?

24   Bruises?  Anything of that nature?

A-260

 1            A.       I didn't notice anything like that.

 2            Q.       There was a subsequent report that was

 3   produced to us that was identified in Officer

 4   Buhrman's deposition actually, and we marked it as --

 5   this is a photocopy of the exhibit.  It was marked as

 6   Buhrman No. 4 and it was a report dated 2/7/06.

 7   You're listed as the reporting officer, and under the

 8   Investigative Narrative, it says, "I spoke with

 9   Patrolman Ballard on this date and time (2/07/2006,

10   1340) in reference to this case.  We decided not to

11   pursue any arrest action at this time against

12   Mr. Walker due the timely --" I'm sorry "-- due the

13   time delay and his mental status."  Have you ever seen

14   that report before?

15            A.       Yes.

16            Q.       Did you write that report?

17            A.       Yes.

18            Q.       Can you tell me about the circumstances

19   in writing that report:  How it came to be that you

20   wrote that report.

21            A.       When this one was written, the initial

22   incident, Officer Ballard suffered some sort of injury

23   to his neck.  The report was written up as Officer

24   Ballard being a victim to an offensive touching

Officer Gordon - Direct                         69

1   against him.  At the time of the incident no arrest

2   action was taken at the time of the incident because

3   Mr. Walker had mental health issues that he needed to

4   deal with.  At that point in time we didn't feel it

5   was necessary for any criminal action be taken at that

6   time.  We thought he had enough on his plate, so to

7   speak, to worry about.

8              What happens with reports that are

9   deemed as pending active as this one was is you're

10  prompted on down the line to clear this report out

11  either by some sort of arrest action or not arrest

12  action.

13             On this particular date, I guess in

14  February, I was prompted to clear this report out.  I

15  talked to Officer Ballard about it.  We still felt,

16  you know, because of his mental history let's just let

17  him deal with that.  We weren't overly concerned about

18  any criminal arrest action at that point in time, so

19  there was no arrest action taken.

20        Q.      Okay.  Thank you.

21             Was there any discussion with Officer

22  Kane about the decision not to make an arrest?

23        A.      No, other than him reading over that

24  report and approving it.

A-262

1              MR. LANDON:  Can I have one minute.

2              (Brief break taken).

3    BY MR. LANDON:

4         Q.     You testified about Officer Kane doing

5    his use-of-force investigation after this event, and

6    that would be -- your understanding is that would

7    be -- the use-of-force investigation is something

8    that's dictated by Wilmington Police Department

9    policy; correct?

10        A.     Yes.

11        Q.     And tell me about your understanding of

12   what the policy is with respect to use-of-force

13   investigations.  Is there supposed to be a

14   use-of-force investigation done every time there's

15   some sort of use of force no matter what that use of

16   force is?

17        A.     Pretty much, yes.  Any equipment

18   utilized, any type of injury that this person's

19   claiming as a result of putting the handcuffs on too

20   tight, it's basically now by our Department being

21   investigated as a use of force.

22        Q.     And does the police department depend

23   upon self-reporting by the police officers in order to

24   trigger a use-of-force investigation?  Do you

1    understand what I mean?

2              In other words, let's say that you

3    effectuate an arrest or have an event with somebody

4    out there in the community and in your mind there's

5    been absolutely no use of force but in the person's

6    mind, the member of the public's mind, there has been.

7    How does the use of force --

8         A.      The person who is being arrested you're

9    saying?

10        Q.      Right.  How does the use-of-force

11   investigation get triggered in that instance?

12        A.      If that person while in our custody is

13   complaining of an injury while they're in our custody,

14   me being the arresting officer, and I pull into the

15   back lot, he starts complaining "My wrist hurts

16   because you got these handcuffs on too tight," what

17   I'm supposed to do is okay, turn around, we're going

18   to the hospital, and I'm gonna call my supervisor up

19   and say this guy is complaining I put the handcuffs on

20   too tightly.  We're going to the hospital.  Anybody

21   complaining of any type of injury while they're in our

22   custody has to be seen.

23        Q.      And then in a situation where you know

24   that you've used some force, how does the use-of-force

1   investigation get triggered?

2          A.       The same way.  Like, to use this

3   incident as an example, equipment was used, we

4   wrestled with him, we're going to the hospital for him

5   to be treated for any type of injury he may have

6   sustained during this altercation, contact my

7   supervisor, we're going to the hospital, and they meet

8   us out there, talk to us about what happened.  He

9   starts the investigation from there.

10         Q.       Okay.  And is it the police department

11  policy that you're supposed to report that

12  immediately, like you apparently did in this case?

13         A.       Yes.

14         Q.       All right.  And what if the supervisor's

15  busy doing something else and he can't get there right

16  away?  What happens in that situation?  I'm sure that

17  comes up from time to time.

18         A.       I've never had it happen personally.

19  There's usually enough supervisors on the street, in a

20  unit, to take care of it.

21         Q.       That somebody else can -- for instance,

22  Officer Kane is doing another use-of-force

23  investigation or he's out doing whatever, somebody

24  else can fill in for him when you call?

A-265

Officer Gordon - Direct                73

```
 1        A.     Yes.  If he's not available to do it for
 2   some reason, yeah.  We have four sergeants that work
 3   on our turn.
 4        Q.     It sounds like to me from what you're
 5   telling me the policy is, there must be a fair number
 6   of these types of use-of-force investigations that
 7   have to occur if anytime somebody wants to claim the
 8   cuffs are on too tight --
 9        A.     I'm sure there is.
10        Q.     I mean, can you give me your best
11   estimate of how often you've had to call a supervisor
12   and report a use of force situation which would
13   trigger a use-of-force investigation?  Is that
14   something that happens every day or --
15        A.     I wouldn't say it happens every day but
16   it happens often.
17        Q.     Okay.  Couple times a week maybe on
18   average, or --
19        A.     I mean, it depends on how busy of an
20   officer you are.  There are a lot of times where no,
21   it doesn't happen; nobody's complaining about it.
22        Q.     Right.
23        A.     But it happens often enough that you're
24   familiar with what needs to happen.
```

A-266

Officer Gordon - Direct                                74

```
 1           Q.      Okay.  And then --

 2                   I take it if as a result of the

 3   use-of-force investigation the supervisor thinks that

 4   there's been an excessive use of force, then something

 5   else happens --

 6           A.      Yes.

 7           Q.      -- internally.

 8                   What's that something else?  What

 9   happens next in that situation?

10           A.      It gets turned over to the Internal

11   Affairs Division.  They go over it.  If they feel

12   there is wrongdoing, you're disciplined for it.

13           Q.      Have you ever had a situation where a

14   use-of-force investigation has resulted in an Internal

15   Affairs investigation of your use of force?

16           A.      No.

17           Q.      And in your ten years on the police

18   force, I'm not holding you to any specific number, but

19   can you give me maybe a general idea of how many times

20   a supervisor has had to conduct a use-of-force

21   investigation of you in a situation that you were

22   involved in?

23           A.      Off the top of my head I can't count the

24   number of times.  Since I've had the tazer I've used
```

A-267

1    the tazer a number of times.  That has to be reported.

2          Q.      Are we talking in ten years more than a

3    hundred times probably in all likelihood?

4          A.      I would say that's fair.

5          MR. LANDON:  Okay.  Thank you.  That's

6    all I have.

7                          -   -   -

8                  (Deposition concluded at or about

9          12:00 p.m.)

10                 (Witness excused.)

11                 (Reading and signing waived.)

12                          -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

A-268

```
 1   STATE OF DELAWARE           )
                                 :   SS.
 2   NEW CASTLE COUNTY           )

 3

 4                    CERTIFICATION

 5

 6           I, CAROL DiSERAFINO, Professional Reporter

 7   and Notary Public, do hereby certify that the

 8   foregoing deposition of OFFICER SHAWN GORDON was held

 9   before me, pursuant to notice, at the time and place

10   indicated; that said witness was by me duly sworn to

11   tell the truth, the whole truth, and nothing but the

12   truth; that the testimony of said witness was

13   correctly recorded in machine shorthand by me and

14   thereafter transcribed under my supervision; and that

15   I am neither of counsel nor kin to any party in said

16   action nor interested in the outcome thereof.

17           WITNESS my hand at Wilmington, Delaware,

18   this 10th day of January, 2007.

19

20   _____
     CAROL DiSERAFINO
21   COURT REPORTER-NOTARY PUBLIC
     Cert. No. 182-PS
22

23

24
```

A-269

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ALICE WALKER and | : | |
| GERALD H.E. WALKER, | : | |
|  | : | |
| Plaintiffs, | : | |
|  | : | |
| v. | : | C.A. No. 06-366 JJF |
|  | : | |
| CITY OF WILMINGTON, CITY OF | : | |
| WILMINGTON POLICE DEPARTMENT, | : | |
| OFFICER SHAWN GORDON, | : | |
| OFFICER MICHAEL BALLARD, and | : | |
| OFFICER KAREN BUHRMAN, | : | |
|  | : | |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I, Alex J. Mili, Jr., Esquire, hereby certify that on this 31st day of August, 2007, I filed the Appendix to Defendants' Motion for Summary Judgment, Vol. I with the Clerk of Court using CM/ECF which will send notification of such filing(s) that this document is available for viewing and downloading from CM/ECF to the following:

Roger D. Landon, Esquire
Murphy, Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805


Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
Assistant City Solicitor
City of Wilmington Law Department
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants