## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALICE WALKER and                         :
GERALD H.E. WALKER,                      :
                                         :
        Plaintiffs,                 :
                                         :
   v.                                   :   C.A. No. 06-366 JJF
                                         :
CITY OF WILMINGTON, CITY OF              :
WILMINGTON POLICE DEPARTMENT,            :
OFFICER SHAWN GORDON,                    :
OFFICER MICHAEL BALLARD, and             :
OFFICER KAREN BUHRMAN,                   :
                                         :
        Defendants.                 :

### APPENDIX TO DEFENDANTS' OPENING BRIEF
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### VOL. II

Alex J. Mili, Jr., Esquire (I.D. #4125)
Senior Assistant City Solicitor
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants

DATE: August 31, 2007

TABLE OF CONTENTS

Volume I

Plaintiffs' Initial Disclosures ............................................................ A-1

United States District Court Subpoena issued to Gabe Hufford .............................. A-6

Non-Est return for Hufford Subpoena ...................................................... A-9

Guardianship Orders for Gerald H.E. Walker .............................................. A-10

Deposition Transcript for Alice Walker .................................................. A-12

Deposition Transcript for Joanne McGowan ............................................... A-39

Deposition Transcript for Karen Buhrman ................................................ A-97

Deposition Transcript for Shawn Gordon ................................................ A-194

Volume II

Deposition Transcript for Michael Ballard ............................................. A-270

Deposition Transcript for Thomas Kane ................................................. A-393

Wilmington Police Department, White Book Directive 6.7 ................................ A-476

Wilmington Police Department, White Book Directive 7.9 ................................ A-490

Wilmington Police Department, White Book Chapter IIX ................................. A-492

Use of Force Reports for 2001 - 2006 (filed Under Seal) .............................. A-518

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE



- - -

ALICE WALKER, individually      : CIVIL ACTION
and as guardian of her          :
husband, GERALD H. E.           :
WALKER, an incompetent          :
person,                         :
                                :
          Plaintiff,            : C.A. No. 06-366 JJF
                                :
     v.                         :
                                :
CITY OF WILMINGTON; CITY OF     : JURY TRIAL DEMANDED
WILMINGTON POLICE DEPARTMENT;   :
OFFICER SHAWN GORDON,           :
individually and as agent of    :
the CITY OF WILMINGTON POLICE   :
DEPARTMENT; OFFICER MICHAEL     :
BALLARD, individually and as    :
agent of the CITY OF            :
WILMINGTON POLICE DEPARTMENT;   :
OFFICER KAREN BUHRMAN,          :
individually and as agent of    :
the CITY OF WILMINGTON POLICE   :
DEPARTMENT,                     :
                                :
          Defendants.           :


          Deposition of **OFFICER MICHAEL BALLARD,**
taken pursuant to notice, before CAROL DiSERAFINO,
Professional Reporter and Notary Public, duly
authorized to administer oaths, on **MONDAY, NOVEMBER 6,
2006, at 9:10 a.m.,** held at the offices of Murphy
Spadaro & Landon, 1011 Centre Road, Suite 210,
Wilmington, Delaware.  There being present:

A-270

A P P E A R A N C E S:

       ROGER D. LANDON, ESQ.
       PHILIP T. EDWARDS, ESQ.
        MURPHY SPADARO & LANDON
       1011 Centre Road, Ste. 210
       Wilmington, Delaware  19805
        on behalf of Plaintiff


       ALEX J. MILI, JR., ESQ.
        CITY OF WILMINGTON LAW DEPARTMENT
       City/County Building, 9th Fl.
       800 North French Street
       Wilmington, Delaware  19801
        on behalf of Defendants

3

## INDEX TO TESTIMONY

DEPOSITION OF:                                                    PAGE

**OFFICER MICHAEL BALLARD**

    Direct by Mr. Landon                                      4

- - -

A-272

4

1              **OFFICER MICHAEL BALLARD**, being

2          first duly sworn/affirmed according to

3          law, was examined and testified as

4          follows:

5                    -   -   -

6  BY MR. LANDON:

7          Q.    State your full name, please.

8          A.    Michael Ellis Ballard; M-I-C-H-A-E-L

9  E-L-L-I-S  B-A-L-L-A-R-D.

10          Q.    What's your date of birth?

11          A.    June 26, 1970.

12          Q.    And by whom are you currently employed?

13          A.    The City of Wilmington, Department of

14  Police.

15          Q.    What's your highest level of education

16  that you obtained?

17          A.    Bachelor's.

18          Q.    Where did you obtain that?

19          A.    I finished at Albright College in

20  Reading, Pennsylvania.

21          Q.    Is that a four-year program?

22          A.    Yes.

23          Q.    What was your degree in?

24          A.    Political science and French.

1          Q.        What year did you obtain that Bachelor's

2    degree?

3          A.        I completed it totally in 1998.

4          Q.        And what was your first employment after

5    college?

6          A.        The United States Army.

7          Q.        And how long were you in the Army?

8          A.        Totally?  Twelve years.  I stopped my

9    college education, joined the Army and then finished

10   in a degree completion program.

11         Q.        What was the highest rank that you

12   obtained while in the Army?

13         A.        I got out of the United States Army

14   Reserve as a Staff Sergeant, an E-6.

15         Q.        Did you have any active duty overseas

16   anywhere?

17         A.        Yes.

18         Q.        Where?

19         A.        Korea.  Persian Gulf.  Somalia.  I went

20   to jungle warfare school in Panama.

21         Q.        Did you see any active combat during any

22   of those?

23         A.        Persian Gulf.  Somalia.

24         Q.        Were you honorably discharged from the

1    Army?

2            A.       I was.

3            Q.       What year did that occur?

4            A.       2001.

5            Q.       Did you see any active warfare?

6            A.       That was in the United States Army

7    Reserve.  My active duty discharge was in '96.

8            Q.       What did you do after '96?

9            A.       Originally went into a management

10   program with MBNA America.

11           Q.       And how long did you stay in that

12   program?

13           A.       After completing the program I was

14   employed by MBNA two and a half years?

15           Q.       What job positions did you hold at MBNA?

16           A.       I was a manager in the Consumer Finance

17   Collections Department.

18           Q.       And so you would have left that job

19   sometime in '98?

20           A.       Early '98.

21           Q.       And why did you leave that job?

22           A.       Um, with most people that leave MBNA,

23   couldn't adapt to the culture.

24           Q.       And what employment did you obtain after

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1    leaving MBNA?

2           A.      Worked for TransAmerica Retail Financial

3    Services, part of TransAmerica Bank.

4           Q.      How long did you do that?

5           A.      I worked there from '98 until they were

6    sold in 2001.  November, 2001.

7           Q.      And what did you do after that?

8           A.      I worked for American Document

9    Management.  They were a client of mine when I was

10   employed at TransAmerica.  And worked with them until

11   they moved their operations to Florida and I chose not

12   to move.

13          Q.      What time frame did you work for

14   American Document Management?

15          A.      I think a total of maybe ten months.

16   They were intending to move, so it would have been --

17          Q.      So most of '02?

18          A.      Early '02.  And then while I was at

19   TransAmerica I had a bad car accident, my first one,

20   and was actually rear-ended on my way to work and took

21   some time off.  Had back surgery.

22          Q.      When was that?

23          A.      My accident?

24          Q.      Yes.

A-276

1        A.      April of 2001.

2        Q.      And when did you have the back surgery?

3        A.      August of 2002.

4        Q.      Fusion or diskectomy or --

5        A.      No.  I refused to have a fusion or

6   diskectomy.  I actually was the third person in

7   Delaware to have -- it was an experimental procedure;

8   now it's common.  It's called IDET where they inject a

9   needle into the disk and kind of shrink the disk.

10       Q.      Who did that?

11       A.      Tony Cucuzzella, Jr.

12       Q.      Did that work?

13       A.      Yes.  Absolutely.

14       Q.      Tell me again the month and year that

15  that happened.

16       A.      August, 2002 is when I had the surgery.

17       Q.      Okay.

18               What was your next job after American

19  Document Management?

20       A.      I was employed by Wackenhut Nuclear

21  Security at the Salem Hope Creek Nuclear Power Plant

22  in Salem, New Jersey.

23       Q.      Time frame for that job?

24       A.      January of '03 until I was hired by the

1    City.   That would have been July of '04.

2            Q.      What types of work did you actually do

3    in the nuclear security job?

4            A.      Initially a nuclear security officer, an

5    armed officer, and then I was a fireman's instructor.

6            Q.      Did you have to obtain some sort of

7    particular type of license for that job?

8            A.      I think -- I believe you're licensed in

9    the State of New Jersey as a security guard.  It falls

10   under that.   Then you have to be trained obviously.

11           Q.      Did Wackenhut do the training --

12           A.      Yes.

13           Q.      -- or did somebody else do the draining?

14           A.      Wackenhut.

15           Q.      Did you have to take a test to get the

16   security guard license in New Jersey, do you remember?

17           A.      No, although there was a lot of testing

18   for access to the nuclear power plant, and that was

19   conducted by PSE&G.   I think it's owned by Exelon now.

20   And that's annual access testing, fitness for duty

21   testing.

22           Q.      Why did you leave that job?

23           A.      I was hired by the City as a police

24   officer.

1          Q.      Did you take the Wackenhut job as sort

2    of a stop-gap job?

3          A.      I would have stayed at Wackenhut if they

4    offered a pension.  At the time I was 34 years old and

5    I really wasn't interested in going back into the

6    banking world.  I figured I wanted to do something

7    more in line with what I spent twelve years doing in

8    the military.

9          Q.      I guess I should back up and ask you,

10   what did you do for twelve years in the military?

11         A.      I was an infantryman and I also was a

12   drill sergeant.

13         Q.      Really?

14         A.      Yes.

15         Q.      Did you like that?

16         A.      I loved it.

17         Q.      You were offered the job by the City of

18   Wilmington July of '04?

19         A.      That's when I started.  I guess I got

20   the offer in late May.

21         Q.      Was that a job that you sought out or

22   did they seek you out?

23         A.      Oh, no.  I sought it out.

24         Q.      Yeah.  Did you know anyone that worked

Hawkins Reporting Servic
715 N. King Street, Ste. 3 - Wilmington, Delaware   1980l
(302) 658-6697   Fax (302) 658-8418

1    at the City of Wilmington Police Department at that

2    point, or --

3            A.      Yeah.   Through incidental, like, second-

4    and third-party friends.  I had friends that are State

5    Police officers and County officers.

6            Q.      But you actually -- your employment with

7    the City of Wilmington started in July of '04?

8            A.      Correct.   That's when I entered the

9    Police Academy.

10           Q.      Tell me about the Police Academy.  How

11   long were you in the Police Academy?

12           A.      Six months.

13           Q.      Generally tell me what type of training

14   you got while in the Police Academy for those six

15   months.

16           A.      Beyond the obvious physical training,

17   constitutional law, search and seizure, use of force,

18   firearms, defensive tactics.  Those were probably the

19   big ones.  Spanish Survival is what it's called.

20   Dealing with the mentally ill.  Officer survival.

21   There's tons of courses.  Those are probably the big

22   ones that I remember.

23           Q.      Educate me a little bit about sort of

24   the format of the training academy because I'm

1   familiar with the Delaware State Police Academy which

2   is different from what you went through.  You went

3   through the City of Wilmington Police Academy;

4   correct?

5        A.     Yes.

6        Q.     Where does it physically take place?  Is

7   there on-the-job work?

8        A.     At the time when I went through it was

9   held at Del-Tech at 4th and Orange, 4th and Tatnall,

10  in that block right there.  Now it's currently at the

11  Police Athletic League, 3400 block of Market.  So I

12  guess Del-Tech donated space for the Academy.

13       Q.     Are we talking about in-class classroom

14  work every day five days a week?

15       A.     In the classroom, out in the field.  We

16  went to the station.  We did our driving portion down

17  at the State Police facility in Smyrna.  Firearms was

18  off of Route 9 at the range that we share with the

19  State, the County in Newark.

20       Q.     Were there opportunities for

21  ride-alongs --

22       A.     Yes.

23       Q.     -- with patrol officers and things like

24  that?

1          A.      Yes.

2          Q.      How much time did you spend doing that

3    sort of thing?

4          A.      Initially they had -- in the syllabus if

5    I remember it was slated for a week, but due to --

6    that year there was a pretty decent hurricane that

7    came through and the City was closed for a couple

8    days, so it was cut to three days, so I actually rode

9    with two different platoons on the 4-to-2 shift.

10         Q.      Is there testing that was done at the

11   end of the Academy?

12         A.      Yes.

13         Q.      Did everybody pass that was in the

14   Academy?

15         A.      Yes.

16         Q.      Is it your understanding that that's

17   typically the case, that people that go through and

18   spend six months in the Academy all pass?

19         A.      I could only speak to my class, not any

20   other ones.

21         Q.      How many people were in your class,

22   approximately?

23         A.      I believe it was 28 Wilmington officers

24   and then we had an officer from Smyrna, three from --

1    the police department doesn't exist anymore but it's

2    between Smyrna and Dover.   Little tiny -- in fact, the

3    three officers there were the three officers,

4    excluding the chief.

5           Q.      Clayton or somewhere?

6           A.      No.   That's a little bit more south.

7    Nonetheless there were three from that department.

8    There was an officer from Smyrna and an officer from

9    Newport.   But the testing was the Council and Police

10   training test which is a State test that everyone

11   takes.   Every law enforcement agency I should say.

12          Q.      So if we're talking six months from

13   July, we're into the first part of January or so of

14   '05?

15          A.      Actually I went on the street the week

16   before Christmas of '04, December.

17          Q.      And what was your rank initially?

18          A.      Patrolman.

19          Q.      What is it now?

20          A.      Patrolman 2.

21          Q.      Is that one promotion or two promotions?

22          A.      The first from recruit to patrolman I

23   guess really isn't a promotion, but your two-year

24   step, Patrolman 2, is where I'm at right now.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware   1980
(302) 658-6697    Fax (302) 658-8418

1        Q.      Did you -- when you went on the street

2   in mid December of '04, tell me about that.  What was

3   the nature of your job at that point?  What did you

4   actually do?

5        A.      A probationary patrol officer in the

6   six-month FTO program, field training officer program.

7   For Wilmington, you have -- you're assigned to three

8   different officers, so -- what's that? -- eight weeks

9   per officer in Wilmington.  The intent is to assign a

10  rookie patrolman to different districts in the City.

11              So my initial assignment was in what

12  Wilmington calls the 16 District, which is Center City

13  Wilmington from the Brandywine River to the City line

14  south are the north and south boundaries, and then

15  from Market Street to Adams street are the east and

16  west boundaries.

17       Q.      What was the name of the officer that

18  you were assigned to?

19       A.      Corporal Johnny Saunders.

20       Q.      So that was the first eight-week

21  session?

22       A.      Correct.

23       Q.      What about the second eight-week

24  session?  Where were you assigned and who were you

Ballard - Direct                                    16

 1  assigned to?

 2         A.      Twenty-eighth Patrol District, which is

 3  from -- the east and west boundaries would be 95 as

 4  the eastern boundary, Union Street as the western

 5  boundary, the Brandywine River as the northern

 6  boundary and Lancaster Avenue is the southern

 7  boundary, and Master Corporal Vincent Knoll was my

 8  FTO.

 9         Q.      K-N-O-L-L?

10         A.      Correct.

11         Q.      And what about your third eight-week

12  assignment?

13         A.      I was assigned to the 13th Patrol

14  District, which is Market Street is the eastern

15  boundary, the City line would be the western boundary,

16  11th Street or the Christina River would be the

17  southern boundary right there about 12th Street, it

18  snakes around, and then the City line would be the

19  north boundary.

20         Q.      There's sort of a northeast quadrant.

21         A.      The northeast corner of the City.  Yes.

22         Q.      Who were you assigned to there?

23         A.      Senior Corporal Shawn Gordon.

24         Q.      Do you remember the approximate date or

1    month when you began the eight weeks with Corporal

2    Gordon?

3         A.      Mid to late April I want to say.

4         Q.      Were you still in the assignment to the

5    13th District on July 11, '05 when the Walker incident

6    occurred that gives rise to this litigation?

7         A.      Yes.  After completing the FTO program,

8    Shawn and I decided --

9              Well, Shawn decided since he was more

10   rank that we were a good fit as partners, so we were

11   partners through December of '05 when he got

12   transferred.

13        Q.      Where did Shawn get transferred to?  Do

14   you know?

15        A.      Community Policing Unit.

16        Q.      Which is what?

17        A.      I'm sorry?

18        Q.      Which is what?  What is the Community

19   Policing Unit?

20        A.      Officers are assigned to specific

21   districts, radio districts, and then they're

22   permanently assigned to those districts and then make

23   community contacts with those individuals in their

24   district.  They attend community meetings among other

1   things.

2          Q.      So he would be assigned to a particular

3   district?

4          A.      Yes.

5          Q.      Which district was he assigned to

6   initially?

7          A.      If he still is, he was assigned to the

8   14th District which parallels or is the sister

9   district to the 13th District.  It would be Market

10  Street is the western boundary.  Essentially --

11         Q.      Is that north of the 13th District or

12  south of the 13th?

13         A.      It's parallel, so it's west of the 13th

14  District.  You have -- the Brandywine is your southern

15  boundary, the City line is your northwestern since it

16  kind of does an oval, but it encompasses everything

17  from -- I mean, it goes as far north as the City line,

18  like 41st Street, Lea Boulevard, as far west as

19  Sallies by the -- how the train tracks go around.  I

20  guess that would be the westernmost, and Brandywine

21  right there.

22         Q.      And were you assigned to a new partner

23  after Senior Corporal Gordon was transferred to the

24  Community Policing Unit?

A-287

1          A.       Infrequently.  I spent half the time by

2   myself.  My partner at the time was also one of the

3   few officers trained to be a house sergeant, the

4   turnkey area, like the holding cell area, and the

5   senior officer that is typically in that assignment

6   was out, injured, so I probably spent 60 percent of my

7   time by myself --

8          Q.       Okay.

9          A.       -- if not more.

10          Q.       What, if anything, have you done to

11   prepare for your deposition here today?

12          A.       Other than speaking to Alex.

13               MR. MILI:  For the record there is the

14   attorney/client privilege.  You're instructed not to

15   relay any discussions you've had with me.

16               THE WITNESS:  Okay.

17   BY MR. LANDON:

18          Q.       I don't want to invade that privilege,

19   believe me.  Whatever you told your lawyer, whatever

20   he told you is off limits to me.

21          A.       Okay.

22          Q.       But I just want to know, other than

23   doing that, have you done anything else to prepare for

24   the deposition today?

A-288

1          A.      No.

2          Q.      Have you reviewed any documents?

3          A.      No.

4          Q.      Have you reviewed any police reports?

5          A.      No.

6          Q.      Have you spoken to Corporal Gordon or

7    Officer Ballard -- I'm sorry -- Officer Buhrman about

8    anything in connection with this incident?

9          A.      Other than when I guess it hit the

10   papers that very first day --

11         Q.      Right.

12         A.      -- no.  I mean, they're both very good

13   friends of mine.

14         Q.      Have you spoken with Officer Buhrman

15   about the fact that she was in here for a deposition a

16   couple weeks ago?

17         A.      I knew that she came for a deposition.

18         Q.      Did you speak to her either before her

19   deposition or after her deposition about the case or

20   about the matter?

21         A.      All I knew was she was going to a

22   deposition.  She's assigned to another unit as well.

23         Q.      You haven't spoken to her since she came

24   in for the deposition?

A-289

1          A.     No.   She was at my house for the

2    Eagles/Cowboys game, so that would have been two or

3    three weeks ago.

4          Q.     Did you have any conversation about the

5    case or her deposition?

6          A.     No.

7          Q.     As a Wilmington police officer have you

8    ever been a Defendant in a lawsuit other than this

9    one?

10         A.     No.

11         Q.     Did you make a personal injury claim for

12   the car accident that happened a couple years ago for

13   which you had surgery, back surgery?

14         A.     Yes.

15         Q.     Were you represented by counsel in that

16   matter?

17         A.     I was.

18         Q.     Do you have counsel -- you said you were

19   recently in another car accident.

20         A.     Yes.

21         Q.     And that was within the last month or

22   so?

23         A.     Two weeks ago.

24         Q.     Are you represented by counsel in

```
 1   that --

 2           A.      It was an on-duty injury.

 3           Q.      All right.

 4                   I want to take you back to July 11, 2005

 5   and ask you some questions about what happened that

 6   day.

 7           A.      Okay.

 8           Q.      Do you recall the incident at

 9   Connections involving Mr. Walker, Gerald Walker?

10           A.      Yes.

11           Q.      You know what? ... before I get to

12   that -- I've jumped ahead of myself.  I want to go

13   back and talk to you about two things.  You mentioned

14   while you were in the Police Academy a number of

15   different areas of training that you received and two

16   in particular I want to talk about.  You talked about

17   use of force, training on use of force, and training

18   on dealing with the mentally ill.

19                   Tell me what type of training you

20   received regarding the use of force while in the

21   Police Academy.

22           A.      Use of force itself is not a specific

23   block.  Like, there wasn't an 80-hour block of

24   instruction on use of force.  Obviously firearms,
```

1    defensive tactics, verbal Judo, things of that nature,

2    all fall within the use of force continuum and they're

3    spread throughout the Academy.

4                    If you look at from Day One in the

5    Academy and looking at the lowest level of force being

6    your officer's presence, I mean, that's kind of

7    drilled into you, to look professional.  Obviously if

8    you look slovenly you'll be not treated with respect,

9    and that kind of steps forward from there.  That was

10   Day One.

11                   We had verbal Judo within the first week

12   which would go to your -- how you speak and how you

13   address people on the street, and then soft hand and

14   hand skills itself is obviously dealt with in the

15   defensive tactics portion as well as handcuffing again

16   was another thing that wasn't specific in a specific

17   block but we practiced that.  Next to driving,

18   probably putting handcuffs on somebody is the thing

19   you do most.

20                   Firearms training obviously was a week,

21   and then OC, or Capstun, pepper spray.  That was

22   actually a day of exposure.

23        Q.        Does the City of Wilmington Police

24   Department have a use of force policy or any policy

1    dealing or that's articulated to the officers about

2    what amount of force they're permitted to use under

3    whatever circumstances?

4         A.    Yes.

5         Q.    And tell me your best understanding as

6    to what that policy is.

7         A.    Again, the use of force continuum states

8    that officer presence is the lowest form.  Verbal

9    commands.  Soft and hard hands, meaning from pressure

10   points to either strikes to the body, and intermediate

11   use would be your Capstun where the tazer -- again,

12   when I started the Academy we didn't have tazers.

13   While they're on the street, they're only issued to

14   certain people.  The tazer, I'm not sure where that

15   falls in the continuum.

16              Then you have your -- either your

17   collapsible baton or your nightstick, both of which

18   are issued, and then finally would be deadly force.

19         Q.    I understand that.  I guess what I'm

20   trying to find out is, as you move through the

21   hierarchy, what events or what behaviors or what

22   circumstances trigger the ability of the officer to

23   move up that hierarchy on the levels of force to be

24   used?

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware   1980
(302) 658-6697   Fax (302) 658-8418

1       A.      The individual suspect, which is

2   probably not a fair term for this specific, but the

3   individual's reaction to the previous commands of the

4   officer would be one of the primary drivers for that

5   in that, for example, the use of force policy is not a

6   suicide pact, so that by I mean if an individual is,

7   let's say, putting their hands on an officer, I can --

8              I don't have to go from verbal or my

9   presence and they immediately put their hands on me

10  and then have to walk intermediately up the steps and

11  make a stop at each step, so to speak.

12             As far as what an individual officer

13  does in a specific example with someone when they're

14  using force, whether or not they choose to use Capstun

15  as opposed to an asp, there are some officers, smaller

16  officers, maybe some officers who aren't as

17  comfortable in dealing with certain people who would

18  have to go --

19             I have a good friend who is

20  five-foot-four, a hundred forty pounds, and he has to

21  use his asp with certain people in certain situations.

22  And my asp has probably come out three times in the

23  past two and a half years that I've been on the job,

24  but I'm six-two, 240.

A-294

1          Again, it's something that you as an

2    individual officer when you're in that situation have

3    to determine what force is applicable to how that

4    individual is reacting to your commands.

5          Q.    Give me an example of a situation where

6    you would need to use pressure points.

7          A.    An individual who is refusing to comply

8    with your verbal commands but is not making any overt

9    physical attempts to resist you or resist what you're

10   trying to accomplish I guess.

11         The best example they give you in the

12   Academy, and I've never seen it happen, would be a

13   protest, a silent protest, where individuals are, say,

14   sitting in front of a building and they are sitting

15   cross-legged and arms like this (indicating) and you

16   can do pressure points to the neck, to the arms, and

17   that pressure point just by digging in and, I mean,

18   it's rather painful, would just be used and at the

19   same time you're telling them to stop resisting, stop

20   resisting, let me see your hands, and then ultimately

21   you do that, but a pressure point would be something

22   that you would use for someone that's not making any

23   overt physical displays towards you.

24         Q.    Okay.  And where are the pressure points

1      that you would typically apply pressure?

2              A.      It would depend on the situation.   I

3      mean, there's probably, if I recall correctly, ten or

4      twelve, beginning under the nose, ears, chin, the

5      brachial nerves, both arms, both legs along the side,

6      on the interior, sternum.

7              Q.      Are there situations where it's

8      appropriate to use a closed fist to actually punch or

9      hit or strike --

10             A.      Yes.

11             Q.      -- a suspect --

12             A.      Yes.

13             Q.      -- or a victim?  Not a victim, but a

14     suspect or somebody that you're dealing with.

15             A.      Yes.

16             Q.      What would the general circumstance be

17     where that would be appropriate use of force?

18             A.      When an individual is actively resisting

19     arrest.

20             Q.      Which means what?

21             A.      Refusing to either (a), be handcuffed,

22     or in striking an officer.

23             Q.      All right.  Let's go back to the example

24     of the silent protest with the person sitting there

1    with their legs crossed and they're refusing to come

2    with the officer.

3              You've told me that the pressure point

4    would be appropriate under that circumstance.  Now

5    that person is also refusing to be handcuffed.

6         A.    Okay.

7         Q.    You tell the person we're gonna handcuff

8    you and take you out of here.

9         A.    Mm-hmm.

10         Q.    The person is keeping their arms in such

11    a position that they won't let you handcuff them.

12         A.    Okay.

13         Q.    You're allowed to actually strike blows

14    with your fists under those circumstances?

15         A.    No.  Again, I wouldn't in that

16    individual example, again not being put in that

17    position, but my next step, and again as I said

18    before, would be the intermediate use of force which

19    would probably be OC, the spray.  If they were --

20         Q.    The pepper spray?

21         A.    Yes.

22         Q.    What does OC stand for?

23         A.    Oleoresin capiscum.  It's the scientific

24    term for it.

1          Q.      Let's do it that way.  Why don't you

2    take me through from start to finish what you would do

3    with the hypothetical that we're talking about and

4    let's just say with each successive measure it's not

5    working for you.  So the first thing you would do is

6    talk to the person?

7          A.      Correct.

8          Q.      The second thing would be probably the

9    pressure point.

10         A.      Well, the first thing would be my

11   presence.

12         Q.      Your presence.

13         A.      And then "It's time for you to leave.

14   You have to go."

15                 "No, I'm not gonna go."

16                 "Okay.  I'm going to apply a pressure

17   point."

18         Q.      Do you usually tell them that before you

19   do it?

20         A.      Absolutely.  There's no reason to just

21   jump on somebody and start, you know, without saying,

22   because my hope -- and as always when you're putting

23   your hands on somebody else, there's an equal risk for

24   me to get injured as well.  If they're not going to

 1    move, I have seen a pressure point done on people

 2    before and if it's done correctly, I can think of some

 3    officers who are large in stature, who could resist to

 4    a certain extent, but, I mean, if you're hit, and I

 5    forget the name of this one right here (indicating) or

 6    even this one under your nose, if you're getting it

 7    right, your body is gonna move away from that, from

 8    the pressure, on that specific nerve.  And so it's

 9    almost near impossible for you to, say, lock your

10    hands and then have somebody do this to you.  I don't

11    want to sit here and do it to you, but, trust me, it's

12    very uncomfortable, I've had it done to me, and your

13    natural physical reaction would be to move away.

14            As an individual, and I'll step back

15    myself, I'm not gonna put myself in a position where

16    I'm putting my hands on somebody unless I absolutely

17    have to, unless there's another officer around.  In

18    that situation I would doubt that between two officers

19    a person doing this (indicating) and another officer

20    bringing the hands back to be handcuffed, that it

21    wouldn't work.

22            You're always gonna have a person that's

23    gonna fight you hard.  I've had maybe two or three

24    times happen to me and ultimately, I mean, you get to

1    that point.  But in our example that we're using I

2    can't see where it would be appropriate to strike a

3    person that's passively resisting.

4         Q.      Okay.  But going back, to be clear,

5    before using a pressure point you're going to always

6    tell the person that this is what you're going to do

7    next?

8         A.      If I said "always," I'll step back from

9    it.  It would be my intent to verbalize what I'm doing

10   next and I do my best to do that but, I mean, you

11   know, "always" I would hesitate to say.

12        Q.      And you would never strike someone with

13   your fist if they were passively resisting?

14        A.      Correct.

15        Q.      So what do you do?  They're passively

16   resisting.  You're not gonna go to the next step of

17   striking them.

18        A.      Correct.

19        Q.      The pressure point, let's say that's not

20   working.

21        A.      Correct.

22        Q.      What do you do?

23        A.      I would most likely spray that

24   individual.

A-300

1        Q.      Okay.  And where do you spray them?

2        A.      Above the eyes.

3        Q.      And do you tell them you're going to do

4   that before you do it?

5        A.      Both for their benefit and for your

6   partner's benefit.

7        Q.      And you give them a chance to -- I mean,

8   by telling them you're going to do this you're giving

9   them an opportunity to give up and comply with your

10  command at that point.

11       A.      Absolutely.  Absolutely.

12       Q.      And is there any policy about how much

13  time you're supposed to give the person to comply with

14  that command before carrying it out?

15       A.      Not to my knowledge.

16       Q.      Now the person has been sprayed with the

17  OC spray and they're still not complying but they're

18  still passively resisting your command to be

19  handcuffed.  What do you do next?

20       A.      We're deep in the hypothetical now.

21  Have you ever been sprayed before?

22       Q.      No.

23       A.      Because the first thing you're gonna do

24  if your arms are locked and you've been sprayed in the

```
 1   eyes, the first thing you're gonna do is bring your

 2   hands up to there (indicating), and then once I have

 3   your hands, I mean, you can guide a person in a

 4   certain situation like that.  Again, by taking a

 5   person by the back of the neck and just guiding them

 6   to where you want them to go, your body is gonna

 7   follow where your head goes, so in a situation like

 8   that in our hypothetical, your arms are locked and

 9   I've sprayed, your hands are here (indicating), I can

10   bring you down.  I don't have to sit there and do

11   anything other than get you to a point where I can

12   apply handcuffs, and I guarantee you -- I'm not gonna

13   guarantee you, I'll step back -- but in 99 percent of

14   the time using pressure points which are painful,

15   getting sprayed in the eyes, trust me, our Capstun,

16   they tell us to take our contacts out, I wear

17   contacts, because it can melt your contacts.  It is

18   one of the most uncomfortable things.  And now we've

19   had to switch from an oil-based to a water-based

20   because of the tazer, but the oil-based was

21   semi-persistent in that it would dry and, let's say,

22   after you wiped it, it's in your eyebrows or it's in

23   your hair and you go and take a shower and then you

24   get your second dose, and it's not a comfortable
```

1    feeling.  And we got sprayed with gusto in the Police

2    Academy and I had it for about a day.

3           Q.      Does the use of force policy that the

4    City of Wilmington has permit officers to strike

5    suspects, call them suspects used in the broadest

6    term --

7           A.      Mm-hmm.

8           Q.      -- does the policy permit an officer to

9    strike a suspect with a handcuff?

10          A.      No.

11          Q.      Under any circumstances?  It's never

12   appropriate?

13          A.      An impact weapon and the use of force

14   policy with regards to the asp or the nightstick in

15   certain situations, be they a suspect is resisting,

16   the only thing you have in your hands is your radio,

17   for example, or -- I can't see handcuffs used as a

18   tool personally.

19                  I could probably dope out a situation

20   where you're trying to handcuff somebody, got 'em in

21   your hand and he starts going crazy and you hit him

22   with them.  In that situation an impact weapon, it

23   doesn't say you can't use handcuffs, you can use this

24   but you can't use that, and that's why I'm kind of

1    hedging on you, but my flashlight could be an impact

2    weapon that I'm issued and it's a little bit shorter

3    than my nightstick.

4        Q.    Well, let me ask it this way:  When you

5    were given your training in the Police Academy, were

6    you ever trained either to refrain from using or to

7    use under certain circumstances handcuffs as an impact

8    weapon?

9        A.    No.

10        Q.    So you were given no training on it one

11    way or the other?

12        A.    No.

13        Q.    Just so that we're -- there was a

14    double-negative there.  Were you given any training in

15    the Police Academy --

16        A.    I was not.

17        Q.    -- about whether or not to use handcuffs

18    as an impact weapon?

19        A.    No.

20        Q.    Thank you.

21            All right.  The other area of training

22    that you mentioned getting at the Police Academy was

23    dealing with mentally ill people.  Tell me what you

24    can recall about what training you received in that

1    regard.

2         A.      It encompassed about a week, not

3    totally, because we were doing other things at the

4    time, but I recall it being about a week long in

5    nature.

6              We met with representatives from the

7    State and some private organizations that deal with

8    the mentally ill.  There was some role-playing,

9    movies.  That block of instruction just like every

10   other block we were tested on.  At the end of the week

11   we received a test, every week on a Friday.

12             I seem to recall in addition to that

13   Dr. Susan Edgar who works or is a consultant for the

14   City came in to deal with mental illness itself aside

15   from that specific block.  We had had representatives

16   from those different organizations coming in.

17        Q.     Were you given any training on the use

18   of force to deal with mentally ill suspects or people?

19        A.     No.

20        Q.     No?

21        A.     No.

22        Q.     Did any of your use of force training

23   that you received in the Police Academy differentiate

24   how you were supposed to deal with mentally ill people

1    as opposed to people who weren't mentally ill?

2         A.    Specifically no, but I will tell you

3    that one of our instructors did give an example of a

4    person who, and it was a real example, who was acting

5    in a certain way and all the indicators were that this

6    person was under the influence of something and was

7    obviously not about themselves, and as it turned out

8    the individual was having a diabetic seizure, and one

9    of the things we talked about with that is with

10   certain reactions that the person is doing, there's

11   also a smell that's associated with that that almost

12   smells like -- it's actually the sugars in your body.

13   It almost smells like they're under the influence, but

14   other than that, no.

15        Q.    Are you generally familiar with what the

16   diagnosis of paranoid schizophrenia is?

17        A.    I basic layman's term, a layman's

18   understanding.

19        Q.    Were you given any training by the

20   Wilmington Police Academy with respect to what any

21   particular psychiatric diagnosis means or involves?

22        A.    Again, I recall Dr. Edgar going over

23   what some of the more general mental illnesses were,

24   but as to identify one from the other, no.

1          Q.      Prior to July 11 of '05 when the Gerald

2    Walker incident occurred had you in your job as a

3    police officer come into contact with any other

4    mentally ill people who you were trying to either take

5    into custody or transport to the mental hospital?

6          A.      Yes.

7          Q.      How many times had that occurred before

8    the Walker incident?

9          A.      I couldn't honestly give you an exact

10   number but I will tell you that it is not uncommon for

11   police to be dispatched to Connections or to the CAPES

12   Unit at Wilmington Hospital which is where a person

13   who possibly has some sort of mental illness or is

14   claiming to hurt themselves, whether it's actually

15   diagnosed by the staff there and then is committed

16   involuntarily to either MeadowWood, Rockford or the

17   State Hospital, so we'll do transports frequently.  I

18   mean, strike frequent.

19                  Again, I might go a month without ever

20   having to do a transport.  Shawn and I in one 50-hour

21   shift that was five 4-to-2 days, every day of that

22   shift we had either a person who was trying or

23   claiming to commit suicide.  We either came into

24   contact on the street and by their actions said they

Ballard - Direct                                        39

1    need to go to the CAPES Unit, or was -- in the one

2    instance the individual was a juvenile who was making

3    some statements that were obviously concerning, I'm a

4    parent, and in this individual case the kid, his

5    parents weren't around all that often, so in that

6    50-hour shift we probably spent 42 hours between

7    dealing with the issue, going with them to CAPES and

8    then taking them to whatever institution that they

9    were committed to.

10            Q.        Do you recall if that particular

11   incident/instance that you're talking about now, that

12   shift, was prior to July 11 of '05 or after?

13            A.        It was -- I know it wasn't after because

14   Shawn obviously senior than I and he takes -- in our

15   platoon at the time your seniority dictated when you

16   could pick vacation and Shawn has always taken late

17   July and August for vacation, so I want to say I know

18   I was off FTO and I would -- that would have been late

19   May, but it was before this.

20            Q.        You were in FTO from mid December of '04

21   through mid May or sometime in May of '05.  We're only

22   talking five, six months there, and then another two

23   months before the Walker incident occurs.

24            During those seven months give me your

1    best estimate as to how many times you had encounters

2    with mentally ill people where you were trying to take

3    them either into custody or transport them from

4    somewhere to a facility or from one facility to

5    another.

6            A.      I couldn't give you right now under oath

7    an exact number.

8            Q.      I don't expect you to.  I'm just asking

9    for a general sense.  Half a dozen times?

10           A.      No.  Way more than that.  In all

11   fairness 20 to 30 times in that six months.

12           Q.      And out of those instances can you

13   recall any where the person that you were dealing

14   with, transporting, taking into custody or whatever

15   resisted your attempts to do that?

16           A.      Two in particular.  One actually

17   happened in front of Connections.  An individual who I

18   see all the time, and as a result of the ten

19   hours-plus that I spent with them, we're actually

20   pretty friendly.

21                   He was striking another individual with

22   a hockey stick right in front of the Connections

23   building, and this other individual got the better of

24   him and proceeded to take him to town with the hockey

1    stick, and he didn't want to go to CAPES because he

2    knew -- he was trying to get his meds from

3    Connections.  I think it was a Sunday afternoon.  And

4    he stated to us, "I'm not gonna go.  I know what

5    you're gonna do to me."  And we were able to talk him

6    into "We're gonna take a ride.  I'm gonna hang out

7    with you for a bit.  I'm not gonna leave you there."

8    And he bought into that.  The other one --

9            Q.    He had already been beaten by the other

10   person?

11           A.    Oh, yeah.  He was bleeding all over the

12   place and was extremely upset.

13           Q.    Did you see the beating occur?

14           A.    No.

15           Q.    You came upon it after it happened?

16           A.    Correct.  He had picked back up the

17   hockey stick.  Now where they're doing the

18   construction, it would have been across the street

19   from Connections, but that's all under construction

20   now.  And he was waving it.  We actually drove up on

21   it and he was bleeding from probably a good two or

22   three decent cuts to the head and was waving a hockey

23   stick in the middle of the street there.  What's

24   that -- 10th, 11th Street?  Ninth, excuse me.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697   Fax (302) 658-8418

1        Q.      So initially when you told him you were

2   taking him --

3        A.      He said, "I'm not going anywhere."

4        Q.      You were able to talk to him?

5        A.      Absolutely.

6        Q.      There was no force necessary --

7        A.      Oh, no.

8        Q.      -- other than talking to him?

9        A.      Correct.

10       Q.      Okay.

11       A.      In the other instance this individual

12   threatened to beat his wife. Consumed the better part

13   of a liter of vodka. He had a blood level of .495.

14   He was an alcoholic, believe it or not. He was a very

15   large man and he was very pissed off, to use the term,

16   and he spent --

17              While he was compliant getting into the

18   car, when we got him to Wilmington, they normally

19   place people for evaluation for CAPES in Room 22 and

20   you normally handcuff them to the bed, and he spent

21   probably the first hour dancing around, trying to -- I

22   don't want to say trying to. He insinuated that if he

23   could just get a little closer, he was gonna get our

24   guns and da-da-da-da, but he's talking and he was

1    extremely inebriated.  No force was used.  Again, it

2    was one of those you don't want to make this any

3    worse.

4                   I also recall --

5          Q.      Before we go to your next recollection,

6    did you actually get this guy handcuffed to the bed?

7          A.      Yes.  And then --

8          Q.      You were able to do that without using

9    any force?

10         A.      Without any force whatsoever.

11         Q.      Okay.

12         A.      There was another individual, Paul Carr

13   is his name.  He is well known to just about everybody

14   in the Wilmington Police Department and he lives with

15   his parents.  Owns or owned at the time a couple

16   weapons.

17                   He threatened to kill his parents and

18   barricaded himself in his room.  Shawn and I, another

19   officer, went into his room.  Actually we were outside

20   of his room to begin with and he had the door locked.

21   Were able to find out that he didn't have access to

22   the weapons at the time.  He opened the door for us.

23                   He's a big Civil War buff.  Looking

24   around in his room I saw a couple things, started

1  talking.  I'm kind of a history guy myself and talked

2  him into handcuffs.

3            When he got to Wilmington he -- I'm not

4  obviously a psychiatrist, but he demonstrated a couple

5  different personalities to us on the way to the

6  hospital, one of which was an Irish guy.  I don't

7  recall what the other two were.  He began to head-butt

8  the cage, it's a metal and plastic cage between the

9  front and rear seats, while he was handcuffed and

10  actually belted in.

11            When he got to the hospital he continued

12  to move around.  Shawn actually did a pressure point,

13  I'm still trying to remember, on him right here

14  (indicating) and the hospital constables had to secure

15  him to the bed and then put a spit mask on him because

16  he was trying to bite us.  Everything else like that.

17       Q.     Okay.

18       A.     But in that instance, this actually

19  worked to the point where it was more like Ow, ow, ow

20  when we got him out of the car.  Had to unhandcuff and

21  rehandcuff him to the bed, then he was given I don't

22  know what the drug was but some kind of sedative.

23       Q.     How much time did you have to spend with

24  that guy in his Civil War decorated room?

1          A.      That was within those five, so it would
2    have been the whole shift.  A whole ten hours.  Well,
3    you figure it's ten hours from start to finish.

4          Q.      No, no, no.  How long did it take you
5    before you got him to be compliant with you and go
6    with you in the car?

7          A.      In his room?

8          Q.      Yeah.

9          A.      Fifteen minutes maybe.  That's from
10   actually going, speaking to the parents, going
11   upstairs, talking to him through the door.

12         Q.      What about the situation with the guy on
13   the street in front of Connections that had gotten
14   beaten with the hockey stick?

15         A.      Maybe a half hour out on the street.
16   That was a little longer.

17         Q.      So there was actually a half hour of
18   back and forth conversation before he was able to
19   become compliant?

20         A.      Yeah.

21         Q.      And this is probably an obvious question
22   or the answer is obvious, but for -- let's say it's 30
23   minutes -- and it might have been 29 minutes or 15
24   minutes or whatever -- but if it was 30 minutes, for

Ballard - Direct                          46

1    29 minutes he wasn't going to be compliant, he was not

2    compliant, and then finally somehow he decided to

3    comply; correct?

4         A.    Yes.   I mean, I'm going to spend the

5    time necessary based on how a person is acting to

6    avoid doing what I need, putting my hands on somebody.

7         Q.    That's what I'm trying to find out.   How

8    do you determine how much time you're gonna spend

9    trying to get somebody to comply using only your

10   presence and verbal force as opposed to hands-on?

11        A.    In my personal -- in my own personal

12   experience that's completely dictated by the

13   individual.   I mean, I'm getting paid to do a job.

14   I'm dispatched to a complaint.   We're pretty busy in

15   the City obviously but I personally am not a person

16   that's gonna blow somebody off or just like it's my

17   way or the highway ... let's go ... and do things that

18   are going to escalate a situation by my own actions.

19        Q.    In your experience riding with Senior

20   Corporal Gordon, Shawn Gordon, between you and he did

21   one of you have a little more patience than the other

22   in dealing with people like this?

23        A.    We were probably hot and cold.   I mean,

24   there were days -- I remember Theo Gregory, the guy

1    that drank all the --

2              Q.    The lawyer Theo Gregory?

3              MR. MILI:  His cousin.  It's not Theo.

4    It's the other Gregory.

5              MR. LANDON:  Okay.

6              THE WITNESS:  Yeah.  The one that drank

7    all the vodka, he was tee-ing off on Shawn more than

8    me because Shawn is a white guy and, you know, that

9    got under Shawn's skin a little bit to begin with, but

10   it got to the point where at the end of the night he's

11   inviting us over for barbecue and everything else like

12   that.  So in that instance at the beginning of it

13   yeah, Shawn was a little bit more irritated than I

14   was.

15             Paul Carr had me in the hospital a lot

16   more pissed off than Shawn was.  Sean thought it was

17   hilarious, but then again it was all dealing with how

18   he was addressing me.

19             MR. MILI:  Let me interrupt if I may.

20   We've been going for about an hour.  Do you need a

21   break?

22             THE WITNESS:  I'm good for a little bit.

23             MR. LANDON:  Keep going?

24             THE WITNESS:  Yeah.

BY MR. LANDON:

    Q.    In your job prior to July 11 of '05 when you were either partnering with Shawn Gordon or any of the other folks that you had partnered with prior to him, had you ever witnessed any of your partners or any other member of the Wilmington Police Department using what you considered to be excessive force under any circumstances?

    A.    No.

    Q.    Have you yourself ever been the subject of any internal police investigations over the use of force?

    A.    No.

    MR. MILI:  Before you answer -- well, you answered it already, but just for the record we have a standing objection to any questions about internal disciplinary investigations based on the Delaware Law Enforcement Officers' Bill of Rights.

    You can continue to ask the questions and you can continue to answer them but we make a standing objection on the record.

BY MR. LANDON:

    Q.    Has there been any internal investigation by the Wilmington Police Department into

1    the Gerald Walker 7/11/05 incident?

2         A.    Yes.

3         Q.    Have you been interviewed or questioned

4    by anyone in response to that?

5         A.    My Sergeant.

6         Q.    Who is your sergeant?

7         A.    At the time it was Master Sergeant Tom

8    Kane.

9         Q.    Tom Kane?

10        A.    Kane.

11        Q.    How's that spelled?

12        A.    Thomas, common spelling, Kane, K-A-N-E.

13        Q.    When did he question you about the

14   incident?

15        A.    After -- while we were at the Wilmington

16   Hospital getting Mr. Walker treated for his Capstun

17   exposure.

18        Q.    Incidentally, did you know that he

19   suffered a subdural hematoma and had to have a

20   craniotomy after this?

21        A.    No, I didn't.

22        Q.    Do you have any idea how that happened?

23        A.    None whatsoever.

24        Q.    Do you know what a craniotomy is?

```
 1          A.      I guess -- I'm assuming that's where

 2   they cut open the brain, only because I had a bleed on

 3   my brain from my car accident.

 4          Q.      Master Sergeant Kane spoke to you at the

 5   hospital?

 6          A.      Correct.

 7          Q.      And which hospital was it?

 8          A.      Wilmington Hospital.

 9          Q.      How did he come to be at the Wilmington

10   Hospital?  Was he just there coincidentally or was he

11   there for this reason?

12          A.      Who?

13          Q.      Master Sergeant Kane.

14          A.      For this reason.

15          Q.      Tell me how he became involved.

16          A.      Anytime you use force you have to notify

17   a supervisor.

18          Q.      Anytime you use any force on the

19   continuum?

20          A.      That results in injury or, for example,

21   Capstun.  An individual would have to go to the

22   hospital to be treated for that exposure.

23          Q.      Do you know if Master Sergeant Kane

24   created any sort of written report or document
```

1    regarding his conversation with you at the hospital?

2         A.    I would assume so.

3         Q.    Have you ever seen it?  Have you ever

4    seen any document that he created?

5         A.    No.

6         Q.    Do you know if the standard operating

7    procedure for the Wilmington Police Department is to

8    document uses of force in writing?

9         A.    Yes.

10        Q.    Is that something that's typically done

11   by the Master Sergeant?

12        A.    That's a supervisory function.  Yes.

13   I'm going to document obviously the incident itself in

14   certain -- yes.

15        Q.    I understand there's three Wilmington

16   police officers involved in this incident, the three

17   people who are Defendants in the case:  You,

18   Miss Buhrman and Mr. Gordon; correct?

19        A.    Yes.

20        Q.    No others; right?

21        A.    No.

22        Q.    Who amongst the three of you reported

23   the use of force to your Master Sergeant?

24        A.    I don't recall if it was either Shawn or

```
 1   I or Karen.  I mean, I would assume it was Shawn or I,
 2   but again --
 3          Q.     Would that have been more likely than
 4   not reported by radio?
 5          A.     Yes.
 6          Q.     And apparently it was reported during
 7   transport, sometime after you got Mr. Walker into the
 8   car, while he was being transported to the hospital
 9   probably.
10          A.     Yeah.  Also I'll say you can tell on the
11   radio when there's an issue going on, and I know at
12   least for my platoon and the different supervisors
13   that I've had, more often than not they will actually
14   be there before you even get a chance to make that
15   call.  I've had it happen to me before.
16          Q.     How does that work?  How's that?
17          A.     Everybody is listening to the radio so
18   you're gonna know 13 Charles, which I was at the time,
19   is being sent to Connections for X, Y or Z and then if
20   one of us is keying up a radio at some point during a
21   scuffle and I don't respond over the radio, people are
22   automatically gonna be thinking okay, there's an issue
23   going on there.  Over the radio you can hear it, a
24   scuffle going on, on the radio keys.
```

1          Q.      Radio keys being depressed inadvertently

2    either by hand --

3          A.      There's been times I've done it by hand

4    and I've had another hand here (indicating) or just by

5    being my body in contact with another individual is

6    gonna key it.  I don't recall any other responding

7    units actually making it upstairs in that specific

8    incident, but I know after a certain point once he's

9    in custody you're gonna come over the radio and say

10   that he's in custody and there's no need for any other

11   units.

12         Q.      Did Master Sergeant Kane actually speak

13   with you at the Wilmington Hospital about what had

14   happened?

15         A.      As I recall, yes.

16         Q.      Do you remember how long that

17   conversation lasted?

18         A.      No.

19         Q.      Remember what you told him?

20         A.      Exactly what happened.

21         Q.      Okay.  Did he also speak with Officer

22   Gordon?

23         A.      Yes.

24         Q.      Did he also speak with Officer Buhrman?

1       A.      I don't know if he spoke -- Karen wasn't

2   at the hospital, so he would have spoken to her

3   somewhere else.

4       Q.      Other than speaking with Master Sergeant

5   Kane at the hospital about the use of force, about the

6   incident with Mr. Walker, did you have any other

7   involvement after that with any type of investigation

8   internally by the Wilmington Police Department into

9   the use of force that day?

10      A.      No.

11      Q.      Did you ever write any type of report

12  about the incident with Mr. Walker?

13      A.      I don't recall if I did it or Shawn did

14  it.

15      Q.      I have one that was apparently authored

16  by Shawn but I don't have one that indicates that you

17  wrote it.

18      A.      In that situation where we're a two-man

19  car, so Shawn would have wrote it I would assume

20  because I was in the hospital myself, and so that

21  would make perfectly good sense, that he would have

22  written it.

23      Q.      Were you injured in the incident?

24      A.      Yes.

Ballard - Direct                                55

```
 1          Q.      What injury or what injuries did you
 2  sustain?
 3          A.      Cervical strain.
 4          Q.      Did you have to receive medical
 5  treatment for that?
 6          A.      Yes.
 7          Q.      What type of medical treatment did you
 8  receive?
 9          A.      Um, I received painkillers,
10  anti-inflammatories.  Was out of work for four or five
11  days.
12          Q.      Did your cervical injury resolve?
13          A.      Yes.
14          Q.      How long did that take to resolve?
15          A.      I went back to work after four or five
16  days.
17          Q.      Were you okay at that point?
18          A.      Yes.
19          Q.      Do you recall what time of the day this
20  incident happened?
21          A.      I know -- I want to say it was before
22  noon.  Like, late morning.
23          Q.      Do you recall what shift you were on
24  that day?
```

A-324

Ballard - Direct                                    56

1          A.       Daywork.

2          Q.       And when would that shift begin and end?

3          A.       I don't recall if we had switched -- we

4    used to be on a 7 a.m. to 3 p.m. and then we

5    switched -- excuse me.  Seven to 4.  And then we

6    switched to half the platoon going from 7 to 4, 8 to

7    5, so I would have been on either the 7 to 4 or 8 to

8    5.  It would have been that split.  Would only have

9    been a difference of an hour.

10         Q.       I take it Shawn Gordon was on the same

11   shift.

12         A.       Yes.

13         Q.       Do you recall anything at all about what

14   the two of you had done earlier in the day from the

15   beginning of your shift until you got the call to go

16   to Connections?

17         A.        It would have been -- that specific day,

18   no.  No.  Shawn and I like drug work and so the river

19   side area is ripe for that kind of thing and we

20   were -- that was our bread and butter, but I don't

21   recall any arrests that day prior to this.

22         Q.       Tell me how you ended up going to

23   Connections.  Did you receive a radio message or

24   something?

A-325

1          A.      I don't remember if we were specifically

2    dispatched or the Radio Room told us to call in and

3    then they told us over the cell phone that we were

4    going to assist Karen who was the transport officer

5    with a disorderly subject at Connections.

6          Q.      Was that term used, disorderly subject?

7          A.      I believe so.  I mean, it's called in

8    our vernacular an AA, which is a disorderly

9    individual.

10          Q.      What's AA stand for?

11          A.      I don't know.

12          Q.      Had you ever been to Connections other

13    than the time that you told us about with hockey stick

14    man to transport anybody from Connections to Delaware

15    State Hospital before Mr. Walker?

16          A.      Yes.

17          Q.      Do you recall approximately how many

18    times you had done something like that?

19          A.      More than ten.  To that specific

20    Connections office?

21          Q.      Any Connections office.

22          A.      Any Connections office, it's way more

23    than ten, because there's a couple in the area.

24          Q.      All right.

A-326

1          A.      There's one on West Street, 800 block.

2   More than ten.  Upwards of twenty.

3          Q.      Upwards of twenty.  Prior to 7/11/05 in

4   the seven months that you were on the job you had

5   transported that many people from any Connections

6   facility to the State Hospital?

7          A.      Oh.  To the State, or any hospital?

8          Q.      Well, to the State Hospital let's say.

9          A.      State?  State's pretty infrequent.  I've

10  probably been to the State Hospital since I've been on

11  the job less than ten times.  It's more common for an

12  individual to go to Rockford or MeadowWood in my

13  experience.

14         Q.      I take it -- did you understand on

15  July 11 of '05 since they wanted this person

16  transported to the State Hospital that there was more

17  than likely some sort of mental illness issue?

18         A.      Yeah.  I would say yeah.  I mean, as far

19  as diagnosing it, no.  But obviously.

20         Q.      Right.  Tell me -- I want you to go

21  through it step by step and describe for me what

22  happened from the time you and Shawn Gordon arrived at

23  Connections until you take Mr. Walker over to the

24  Wilmington Hospital in as much detail as you can

1   recall, and I'm gonna probably interrupt you a

2   thousand times.

3           A.      That's fine.

4           Q.      But that's what I want.

5           A.      Can we take a break now, like five

6   minutes?

7           Q.      Absolutely.

8                   (Break taken)

9   BY MR. LANDON:

10          Q.      Can you explain the incident in detail.

11          A.      Again, I don't recall how we got the

12  initial dispatch, if it was either by phone or by

13  radio.

14                  Got to Connections.  The receptionist

15  right by the elevator -- I don't recall if it was her

16  or the one upstairs, said, "You're here for the guy

17  upstairs," and her exact words I don't recall, but she

18  insinuated that he was going to be difficult.

19                  When we got upstairs, as I recall the

20  second floor there's kind of office space to one side

21  and then a long hallway that extends down the hall.  I

22  could see Karen standing about midway down and my

23  first observation of Mr. Walker was that he was

24  sitting on it was either a bench or a chair up against

1  the wall farther down from Karen, probably 20, 30

2  feet?

3              Another Connections employee approached

4  us as we were going to Karen and that's what I said

5  earlier, I don't remember which one of the two that

6  made the comment, and as well I don't recall if it was

7  either Karen or the other employee that mentioned that

8  Mr. Walker either had made comments that he wanted to

9  rape his granddaughter or had actually taken some

10 steps to that effect, and that all would have gone in

11 line with us trying to get some more information as to

12 what the deal was.

13             As we got closer to Mr. Walker he stood

14 up and we said, "Mr. Walker, I'm Officer Ballard with

15 the Wilmington Police Department." I don't know if

16 those were my exact words, but I typically say who I

17 am.  "And I understand that we're to transport you to

18 the State Hospital."

19             His first comment to me was, "Well, I'm

20 not going." And I don't recall if he stood up as he

21 said that or if he was already standing.

22             To my recollection, Mr. Walker -- like I

23 said, I'm six-two, 240.  Mr. Walker was at least as

24 tall, if not taller than me, and probably had a good

1    40 to 50 pounds in my estimation on me.

2              He continued to kind of pace back and

3    forth in the area there.  There are, like, the

4    partition walls, I don't recall how high they were,

5    but he was walking kind of back and forth.

6              Shawn took -- there was, like, a doorway

7    through some of the partitions where you could get

8    around to the other side of Mr. Walker.  Just kind of

9    based on how he was moving around there's an obvious

10   concern of if he has access to anything that could be

11   used to either injure himself or anybody else, so we

12   were trying to kind of contain him, the whole time

13   just kind of talking to him, and at a certain point I

14   guess our conversation just kind of degenerated into,

15   "Well, I'm not going," and I said, "Well, Mr. Walker,

16   we can do this the easy way or we can do it the hard

17   way but the bottom line is you're going to go to the

18   hospital."

19             He was at that time facing me but kind

20   of moving in between Shawn and I.  Neither of us was

21   really close on him.  I'd say probably the distance

22   between me and Shawn was 20 feet.  And Mr. Walker was

23   kind of moving in between the two of us.  At that

24   point Karen was behind me.

A-330

1              As we moved closer to Mr. Walker, he was

2  facing Shawn and kind of waving his arms around and,

3  again, we were by that doorway area by the partitions

4  and the next thing I know he turns around and he's got

5  me in a headlock and my right arm was up against the

6  side of my head like this (indicating), and his arms

7  were around -- on this side (indicating), up under my

8  arm, and on my other side around my neck, and we were

9  nose to nose.  For that reason alone I say he was at

10 least -- he was taller than I was because I was up off

11 the ground.

12             In my own mind at that point Shawn and I

13 about a month before that had been involved with an

14 individual who had attempted to remove Shawn's weapon

15 and the first -- my first thought at that point was

16 I'm righthanded and I have absolutely no way.  My

17 weapon is now wide open and we're sitting there like

18 that.

19             At some point, because I didn't see what

20 Shawn did, I ended up on the ground on top of

21 Mr. Walker, again with my hand up above my head,

22 Mr. Walker was on his back, and we were nose to nose.

23 I do recall at that point -- he wasn't letting go of

24 me either.

1              I do recall striking him with my head,

2    head-butting him, at least two or three times.  At the

3    same time when we were on the ground I started moving

4    to my left.  He still had ahold of me by the neck and

5    right shoulder and my intent was to get my weapon away

6    from his body, so I was kind of maneuvering my body in

7    I guess almost like a T shape.

8              He still was holding on to me.  Again, I

9    don't recall how many times, like I said two or three

10   times, I was hitting him with my head.  The last one,

11   obviously I hit him hard enough that he let go of my

12   neck and I was able to kind of get up into as close to

13   being on my knees and I recall striking him with my

14   hand in his face.  The back swing, I actually hit

15   Shawn, because at this point Shawn was behind me and

16   it was just me and Mr. Walker.

17             He continued to wave his arms around at

18   us.  I don't recall if Shawn sprayed him first or I

19   did in the face.  We go, "Let me see your hands.  We

20   gotta turn you around."  We sprayed him.  As soon as

21   we sprayed him we were able to kind of move him up on

22   the one side, got out of the way.  I don't recall if

23   it was his left or right arm we cranked back first and

24   got a handcuff on that, and I don't remember if we

1    used both my handcuffs and Shawn's handcuffs to secure

2    him.  With some larger people you can't get their arms

3    all the way back behind them, so I may have put my

4    handcuffs on one arm and Shawn on the other and we

5    joined the two.  At that point we got him up into a

6    standing position and then walked him out.

7              Q.    How long did the whole episode last from

8    the time that you arrived at Connections until the

9    time you started walking Mr. Walker out of the

10   building?

11             A.    Ten, 15 minutes maybe?

12             Q.    What was Officer Buhrman doing during

13   those 10 to 15 minutes?

14             A.    Karen was behind me.  I didn't see her.

15   I was more concerned with Mr. Walker.

16             Q.    Do you know whether she was physically

17   involved in the struggle with Mr. Walker at all?

18             A.    I know she stated later to me that she

19   had ahold of Mr. Walker's legs at one point while I

20   was on top of him.

21             Q.    When did she tell you that?

22             A.    Later on in the day.  I didn't see it

23   myself though.

24             Q.    All right.  I'm gonna go back and ask

Ballard - Direct                                    65

1    you questions about what you just told me.

2              How many different employees of

3    Connections do you recall talking to or talking to you

4    or the other two police officers while you were there?

5         A.    I remember I believe she's a black

6    female who was the receptionist downstairs.  I

7    remember a white female upstairs.  And although I

8    didn't talk to him, there was another white male that

9    I saw.

10        Q.    Was that upstairs?

11        A.    Yes.  I'm sorry.

12        Q.    Can you describe the approximate age of

13   the black female receptionist, roughly?

14        A.    Thirties, 40s.

15        Q.    Had you ever seen her before?

16        A.    When I'd gone to Connections.

17        Q.    Did you know her name?

18        A.    No.

19        Q.    And the white female, how old would you

20   say she was?

21        A.    Little bit older.  Maybe in her 40s.

22        Q.    Do you know her name?

23        A.    No.

24        Q.    And the white male, about how old was

1    he?

2          A.     He was younger, mid to late 20s, and I

3    didn't know his name.

4          Q.     Did you know anything about them?  What

5    their jobs were?  Whether they were doctors or nurses

6    or whatever?

7          A.     No.

8          Q.     But you knew that they were both

9    employees?  The white female and white male were both

10   employees of Connections?

11         A.     Yes.

12         Q.     How did you know that?

13         A.     Either from previous experience or ID

14   cards; one of the two.

15         Q.     Were there any other --

16                Do you recall there being any other

17   employees of Connections that would have witnessed

18   anything that happened between you three officers and

19   Mr. Walker?

20         A.     Those are the ones that I recall.  It

21   was the middle of the day.  I would assume they were

22   fully staffed, but I don't recall seeing anyone else.

23         Q.     Do you recall seeing any other people in

24   Connections?  Any other patients or people other than

1    Mr. Walker?

2           A.      In that immediate area, no.

3           Q.      Did the white female witness what

4    happened between you and Officer Gordon and

5    Mr. Walker, the physical part of it?

6           A.      I don't know.

7           Q.      Did the white male witness it?

8           A.      I believe so.  I think he was on the

9    other side of the partition.

10          Q.      Was he in a position to see what

11   happened?

12          A.      From where he was I think he would have

13   seen me on top of him and that portion of it; the last

14   third I guess of the incident when we were on the

15   ground.

16          Q.      Would it surprise you to know that both

17   of those individuals have indicated that they saw the

18   entire episode?

19          A.      No.

20          Q.      The first person that you come into

21   contact with there is the receptionist downstairs;

22   correct?

23          A.      Yes.

24          Q.      And you don't recall specifically what

1    she said other than you have a general recollection

2    that she I think it was your word *insinuated* that

3    Mr. Walker was gonna be difficult.

4         A.    And I only say "insinuated" because I

5    don't remember the correct or the specific words that

6    she used.

7         Q.    Okay.

8         A.    But between the two of them, the mention

9    was made that it wasn't gonna be easy.

10        Q.    Now you walk upstairs and that's when

11   you see Karen Buhrman?

12        A.    Yes.

13        Q.    And you see Mr. Walker at about the same

14   time that you see Karen Buhrman there 20 or --

15        A.    He's farther down.  Yes.

16        Q.    Do you talk to either the white male

17   employee or the white female employee while you're

18   upstairs before you begin talking to Mr. Walker?

19        A.    As I recall, but, again, I don't

20   remember which of the -- it was either the female

21   upstairs or downstairs that made the comment about

22   Mr. Walker, but I don't recall at least at that point

23   talking to the male.

24        Q.    I think you told me that you don't

1    recall whether it was one of the employees or Karen

2    that mentioned that Mr. Walker had made comments

3    regarding rape of the granddaughter.

4          A.      Correct.

5          Q.      What was going through your mind at that

6    point in terms of what kind of person you were dealing

7    with, meaning Mr. Walker, when you heard that comment?

8          A.      That played no bearing on -- I mean,

9    you'd be surprised the things that I see on a daily

10   basis.  I mean, I'm not gonna make a judgment as to --

11   that's not my job I guess is what I'm saying.

12         Q.      I'm just trying to figure out, in your

13   mind at that point was it your impression that he had

14   raped his granddaughter or not?

15         A.      Again, I don't recall what the specific

16   term was, either that he had thought about it or

17   whatever, so I wouldn't have drawn a conclusion one

18   way or the other.

19         Q.      All right.  Do you have any specific

20   recollection of talking to either the white female or

21   the white male upstairs about Mr. Walker?

22         A.      Again, like I said, I don't remember if

23   it was the downstairs receptionist or the upstairs

24   woman, but I had a conversation with one of the two

1   with Shawn, and I'm only hedging because I don't

2   remember which of the two it was.  I will say it

3   wouldn't be normal for me to have a conversation with

4   a receptionist about somebody, you know what I mean?

5   But walking in there she obviously knew what we were

6   going there for which is why I say or I'm hesitating

7   to say which of the two it was.

8         Q.     And I take it whoever it was that you

9   talked to, you really don't recall any of the

10  specifics of the conversation.

11        A.     Other than we're taking him to the State

12  Hospital.  The white female may have made the comment

13  about what he had done to be committed.  I mean, other

14  than getting committal papers and things of that

15  nature, it's really not within our purview to have a

16  discussion about.

17        Q.     I'm just trying to figure out what

18  background -- that's not the correct word.  I'm trying

19  to figure out what you did to try to determine what

20  type of person you were dealing with before you

21  started to deal with him.  Maybe you didn't do much at

22  all and maybe you wouldn't do much at all under the

23  circumstances.  I'm just trying to figure out what you

24  did do.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware   1980(
(302) 658-6697   Fax (302) 658-8418

1          A.    As an individual, and as I've stated

2   earlier, I mean, my first reaction or my first option

3   that I am gonna use is to go and see if I can talk to

4   a person.  I can talk to people.  I've had to use

5   force on people but I would much rather have a

6   conversation with somebody, and as I explained to you

7   earlier it's worked with some people that are --

8   obviously aren't together for whatever reason, and I'm

9   not being facetious when I say "aren't together," but

10  for whatever reason my involvement as a police officer

11  has come into play and, I mean, I have a job to do

12  just as well.

13          There really wasn't a road map to say,

14  you know, if presented with this, then you do this,

15  but my first option would be let's see if we can just

16  say hey, we have a place to go.  Let's go there.

17          I know in -- sometimes people are a

18  little upset with the fact that they may not have

19  committed a crime but they still have to be

20  handcuffed, and that's our policy, that anybody that

21  rides in the back of the car has to be handcuffed and

22  in some examples individuals get a little put off by

23  that because they feel they haven't done anything

24  wrong, and typically I've never had to fight somebody

1    to the point where we're at the car or anything like

2    that and say, you know -- typically, you know, it's

3    This is my policy.  They come off as easily as they go

4    on.  We'll be there in ten minutes.  I'm gonna take

5    them right off when we get to where we're going.  And

6    that's it.

7         Q.     Well, that's what I'm wondering about.

8    What sort of conversation did you have with

9    Mr. Walker?

10        A.     It would have been right along those

11   lines.  What made Mr. Walker's situation different

12   was, No. 1, when he got up out of that chair and was

13   walking in between Shawn and I, I could see that it

14   wasn't gonna be easy just by how he was acting,

15   multiplied by the fact that he was a large guy.  I

16   certainly didn't expect to be put into a headlock

17   almost immediately as soon as I got probably our

18   distance between us.

19             I mean, he was facing Shawn and next

20   thing you know I'm like that (indicating), so that

21   obviously didn't come into play, and from that point

22   forward we're in a whole different realm as far as

23   dealing with this situation.

24             I mean, you're going from trying to

1    mitigate a bad situation by using, you know, verbal

2    Judo, how you speak to people, to now he's put "my"

3    hands on me, he's in a position where he has better

4    access to my gun than I do, I'm off the ground and

5    we're in close quarters, and based on my previous

6    experience to that point that's an ugly situation.

7            Q.     Let's concentrate for a minute on

8    everything that happens up until the point where he

9    grabs you and puts you in a headlock with your right

10   arm up above your head.

11                  First of all, how much time did you

12   spend upstairs at the Connections facility from the

13   time you first got up there and you see Mr. Walker and

14   Officer Buhrman until you're in a headlock with your

15   arm up above your head?  How much time passed?

16           A.     Somewhere between five and ten minutes

17   from start to finish.

18           Q.     Was there conversation going on during

19   those five to ten minutes the whole time between you

20   and Mr. Walker?

21           A.     Not the whole time.  Like I said, when

22   we first got upstairs I was talking to Karen.  Shawn

23   and I both were trying to figure out what's going on.

24   And then from that point, after -- now Shawn and I are

1    there.  Now it's us dealing with Mr. Walker and

2    Karen's kind of out of it because we were dispatched

3    to it.  From that point forward, I mean, we're

4    addressing Mr. Walker.  I'm dealing with him.

5           Q.     What's he saying to you?

6           A.     I remember him saying, "I'm not going to

7    the hospital."  He had -- I seem to recall him having

8    like almost like a Caribbean accent almost and a lot

9    of the -- my grandparents live in Barbados so it's not

10   like I wouldn't understand the dialect, but he was

11   speaking so fast that some of it was unintelligible,

12   especially when you got to the point where he was

13   waving his arms around and saying, "I'm not going."  I

14   remember hearing "I'm not going ... I'm not going ..."

15   and then when I made the comment, you know, we can do

16   it the easy way or the hard way, I remember him

17   saying, "Then we'll do it the hard way," and, I mean,

18   that's all leading up to that point.

19           But he wasn't articulate to the point

20   where, you know, he was giving me lucid reasons for

21   why he wasn't going to go to the hospital above and

22   beyond the fact that he was being committed, and

23   really I wouldn't debate that with him at that point.

24           Q.     Was he saying, like, nonsensical stuff?

1    Was there just jibber-jabber coming out of his mouth?

2            A.      No.  It wasn't to the point where it

3    was -- and I've seen that, you know, where everything

4    that comes out, you don't understand a word, but

5    everything was running together at certain points, so

6    when I say unintelligible, it was because maybe he was

7    speaking so quickly, but I distinctly remember him

8    having some sort of accent.

9            Q.      Did you have the sense that he

10   understood you were a uniformed police officer?

11           A.      I was in uniform.  I mean, I hate to

12   assume for anybody, but it's not like our uniforms

13   aren't anything other than what they are, if you can

14   understand that answer.

15           Q.      Well, I'm just wondering whether he said

16   anything or did anything that indicated to you that he

17   understood you were a police officer.

18           A.      I don't remember specifically.

19           Q.      Did Shawn Gordon have any conversation

20   with him before the headlock occurred or was it just

21   you talking to him?

22           A.      No, no, no.  We were both talking.  I

23   don't remember what Shawn would have been saying but,

24   again, I mean, we were partners.  We dealt with

1   situations like that so there's a back and forth, but

2   as to what he specifically said --

3          Q.      Was Mr. Walker being verbally aggressive

4   in any way toward either you or Shawn Gordon?  In

5   other words, saying anything of a threatening nature

6   or of a derogatory nature or anything like that?

7          A.      I wouldn't say that he specifically

8   verbalized any specific threats towards any of the

9   three police officers that were there.  I wasn't there

10  when Karen had her initial interaction with him so I

11  couldn't speak to that.

12              Based on his demeanor, that was a pretty

13  good indicator for me that he wasn't going to be -- he

14  wasn't gonna go willingly.  I was gonna say willing

15  participant but I didn't want to sound facetious.  He

16  wasn't going to buy into the "Let's just take this

17  trip.  We'll get it all hashed out.  I'm gonna have to

18  put handcuffs on you."  Attempts that I've used with

19  other people.

20         Q.      Did you try to enlist any assistance

21  from either the white male or the white female

22  Connections employees in figuring out how to try to

23  deal with him?

24         A.      No.

1          Q.      Did they offer any advice or information

2    to you that you can recall?

3          A.      Other than the fact that he was gonna be

4    difficult, and I don't recall which one said that.

5    No.

6          Q.      Did either of them indicate to you that

7    he would likely be violent?

8          A.      I would assume difficult.  I would have

9    placed difficult in that category.

10         Q.      The word "difficult" was used by the

11   Connections employee and you interpreted that as

12   meaning violent?

13         A.      I don't know if "difficult" was the

14   specific word used.  I used the word "difficult."  But

15   if a person -- at least in that situation, when

16   someone is saying that to me, and it's happened to me

17   on a couple of occasions with Connections specifically

18   where a client, because that's what they are to

19   Connections, isn't advised by their staff that the

20   police are coming to take them somewhere until we get

21   there, and by that I mean the first knowledge that

22   that client has that the police are involved is when

23   we show up.

24               My personal opinion?  For a person that

1    is already for whatever reason going somewhere

2    unwillingly, my presence then becomes incendiary.

3    They're already upset with the fact that a cop is

4    there and no one told them about it and, like I've

5    said, I've seen that happen before.

6              I couldn't tell you what conversation

7    the Connections staff had with Mr. Walker or whether

8    or not he knew he was going to the hospital prior to

9    anybody getting there but, you know --

10        Q.    Well, you knew from Karen Buhrman that

11   she had tried to talk to him.

12        A.    Correct, correct.  But I'm saying from

13   50,000 feet before Karen got there whether or not that

14   conversation ever happened.  And in my own opinion

15   that's a huge problem because it then puts me or any

16   other cop in a position of selling somebody on

17   something.  You would think that the Connections staff

18   says Hey, Mr. Walker, we're gonna have the police

19   come.  You're going to the DSH or you're going to

20   MeadowWood or you're going to Rockford and the police

21   are going to be taking you there.

22        Q.    In this instance you don't know whether

23   the Connections staff told him that before Officer

24   Buhrman got there or not.

                                            A-347

1        A.      Correct.

2        Q.      They may have; they may not have.

3        A.      Correct.  But in my experience over

4    those times that I've been before, more often than not

5    it's a surprise to that patient or client when we show

6    up.

7        Q.      Given what you've just told me if that

8    was your experience and those were your thoughts about

9    that experience, did you ever communicate those

10   thoughts to Connections?  Say you get the call from

11   Connections.  Did you ever get on the phone with

12   Connections and say Hey, why don't you tell this

13   person that we're on our way so that when we get

14   there, that news has already been broken to them?

15       A.      I don't get dispatched from Connections.

16   I get dispatched from my 9-1-1 dispatchers so, you

17   know, I'm not gonna speak to policy.  That's not

18   within my purview.

19       Q.      All right.  Back to the question that

20   sort of led into this last discussion.  Somebody at

21   Connections told you something along the lines of this

22   patient is going to be difficult.  "Difficult" you

23   said was your word, not necessarily the word that

24   Connections used.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697    Fax (302) 658-8418

1          A.      Correct.

2          Q.      You don't recall the word that

3    Connections used.

4          A.      Correct.

5          Q.      In your mind, though, did you believe

6    that Mr. Walker might be violent or could be violent

7    with you?

8          A.      Not based on those words.  You know,

9    "difficult" has, and again that's my word, but I'm not

10   going to go and make a -- presuppose that a person is

11   going to be likely to do a certain thing.  That's not

12   to say if I get sent to a gun complaint and someone

13   says there's a gun that I'm not expecting to see a

14   gun, but in this specific instance, you know, until

15   they exhibit some kind of behavior that's going to

16   lead me to believe that we're not gonna have an easy

17   run of it, I'm gonna go with an open mind.

18         Q.      Sitting here listening to your

19   recollection of events, this is just my personal

20   observation, it sounds to me like you got to the point

21   of when you said to him we're gonna either do this the

22   easy way or the hard way, that that came fairly early

23   on in your process given what you've told me about

24   having to deal with other people and taking as long as

1    a half an hour to talk to people and finally

2    persuading them to go with you.

3              A.     And I did say that it's all gonna depend

4    on the individual situation, how that individual is

5    acting.  If a person is receptive to me talking to

6    them -- Paul Carr for example.  I went way out to left

7    field and brought up Civil War stuff.  Shawn was in

8    the room with me and he looked at me later and said

9    Where the Hell did that come from?  Because I was in

10   Paul Carr's room in his personal space and saw

11   something right there that I could draw a parallel

12   with him about.

13              I was in a hallway, a bland hallway, and

14   from immediately stating where we were going, I got

15   "I'm not going," and then lots of fast words and that

16   situation deteriorated and I don't know, because I'm

17   personally willing to put a little bit of extra effort

18   into some things, that there was anything I could do

19   to sell him on having to be handcuffed and walking him

20   downstairs, if I took an hour or whatever, just based

21   on how he was acting, and I say that with complete

22   honesty regardless of the situation that we're in

23   today and why we're here.

24              Q.     So even in hindsight sitting here today

1   you think you did the right thing.

2           A.      Are you asking me totally?  Because

3   everything I did after I got in the handcuff or,

4   excuse me, in the headlock I would do without a

5   heartbeat.

6           Q.      I gathered that from what you said

7   before.

8           A.      And I'm not trying to be sarcastic.

9           Q.      Yeah.

10          A.      But up to that point, yeah, and, I mean,

11  it's not hard for you to look at the names of the

12  people that I gave you and go back and say that I have

13  invested time talking to certain people and there is

14  nothing other than Mr. Walker's actions at that time

15  that led us down the path to where we were.

16          Q.      So you don't believe that it was a

17  situation where you and your partner lost your

18  patience a little too quick?

19          A.      No.

20          Q.      When you told Mr. Walker that you were

21  either gonna do this the easy way or the hard way,

22  were you and Officer Gordon at that point in time sort

23  of moving closer to him from opposite sides of him?

24          A.      I don't know if we were moving as we

1    said it or if that came as a result of his answer that

2    we would do it the hard way.  I mean, again, I'm not

3    going to intentionally initiate me putting my hands on

4    somebody.  I'm gonna let the situation dictate that.

5            Q.      But in this situation is that what

6    triggered you to move toward him and try to handcuff

7    him?

8            A.      His answer did.

9            Q.      His answer?

10           A.      Yes.

11           Q.      "We're gonna do it the hard way."

12           A.      Right.  His answer and the fact that his

13   demeanor leading up to that point but, I mean, for me

14   that was --

15           Q.      Okay.  At the point where he said "Then

16   we're gonna do this the hard way," now what was in

17   your mind?  What was your intention as to what you

18   were going to physically do then?

19           A.      At that point --

20           Q.      Yeah.

21           A.      -- in the confines we had right there,

22   get him to a point where we could get him on the

23   ground and handcuff him and walk out, because it was

24   obvious that he wasn't gonna willingly put his hands

 1    behind his back and allow himself to be handcuffed.

 2         Q.    And you had had that discussion with

 3    him?

 4         A.    I'm sorry?

 5         Q.    You had had that discussion with him?

 6         A.    Yeah.  That we were gonna have to put

 7    handcuffs on him?

 8         Q.    Yes.  He's like You're not putting

 9    handcuffs on me.

10         A.    Exactly.

11         Q.    And the getting him on the ground part

12    of it, would that be -- was that, like, standard

13    operating procedure or was that something that you and

14    Shawn Gordon actually verbalized to each other, or did

15    you both sort of have the same mind that this is

16    what's happening next?  How did that -- what was your

17    plan and how did that occur?

18         A.    To answer your first question, a willing

19    suspect or a willing individual can typically be

20    handcuffed by just telling them place your hands

21    behind your back.  I'm gonna put them at a position of

22    disadvantage in that they're off balance a little bit,

23    either leaning forward and putting their hands behind

24    their back to where I can handcuff them, or placing

1    them forward and bringing one hand back and then the

2    other for a person that's willing.

3              For a person that's not willing, it's

4    all about control.  The best place to control an

5    individual is prone, on their face, and then from that

6    point you can bring their arms back one at a time and

7    handcuff them.

8              Getting him to the ground, you're

9    sometimes dependent on the location where you are.  Is

10   it in a house?  Is there a lot of stuff around?  You

11   kinda have to improvise to a certain extent.  I know

12   that Shawn and I have had to do that before and it's

13   normally one person is controlling the upper part of

14   the body and one person is controlling the lower half

15   of the body and then you get them down on the ground

16   and put handcuffs on them.

17        Q.    I guess what I'm trying to figure out

18   is, did you and Shawn Gordon go into a huddle and say

19   okay, this is how we're doing it --

20        A.    No, no.

21        Q.    -- or did you both just start moving?

22        A.    Shawn and I -- as I said before, Shawn

23   asked our lieutenant if we could partner together.  I

24   have yet thus far in my short police career ever

1    worked with somebody who, No. 1, evaluated me for six

2    months and then after that was my partner, my equal so

3    to speak, who I ever worked so closely with, who I

4    could anticipate what he was doing. We're good

5    friends. But I will tell you I felt safe, and I'm a

6    big guy, and I felt safe with Shawn. I knew that

7    Shawn would be there for me in certain situations

8    where Kevin Britt, the guy that tried to take Shawn's

9    gun, who is now dead for doing the same thing I might

10   say, with Kevin, that was a ten-minute fight and

11   probably for the first four or five minutes Kevin's

12   got his hand on Shawn's gun and we're on a stoop and

13   from that moment, and I was still in FTO, it was May

14   of '05, I never once hesitated or thought, and it's

15   happened to me since, where I'm like I wonder if this

16   person is gonna be there in this situation with me?

17            And I recently finished FTO'ing a new

18   rookie and I know for a fact I wouldn't put myself in

19   certain situations, (1), because I didn't know -- I

20   wasn't as confident, at least initially. I wouldn't

21   say that more recently now that I'm done with him six

22   months later, but I wasn't as confident early on of

23   how he would acquit (sic) himself in certain

24   situations, but I never had that concern with Shawn,

1   so I guess that's a long verbose way to answer your

2   question that through a lot of experience, a lot of

3   working together for two guys that like to go out,

4   liked to be proactive on the street, we learned to

5   anticipate each other's moves.

6           Q.      Were you going for the top or the

7   bottom?

8           A.      I've said this before.  I don't remember

9   if I was trying to go for the top and Shawn was going

10  for the top.  I just know my head was up so I

11  obviously was thinking -- you know, I'm going this way

12  as I'm moving towards Mr. Walker, whereas if I was

13  trying to go for his legs, I probably put -- his back

14  was to me initially, so in retrospect and in hindsight

15  it probably would have been smarter for me to go for

16  his legs because he couldn't see me, but it was what

17  it was.

18          Q.      All right.  So you're going toward his

19  back.  He spins around unexpectedly --

20          A.      Yeah.  Surprising.

21          Q.      -- and somehow your -- were both of your

22  arms out and he managed to get underneath the one of

23  them?

24          A.      I guess.  I don't remember specifically

1   what my body -- other than after the fact because I

2   distinctly remember being like this (indicating).

3         Q.    And when he had you -- you said he had

4   you in a headlock.  Describe what you mean by that.

5         A.    His head's like this (indicating).

6         Q.    His face is right in front of your face.

7         A.    We're nose to nose like this

8   (indicating), and my arm -- this is a replication of

9   him (indicating); this (indicating) is me.

10        Q.    Your right arm is up over your head.

11        A.    Correct.  And I know he had an arm this

12   way (indicating) and another arm around my neck.

13        Q.    So he had his left arm probably

14   underneath your right arm.

15        A.    In my armpit.

16        Q.    And his right arm --

17        A.    Around my neck.

18        Q.    -- around the back of your neck.

19        A.    Yes, as I recall.  I obviously didn't

20   see it.

21        Q.    Were his hands locked together behind

22   your body?

23        A.    I don't know.

24        Q.    And tell me what happened right after

```
 1  that happened.

 2          A.      I was scared shit --

 3          Q.      You were scared.

 4          A.      Yes.  I was very -- I mean, like I

 5  said --

 6          Q.      It was a surprise to you.

 7          A.      Complete.

 8          Q.      Okay.

 9          A.      And up to that point --

10          Q.      You had a gun on your right side?

11          A.      Yes.  I'm righthanded.  Up to that point

12  I'm just --

13          Q.      Did he ever make a move for your gun?

14          A.      No.  No.

15          Q.      Did you have some sort of a baton as

16  well?

17          A.      Yes.

18          Q.      Where was that?  On your left side?

19          A.      No.  I carry mine across, so it would

20  have been right here (indicating).

21          Q.      Did he ever make a move for that?

22          A.      No.

23          Q.      Did he ever try to grab any of your

24  weapons?
```

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware    1980
(302) 658-6697    Fax (302) 658-8418

1        A.      No.

2        Q.      Did he ever try to grab any of Officer

3   Gordon's weapons to your knowledge?

4        A.      Not to my knowledge.

5        Q.      Where do you keep your handcuffs?

6        A.      Behind my weapon right along the -- I

7   guess to the --

8        Q.      Back right side?

9        A.      To the right of my spine.  Yeah.

10       Q.      He's got you in a face to face.  Are you

11   both still standing at this moment?

12       A.      I was off my feet.

13       Q.      You were what?

14       A.      I was off my feet.

15       Q.      He picked you up in the air?

16       A.      When we were nose to nose I initially

17   said I wasn't sure if we were the same height, but I

18   know I was off my feet.

19       Q.      Were you up against a wall?

20       A.      No.

21       Q.      Did you head-butt him while you were up

22   off your feet when your feet were in the air while he

23   had you in this as you described it headlock?

24       A.      Yeah.  I think so.  I think so.  From me

1   being up like that to both of us being down was pretty

2   quick though, but I know I was immediately going into

3   get-him-the-Hell-off-of-me mode.

4        Q.    And was Officer Gordon trying to get him

5   off of you?

6        A.    Well, I don't know.  I mean, Shawn at

7   that point was behind him and I know Shawn said to me

8   later that he actually picked us both up and threw us.

9        Q.    Who picked who?

10       A.    Shawn.

11       Q.    Shawn picked you and Walker up?

12       A.    (Witness moves head up and down).

13       Q.    How big is Shawn?

14       A.    Shawn is my size but he is probably one

15   of the strongest human beings I've ever met and when

16   you see him and you talk to him you can figure that

17   out on your own, but I will tell you I have yet to

18   meet a person who has raw strength like that, and

19   obviously adrenalin had a lot to do with it, but I've

20   seen Shawn do some things.

21       Q.    Is Shawn taller than you?

22       A.    No.

23       Q.    Shorter?

24       A.    Yes.  He's probably five-ten,

1    five-eleven.

2         Q.    How much does he weigh?

3         A.    At least 240.

4         Q.    He told you later that he picked both of

5    you up off the ground?

6         A.    Yes.

7         Q.    Do you recall that happening?

8         A.    No.  All I remember is next thing I know

9    Mr. Walker's on his back and I'm on top of him.

10        Q.    All right.  How did Mr. Walker end up on

11   his back if Shawn's behind him?

12        A.    I can guess.  If Shawn picks him up and

13   we go that way (indicating), because I'm Shawn now

14   (indicating), Mr. Walker (indicating) and I'm behind.

15   So if he comes and grabs us both, and there was a

16   doorway right here (indicating), I mean I don't

17   remember any, you know, triple Lindy spins in the air

18   or anything, but I remember being on top.

19        Q.    So your best explanation now as to how

20   you and Walker ended up on the floor was that Shawn

21   probably picked you both up and then dropped you both

22   on the floor.

23        A.    Only because he said it.

24        Q.    Because that's what he told you after

1    the fact?

2            A.      Correct.

3            Q.      And it's not funny, but it's --

4            A.      I saw Shawn very angrily punch a wall

5    locker in our locker room once, it was a list, I don't

6    know, probably ten or eleven wall lockers.  He knocked

7    every one down.  So I know you probably don't -- it

8    looks -- he's a very strong guy.

9            Q.      Right.  What was he angry about that

10   time?

11           A.      I don't remember.

12           Q.      Now you're on the floor in this doorway.

13   Walker is you say on his back.

14           A.      Correct.

15           Q.      When you and he go down to the floor, I

16   take it the whole back side of him, back, back of head

17   and so forth, goes down and hits the floor with your

18   weight on top of him.

19           A.      I would assume so.

20           Q.      Did his head hit the floor?

21           A.      I don't recall.

22           Q.      Is this a tile floor?

23           A.      No.  It was carpet.

24           Q.      Carpeted floor?

A-362

1              Where is your left arm when that

2   happens?  Do you remember?

3       A.      I don't remember.

4       Q.      Does he still have ahold of the back of

5   your head with his arm as you're falling?

6       A.      Yeah.  He was still holding onto me at

7   that point.

8       Q.      When you're on the ground on top of him

9   now, he's face up?

10      A.      Yes.  We're face to face.

11      Q.      You head-butt him again while he's in

12  that position?

13      A.      Yes.

14      Q.      At least a couple times?

15      A.      I said between two and three times.

16      Q.      Probably at least once while you're

17  standing up and then --

18      A.      Correct.  For a total of three.

19      Q.      -- and a couple more times on the

20  ground?

21      A.      Yes.

22      Q.      The falling to the ground doesn't loosen

23  his grip on you?

24      A.      No.

A-363

1          Q.      Is he saying anything while all this is

2    happening?

3          A.      We weren't having a conversation at that

4    point.

5          Q.      You described trying to maneuver your

6    body to get your legs out to sort of get I guess

7    perpendicular to his body?

8          A.      Correct.

9          Q.      Were you able to do that?

10         A.      Yes.

11         Q.      And you were able to free your -- were

12   you able to free both of your arms?

13         A.      At some point after getting in that

14   position, because I remember being in the space

15   between his body and I guess it would have been his

16   right arm, so I'm down on the ground like this

17   (indicating) and that's when I rear back and I said I

18   actually inadvertently hit Shawn.

19         Q.      So Shawn is behind you somewhere?

20         A.      Yes.

21         Q.      Do you feel anybody else on you?  Do you

22   feel Shawn on you or did you feel his weight on any

23   part of your body?

24         A.      Maybe.  I mean, I wasn't really

1    concentrating on --

2         Q.    You rear back -- you pull your right

3    fist back and on the way back you hit Shawn.

4         A.    Yes.

5         Q.    With your fist or your elbow or what?

6         A.    My fist.

7         Q.    Where do you hit him?  On the face?

8         A.    Somewhere in the face because I remember

9    looking at him and he said just get away from him.

10        Q.    And then you come back with your fist

11   and hit Walker where?

12        A.    Either from somewhere from here to here

13   (indicating).

14        Q.    Somewhere from the chest to the top of

15   the head?

16        A.    Yeah.  All I was trying to do was get

17   away from him at that point.  Like, make some distance

18   between the two of us.

19        Q.    Okay.  Well, does he still have ahold of

20   you at all?

21        A.    With his right arm perhaps.  I mean, I

22   went from being in a headlock, just doing that to

23   break contact and get away.  He certainly wasn't being

24   passive.

A-365

1          Q.      You felt like you needed to punch him

2     somewhere in the upper torso to the head to break away

3     from him?

4          A.      Yes.

5          Q.      Was there any other way that you could

6     have broken away from him other than doing that?

7          A.      No.  In that situation that was the best

8     thing I could do at that time.

9          Q.      How many times did you hit him with your

10    right fist?

11         A.      At least once.  I don't recall hitting

12    him a second time.

13         Q.      In the time that you recall hitting him,

14    he was still laying on his back?

15         A.      Yes.

16         Q.      What did you do after you hit him to

17    break away from him?

18         A.      I came back and I took my Capstun out.

19    Shawn kind of moved along to my side and Mr. Walker at

20    that point was -- at least one of his hands, and I

21    don't remember which one, we were just trying to say,

22    you know, "Give us your hand so we can handcuff you."

23    We sprayed him at that point while he was still on his

24    back.

Ballard - Direct                                    98

1        Q.      Tell me what a Capstun is.

2        A.      It's a little two-ounce pepper spray.

3        Q.      Did you take that out with your right

4    hand?  Where is that on your --

5        A.      On my belt.

6        Q.      Yeah.

7        A.      To the right of my buckle between my

8    weapon and my belt buckle, right here in the front.

9        Q.      So are you still -- what are you, on

10   your knees at that point?

11       A.      Yeah.  Or -- I was either on my knees or

12   coming up to a crouch.

13       Q.      Did you say anything to him before you

14   sprayed him?

15       A.      I don't recall.

16       Q.      Where is Gordon at the point where

17   you're spraying him?

18       A.      Off on my right side, and I don't

19   remember if I sprayed him first or if Shawn did.

20       Q.      Did you both spray him at some point?

21       A.      Yes, yes.

22       Q.      Is there enough spray in one of those

23   things to -- is that like a one-shot deal?

24       A.      No.  I think it's either 10 or 15

1    one-second bursts, something like that.

2              Q.      How many times did you spray it?

3              A.      I still have the same Capstun, so I

4    would say not that much.

5              Q.      And how far away from his face were you

6    when you sprayed it?

7              A.      Three feet maybe.

8              Q.      And how close do you have to be for that

9    stuff to be effective?

10             A.      I'd say within that range.  Probably

11   could go back a little bit more because it streams,

12   but it diffuses as you go farther away.

13             Q.      I've never seen it in use.  Is there a

14   stream --

15             A.      It's a stream.

16             Q.      -- or is it like a --

17             A.      It's not a fog.  There's actually a

18   foam.  Ours is a stream, but obviously if I'm this far

19   away from you as opposed to half the distance, you're

20   more likely to get a more concentrated dose if I'm

21   closer.

22             Q.      So if you get him anywhere in the facial

23   region it's gonna be effective.

24             A.      You're gonna aim for here (indicating).

1    It will irritate you.  If it's down here (indicating),

2    irritate your mouth and irritate your nose, but this

3    (indicating) is where you're aiming so it gets in your

4    eyes.

5          Q.    When you say "this," you're pointing to

6    your forehead.

7          A.    Forehead.  You're aiming into the

8    forehead region so it comes into your eyes.  It's not

9    gonna travel up.

10         Q.    Were you able to hit him in the

11   forehead?

12         A.    Yeah.  I mean, he -- he had it pretty

13   good.

14         Q.    Did Shawn get him in the forehead, too?

15         A.    I would assume so.

16         Q.    Were the two shots from you and Shawn

17   with the Capstun basically at about the same time?

18         A.    Yeah.  I mean, it wasn't like I'm gonna

19   spray him and I'm gonna spray him.  It was more just

20   to get him to a point where we could then control him

21   enough, get him off of wanting to wave his arms around

22   and putting his hands on people to roll over and let

23   me get these on you and we can get you attending care

24   of as far as getting the stuff out of your eyes.

1       Q.      So in the sequence of events, you're

2   punching him once that you recall to break away from

3   him, then you spray him, Shawn sprays him.  Now what

4   happens?

5       A.      We had to roll him over, and I don't

6   remember if we rolled him from his back using his left

7   shoulder contact to the floor or rolled him from the

8   right, if you understand what I'm saying.  I don't

9   remember which way around we got him.  And he wasn't

10  giving up.  It was this arm, the arm, the side I was

11  on, so it would have been left arm when he was on his

12  stomach.

13      Q.      You were able -- the two of you were

14  able to roll him onto his stomach?

15      A.      Correct.  At that point I think Shawn

16  had gotten a handcuff onto his right hand.

17      Q.      Where was his right hand?  Behind his

18  back?

19      A.      Up along his side.  He was a pretty big

20  guy.  I don't remember if I got my handcuff on and we

21  connected them or if I got his other arm around.  I do

22  recall at that point him still laying on the arm and I

23  think at that point Shawn struck him I don't remember

24  how many times, but along, like, your brachial nerve

1    up along the side of his arm because, again, we were

2    in a doorway, like a standard doorway, so it wasn't

3    like anybody could get, like, full swings or motion.

4           Q.    So Shawn was striking him to try to get

5    him to release his left arm --

6           A.    Correct.

7           Q.    -- so that you could get a cuff on that?

8           A.    Correct.

9           Q.    And was he on --

10          A.    He was on his stomach at this point.

11          Q.    Walker was on his stomach.  Shawn was

12   where?

13          A.    Still on my righthand side.

14          Q.    On top of Walker or just beside him?

15          A.    We were kind of like on our knees or

16   crouched down, between the two of those two positions,

17   behind him.

18          Q.    Behind him?

19          A.    Yeah.  I mean, he's on his stomach and

20   we're back around his buttocks area.

21          Q.    If Officer Buhrman had been right there

22   on his legs, you would have seen her at that point,

23   wouldn't you?

24          A.    At that point yes, I would have.

1       Q.      She wasn't there, was she?

2       A.      No, not right behind me at that point.

3       Q.      Do you know where she was?

4       A.      No.

5       Q.      Shawn was striking you said the brachial

6  plexus.  I know where that is, but tell us where that

7  is.

8       A.      I'm sorry.  I didn't mean to say

9  brachial.  Brachial is up here (indicating).  I didn't

10  mean to say that.  Radial.  The one along your thigh.

11      Q.      He was hitting him in the thigh?

12      A.      In the thigh region.  Up here

13  (indicating).

14      Q.      Let's describe where he was hitting him.

15      A.      The outside of the thigh.

16      Q.      Which thigh?  Left thigh or right thigh?

17      A.      He's on his stomach, so it would have

18  been his righthand side.  I'm on the lefthand side of

19  him as he's facing down.  Shawn was on the righthand

20  side.

21      Q.      Shawn is hitting Walker in his right --

22      A.      Right side, right thigh.  He may have

23  struck him in the face.  I don't remember.

24      Q.      How many times did Shawn strike him?

1        A.      No more than five.

2        Q.      Anybody draw blood?

3        A.      I recall when we got Mr. Walker to the

4   Wilmington Hospital and we were sitting there for a

5   bit I actually went to get a rag or a hospital rag to

6   wipe some of the Capstun out of his face and he had a

7   small cut over one of his two eyebrows, enough that

8   when he was released they didn't treat it.  They

9   didn't use a butterfly bandage or anything.

10       Q.      When Mr. Walker was on his stomach and

11  Shawn Gordon was striking him on the right thigh,

12  maybe in the face, you were on his left side, did you

13  strike him?

14       A.      At that point, no.

15       Q.      You only recall -- so far as I

16  understand it, you only recall striking him one time

17  and that's with your fist to break away from him.

18       A.      I recall striking him with my head two

19  or three times.

20       Q.      I'm sorry.

21       A.      Yeah.

22       Q.      Head-butting two or three times,

23  striking him with the fist one time.

24       A.      Correct.

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  1980
(302) 658-6697    Fax (302) 658-8418

1          Q.      Did you ever strike him using your

2    handcuffs?

3          A.      No.

4          Q.      Did Officer Gordon strike him using his

5    handcuffs?

6          A.      No.

7          Q.      Are you sure?

8          A.      Positive.

9          Q.      Did you use any pressure point holds or

10   apply pressure to any pressure points during the whole

11   altercation?

12         A.      No.

13         Q.      Did Officer Gordon do so?

14         A.      Not that I recall.

15         Q.      Did you ever use your baton during the

16   altercation?

17         A.      No.

18         Q.      Did Officer Gordon?

19         A.      No.

20         Q.      That Capstun spray you did one time and

21   you saw Gordon do one time at about the same time that

22   you did it?

23         A.      Yes.  I hesitate to say I only hit it

24   once.  You know, like I said, I mean, I have the same

1  Capstun that I was issued since that time, so I

2  obviously didn't empty it all.

3            Q.      You may have sprayed it more than one

4  time?

5            A.      Correct, but I didn't empty the can.

6            Q.      Do you recall Mr. Walker saying anything

7  at all during the whole physical part of this event,

8  in other words from the time that he grabbed you

9  around the head until the time that you finally got

10  the cuffs on him?

11            A.      No.

12            Q.      And that was a poorly-asked question.  I

13  want to be clear.

14                    Is it your best recollection that he did

15  not say anything during that entire time?

16            A.      In what parameters?

17            Q.      Headlock until being cuffed.  In that --

18            A.      In that specific time frame, no.

19            Q.      In that specific time frame he didn't

20  say anything?

21            A.      Other than the grunting and groaning

22  type stuff, but anything articulate where I can

23  remember him saying anything specific, no.

24            Q.      Do you have any reason to believe that

1    any of the folks at Connections would have any

2    incentive not to tell the truth about what they

3    witnessed that day?

4            A.      Other than -- no.

5            Q.      You were about to say something.  Other

6    than what?

7                    MR. MILI:  Objection.  His answer is

8    clear.

9    BY MR. LANDON:

10           Q.      You can answer.  What were you about to

11   say.  Other than what?

12           A.      I was only going to say that I can't

13   speak what anybody else's motivations are but, again,

14   I will say that I -- when you asked me before did I

15   use my baton, I would have been justified in using my

16   baton on Mr. Walker both after being touched and his

17   refusal not to be handcuffed, and I didn't.

18                   Mr. Walker -- I pretty much treated

19   Mr. Walker at the hospital myself prior to anybody

20   getting there by wiping the Capstun out of his eyes,

21   when he could have sat there until a nurse or doctor

22   came to treat him, and I had no motivation whatsoever

23   to harm him in the way that it's been displayed.

24                   And, you know, he was not injured in th

1   way -- I'm not a doctor, I didn't look at him, but if

2   he suffered any of those type of injuries, you would

3   have thought that he wouldn't have been discharged

4   from the hospital at that time.

5          Q.     Now after Officer Gordon and you were

6   doing what you were doing with Mr. Walker now face

7   down, eventually his left arm came out from underneath

8   his body?

9          A.     Yeah.  I recall pulling it, getting it

10  back and around.

11         Q.     During that time frame while he's face

12  down, is he struggling to turn himself back over or

13  what?

14         A.     No.  I think he was more concerned with

15  not getting his hands handcuffed.

16         Q.     Trying to keep his left arm in?

17         A.     Yes.

18         Q.     His right arm was already cuffed?

19         A.     It had a handcuff on it, yes, which is

20  also probably the most dangerous time statistically

21  for a cop, with one handcuff on.  Both, No. 1, most

22  people are more apt to resist when there's one

23  handcuff on and, No. 2, you have a handcuff that

24  either by just hitting the ratchets all the way, it

1    becomes a pretty decent sharp object.  So the only way

2    you can control that is by holding onto it, if you

3    understand what I'm saying.

4            Q.      Yes.

5                    Was Officer Gordon holding onto the --

6            A.      I would assume so.  I wasn't looking at

7    Shawn.  I was more worried with --

8            Q.      Well, I'm picturing a guy on his stomach

9    with, I mean, a right arm with a handcuff on it with a

10   left arm underneath the body.  That right arm is not

11   gonna be too dangerous at that point, is it?

12           A.      I'm not going to assume.  If it's got a

13   loose handcuff, that's something drilled into you, a

14   loose handcuff, you can lose an eye.

15           Q.      I guess -- what did you see, if

16   anything, Mr. Walker doing with his right arm when it

17   was handcuffed?

18           A.      I don't remember.

19           Q.      And were you able to get a handcuff on

20   his left arm?

21           A.      Either the other -- one of Sean's or my

22   own.

23           Q.      Don't remember which?

24           A.      No.

A-378

1        Q.      But if you got your own on there, you

2    would have likely handcuffed that to the --

3        A.      To the loose cuff, and my only intent

4    for doing that would be he's too big.

5        Q.      His arms don't go that far behind his

6    back?

7        A.      Correct.

8        Q.      Describe his physical stature,

9    Mr. Walker's physical stature.  You said he was tall

10   and you thought he was at least as tall as you.  But

11   build-wise?

12       A.      He was thick.  I wouldn't say he was,

13   you know, ripped, muscular, but he was strong.  He was

14   a very strong guy.  I played football and it took

15   everything I had to get him off of me.  And I guess

16   the best way to put it, you got a guy that's big and

17   maybe was big and then as he ages he still retains

18   that mass but it's not as firm, what have you, but he

19   still has the strength.  I mean, he wasn't weak by any

20   stretch of the imagination.

21       Q.      How old a guy would you say he is?

22       A.      Late 50s, 60s.

23       Q.      Once the two of you, you and Officer

24   Gordon, got him handcuffed, how did you get him to

1   stand up?

2          A.      Pulled him up.  That's the only way

3   you're gonna -- you kinda get him to roll on one side,

4   tell him to roll his legs up and then you're escorting

5   him up.

6          Q.      Once you got him up on his feet, he

7   stood on his feet on his own power?

8          A.      Yes.

9          Q.      Was he verbal at that point?  Was he

10  saying anything?

11         A.      I'm trying to remember what he

12  specifically said.  I know he was -- I'm trying to

13  articulate it in words.  He was obviously upset with

14  us, but I'm trying to remember what he specifically

15  said.  He kept repeating a phrase and I know he

16  repeated it when we got to the hospital but I don't

17  remember specifically what it was, but it had to deal

18  with We didn't have to do this, we didn't have to do

19  this, and I was, I gave you an option.  I certainly

20  didn't want to get myself hurt either, you know, and

21  that's not what I wanted to do.

22         Q.      Did he willingly walk down the stairs

23  and out into the car?

24         A.      Yeah.  Into the car.  Into the hospital

1   Back into the car.  Back out of the car when we got to

2   DSH.  Was absolutely passive when we were at DSH.  We

3   actually unhandcuffed him at DSH.  I don't know if

4   you've been there to the in-take area.  It's an open

5   area.  We have to take our guns off.  Left ours in the

6   car.  We were in that in-take area for ten or fifteen

7   minutes and he sat down.  I mean, it was a hundred

8   percent different from how he was acting inside

9   Connections.  He was completely passive at that point.

10         Q.      And you found a rag to get him to

11  wipe --

12         A.      No, no.  That's not at DSH.  When we

13  were at Wilmington.  And he wasn't even -- I think he

14  was calming down I guess from being angry, but when I

15  wiped his face off and Look, let me do this for you

16  now, because it was obvious -- it's got a dye in it.

17  And we were probably there for 10, 15 minutes.  I

18  could tell it was bugging him.  I was like, Let me go

19  find a rag and let me start doing this for you now,

20  and he appreciated that, so --

21         Q.      Was he rational at that point when you

22  were talking to him at Wilmington?

23         A.      More rational than he was at

24  Connections.  Yeah.

A-381

1        Q.      Did he seem almost like a normal person

2   at that point, able to sort of act semi-normally?

3        A.      I guess.  It was complete -- I will say

4   it was completely different from how he was acting at

5   Connections.  It's surprising in the sense that when

6   you get to the hospital you know you're gonna have to

7   take the handcuffs off a person again and if you had

8   to fight to get them on, the last thing you want to do

9   is take them off again and then lead yourself to a

10  position where you're gonna have to struggle, and he

11  was completely different.

12       Q.      So you took them off at Wilmington

13  Hospital?

14       A.      We took one off and handcuffed him to

15  the stretcher and then, you know, he complied with

16  that.  When we left Wilmington, he was rehandcuffed,

17  got back in the, car then we took the handcuffs off

18  when we got to DSH and he sat there for 10, 15

19  minutes.

20       Q.      This is your first and only encounter

21  with Mr. Walker I take it.

22       A.      Yes.  Never seen him before.

23       Q.      Never seen him since?

24       A.      No.  He may have seen me.  It's a small

Ballard - Direct                                      114

1  city, but as far as going to a Dispatch complaint for

2  him specifically, no.   That was my only encounter with

3  him.

4          Q.      Did you and Officer Gordon have any

5  discussion about who was going to write up the report

6  about the incident?

7          A.      No.   I mean, I was off FTO.   Shawn

8  probably typed it because I went to the hospital after

9  we dropped Mr. Walker off at DSH.

10         Q.      Do you know whether Shawn wrote the

11 report that day or some other day thereafter?

12         A.      I am assuming he wrote it at some point.

13         Q.      You must have some communication with

14 him because somebody had to write the report.   I mean,

15 he must have said I'm gonna do it.

16         A.      It wouldn't have been in that specific

17 instance.   I would only assume Shawn was gonna do it

18 because I'm at Wilmington Hospital.   As far as a

19 specific -- us specifically articulating you're gonna

20 do it this time, no, no, that wouldn't happen.

21         Q.      Did you ever give consideration to

22 charging Mr. Walker with the commission of any crime?

23         A.      I did.

24         Q.      When did you do that?

A-383

1          A.       Sergeant Kane asked me if I was going t[r]

2    charge him with resisting.

3          Q.       Did he ask you that at the hospital?

4          A.       I believe so.

5          Q.       Did you make a call, or --

6          A.       I said no.

7          Q.       You made a determination that day that

8    you weren't gonna charge him?

9          A.       No, we weren't.  I didn't see the point

10   in it.  I will say this though:  I'll never do that

11   again to be honest with you.

12         Q.       Why?

13         A.       Because, for one thing, I learned a

14   lesson.  That if I'm going to use force, and that was

15   the first time where I had to use force and I didn't

16   charge somebody, because this was a completely

17   atypical situation from other instances where I've

18   used force in the past, but it gives the appearance in

19   resisting arrest, although now the law has changed to

20   where it would have been a felony because I was

21   injured, at the time it was a misdemeanor, and whether

22   or not he did any time on a resisting arrest because

23   he was obviously mentally ill, was going to an

24   institution to be committed, I didn't see the point i[n]

1    it, but from this point forward I'll do it because it

2    leaves open the avenue that perhaps there was some

3    impropriety in what happened at the time.

4        Q.    You said this was atypical from any

5    other use of force which you had been involved in.

6    What did you mean by that?

7        A.    In any other time I've used force on

8    this job, it has been from a self-initiated or

9    dispatched complaint, call for service, in which

10   there's a suspect and as a result of my contact with

11   that suspect some force was used and a crime was

12   committed.

13            In this case, up until he was resisting

14   arrest, and he wasn't really arrested, I mean he was

15   in custody because he had handcuffs on him in order to

16   be committed, he hadn't made any crime.  It's not a

17   crime to say no to the cops.

18       Q.    Well, let me ask you about that.  When

19   you and Officer Gordon told him to put his hands

20   behind his back because he was gonna handcuff him

21   because that was the policy that you had to follow to

22   transport him and he said no, had he committed a crime

23   at that point?

24       A.    We'd be splitting hairs.  You could say

1  yeah, disorderly conduct.  I could play that all day

2  long, but obviously with this specific instance with

3  Mr. Walker, I mean, I wasn't going to charge him with

4  anything at that point.

5       Q.     And you're saying well --

6              Well, refresh my recollection.  Did you

7  ever read the report that Officer Gordon wrote

8  concerning this incident?

9       A.     I may have.  I don't recall.  I'd have

10  no reason to.  I wasn't going to court for it.

11       Q.     Are you telling me you didn't read his

12  report before you came in here to this deposition?

13       A.     You can pull up LEIS, the Law

14  Enforcement Investigative Search, and find out when I

15  ever accessed that complaint number, and if I ever did

16  I'd be surprised.  I have no reason to.

17       Q.     You mentioned that at the point where

18  Mr. Walker grabbed you and put you in what you

19  described as a headlock and your right arm was up

20  above your head, that the whole nature of the

21  confrontation changed because at that point and you've

22  expressed here today that you were concerned that he

23  might get your weapon or that you were in danger or

24  you could possibly be in danger and at that point you

1  believe that more force was appropriate than may have

2  been appropriate prior to that point.  Is that a fair

3  statement?

4        A.     Yes.  He's now gone from willful

5  disobedience to actually offensive touching if not

6  assault on a law enforcement officer.

7        Q.     Right.  And that would be the critical

8  change in the nature of what was going on at that

9  point in time.

10       A.     Absolutely.

11       Q.     And you were there to witness that and

12 Gordon was there to witness that and Buhrman was there

13 to witness that.

14       A.     Yes.

15       Q.     Three Wilmington police officers would

16 have witnessed what you're saying happened.

17       A.     Absolutely.

18       Q.     And being that that was a critical

19 change in the nature of what was going on, you would

20 expect that to be in any report written by either of

21 you three officers about this incident, wouldn't you?

22       A.     That what?  He put me in a headlock?

23       Q.     Yeah.

24       A.     Yeah.  Absolutely.

A-387

1          Q.       While you're standing up.

2          A.       Yeah.

3          Q.       I mean, you're trained as a police

4    officer to write your reports in such a fashion that

5    you're putting in what's the critical information, and

6    that would be critical information, wouldn't it?

7          A.       The fact that he put his hands on me?

8    Yes.

9          Q.       I'm going to show you a document that

10   was previously marked, and I don't have the actual

11   deposition exhibit because I think it's with the Court

12   Reporter who took Officer Buhrman's deposition, but it

13   was marked I'll represent to you as Buhrman No. 4.

14   It's a Supplemental Report that Corporal Gordon is

15   listed as the reporting officer and the date on this

16   Supplemental Report is February 7 of 2006, and ask you

17   if you've ever seen that before.

18         A.       Have I seen this report?

19         Q.       Yes.

20         A.       No.

21         Q.       This report on the second page under

22   Investigative Narrative, and again it's Corporal

23   Gordon listed as the reporting officer so I presume

24   he's the one writing this report, would that be an

1    accurate presumption on my part?

2          A.      Yeah.

3          Q.      Okay.  Under Investigative Narrative, he

4    says, "I spoke with Patrolman Ballard on this date and

5    time," this is 2/7/06 at 1340 hours, "in reference to

6    this case.  We decided not to pursue any arrest action

7    at this time against Mr. Walker due the time delay and

8    his mental status."  See where I'm reading from?

9          A.      Yes.

10         Q.      Do you have a recollection of revisiting

11   with Gordon in February of '06 whether or not to

12   charge Mr. Walker?

13         A.      We might have had a conversation whether

14   or not he would have cause to write a report about it.

15         Q.      I'm wondering if you can tell me, if you

16   know, why would this report have been written --

17         A.      I don't know.

18         Q.      -- seven months after the event?

19         A.      Shawn was not on my platoon anymore at

20   that point.  I don't know why he wrote that report.

21         Q.      Is this an unusual circumstance, for an

22   officer to write a report deciding not to charge

23   someone so many months after an incident like this?

24         A.      You gotta be careful with that.  The way

1    LEIS is set up, if at the time that this was written,

2    and now we've actually had ways to avoid this

3    happening, if the status of the crime when you

4    initially write the report is put into a Pending

5    Active status, the system automatically prompts you to

6    at a certain date in the future write a supplement

7    report on it. You won't get -- I consider myself to

8    be a pretty attention-to-detail person, but probably

9    the one thing that will jam me up as far as things I

10   forget about is on certain reports, if I change it

11   from Pending Active to Pending Inactive, I'm getting

12   prompted for a list of supplements.

13           Prior to my car accident one of the

14   intents of my midnight shift was to clear out

15   follow-up reports. I probably had 60 of them since I

16   was a rookie. So I don't know.

17       Q.    This might be more of a paperwork type

18   thing that was prompted by the system?

19       A.    You'd have to ask Shawn, but there would

20   be no reason for us to discuss something that happened

21   in July in February. I seem to recall us talking

22   about whether or not to charge him. It would have

23   been at least in my opinion closer to when it happened

24   as opposed to later but, I mean, you'd have to ask

1    Shawn why he wrote that report.   I can only guess

2    that's why he did it.

3                    MR. LANDON:   Thank you.   We're done.

4                    MR. MILI:   He's going to read and sign.

5                         -    -    -

6                    (Deposition concluded at or about

7              1:00 p.m.)

8                    (Deposition transcript was

9              presented to the witness for reading and

10             signing.)

11                        -    -    -

12

13

14

15

16

17

18

19

20

21

22

23

24

                                                            A-391

123

```
 1   STATE OF DELAWARE        )
                              :  SS.
 2   NEW CASTLE COUNTY        )

 3

                        CERTIFICATION
 4

 5           I, CAROL DiSERAFINO, Professional Reporter

 6   and Notary Public, do hereby certify that the

 7   foregoing deposition of OFFICER MICHAEL BALLARD was

 8   held before me, pursuant to notice, at the time and

 9   place indicated; that said witness was by me duly

10   sworn to tell the truth, the whole truth, and nothing

11   but the truth; that the testimony of said witness was

12   correctly recorded in machine shorthand by me and

13   thereafter transcribed under my supervision; and that

14   I am neither of counsel nor kin to any party in said

15   action nor interested in the outcome thereof.

16           I certify that the foregoing transcript

17   was presented to the witness for reading and signing.

18           WITNESS my hand at Wilmington, Delaware,

19   this 14th day of November, 2006.

20

21           _Carol DiSerafino_____
             CAROL DiSERAFINO
22           COURT REPORTER-NOTARY PUBLIC
             Cert. No. 182-PS
23

24                                              A-392
```

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

ALICE WALKER, individually and )
as guardian, of her husband, )
GERALD H.E. WALKER, an )
incompetent person, )
                             )
           Plaintiffs, )
                             )
 v. )  Civil Action No.
                             )  06-366 JJF
                             )
CITY OF WILMINGTON; CITY OF )
WILMINGTON POLICE DEPARTMENT, )
OFFICER SHAWN GORDON, )
individually and as agent of the)
CITY OF WILMINGTON POLICE )
DEPARTMENT; OFFICER MICHAEL )
BALLARD, individually and as )
agent of the CITY OF WILMINGTON )
POLICE DEPARTMENT; OFFICER KAREN)
BUHRMAN, individually and as )
agent of the CITY OF WILMINGTON )
POLICE DEPARTMENT, )
                             )
           Defendants. )

COPY

        Deposition of SERGEANT THOMAS KANE, taken
pursuant to notice at the law offices of MURPHY &
LANDON, 1011 Centre Road, Suite 210, Wilmington,
Delaware, beginning at 2:10 p.m., on Wednesday,
February 7, 2007, before Karen McCloskey,
Professional Reporter and Notary Public.

                                     A-393

APPEARANCES:

        ROGER D. LANDON, ESQ.
        PHILIP T. EDWARDS, ESQ.
        MURPHY & LANDON
          1011 Centre Road, Suite 210
          Wilmington, Delaware  19805
          for the Plaintiff


        ALEX J. MILI, JR., ESQ.
        CITY OF WILMINGTON LAW DEPARTMENT
          City/County Building, 9th Floor
          800 North French Street
          Wilmington, Delaware  19801
          for the Defendants

A-394

```
 1              SERGEANT THOMAS KANE,
 2         the deponent herein, having first
 3         been duly sworn on oath, was
 4         examined and testified as follows:
 5  BY MR. LANDON:
 6     Q.    State your full name and work address,
 7  please?
 8     A.    Sergeant Thomas Kane, K-A-N-E.  I work
 9  for the City of Wilmington Police Department at
10  300 North Walnut Street, Wilmington, Delaware.
11     Q.    How long have you been employed by the
12  Wilmington Police Department?
13     A.    Last 25 years.
14     Q.    Briefly take me through your career and
15  tell me what your assignments were beginning with
16  25 years ago leading up to today?
17     A.    I was sworn in in May of 1982.  I started
18  in January of 1982 in the academy and went on the
19  street in May of 1982 for about six years in a
20  patrol car uniform.  And then I went to the
21  Community Police Unit where I walked the beat on
22  the east side for approximately two years.  I went
23  to the Drug and Vice Division where I did
24  primarily drug investigations for three and a half
```

A-395

1    years.

2                  Back in uniform for about two or

3    three years.  I went to detectives.  I was

4    assigned to the Safe Streets Unit which worked

5    with probation and parole.  After that I was

6    assigned to conduct fraud investigations for about

7    two years.  I was promoted to sergeant and I went

8    back to uniform as a supervisor in our uniform

9    patrol division.

10      Q.    What year was that?

11      A.    I was promoted in 1999.  I was there for

12   two or three years.  Then I started with the

13   Supervisory Community Policing Unit and I went

14   back to patrol for seven more years and now I'm

15   back up in the Community Policing Unit

16   supervising.

17      Q.    When did you become a supervisor in the

18   Community Policing Unit for the first time?

19      A.    It would have been sometime in 2001,

20   spring of 2001.

21      Q.    How long were you in that job before you

22   went back on the streets?

23      A.    I think it was about two and a half to

24   three years.

                                          A-396

1       Q.    What was your job in July of 2005?

2       A.    At that time I was on the platoon as a

3    street supervisor for the Community Services

4    Division.

5       Q.    Did that take us up to today?

6       A.    Yes, sir.

7       Q.    In July of '05 did the Wilmington Police

8    Department have any particular policies with

9    respect to the use of force by officers?

10      A.    Yes.

11      Q.    Can you tell me what policy or policies

12   existed in July of '05 in that regard?

13      A.    The policies mostly concerned the use of

14   force, either deadly force or use of force

15   continuum.  Regarding either deadly force or

16   lesser force as far as pepper spray or asp or just

17   using your hand.  And when those different items

18   are supposed to be used.

19      Q.    Did the use of force policy, was it

20   reduced to a written form?

21      A.    Yes, it is.

22      Q.    Would that be -- where would I find the

23   use of force policy that would have been in effect

24   July of '05 for the Wilmington Police Department?

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

1   Where would that written form be kept?

2       A.    Each officer has a binder that has all of

3   our policies on it.  Not just use of force but

4   vehicle procedures, how to responsible to bank

5   alarms or bomb threats.  It's a big white binder

6   where all the policies and procedures are.

7       Q.    Some of the officers refer to that as the

8   white book?

9       A.    That's correct.

10      Q.    I take it you, yourself, had a copy of

11  this white policy binder back in July of '05?

12      A.    Yes.

13      Q.    Are you aware of what if any training

14  Wilmington police officers are given either before

15  they begin their job as a Wilmington police

16  officer or after as to appropriate use of force in

17  dealing with mentally ill individuals

18  specifically?

19      A.    When I went through the academy we were

20  given -- go through extensive training with the

21  use of force. And we also have separately someone

22  come in and discussing dealing with mentally ill

23  people.

24      Q.    When you say they have someone come in,

A-398

```
 1   what do you mean by that?  Are you talking about

 2   on the job training or seminars or something of

 3   that nature?

 4        A.   In the academy they have someone come in.

 5   It's usually like a psychologist that works with

 6   the police department comes in and gives you -- I

 7   don't remember how long it was but a full day or

 8   several hours on mentally ill people.  How much

 9   hours they do now I'm not familiar with.

10        Q.   So you're saying when you went through

11   the academy back in 1982 you received some

12   training through the academy from a psychologist

13   or psychiatrist about how to do use of force with

14   mentally ill individuals?

15        A.   Yes.

16        Q.   Did you, yourself, have any further

17   training after the academy on that topic while

18   employed as a Wilmington police officer?

19        A.   I have had more training on the use of

20   force both as a supervisor, how to review them,

21   and also when we change equipment.  When we went

22   from blackjacks to asps, maybe eight or ten years

23   ago.  And when we changed we had training on the

24   new equipment.
```

A-399

1    Q.    Was any of that training, did any of that

2    training include specifically training as to how

3    to use that equipment in situations where you were

4    dealing with mentally ill individuals?

5    A.    It's not separated like that.  It was

6    just training on the new equipment and use of

7    force.

8    Q.    Do you recall in your 25 years after

9    graduating form the police academy being given any

10    training by the Wilmington Police Department that

11    had to do with how do deal in general with a

12    mentally ill person that you might come into

13    contact with on the job as a Wilmington police

14    officer?

15    A.    There is probably two or three times.

16    What we have every six weeks in the Uniform Patrol

17    Division there will be training days during the

18    summer months where we usually shoot down the

19    range and things like that or training for CPR and

20    stuff like that we have to do every year.

21         And there has been at least a couple

22    training where I remember where they just kind of

23    went over some of the changes how drugs effect

24    mentally ill people. And some refresher on dealing

A-400

Sergeant Thomas Kane

```
 1   with mentally ill people.  Yes.
 2      Q.   I think you just told me you recall a
 3   couple of occasions where that has occurred in 25
 4   years?
 5      A.   Yes.
 6      Q.   Does that mean two?
 7      A.   I would say two or three times over the
 8   years we have had some refresher training.
 9      Q.   Can you tell me when those occasions
10   occurred and what you learned during each of those
11   occasions?
12      A.   I couldn't tell you anything specific,
13   no.  Sorry.
14      Q.   Do you recall how many times those
15   training sessions comprised when those topics were
16   being discussed, those two or three times?
17      A.   The entire training day is four and a
18   half hours.  I would say maybe an hour and a half
19   or two hours where they would discuss the mentally
20   ill.
21      Q.   Per session?
22      A.   Yes.                          A-401
23      Q.   You just can't recall specifically when
24   any of those training sessions occurred or what
```

Sergeant Thomas Kane

1  you may have learned about dealing with the

2  mentally ill during those sessions?

3      A.    I can't recall.   It's every six weeks

4  over the 25 years.   I can't remember exactly when.

5  The changes as I recall like the different newer

6  drugs that they might be using for the mentally

7  ill.   Or the different places, like a lot of

8  places for the mentally ill are subcontracted out

9  and their location might change or Connections and

10 we would have training on what their policy is.

11             And also a change that goes back a

12 while before the Christiana Hospital opened, all

13 the mentally ill were brought to Wilmington and we

14 transported them.   But that would have been

15 changed when Christiana opened and how Wilmington

16 was dealing with them.   That's when we would get

17 training when something changed.

18     Q.    Would it be fair to say that in your

19 experience in the 25 years with the Wilmington

20 Police Department, Wilmington police officers

21 transporting mentally ill patients from one

22 facility to another or from a home to a facility

23 or vice versa would be something of not an unusual

24 activity for a police officer to be engaged in; is

A-402

1    that fair?

2        A.    Yes.

3        Q.    Do you recall whether any of the training

4    sessions that you have taken part in in your 25

5    years with respect to the dealing with mentally

6    ill people have involved training on the

7    techniques as to how to actually interact with

8    these mentally ill people to get them to do

9    whatever it is that you want them to do when you

10   are transporting them?

11       A.    I don't remember anything specific with

12   the mentally ill. We were told how to deal with

13   people in general as far as how to speak to them,

14   remain calm and being polite is just the basics.

15   I really don't remember anything specifically with

16   the mentally ill.

17       Q.    For instance I'm thinking about a

18   hypothetical situation where you have somebody who

19   might be mentally ill and diagnosed as a paranoid

20   schizophrenic for instance.  And the police are

21   asked to transport this person from somewhere to

22   somewhere else and this person is having delusions

23   about something that is not reality.  And the

24   police officers that are there are trying to get

1    this person to comply with their wishes.

2              Do you recall ever being part of any

3    training session where some professional or

4    someone was providing guidance to the Wilmington

5    Police Department on how to handle a situation

6    like that?

7         A.   Not specifically for the mentally ill but

8    more for just people in general. Most of the time

9    when we are dealing with them there is a

10   professional there.  Either somebody at the

11   Wilmington Hospital or Christiana or Connections.

12   Or at the home usually there is paramedics

13   standing by just in case to help.  Sometimes they

14   get called first so they would be there.  A lot of

15   the times when we're dealing with the mentally ill

16   we're not there by ourselves.  We are there with a

17   medical professional.

18        Q.   Let's say we've got that hypothetical

19   situation and there is some hospital or medical

20   person there, are you aware of the Wilmington

21   Police Department providing any training to its

22   officers in the last 25 years that you have been

23   there as to how they are supposed to utilize that

24   medical person or that professional health care

A-404

1    person in a situation where they are trying to get

2    a mentally ill person to comply with their wishes?

3        A.    Again, not specifically for the mentally

4    ill.  No.

5        Q.    In July of '05 was there some sort of

6    policy in the Wilmington Police Department about

7    investigating use of force incidents among the

8    Wilmington police officers?

9        A.    Yes.

10       Q.    Tell me what that policy was in July of

11   '05?  Before you tell me that, is that policy any

12   different today than it was in July of '05 to your

13   knowledge?

14       A.    No.

15       Q.    Tell me what that policy was and is?

16       A.    Whenever an officer has to use force or

17   anybody is injured, they are responsible for

18   notifying the supervisor right away.  The

19   supervisor is responsible for responding out as

20   quickly as possible.  Interviewing the officers

21   involved.  The defendant will speak to us and

22   trying to locate any witnesses that might have

23   witnessed the incident.

24                  After that is all done the

A-405

1    supervisor, usually a sergeant or lieutenant, is

2    responsible for typing up the use of force

3    report.  Reviewing what happened with the

4    incident.

5        Q.   Is that policy that you have just

6    described for me, has that been reduced to a

7    written form as well?

8        A.   Yes.

9        Q.   Is that in the white book also?

10       A.   Yes.

11       Q.   Is there more to it than what you have

12   described --

13       A.   As far as the supervisor's role?

14       Q.   Right.  You said the officer is supposed

15   to report it to the supervisor and the supervisor

16   is supposed to respond as quickly as possible. And

17   is supposed to speak to the officer or officers,

18   speak to the defendant and speak to any witnesses

19   and then type up a use of force report.  Am I

20   right so far?

21       A.   Yes.

22       Q.   Is there anything else to the use of

23   force investigation policy?

24       A.   No.

A-406

1    Q.    What happens if the supervisor determines

2  that there has been excessive use of force?

3    A.    There would be what we call a trial board

4  where the officer would be notified. It's a

5  notification of complaint that there are

6  allegations being made against an officer.  And

7  the Office of Professional Standards for Internal

8  Affairs would assign an investigator from internal

9  affairs to investigate anything further.

10         The first line supervisor did it and

11  then the complaint hearing board would be

12  convened.  And that would comprise of three

13  captains from the Wilmington Police Department.

14    Q.    How long have you been in a position

15  where you would be actually responsible to conduct

16  use of force investigations for officers under

17  your supervision?

18    A.    When I was promoted to sergeant.

19    Q.    Would that be 1999?

20    A.    Yes.

21    Q.    Have you continuously over that period of

22  time from 1999 to present been responsible for

23  conducting use of force investigations?

24    A.    Yes.

A-407

1    Q.   Do you have any idea how frequently you

2    have had to do that or how many in those seven or

3    eight years, just roughly?

4    A.   It's hard because you might go a month or

5    two where you don't have any and you might go a

6    month where you have three or four.  It would be

7    difficult for me to give you an approximate

8    number.  Things happen and they kind of come in

9    cycles where you don't have any for a while and

10    then you have maybe two or three.

11    Q.   If you could narrow it for me at all, I

12    mean, are we talking a hundred or more a year, a

13    lot less than that, a lot more than that?

14    A.   The best I could say probably like one to

15    three a month on average.

16    Q.   Some months might be zero and some months

17    might be more than three?

18    A.   Yes.

19    Q.   Does the written use of force

20    investigation policy require the supervisor to

21    type up a use of force report in every instance?

22    A.   Every instance where an officer either

23    used force or the defendant was injured.

24    Q.   Do you typically try to comply with that

A-408

1    policy?

2        A.    Yes.

3        Q.    Have you complied with that policy in

4    every use of force investigation that you have

5    done since 1999?

6        A.    Yes.

7        Q.    Including the Walker case?

8        A.    Yes.

9        Q.    You typed up a report?

10       A.    Yes, sir.

11       Q.    You can't find it?

12       A.    No.

13       Q.    When you type up a report is that typed

14   on a computer?

15       A.    Yes.

16       Q.    How many times since 1999 when you have

17   conducted a use of force investigation have you

18   made a determination that there was reason to

19   believe that there was excessive force used?

20       A.    I have never had any.

21       Q.    So then I take it by that answer there

22   has never been a use of force investigation that

23   you have conducted where the Office of

24   Professional Standards has had to get involved by

A-409

1   assigning an investigator or doing anything at

2   all?

3       A.    That's correct.

4       Q.    Have you ever worked in the Office of

5   Professional Standards or what used to be called

6   Internal Affairs Group?

7       A.    No.

8       Q.    Are you personally aware of any instances

9   since you have been employed by the Wilmington

10  Police Department where the Office of Professional

11  Standards or whatever its predecessor is called,

12  actually did an investigation into a situation

13  where a supervisor thought there was potentially

14  excessive use of force?

15      A.    Yes.

16      Q.    How many such investigations of that

17  nature are you aware of?

18      A.    I mean, they could have occurred and I

19  didn't know about them because it wasn't on my

20  shift.  We are a fairly small department.  I

21  wouldn't know about any other platoons or anything

22  like that.

23      Q.    I understand your answer and I appreciate

24  it.  You wouldn't necessarily know whether such

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

Sergeant Thomas Kane

```
 1   investigations were going on. My questions is are

 2   you aware of any?

 3       A.   Yes, there has been some.

 4       Q.   Do you have any idea how many you are

 5   aware of?

 6       A.   For the last 25 years?

 7       Q.   Yeah.

 8       A.   Again, I just don't feel I could answer

 9   it giving a number with all the years.  I only

10   work certain hours on certain days and it could

11   have been other divisions. I really couldn't

12   answer accurately.

13       Q.   Do you know who currently in the

14   Wilmington Police Department would probably be in

15   the best position to know how many such

16   investigations have been conducted let's say in

17   the last ten years by the Office of Professional

18   Standards for excessive use of force?

19       A.   I would assume it's Captain Jerry Custis

20   who is in charge of the Office of Professional

21   Standards right now.  There has been several other

22   captains over the years.  I would assume that they

23   do a report every month of every year where it is

24   tallied up.
```

A-411

1     Q.    His name is Jerry Custis?

2     A.    C-U-S-T-I-S.

3     Q.    He's in charge of the Office of

4  Professional Standards?

5     A.    Yes.

6     Q.    Do you know how long he has been in that

7  position?

8     A.    I would say about a year.  He was just

9  promoted.

10    Q.    Do you know what his job was before the

11  promotion?

12    A.    He was a lieutenant in the Special

13  Operations Division.

14    Q.    What happens in a situation where the

15  Office of Professional Standards assigns an

16  investigator, what's the next step?  Does that

17  investigator make a determination on his or her

18  own about whether or not there was excessive force

19  or does it have to go the complaint hearing board?

20    A.    I have never been assigned to internal

21  affairs.  To my knowledge the sergeant would

22  probably discuss with the captain and maybe one or

23  two of the other sergeants in the office trying to

24  cover all the basis.  I guess it would be the

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

1  captain of the Office of Professional Standards to

2  make the determination on whether to take it to

3  the complaint hearing board or not.

4      Q.   Do you know what the potential sanctions

5  or actions taken by the complaint hearing board

6  are after a hearing on excessive use of force

7  charge; what they can do about it?

8      A.   It would depend on -- each violation of

9  our policy has a different level. If it is

10  something minor your might just get a written

11  reprimand in the file.  You could get suspended

12  for so many days.  There is a range of two days to

13  five days if you do something.  As far as

14  excessive use of force I don't know what kind of

15  charge they put on that.

16     Q.   Let's say hypothetically there is a

17  situation where a supervisor after receiving a

18  report from one of his officers under his

19  supervision that there has been use of force, the

20  supervisor goes out and does his investigation and

21  determines that use of force was appropriate.  The

22  matter is essentially put to rest internally with

23  the police department.

24          And then subsequently a claim is

A-413

1  made by somebody that there was excessive use of

2  force. Does that reopen the investigation

3  internally?

4      A.   Yes.

5      Q.   Is there a separate written policy that

6  deals with that sort of situation?

7      A.   I believe there is one in our white

8  book.  I don't know if there is something separate

9  in the procedures for the Office of Professional

10 Standards or not.

11     Q.   What happens in that situation?  What

12 internally happens in terms of reopening the

13 investigation?

14     A.   Again, it would be assigned to one of the

15 sergeants assigned to the Office of Professional

16 Standards.  Exactly what they would do, again, I

17 have never been assigned there.  I would assume

18 they would review it and re-interview some of the

19 witnesses.

20          MR. MILI:  When you say claim could

21 you specify what you mean by claim in terms of

22 someone filing a complaint with the Internal

23 Affairs Office versus filing a lawsuit against the

24 City.  Just to make the record more clear.

A-414

Sergeant Thomas Kane

BY MR. LANDON:

Q.    I'll try to do that.  Do you understand what the City lawyer just said?

A.    Yes.

Q.    Were you answering as to what would happen if a claim was made with the Office of Professional Standards, or was your answer what would happen if a lawsuit was filed or would your answer be the same regardless of either of those two options?

A.    From my perspective it would be the same.  I haven't been assigned to internal affairs and I can't be specific on how they determine whether to reopen a case or not.

Q.    Do you know whether there has been any reopening of any internal investigation into whether or not Officers Gordon, Ballard or Buhrman used excessive force in dealing with Gerald Walker on 7-11-05?

A.    I'm not aware of anything.  No.

Q.    What if anything did you do to prepare for your deposition here today?

A.    Last Friday I had a meeting with the City attorney.

A-415

```
 1              MR. MILI:   Before you continue on
 2   the record, you are not allowed to answer any
 3   disclosures about conversations you had with me.
 4   And he knows he's not entitled to any of that
 5   information.
 6   BY MR. LANDON:
 7       Q.   Other than having a conversation with the
 8   City attorney last week, did you do anything to
 9   prepare for today's deposition?
10       A.   I just reread my file and the police
11   reports this afternoon.
12       Q.   Did you bring your file with you today?
13       A.   Yes.
14       Q.   Do you mind if I take a look at it?
15              MR. MILI:   Let me make sure there
16   is nothing in there from me to you or vice versa.
17   There is a memo from me to him.  You can put it
18   under seal --
19              MR. LANDON:   Just take it out.
20              MR. MILI:   There is a handwritten
21   note from me and I'm taking that out as well. The
22   remaining of the documents look like the same
23   documents that are in the Rule 26 disclosure if
24   you want to look at the comparison.
```

A-416

```
 1              MR. LANDON:    That's fine.   Thank

 2    you.

 3    BY MR. LANDON:

 4       Q.    Let me just identify the documents as I'm

 5    looking at them.   There is a first report of

 6    occupational injury or disease.   It has to do with

 7    Officer Ballard's injuries. Was this completed by

 8    you?

 9       A.    Yes.

10       Q.    That is a one page document.   Then there

11    is a one page document with a bate stamp of June

12    15, 2006 in the top right corner it says Office of

13    Public Safety Department of Police.   It's a memo

14    to Michael Szczerba; is that right?

15       A.    Yes.

16       Q.    It's dated June 9, 2006.   There is a

17    photocopy of what appears to be handwritten notes

18    dated July 11, 2005 in the upper right-hand

19    corner.   I'll ask about these in a minute.   There

20    is a second handwritten page that has some

21    information crossed off in the middle of it and

22    then underneath that crossed off information it

23    appears to say Gabe, H-U-R-R-A-R-D, with a phone

24    number.   A work status form.   Back to Chief
```

A-417

1    Szczerba from Dr. Franklin regarding Michael

2    Ballard, July 11, 2005. A copy of the amended

3    complaint in this case.   The initial crime report

4    dated 7-11-05 for this incident which was Corporal

5    Gordon's report.   Corporal Buhrman's report dated

6    7-12-05.   Another report by Corporal Gordon dated

7    2-7-06, the one where they decided not to charge

8    Mr. Walker.   And that's it.

9              Other than the documents in this

10   file have you reviewed any other documents in

11   conjunction with this particular lawsuit?

12        A.    No, that is everything.

13        Q.    Did you ever see the answer that was

14   filed to the amended complaint by the defendants?

15        A.    No.

16        Q.    Have you spoken with Officer Buhrman

17   about this lawsuit since the lawsuit was filed?

18        A.    Yes, she mentioned it.   I think it was in

19   the paper and she mentioned it to me.   Yes.

20        Q.    How many times have you spoken to her

21   about the suit?

22        A.    I remember once or twice. She might have

23   mentioned that she did her deposition.

24        Q.    Do you recall the substance of the

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

1    conversations with her?

2         A.    The first one I remember we were just

3    kind of surprised that it had come to a lawsuit.

4    We were just surprised about that.  I didn't

5    remember it at first until she discussed it a

6    little bit.  Mainly being surprised that a lawsuit

7    had been filed.

8         Q.    She expressed surprise?

9         A.    We both did.

10        Q.    Why were you surprised?

11        A.    I didn't think the use of force was

12   excessive at all.  I thought the officers had

13   actually used a lot less force by not harming Mr.

14   Walker.  I was just surprised.

15        Q.    Have you spoken with Officer Ballard

16   about the lawsuit since it was filed?

17        A.    I don't remember talking to him.  It

18   might have been when it first hit the newspaper.

19   He's working a different shift now and I don't see

20   him very often.  I don't remember.  If it was it

21   was very briefly for a minute or two.

22        Q.    Same question about Officer Gordon, have

23   you spoken to him about it?

24        A.    Yes.

A-419

1    Q.    How many times have you spoken to him

2    about it?

3    A.    Again, just once or twice. About the same

4    as Buhrman when we first learned about the lawsuit

5    in the paper. He works in my unit now so I just

6    knew that he was going to the deposition.

7    Q.    This incident happened at the Connections

8    on the morning of July 11, 2005.  Are you aware of

9    that?

10    A.    Yes.

11    Q.    At that time were you Officer Buhrman's

12    supervisor?

13    A.    She was actually assigned to our booking

14    in the police station and she mainly transports

15    prisoners. When someone is arrested and they don't

16    make bail they go to Gander Hill or the women's

17    prison and she basically transports.  So she works

18    actually for the house sergeant in the house

19    sergeant's office.  She's more directly under me.

20    Q.    What about Officers Gordon and Ballard,

21    are they directly under you?

22    A.    Yes.

23    Q.    How long have they been directly under

24    you, do you recall?

A-420

1      A.    I would say approximately two years.

2  Possibly a year to two years.

3      Q.    During the time that Officer Gordon was

4  under your supervision prior to July 11, 2005, had

5  you ever had to conduct a use of force

6  investigation relating to any incidents that he

7  may have been involved in?

8      A.    Yes.

9      Q.    How many times?

10      A.    It's hard to give a number.  I probably

11  couldn't give you a certain number.

12      Q.    Are those use of force investigation

13  reports saved for some length of time?

14      A.    I know they are filed in the Office of

15  Professional Standards.  I don't know how long

16  they keep them.

17      Q.    Are they filed by -- how are they filed

18  by name or by year?

19      A.    Again, I haven't been assigned there so I

20  don't know their filing system.

21      Q.    Can you give me any general sense of the

22  number of use of force investigations you had to

23  do regarding Officer Gordon in that one to two

24  year time period before July 11, 2005?

A-421

```
 1        A.    I'm sorry, I couldn't give you a number.

 2        Q.    Same question with regard to Officer

 3   Ballard, did you have to do any use of force

 4   investigations involving Michael Ballard in that

 5   time frame?

 6        A.    There wouldn't have been too many.  He

 7   was a fairly new officer and I don't remember what

 8   year he graduated.  He was a fairly new officer,

 9   maybe a year or two on at the most. Again, I

10   couldn't give you a number.

11        Q.    What do you remember about how you first

12   came to know that there was an incident involving

13   particular officers that are defendants in this

14   lawsuits in regard to Gerald Walker?

15        A.    Possibly would have been over the radio

16   or maybe cell phone from either Gordon or Buhrman.

17   They would have called me on their cell phone or

18   by radio letting me know they had to struggle with

19   an individual.

20        Q.    Do you actually remember how you got the

21   notification?

22        A.    My best recollection would be either

23   radio, police radio, or my cell phone.

24        Q.    Do you remember which one called you or
```

Sergeant Thomas Kane

1  radioed you?

2      A.   No.   The reason I say Gordon or Buhrman

3  is because they had more time out.   Ballard

4  wouldn't have called because he was a fairly new

5  officer. It probably would have been Gordon or

6  Buhrman letting me know they were in route to the

7  Wilmington Hospital.

8      Q.   Do you remember anything about the

9  specifics of the first either radio or telephone

10  communication other than what you just told me?

11      A.   No.   It would have been being notified

12  briefly and that they were going to Wilmington

13  Hospital. Once they called me I would go there and

14  speak to them in person.   So they wouldn't have

15  given me a lot of information.   Just sergeant

16  we'll meet you at the hospital or something like

17  that.

18      Q.   Do you recall where you were when you got

19  the communication?

20      A.   No, I don't.

21      Q.   Do you know whether you went to

22  Wilmington Hospital right away or whether there

23  was a delay?

24      A.   In the handwritten notes that you have I

A-423

1    have got going to the Wilmington Hospital at 11:40

2    hours.  It's on that page there. You will see the

3    words 10-2 Wilmington 11:40.  10-2 is the police

4    code for arrival.

5         Q.   Can I see your original notes that are

6    there.

7              MR. LANDON:   Can I have this marked

8    as Kane number 1.

9              (Whereupon, Exhibit Sgt. Kane 1 was

10   marked for identification.)

11   BY MR. LANDON:

12        Q.   So we can identify what we have marked,

13   Kane 1, and you're retaining the original exhibit,

14   is a two page exhibit on yellow lined notebook

15   paper containing handwritten notes. Are these your

16   handwritten notes?

17        A.   Yes.

18        Q.   The date at the top of the right-hand

19   corner of the first page says 7-11-05; correct?

20        A.   Yes.

21        Q.   And the next page has something scratched

22   out in the middle and underneath has a name with a

23   phone number --

24        A.   Yes.

A-424

1      Q.    When did you make these notes?

2      A.    It would have been at the hospital when I

3    talked to Mr. Walker and that is mostly the first

4    page. The second page is the gentleman at

5    Connections, Gabe Huffard and what he told me.

6      Q.    What is the 3155 that is scratched out at

7    the top of the first page?

8      A.    I don't remember. It might have been an

9    extension number that I might have been asked to

10   call earlier.  To the best of my recollection it

11   is not connected to anything.

12     Q.    Did you actually make these notes at the

13   Wilmington Hospital?

14     A.    Yes.

15     Q.    I just want you to read through them

16   because my photocopy, some of it is hard to read

17   the handwriting.  Why don't we just read through

18   these pages and tell me what they say starting

19   with the first page.  It looks like it says

20   Connections?

21     A.    Yes.  Connections 500 West 10th Street.

22   That is just the location where it happened at and

23   the address.  The next line is Gerald Walker.  A

24   black male, 59 is identified as Mr. Walker.  His

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

1  race and sex and his age. And then the next few

2  lines are just --

3      Q.    Just read what they say and I'll ask you

4  about them later.

5      A.    The next line says nurse picked.  And the

6  next line is his address, 513 West 26th. The line

7  crossed out I think I must have misunderstood his

8  address.  I first wrote down 530 West and then I

9  wrote down 513 West 26th.  The next line is brings

10 meds, said doctor wanted to see, computer telling

11 doctor what to do.  I didn't want to do what

12 computer said.

13          Connections people wanted him to go

14 to Wilmington Hospital.  And in quotes,"All I want

15 is my medication" unquote.  The next three lines

16 are blank.  The next line is 10-2 which means

17 police code for arrival at Wilmington,

18 11:40 hours.

19          A line is skipped.  Police say put

20 hands behind back.  I said no, I don't want to

21 go.  Held down and punched in face.  There is four

22 blank lines. The next line says live with wife and

23 granddaughter.

24          The second page the first six lines

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane

 1    are blank.  The next five or six lines was a

 2    complaint that I had gone to earlier.  Do you want

 3    me to explain that?

 4        Q.    Please do.  It looks like it says United

 5    Check Cashing?

 6        A.    Yes.  It was United Check Cashing and I

 7    think that is a person's name but I'm not sure.

 8    The next line is the phone number of United Check

 9    Cashing, 777-4606.  And then the address 707 South

10    Union Street.

11        Q.    Were you making those notes at the

12    Wilmington Hospital?

13        A.    Those were on this paper before. Prior I

14    used it for these notes.

15        Q.    Keep going.

16        A.    The next line is Gabe Huffard 984-2302,

17    extension 124 and then Connections.  There is a

18    blank line and then the next line had to go to

19    state hospital.  Dr. Mehalick filled out

20    commitment, Huffards offered to transport.

21    Another blank line and next Karen tried to talk.

22    Another blank line and Officers talked to Walker.

23    They were very calm.  Walker refused to

24    cooperate.  Put hands underneath and then two

A-427

Sergeant Thomas Kane

1   blank lines.

2       Q.    Did you take any other notes other than

3   these two pages of notes in conjunction with your

4   investigation into the use of force?

5       A.    No.

6       Q.    Were all of these notes taken on July 11,

7   2005 by you?

8       A.    Yes.

9       Q.    Were they all taken while you were

10  present at the Wilmington Hospital?

11      A.    The first page from Wilmington and the

12  bottom half of the second page was talking to Mr.

13  Huffard at Connections.

14      Q.    Personally or on the phone?

15      A.    Personally.

16      Q.    Do you have any recollection of what any

17  of the people who you spoke to about this incident

18  told you other than what is referenced in the

19  notes on these two pages?

20      A.    Just whatever is in the police reports

21  from Officers Gordon, Ballard and Buhrman.

22      Q.    The police reports, my understanding of

23  those police reports weren't written until after

24  you conducted your investigation.  Does that sound

A-428

1    right to you?

2        A.    They are a part of the investigation.  So

3    I saw the reports and reviewed them.

4        Q.    Would you have seen those reports on the

5    date that you indicated you reviewed those reports

6    that is on those reports?

7        A.    What I usually do is try to get a copy of

8    the report that day and review them.  I might not

9    print it out until a day or two later, but I

10   always get a copy of it that day.

11       Q.    Just tell me and if you need to refer to

12   these notes that's fine. Tell me what you can

13   remember about who you spoke to and what they told

14   you while you were at the Wilmington Hospital.

15   Who did you speak to first?

16       A.    I usually just speak to the officers

17   first to find out the basics of what happened.

18       Q.    Do you recall the officers being there at

19   the hospital?

20       A.    Yes.

21       Q.    Which ones were there?

22       A.    I know for sure Gordon and Ballard.  I

23   don't know if Corporal Buhrman came over or not.

24       Q.    You remember seeing Gordon and Ballard at

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

Sergeant Thomas Kane                    38

1    Wilmington Hospital?

2        A.    Yes.

3        Q.    Where were they, were they in a waiting

4    room somewhere?

5        A.    I don't remember where they were at.

6    Usually we have to sit out front for a few minutes

7    until they get triaged in.  I believe they were

8    out in the hallway by the emergency room waiting

9    until they get registered in the hospital. The

10   hospital people get their names and addresses and

11   date of births.  And then they assign us a room.

12       Q.    Do you know where Mr. Walker was when you

13   first saw Officers Gordon and Ballard?

14       A.    No, I don't.

15       Q.    Do you remember seeing him when you first

16   saw Ballard and Gordon?

17       A.    They would have been right there watching

18   him.  Since he was a prisoner they would have been

19   either in the same room or right outside of the

20   room.

21       Q.    Did you speak to Gordon and Ballard

22   together or did you separate them and speak to

23   them individually?

24       A.    I believe just standing together.  While

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

Sergeant Thomas Kane

```
 1   I'm speaking to them they have to keep an eye on
 2   Mr. Walker, so we would have all been in close
 3   quarters.
 4       Q.   Did you receive any training from the
 5   police department as to how to go about conducting
 6   a use of force investigation?
 7       A.   Yes.
 8       Q.   Did you ever receive any training about
 9   whether or not you should interview witnesses
10   separately or together?
11       A.   Not witnesses.  Defendants I would
12   normally interview separately.
13       Q.   Anybody else you would interview together
14   if they happened to be together?
15       A.   No.
16       Q.   Let's back up.  First of all, were you
17   given any training as to how to go about
18   interviewing witnesses or anybody you are going to
19   talk to during a use of force investigation
20   whether it's a potential criminal defendant, a
21   victim, an independent witness, a police officer
22   that may have been involved.  Do you understand
23   what I mean by witness, I'm talking about anybody
24   that you are talking to?
```

A-431

1     A.    Okay.

2     Q.    Did you receive any training from the

3  Wilmington Police Department as to how to go about

4  interviewing witnesses in a use of force

5  investigation and specifically whether you should

6  interview them separately, independently or

7  together?

8     A.    In the use of force I don't remember

9  anything specific on how to interview people.

10 Usually by the time somebody becomes a supervisor

11 you have interviewed a lot of people.  I really

12 don't recall specifically about separating anyone

13 through the use of force training.

14    Q.    You understand where I'm going with this,

15 don't you?  If you are going out to interview a

16 couple of police officers and let's just say they

17 have engaged in excessive use of force, and you

18 don't know that yet because you are just starting

19 your investigation.

20             Isn't it more likely that they are

21 going to cover for one another if you are

22 interviewing them together in one another's

23 presence?

24             MR. MILI:   Objection to form.  You

Sergeant Thomas Kane

 1    can answer.

 2                    THE WITNESS:    In this specific

 3    instance they are responsible for Mr. Walker and

 4    to watch him.  So when I was talking to them they

 5    would have been in a position where they had to be

 6    together to keep an eye on Mr. Walker.

 7    BY MR. LANDON:

 8        Q.    Was it necessary for two officers to keep

 9    an eye on him or could one have accomplished that

10    task?

11        A.    When they have had to use force on

12    someone, a combative subject, most of the time

13    there is two officers.

14        Q.    Was he handcuffed to a table in the

15    emergency room?

16        A.    I don't recall whether he was or not.

17        Q.    Would that be standard procedure to

18    handcuff somebody in the police's custody when

19    they are being treated in the hospital?

20        A.    It depends.  Usually yes. Sometimes we

21    have to take the cuffs off if the hospital

22    personnel asks us to to check their blood pressure

23    or check them. It also depends on how they are

24    acting. If they calm down the situation is

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane                                    42

1  stabilized.

2      Q.    In other words, if Mr. Walker was stable

3  and seemed to be calm couldn't you leave Gordon

4  with Mr. Walker and walked out in the hall with

5  Ballard and said Ballard what happened?

6      A.    Again, of having a combative subject I

7  would rather have two officers there all times as

8  much as possible.

9      Q.    Couldn't you in that situation if you

10 were afraid he was going to be combative have one

11 of your officers handcuff him to something and

12 have one officer keep an eye on him and take the

13 other officer down the hall and talk to him?

14     A.    Are you asking me if it was done?

15     Q.    I'm asking you wouldn't that be a good

16 idea to do it that way given my hypothetical with

17 the assumptions which are in part that officers

18 might tend to cover for one another in an

19 excessive use of force investigation?

20             MR. MILI:    Objection to form.   You

21 can answer it.

22             THE WITNESS:    I guess I would

23 answer it the same way.  I would be more concerned

24 with them being together and keeping an eye on Mr.

A-434

Sergeant Thomas Kane

```
 1   Walker so he didn't act up anymore being a
 2   mentally ill person and they were just together.
 3   BY MR. LANDON:
 4       Q.   So your recollection is when you
 5   interviewed Ballard and Gordon they were together
 6   so that they could both hear what each other was
 7   saying to you?
 8       A.   Yeah.
 9       Q.   Do you remember whether they both gave
10   you information or whether one of them did all the
11   talking?
12       A.   Again, just from the time on it was
13   probably Officer Gordon because he had more time
14   on Officer Ballard.  Ballard was a newer officer
15   so it would have been Corporal Gordon.
16       Q.   I can appreciate that you are not going
17   to remember every detail of every incident that
18   you have been involved in on the job.  What I need
19   to know is whether you actually remember or
20   whether you are just giving me your best guess as
21   to who gave you the information?
22       A.   It is my best recollection based that
23   Corporal Gordon had more time than Officer Ballard
24   who was a new officer.
```

A-435

Sergeant Thomas Kane

```
 1        Q.    Do you remember Officer Ballard giving

 2   you any information whatsoever about what happened

 3   at Connections?

 4        A.    He was injured and I would have asked him

 5   about that.   I have a form I have to fill out for

 6   workers' comp about what was injured.   I would

 7   have spoken to him mainly about that injury and

 8   where he was hurt.

 9        Q.    Are there any notes on your two pages of

10   notes, Kane Exhibit 1, that reflect information

11   given to you at the Wilmington Hospital by either

12   Gordon and or Ballard?

13        A.    No.

14        Q.    So whatever they told you you didn't take

15   notes on it.   Is that what you're saying?

16        A.    That's correct.

17        Q.    Why not?

18        A.    I just got basic information on what

19   happened.   And then the rest I would get from

20   their police report.

21        Q.    Do you recall how much time you spent

22   talking with Gordon and Ballard at the hospital

23   about what they said happened?

24        A.    No, I don't.
```

A-436

Sergeant Thomas Kane                    45

1      Q.   Do you sitting here today actually

2   remember what they told you happened while you

3   were talking to them at the hospital?

4      A.   Not without reviewing their reports.

5      Q.   And you talked to Mr. Walker at the

6   hospital?

7      A.   Yes.

8      Q.   Did you talk to him alone, in other

9   words, out of the presence of Gordon and Ballard?

10     A.   I don't recall.

11     Q.   My recollection of what they both

12  testified to is that you actually went into a room

13  where Mr. Walker was being treated.  But that the

14  door remained opened and they were outside the

15  room and you were inside the room with Mr.

16  Walker.

17            Having told you that does that

18  refresh your recollection as to where you talked

19  to Walker and whether or not they were in ear shot

20  --

21     A.   No, it doesn't.

22     Q.   I'm making a judgment based on your notes

23  as to what Walker was saying.  He appeared to be a

24  little bit mentally off or not completely normal

A-437

Sergeant Thomas Kane

```
 1   when you spoke to him. Is that how he appeared to

 2   you?

 3        A.   Nothing really stands out about how he

 4   was acting.

 5        Q.   Do you have any recollection of what he

 6   looked like?  I know you say he's a black male,

 7   age 59.  Do you remember his stature, anything

 8   about him?

 9        A.   I just remember him being not too tall

10   and fairly stocky.  An older gentleman.

11        Q.   Do you remember anything in particular

12   about how he looked and whether or not it looked

13   like he had any abrasions to his head or face

14   area.  Whether he looked like dishevelled, whether

15   he looked like he had been in a fight or anything

16   of that nature?

17        A.   No.

18        Q.   Do you recall how much time you spent

19   talking to Mr. Walker?

20        A.   Possibly five or ten minutes.

21        Q.   That is a long time?

22        A.   Maybe five.

23        Q.   You think maybe five minutes?

24        A.   Just from looking at the notes, yeah.
```

A-438

Sergeant Thomas Kane

```
 1        Q.   Would you agree with me that it may have
 2   taken him all of about 30 seconds to utter at
 3   least what you wrote down in your notes; that
 4   wouldn't have taken a long time to say, would it?
 5        A.   I might have been asking him questions in
 6   between and just wrote down what he said.  Getting
 7   his address. I wrote down the wrong one, 530
 8   instead of 513.
 9        Q.   So he told you that, if I'm reading these
10   notes correctly, the police said he needed to put
11   his hands behind his back.  And he told you that
12   he said no to that request?
13        A.   That's correct.
14        Q.   No, I don't want to go.  And that word
15   underneath there that that precedes the word down?
16        A.   Held.
17        Q.   He told you he was held down and punched
18   in the face?
19        A.   Yes.
20        Q.   Prior to Mr. Walker telling you that he
21   was held down and punched in the face, had Ballard
22   and or Gordon mentioned anything along those lines
23   to you?
24        A.   Specifically what they said at the
```

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane

```
 1   hospital, I just know what was in their police

 2   report.

 3       Q.   Do you happen to recall feeling surprised

 4   or -- well, do you happen to recall feeling

 5   surprised by any chance when Mr. Walker told you

 6   he was held down and punched in the face?

 7       A.   No, I don't remember.

 8       Q.   Do you recall whether Mr. Walker told you

 9   anything else when you interviewed him at the

10   hospital other than what appears in your notes on

11   Kane Exhibit 1?

12       A.   No.

13       Q.   Did you ever talk to Mr. Walker again

14   after you talked to him at the Wilmington

15   Hospital?

16       A.   No.

17       Q.   Did you ask him any questions?

18       A.   What my notes are either in response to a

19   specific question or if I asked him one question

20   and he talked, that's what I wrote down.

21       Q.   After you talked to Mr. Walker in the

22   hospital did you again talk to Officers Gordon or

23   Ballard in the hospital about what you had just

24   been told by Mr. Walker?
```

A-440

Sergeant Thomas Kane

```
 1       A.    I don't believe so, no.

 2       Q.    What is the next thing you did after

 3  talking to Mr. Walker at the hospital in this

 4  investigation?

 5       A.    The best I remember is going back over to

 6  Connections to talk to Mr. Huffard.

 7       Q.    How did Mr. Huffard's name come up in the

 8  investigation, how did you know to talk to

 9  somebody called Huffard?

10       A.    I probably had gotten that from Corporal

11  Gordon.  Or I know Mr. Huffard is the one that

12  called our dispatcher to have them dispatch a

13  police officer. They might have given it to me or

14  I might have gotten it from Corporal Gordon.

15       Q.    Did you leave the Wilmington Hospital and

16  go directly over to Connections?

17       A.    Yes.

18       Q.    Did you go by yourself?

19       A.    Yes.

20       Q.    And what did you do when you got there?

21       A.    I just asked to speak to Mr. Huffard.  I

22  believe he was up on the second floor.  I'm not

23  positive.

24       Q.    Had you been there before?
```

A-441

1    A.    No, I had never been inside. The building

2  I think was the old social security. I have been

3  in that building before but I don't believe during

4  the time Connections was there.

5    Q.    And you actually spoke to someone named

6  Huffard?

7    A.    Yes.

8    Q.    Can you describe him for me, please?

9    A.    The only thing I remember is he was a

10  white male.  Maybe 30 or late twenties.

11    Q.    Did you speak to anyone else while you

12  were there?

13    A.    No.

14    Q.    How long did you spend talking to Mr.

15  Huffard?

16    A.    Probably at the most five minutes.

17    Q.    Other than what you have written in your

18  notes under Mr. Huffard's name, do you have any

19  memory of him telling you anything else about what

20  happened that day?

21    A.    No.

22    Q.    Did he tell you anything else about what

23  happened that day that you just didn't write down

24  for whatever reason?

                                          A-442

```
 1        A.    No.

 2        Q.    Did you tell him that Mr. Walker had told

 3  you that he had been held down and punched in the

 4  face?

 5        A.    No.

 6        Q.    Did you ask Mr. Huffard whether Mr.

 7  Walker had been held down and punched in the face?

 8        A.    I don't remember asking him specifically,

 9  no.

10        Q.    Did you ask him any questions about

11  whether or not the officers used any force in

12  trying to get Mr. Walker to go with them?

13        A.    To the best of my recollection I asked

14  what had happened as far as what he had seen.

15        Q.    Did he seem reluctant to talk to you

16  about what he had seen?

17        A.    No.

18        Q.    Your notes indicate that Mr. Huffard told

19  you that Walker refused to cooperate, and then he

20  put his hands underneath?

21        A.    Yes.

22        Q.    Do you recall what Mr. Huffard was trying

23  to tell you there?

24        A.    Just that the officers were trying to
```

A-443

1   handcuff Mr. Walker and put his hands underneath

2   his body when he was down on the ground so they

3   could get his hands to handcuff them.

4        Q.   Did you ask Mr. Huffard how it was that

5   Mr. Walker ended up being down on the ground?

6        A.   No.

7        Q.   Did you ask Mr. Huffard any questions

8   other than a general what happened question?

9        A.   No.

10       Q.   Why not?

11       A.   He was the one that was there.  So I just

12  asked him what happened and to just give me your

13  -- be as specific as possible as far as what you

14  saw.

15       Q.   What did you do after you talked to Mr.

16  Huffard in this use of force investigation?

17       A.   That would have been all that I would

18  have done immediately as far as this.  United

19  Check Cashing is on there and I believe after I

20  left Connections I went to there.  That would have

21  been somebody called in and complained and one of

22  my officers went there and the person wasn't happy

23  with what my officer said.  So I believe I went to

24  United Check Cashing to speak to that person about

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane

1    what had happened on that complaint.

2        Q.    What was the next thing that you did in

3    connection with your use of force investigation

4    into that Walker incident?

5        A.    Just waited for Ballard and Gordon and

6    Buhrman to complete their police reports.

7        Q.    And is that typically what you would do

8    in a use of force investigation?  Is that the

9    sequence that you would normally follow?

10       A.    Yes.

11       Q.    Did you ask Mr. Huffard whether anyone

12   else witnessed what happened with the officers and

13   Mr. Walker?

14       A.    I don't remember specifically.  I don't

15   remember there was anybody else in that office by

16   the time I got there or not.

17       Q.    Do you remember whether you asked him

18   whether there was anybody else that witnessed the

19   incident?

20       A.    I don't remember, no.

21       Q.    Did you speak to any medical personnel at

22   the Wilmington Hospital about whether or not Mr.

23   Walker had any injuries?

24       A.    No.

A-445

Sergeant Thomas Kane

```
 1        Q.    You have a copy in your file of Corporal
 2   Gordon's report of 7-11-05 initial crime report?
 3        A.    Yes.
 4        Q.    It looks like you signed off on that or
 5   gave supervisor approval on 7-12-05; correct?
 6        A.    Yes.
 7        Q.    Is that 10:06, is that the time?
 8        A.    Yes.
 9        Q.    So 10 a.m., the day after you approved
10   this report?
11        A.    Yes.
12        Q.    Did you see this report on the 11th or on
13   the 12th or don't you remember?
14        A.    I don't remember. Sometimes they would
15   give me a copy right when they did it for me to
16   review.
17        Q.    Did you read this entire report before
18   you approved it?
19        A.    Yeah.
20        Q.    What does it mean to get a supervisor's
21   approval to a report; what are you supposed to do?
22        A.    Mainly try to check each block to make
23   sure everything is filled out correctly. As far as
24   the narrative goes, just that everything is
```

A-446

```
 1   complete and specific as possible.
 2        Q.    So you read the investigative narrative
 3   that Officer Gordon wrote?
 4        A.    Yes.
 5        Q.    Did you have any conversation with Gordon
 6   after you read this report about the content of
 7   the investigative narrative section in the report?
 8        A.    I don't believe so.
 9        Q.    Was there anything about the
10   investigative narrative that led you to believe
11   that any excessive force was used by either of the
12   officers involved in this incident?
13        A.    No.
14                  MR. MILI:    Roger, we have been
15   going for about an hour.  So at some point can we
16   take a break.  Finish up your topic if you would
17   like and take a break?
18                  MR. LANDON:    We can take a break
19   right now.
20                  (Whereupon, a short break was
21   taken.)
22   BY MR. LANDON:
23        Q.    I am looking at Officer Buhrman's report
24   and we had previously marked it as Buhrman Number
```

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

Sergeant Thomas Kane

```
 1   3.  Her report is dated 7-12-05 and it looks like
 2   you signed off on it on 7-12-05 also at 10:08 a.m.
 3   So I guess you looked at her report right after
 4   you looked at Gordon's report?
 5       A.   Yes.
 6       Q.   After looking at those two reports on the
 7   12th of July, did you do anything else in
 8   conjunction with your use of force investigation
 9   into the Walker incident that occurred the day
10   before?
11       A.   Not at that point.  I just typed up my
12   report.
13       Q.   Do you actually have a recollection of
14   doing that?
15       A.   Yes.
16       Q.   Is there a form that you fill out for
17   that type of use of force report?
18       A.   Yes.
19       Q.   And do you recall where you were when you
20   typed up that report.
21       A.   Patrol sergeants' office.
22       Q.   Do you recall how long that report was or
23   how many pages it comprised of?
24       A.   Probably three.
```

A-448

Sergeant Thomas Kane

```
 1      Q.    Is it set up in a similar format as the

 2  initial crime report which Corporal Gordon did or

 3  supplemental report that Corporal Gordon did or is

 4  it a completely different type of form?

 5      A.    Completely different.

 6      Q.    Is there a narrative portion of the form

 7  that you have to do?

 8      A.    Yes.

 9      Q.    Do you recall how long the narrative

10  portion of the form was?

11      A.    Probably three quarters of a page to a

12  page.

13      Q.    And in general what comprises the content

14  of the narrative portion of a use of force report

15  that you would do?

16      A.    I would basically start out by putting

17  out the general facts of the incident, what

18  happened.  And then put in what Gordon and Ballard

19  had done.  I would cover what Corporal Buhrman had

20  done.  I would put my conclusion in it.

21      Q.    And in the sections where you would

22  recite what the officers did, would that content

23  in this case have come from the actual reports

24  that Gordon and Ballard wrote?
```

A-449

1      A.   Yes.

2      Q.   Do you remember whether you supplemented

3   that portion of your narrative with any

4   information that you learned from interviewing

5   Ballard and or Gordon that may not have found its

6   way into either Gordon or Buhrman's written

7   reports?

8      A.   No.

9      Q.   No you don't recall or no there wasn't

10   any supplementation?

11      A.   No, I don't believe there was any

12   supplementation.

13      Q.   So in other words, if we were ever to

14   locate this use of force report that you say you

15   typed for that case, and the narrative portion

16   where you are reciting what these officers did,

17   all of that information would have come from

18   either Gordon's written initial crime report and

19   or Buhrman's supplemental report?

20      A.   That's correct.

21      Q.   Did the narrative in this case contain

22   any information that you obtained from either Mr.

23   Walker or Mr. Huffard?

24      A.   They would be in separate paragraphs as

A-450

Sergeant Thomas Kane

```
 1   far as the witness interview and defendant

 2   interview.

 3       Q.    You said you reached a conclusion at the

 4   end of your report?

 5       A.    Yes.

 6       Q.    Is that something that you are supposed

 7   to do when you doing a use of force investigation

 8   report?

 9       A.    Yes.

10       Q.    What conclusion did you reach and include

11   in the report in this particular matter?

12       A.    Just that the officers involved followed

13   departmental policies and used proper conduct.

14       Q.    Does someone above you in the chain of

15   command have to review your use of force

16   investigation report?

17       A.    Yes.

18       Q.    Back in July of 2005 who would that

19   person have been?

20       A.    Lieutenant Elmer Harris.

21       Q.    Did he to your knowledge review your use

22   of force report?

23       A.    Yes.

24       Q.    Did he do that in your presence or not?
```

A-451

Sergeant Thomas Kane

```
 1      A.    I don't believe so, no.  I either turned
 2  it into him or put it in his basket in the
 3  lieutenant's office.
 4      Q.    Is this a report that you created on a
 5  computer that is actually hard-wired into your
 6  office or was this on a laptop?
 7      A.    A computer in the office.
 8      Q.    Did you have the capability of e-mailing
 9  that report or sharing that report electronically
10  with, for instance, Elmer Harris, Lieutenant
11  Harris or anyone else?
12      A.    No.  I just printed it and gave it to
13  them.
14      Q.    What is your typical procedure for how
15  many copies of the report get printed and where
16  they all go?
17      A.    Usually I just print the one and I just
18  send it onto the chain of command.
19      Q.    You don't keep a copy for your own file?
20      A.    I did my first couple of years when I was
21  promoted.  I usually tried to but after doing
22  enough of them I felt comfortable and I didn't
23  keep a file.
24      Q.    Did you save the report in some fashion
```

A-452

1    on your computer?

2        A.    I believe I did, yes.

3        Q.    Have you gone back to try to retrieve it?

4        A.    Yes.

5        Q.    When did you go back and try to retrieve

6    it?

7        A.    Not until when I wrote the report to

8    Captain Custis when I was aware of the lawsuit

9    being filed, probably June 9, 2006.

10       Q.    Has anybody else at the Wilmington Police

11   Department to your knowledge tried to retrieve

12   your report out of the computer?

13       A.    What had happened was in between this

14   time the computers have been replaced in the

15   patrol sergeants' office with newer computers.

16       Q.    What happened to all the information on

17   the older computers when they replaced those

18   computers?  Presumably there was information you

19   needed to do your job; right?

20       A.    Well, they replaced the basic blank forms

21   on the computers in there.  There is almost a

22   total of 15 sergeants that use those four

23   computers in the office. We work shift work so we

24   don't have our own individual computer in the

1   patrol division.

2      Q.   Do you know whether the information that

3   was on the old computers was somehow stored

4   somewhere by the Wilmington Police Department when

5   they bought the new computers?

6      A.   I'm not aware, no.

7      Q.   Who would be the person that would most

8   likely be able to answer that question?

9      A.   That would be Sergeant John Martin.

10     Q.   I want to make Exhibit 2 this June 15,

11  2006 bate stamped memo that is actually dated June

12  9, 2006.

13          (Whereupon, Exhibit Sgt. Kane 2 was

14  marked for identification.)

15  BY MR. LANDON:

16     Q.   Before we get to that, your use of force

17  report.  Once your supervisor, and in this case

18  that would have been Lieutenant Harris, reviewed

19  the report and signed off on it what would he do

20  with it?

21     A.   Send it on to the patrol captain.

22     Q.   Who would that have been at the time in

23  July of 2005?

24     A.   Captain Marlin Dietz.

A-454

1    Q.    What would the patrol captain do with it?

2    A.    He would send it next up the chain of

3    command which would have been the inspector of

4    uniform operations.  That would have been

5    Inspector James Wright at that time.

6    Q.    Then what would he do with it?

7    A.    He would then send it over to the Office

8    or Professional Standards to the captain.

9    Q.    Who would that have been at the time?

10    A.    I believe Captain Nancy Dietz.

11    Q.    What would that person do with it?

12    A.    I'm not sure.  She would have maybe a

13    sergeant in there review it or not.  I'm not sure.

14    Q.    So you are telling me the practice was to

15    create back in July of 2005 when these typed forms

16    were created by the supervisor or investigating

17    officer -- let me ask you, was the practice as to

18    how this form was supposed to go through the chain

19    after it left your possession as you described --

20    strike that.

21            What was the procedure that the

22    Wilmington Police Department was supposed to

23    follow in getting one of these use of force

24    investigation forms completed and then to its

A-455

Sergeant Thomas Kane

```
 1   final destination?

 2       A.   Again, I would have done my use of force

 3   report.  Included with that would have been all

 4   the copies of the report from my officers.  I

 5   probably would have put in the workers' comp form

 6   where Patrolman Ballard was injured.  I would give

 7   that to my patrol lieutenant.

 8            The patrol lieutenant would send it

 9   up to the patrol captain. The patrol captain sends

10   it up to his boss who is the inspector of uniform

11   operations.  Again, I don't believe it goes right

12   to the chief.  I believe the inspector of uniform

13   operations sends it over to the captain of the

14   Office of Professional Standards.

15       Q.   So in other words the document gets

16   printed and then it physically has to pass through

17   all of these hands before it ends up in its final

18   resting place?

19       A.   Yes.

20       Q.   Is that the way the procedure works there

21   at the Wilmington Police Department?

22       A.   Yes.

23       Q.   How many of these forms get lost in that

24   sequence of events in your experience?
```

A-456

1    A.    In my experience I have never had one

2  lost before. This is the first time it has

3  happened to me.

4    Q.    In Exhibit Number 2 I take it the chief

5  of police back in June of '06 was asking you where

6  the use of force report was?

7    A.    It was actually Captain Custis.  Every

8  departmental information is officially sent to the

9  chief of police.

10    Q.    I'm reading what you have wrote here, and

11  you correct me if I'm wrong. As I read it you

12  don't tell him that you ever actually wrote the

13  report, do you?

14    A.    Maybe on the second paragraph, writer,

15  which is me, conducted the required investigation

16  into the use of force by the officers.

17    Q.    Right.

18    A.    I guess I don't specifically say the

19  report, the required investigation into use of

20  force.  I guess I should have put report but I

21  didn't.  The next paragraph I might have just been

22  unable to find the use of force report.  And that

23  one I put report and the one up top I just didn't

24  put report of use of force and I should have.

Hawkins Reporting Service
715 N.  King Street, Suite 3 - Wilmington, DE 19801
(302)  658-6697    FAX (302)  658-8418

1    Q.    What if any follow-up did anyone do with

2    you after you wrote this memo?

3    A.    What I did?

4    Q.    No.  Did anybody in the police department

5    come back to you and do anything or say anything

6    in response to this memo that you wrote?

7    A.    No.

8    Q.    Back when you were describing the chain

9    that the report goes through after it leaves your

10    hands, as I recall your answer that report never

11    actually gets shown to the officers that you were

12    investigating; correct, if you have determined

13    that there was not an excessive use of force?

14    A.    That's correct.

15    Q.    In your experience has there ever been a

16    situation where a supervisor doing a use of force

17    investigation has concluded no excessive use of

18    force and then somebody up the chain from that

19    supervisor takes a fresh look at it because

20    something just maybe just doesn't sit quite

21    right.  And the matter is opened again for fresh

22    eyes to look at?

23    A.    I'm not aware of any, no.

24    Q.    Did you ever make a judgment when you

1    were doing your use of force investigation into

2    the Walker incident as to whether or not Mr.

3    Walker sustained any injuries as a result of the

4    incident?

5        A.    Normally we get the treatment papers from

6    the hospital when they get released and we keep a

7    copy of that.  I don't remember what his treatment

8    was or anything.

9        Q.    How would you get those papers?

10       A.    From the officers.  They would get a copy

11   from the people at the hospital and one of the

12   nurses makes a copy for us.

13       Q.    What do you do as the supervisor looking

14   into a use of force situation, what do you do with

15   those papers?

16       A.    They would have been attached to all the

17   reports that go up the chain of command, the

18   treatment papers.

19       Q.    Your file that you brought with you

20   today, are all of the documents in that file

21   documents that you have had in your physical

22   possession in your office since July '05?

23       A.    I created this file when I was aware of

24   the lawsuit probably in June of '06.

1    Q.    You created the file?

2    A.    Yes.

3    Q.    Did you have any of those documents in

4    that file before you created it?  Did you already

5    have some of the documents --

6    A.    Yeah.  I was able to find these

7    handwritten notes.  And then I went to our

8    personnel department and got the injury from

9    Ballard.  I was just trying to recreate as much as

10   I could.  I knew that was on file that I had done

11   that, the injury report on Ballard.

12   Q.    Other than the handwritten notes did you

13   have any of the other documents in your file in

14   June of this year when you became aware of the

15   incident?

16   A.    Again, the only thing I could find were

17   these handwritten notes.  I got these two forms

18   from Officer Ballard's personnel file, work status

19   on the injury form. I was just trying to put

20   together as much as I could remember.

21   Q.    Where had you kept your handwritten

22   notes, what sort of file had you kept those in?

23   A.    They were just in a box under my desk.

24   Not too long after this happened, June 11th, I

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane

1    remember I was on vacation the last two weeks of

2    July and I didn't go back to the patrol unit, I

3    went to the community policing unit so I just

4    boxed up some things.  And I just found them in

5    one of my boxes where I keep things.

6        Q.    Is it ever appropriate under the City of

7    Wilmington's Police Departments use of force

8    continuum to strike an individual or a suspect

9    with handcuffs in the head?

10       A.    When you're struggling with somebody

11   especially on the street you do what you have to

12   do to control the situation.  You try to use the

13   minimum amount of force necessary.  But we have to

14   control the situation for our safety and others

15   safety.  I don't think you can specifically say

16   never do this or never do that.

17       Q.    Under the City of Wilmington's Police

18   Departments use of force continuum rules, is it

19   ever appropriate to use any force whatsoever to

20   coerce a mentally ill individual to go with

21   officers in a police car to be transported to

22   another mental ill facility?

23       A.    I don't believe there is anything

24   specific in our use of force policy about dealing

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane

1  with mentally ill people.

2      Q.    I'm just asking is it ever appropriate to

3  use force when somebody simply says no, I don't

4  want to go and doesn't do anything physically

5  threatening to the officers or anyone else in the

6  area?

7      A.    When we're required to transport people

8  -- dealing with the mentally ill is tough. We

9  don't want to hurt them. We know they are mentally

10 ill, but at the same time our policy is to

11 handcuff somebody that is being transported for

12 our safety and theirs. We have to get them

13 handcuffed.  We try to do the best we can with

14 getting them handcuffed and use the least amount

15 of force we have to.

16     Q.    Let's say all the person is saying no, I

17 don't want to go; you're not going to handcuff

18 me.  But he's not making any threatening moments.

19 Take me through the use of force continuum and

20 tell me where the police are allowed to go on that

21 continuum with that situation under the Wilmington

22 Police Department use of force policy?

23     A.    Again, I don't think there is anything

24 specifically in there to deal with the mentally

A-462

Sergeant Thomas Kane

1   ill.  We try to talk to them as best we can and

2   explain the situation to them.  We have been

3   called there because they have been usually

4   committed by a doctor.  We are there just to

5   transport them because the workers or the

6   commission or whoever couldn't get them

7   transported they want us to transport them for

8   some reason.  And our policy is to handcuff them.

9        Q.   What I'm trying to get you to answer if

10  you can is what do the officers do?  Here is a

11  hypothetical question that is at least pretty

12  close to what I think I'm going to be able to

13  prove in this case.  You have got a guy who is

14  saying I'm not going to go. He's not making any

15  threats and he's not threatening to hurt anybody

16  and he is not threatening to hurt himself.  He is

17  just refusing to put his hands behind his back so

18  that he can be handcuffed and transported.  He is

19  just standing there basically --

20            MR. MILI:   Objection to form.  You

21  can answer.

22  BY MR. LANDON:

23       Q.   How do the officers progress through the

24  use of force continuum to deal with that

A-463

Sergeant Thomas Kane

1  situation?

2      A.    I guess the first thing if a doctor has

3  determined that he does need to go to the hospital

4  and there is some determination that he is either

5  a threat to himself or others, so that's usually

6  why we're called.  A medical doctor thinks this

7  person needs to be evaluated and he could be a

8  threat to himself or others.

9              Our policy is to handcuff people and

10  we try to explain that to him that we won't put it

11  on tight but they need to be handcuffed for their

12  safety because a doctor has said they are mentally

13  ill so we handcuff.  If a person doesn't do what a

14  police officer tells them to do then technically

15  it is resisting arrest.

16              If I tell you right now you're under

17  arrest and even if it's completely wrong and you

18  resist you are still resisting arrest.  Even if I

19  have no reason to arrest you and if I tell you to

20  put your hands behind your back and you don't do

21  something that a police officer tells you, it is a

22  crime.  It is resisting a police officer and

23  resisting arrest. At some point we have to get the

24  individual handcuffed and transported for their

A-464

Sergeant Thomas Kane

 1  safety.

 2     Q.   Well, thanks. Under what you have just

 3  told me now you are throwing a new element into

 4  it.  And what you're saying to me is it would be a

 5  crime for a person to refuse a request by a police

 6  officer to put their hands behind their back to be

 7  handcuffed.  Is that what you're saying?

 8     A.   Yes, yes.

 9     Q.   Refusing to obey a police officer you're

10  saying that is a crime?

11     A.   Yes.

12     Q.   So what does the police officer do when

13  this person has committed a crime, do you let them

14  know that they just committed a crime or do they

15  just keep that information to themselves and then

16  do something else?

17     A.   Well, I guess that probably depends on

18  the police officer and his communication skills.

19  In this instance they explained to Mr. Walker they

20  had to transport him and our policy was to

21  handcuff him.

22     Q.   He is saying no, you are not going to

23  handcuff me.  What do they do next?  Do they keep

24  talking to him or do they do something physical

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697   FAX (302) 658-8418

Sergeant Thomas Kane

1    involving force?

2        A.    The amount of time that they would spend

3    talking to him would depend on the officer.

4        Q.    Let's say we have gotten past talking and

5    talking doesn't seem to be working and we have

6    been there for let's say hours.  What do they do

7    next?

8        A.    Again, they do the best they can with

9    trying to get the individual handcuffed.

10       Q.    Does that mean using force?

11       A.    They use what means they have to to

12   control the situation and get the person

13   handcuffed.

14       Q.    Would that include tackling the person

15   and getting them down to the ground or down to the

16   floor?

17       A.    In most instances you are more

18   comfortable having the person down on the ground

19   where you can control them rather than standing

20   up.

21       Q.    Would that include spraying pepper spray

22   in their face while they are down on the ground

23   face down?

24       A.    Again, depending on the individual

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

1    officer and how long the struggle went on and what

2    level of force they deem necessary to get the

3    control of the person and get them handcuffed.

4        Q.    Would it include beating the person in

5    the face from the back of the head with a fist to

6    the point where the officer feels like he has

7    broken his fist where he hit him so hard?

8        A.    Again, the use of force continuum we do

9    what we have to do to get the person handcuffed.

10       Q.    So that might be appropriate under the

11   certain circumstances that I have just described?

12       A.    Depending on the individual officer and

13   how he felt. How threatened he felt with his

14   safety and other people in the office and the

15   suspect's safety.

16       Q.    What's the electronic shock gun that you

17   guys have?

18       A.    The taser.

19       Q.    What about using the taser?

20       A.    I don't believe we had those at that

21   time.  I'm pretty sure.  I'm not positive but it

22   has only been the last year.

23       Q.    I'm talking hypothetically now, what if

24   in our hypothetical the officer decided to use the

Hawkins Reporting Service
715 N. King Street, Suite 3 - Wilmington, DE 19801
(302) 658-6697    FAX (302) 658-8418

Sergeant Thomas Kane

1   taser, would that be an appropriate use of force?

2       A.   Again, if it got to the point where the

3   officer felt that was necessary than he could use

4   the taser.

5       Q.   What about deadly force, would deadly

6   force be appropriate under the circumstances of my

7   hypothetical?

8       A.   Again, deadly force is a judgment made by

9   the officer on an individual basis as far as the

10  totality circumstances, what is going on and how

11  he feels. Just depends on each individual

12  incident.

13      Q.   As a supervisor evaluating use of force

14  what control is your determination as to whether

15  the use of force was excessive in any given

16  situation?  How do you determine that?

17      A.   I usually get our policy out and review

18  it.  Just review the reports.  Review the

19  injuries. Again, all the circumstances involved as

20  far as who was around, what the specific

21  circumstance were.

22      Q.   I understand that.  How do you actually

23  get to the point of making a judgment yourself as

24  to whether or not in light of all these

A-468

Sergeant Thomas Kane

1    circumstances the actual force used was

2    excessive?  And maybe that is not a fair question

3    because I think you have testified earlier you

4    have never actually made that determination, have

5    you?

6        A.    I never have.

7        Q.    How would you know, how would you know?

8    How would you know if you had an excessive use of

9    force situation that you were investigating?

10       A.    Again, just be looking at all the facts

11   between what the officers say, witnesses say and

12   the defendant says.  There is one case where

13   something happened in the turn-key and there was

14   video cameras there and had some kind of video

15   that showed something that was different from what

16   the officers said what happened.  But I have never

17   had that.

18       Q.    What if you had independent eyewitnesses

19   that were telling you a story about what happened

20   that was extremely different from what your

21   officers told you.  And in fact if these witnesses

22   were to be believed the use of force was way out

23   of proportion at least in their perception and

24   judgment as to what the situation required.  What

Sergeant Thomas Kane

```
 1   would you do then?
 2       A.    In my use of force report in my
 3   conclusion I would put that the officers didn't
 4   use proper conduct and didn't follow our
 5   procedures. And that would go to the Office of
 6   Professional Standards for the complaint hearing
 7   board with the captain. And they would basically
 8   have a trail, mini trial.
 9       Q.    If you have eyewitnesses telling you
10   something that is materially different from what
11   your officers are telling you about what they did,
12   are you saying in that situation that would always
13   be something that you would pass up the line to
14   the next level of investigation?
15       A.    Not always.  If what all these witnesses
16   were saying fit the facts more than what the
17   officers said from what the injuries were and from
18   what the situation was, if there was enough doubt
19   in my mind that the witnesses were telling the
20   truth and the officers weren't, I would send that
21   up the chain.
22       Q.    I appreciate your answer.  That's a
23   little bit different than what I thought you were
24   going to tell me.  Let me see if I understand what
```

A-470

Sergeant Thomas Kane

1    you are saying.  So you're saying even in a

2    situation where independent eyewitnesses have

3    vastly and materially different views of what

4    happened than what your officers are telling you

5    they did, you would still exercise your judgment

6    to determine whether or not this investigation

7    needed to go to the next step.  And depending on

8    how you exercised your judgment you may send this

9    investigation to the next step or you may not?

10        A.    Yeah.  If I am a patrol sergeant and the

11   sergeants up in the Office of Professional

12   Standards they have the time to do more than I can

13   do.  Every day that I come to work I still have to

14   do certain things, supervise guys on the street.

15   So my investigation would get to a certain point

16   but I could turn it over to them because they

17   would have more time to spend on it to interview

18   these people.  They would come into the police

19   station or go over to their house and conduct a

20   little more in-depth interview than I would have

21   done if these facts are so different.

22              As a patrol sergeant I don't have

23   the luxury of spending two weeks just on this one

24   case. I still have to go out every day and

A-471

Sergeant Thomas Kane

```
 1   supervise the guys handling the complaints.  The

 2   sergeants in the Office of Professional Standards

 3   could spend more time re-interviewing people.  And

 4   they would also at that point if it looked like

 5   they were going to be put on charges or something

 6   the Office of Professional Standards has to

 7   according to the Policeman's Bill of Rights, they

 8   have to read them their rights and serve them

 9   papers and let them know exactly what is going on

10   as far as the internal charges.

11       Q.   Okay.

12                 MR. LANDON:    Thank you, sir.

13   That's all I have for you.

14                 MR. EDWARDS:    Can I just ask a

15   couple questions just preliminary.

16                 MR. LANDON:    Sure.

17   BY MR. EDWARDS:

18       Q.   Is the Office of Professional Standards,

19   is that part of the City of Wilmington Police

20   Department?

21       A.   Yes.

22       Q.   When you looked for your report did you

23   contact the Office of Professional Standards to

24   see if they had a copy of the report?
```

A-472

1      A.    Captain Custis told me that they couldn't
2   find it.  He is the one that advised me that they
3   couldn't find it.
4      Q.    The Office of Professional Standards is
5   actually part of the City of Wilmington?
6      A.    Yes.
7                  MR. EDWARDS:    That's all.  Thank
8   you.
9                         *  *  *
10                  (Deposition concluded at 4:28 p.m.)
11                         *  *  *
12
13
14
15
16
17
18
19
20
21
22
23
24

A-473

1                        I N D E X

2    DEPONENT:   SERGEANT THOMAS KANE                    PAGE

3        Examination by Mr. Landon                          3
         Examination by Mr. Edwards                        80
4

5

6

7

8

9

10

11                      E X H I B I T S

12
     Sgt. Kane 1                                          32
13   Sgt. Kane 2                                          62

14

15

16

17

18   CERTIFICATE OF REPORTER                         PAGE 83

19

20

21

22

23

24
                                                    A-474

```
 1   State of Delaware   )
                         )
 2   New Castle County   )

 3

 4                   CERTIFICATE OF REPORTER

 5
             I, Karen McCloskey, Professional Reporter
 6   and Notary Public, do hereby certify that there
     came before me on the 7th day of February, 2007,
 7   the deponent herein, SERGEANT THOMAS KANE, who was
     duly sworn by me and thereafter examined by
 8   counsel for the respective parties; that the
     questions asked of said deponent and the answers
 9   given were taken down by me in Stenotype notes and
     thereafter transcribed by use of computer-aided
10   transcription and computer printer under my
     direction.
11
             I further certify that the foregoing is a
12   true and correct transcript of the testimony given
     at said examination of said witness.
13
             I further certify that I am not counsel,
14   attorney, or relative of either party, or
     otherwise interested in the event of this suit.
15

16

17   _____
                 Karen McCloskey
18               Cert. #183-PS

19
     DATED: February 23, 2007
20

21

22

23

24
```

                                                    A-475

# USE OF FORCE/DEPARTMENTAL WEAPONS

<u>Directive</u>: **6.7**

I.    Purpose:

The purpose of this directive is to establish a uniform policy that will provide members of this Department with guidelines on the use of deadly, less than lethal force and non-deadly force.

II.   Policy:

This Department recognizes and respects the value and special integrity of each human life. The value of human life is immeasurable in our society. Police officers have been delegated the ultimate responsibility to protect life and property and to apprehend criminal offenders. The apprehension of criminal offenders and the protection of property must, at all times, be secondary to the protection of life. The officer's responsibility for protecting life must include his or her own.

In vesting police officers with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of the Wilmington Police Department to use the minimal degree of force that is reasonably necessary to effectively bring an incident under control while protecting the lives of the officer or another.

III. Definitions:

1.    Deadly force:

Any use of force that is likely to cause death or serious bodily injury, or which creates some degree of risk that a reasonable prudent person would consider likely to cause death or serious bodily injury.

2.    Non-deadly force and less than lethal force:

Any use of force other than that which is considered

deadly force.

3.    Reasonable Belief:

The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

4.    Serious Physical Injury:

That which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of the function of any bodily organ.

IV.   Continuum:

The use of force should follow a prescribed continuum: physical presence, verbal warning, verbal command, hands-on control, hands-on counter measures, intermediate weapon (which includes the choice of a chemical weapon, Asp baton, **Taser**®), and finally, if necessary, the use of deadly force.

However, members should be mindful that the force needed to control an incident may not fall on the prescribed continuum sequentially in all circumstances. Therefore, members should use their discretion to quickly and safely apply the necessary level of force to meet situations involving arrest, safety of citizens or officer self-defense.

V.    Procedure:

A.    Parameters for use of deadly force:

1.    An officer is authorized to un-holster his pistol whenever he has reasonable suspicion to believe that he or anyone in his immediate vicinity is in imminent danger or physical harm.

2.    If feasible, prior to using a firearm, the officer shall identify himself as a police officer and shall give warning.

3.    An officer is authorized to use deadly force if the

officer has probable cause to believe that the suspect poses an imminent threat of serious physical harm to the officer or others.

4.   An officer may use deadly force to prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur.

5.   A police officer may also discharge a weapon under the following circumstances:

a.   During range practice or competitive sporting events.

b.   To destroy an animal under the following circumstances:

1)   For self-defense,

2)   To prevent substantial harm to the officer or another,

3)   When the animal is so badly injured that it is humane to relieve suffering. When feasible, a seriously injured or wounded animal may be destroyed only after all attempts have been made to request assistance from the Delaware S.P.C.A. and/or with the approval of a supervisor.

4)   Whenever an animal is shot by an officer or an officer discharges a weapon for the purpose of destroying an animal, the officer's immediate supervisor will conduct an investigation of the incident.

6.   Police officers shall adhere to the following restrictions when their weapon is exhibited:

a.   Except for maintenance or during training, police officers shall not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance with this policy.

      b.    Warning shots are prohibited.

      c.    Police officers shall not fire their weapons at, or from a moving vehicle except for under exigent, life-threatening circumstances.

      d.    Firearms shall not be discharged when it appears likely that an innocent person maybe injured.

B.   Parameters for use of non-deadly force:

    1.   Where deadly force is not authorized, officers should assess the incident in order to determine which non-deadly technique or weapon will best de-escalate the incident and bring it under control in a safe manner.

    2.   Officers are authorized to use Departmental approved non-deadly force techniques, less than lethal force (extended range impact weapon **and Taser®**) and issued equipment for resolution of incidents, as follows:

      a.    To protect themselves or another from physical harm, or

      b.    To restrain or subdue an actively resisting individual, or

      c.    To bring an unlawful situation safely and effectively under control.

    3.   Extended Range Impact Weapons shall only be used by the C.M.T.T. Unit.

    **4.   The Taser®, an electro-muscular disruption devise, shall be issued to and used only by those officers who are certified in its use through successful completion of the Department's Taser® training course or a Taser® International training course.**

C.   Training and qualifications:

1.   Deadly weapons:

   a.   While on-and off-duty, officers shall carry only weapons and ammunition authorized by and registered with the Department.

   b.   Authorized weapons are those with which the officer has qualified and received Departmental training on proper and safe usage, and that are registered and comply with Departmental specifications. (Refer to Directive 6.48, entitled "Annual Firearms Training and Qualifications.")

   c.   The Firearms Instructor shall schedule regular training and qualification sessions for duty, off-duty and specialized weapons, which will be graded on a pass/fail basis.

   d.   Officers who fail to receive a passing score with their duty weapon(s) in accordance with Departmental testing procedures shall be relieved of their police powers and immediately reassigned to non-enforcement duties.

   e.   An officer shall not be permitted to carry any weapon with which the officer has not been able to qualify during the most recent qualification period.

   f.   An officer who has taken extended leave or suffered an illness or injury that could affect his use of firearms ability will be required to re-qualify before returning to enforcement duties.

2.   Non-deadly force weapons and Less Lethal Weapons:

   a.   An officer is not permitted to use a non-deadly weapon or less lethal weapon unless qualified in its proficient use as determined by training procedures.

   b.   Chemical weapons, night sticks, the ASP Baton, **the Taser®, and extended range impact weapons**

when used in accordance to Departmental policy and training, are the only non-deadly weapons which are authorized by the Department.

D.   Reporting uses of force:

1.   A Defensive Tactics Report will be required in the following circumstances:

a.   When a firearm is discharged outside of the firing range.

b.   When a use of force results in death or injury.

c.   When a **less-lethal** or non-lethal weapon (such as chemical weapons **or a Taser®**) is used on a person. **(An officer shall immediately report any discharge of the Taser®, other than the function test, either intentional or accidental, to the officer's supervisor. Computer downloads shall be conducted periodically of each weapon to ensure its proper usage.)**

d.   When an officer sustains or complains that an injury has been inflicted as a result of any use of force.

e.   When a suspect or bystander sustains or complains that an injury has been inflicted as a result of any use of force.

f.   Whenever an impact weapon or extended range impact weapon (bean bag projectile) are used.

g.   Whenever an officer strikes, punches, or kicks a subject.

h.   Whenever an officer shoots an animal, or discharges a weapon for the purpose of destroying an animal.

i.   Officers are required to immediately report to their immediate supervisor, or, if this is not possible, the House Sergeant, whenever they

4.   Post Use of Chemical Weapons:

   a.   After a chemical weapon has been used on a subject, the officer(s) will ensure that the subject is transported to a medical facility for treatment.

   b.   After a chemical weapon has been used, the officer(s) will immediately notify their supervisor as to the use of force and will submit an appropriate report documenting the circumstances.

   c.   It will be mandatory for all sworn police personnel to carry the department issued chemical weapon at all times when circumstances are such that they may have to perform a police action.

   d.   The chemical weapon has an unlimited shelf life and only requires an occasional shaking to ensure its contents are thoroughly mixed.

   e.   As with other similar aerosol products, chemical weapon canisters should not be exposed to heat or flame. Do not puncture, incinerate or store above 130 degrees Fahrenheit. Prolonged exposure to sunlight may cause bursting.

   f.   The duration of the spray should be only that amount necessary to affect the lawful police task.

F.   Use of the Taser®:

1.   Description of Department Issued Taser®:

   Electro-Muscular Disruption Technology (EMDT) describes a group of devices that use a high-voltage, low power charge of electricity to induce involuntary muscle contractions that cause temporary incapacitation. The Taser® is one such device. The Taser® is a conducted energy device which uses propelled wires to conduct energy that affects both the sensory and motor functions of the

central nervous system.  The Taser® sends short duration, high voltage electrical waves that over power normal electrical signals within nerve fibers which physically debilitate the subject by causing uncontrollable muscle contractions.  This device has an effective range of up to 21 feet.

Subjects exposed to the Taser® and its probes may exhibit the following possible side effects: slight signature marks that resemble minor surface burns which appear red and may blister; pain and associated stress; secondary injuries from falling down after being struck; eye injury if shot too high; and ignition of flammable liquids or gases (note: The Taser® may not be utilized on subjects who have been exposed to alcohol-based chemical weapons).

2.   Authorized Use of Taser®:

a.   The Taser® may be utilized under the same circumstances in which an officer is authorized to use chemical weapons, with the exception of E (2) (f). (See subsection E (2), above).

b.   Each Taser® shall be assigned to an individual officer who shall be responsible for maintaining the Taser® in good working condition.  The operating officer shall carry one (1) spare cartridge when armed with the Taser®.

c.   Only properly functioning and charged Tasers® shall be used by officers.

d.   Tasers® shall only be carried in the approved holster.

e.   The Taser® operator shall take all steps necessary to avoid targeting the head, face, neck, groin and female breast.

3.   Unauthorized Use of the Taser®:

a.   It shall not be used to threaten or attempt to gain information.

    b.    It shall not be used against a person in custody unless physical resistance must be overcome.

    c.    It shall not be used to wake up a person who is intoxicated or asleep.

    d.    It shall not be used in conjunction with flammable, alcohol-based weapons.

    e.    It shall not be utilized to prevent an individual from ingesting suspected contraband.

4.    Post Use of Taser®:

    a.    All persons who have been subject to the Taser® or the probes shall be transported to a hospital. Probes shall be removed by hospital personnel except when in the opinion of the officer removal of the probes at the scene are necessary for the safe transport of a subject. When removing a probe from a subject, stabilize the flesh with one hand and firmly and quickly pull the probe free. The stabilizing hand should be placed several inches from the probe impact sight. Officers removing probes shall wear latex gloves to avoid contact with bodily fluids.

    b.    An officer shall immediately report any discharge of the Taser®, other than the function test, either intentional or accidental, to the officer's supervisor. Computer downloads shall be conducted periodically of each weapon to ensure its proper usage.

    c.    A photograph of the impact sight shall be taken and maintained.

G.    *LEOSA - Law Enforcement Officers Act of 2004*

*Active police officers are permitted to carry their Departmental issued service weapon while off-duty in the State of Delaware, or to and from work and their place of*

*residence or on official business.*

*Officers who want to carry a weapon outside the State of Delaware must carry their privately owned weapon for which they are qualified.*

VI.   The Departmental Shooting Investigation Process

    A.   The Department Shooting Investigation Process will be used to investigate EVERY incident of a firearm discharge and/or an extended range impact weapon (bean bag projectile) where serious physical injury, penetration, or death occurs. The aforementioned applies to every Department member other than exceptions.

        1.   Front Line Supervisor Responsibility:

            a.   A supervisor will be dispatched to the scene of the incident, and will assume responsibility for caring for the involved personnel.

            b.   The supervisor will make appropriate arrangements for all necessary medical treatment.

            c.   During any period where the involved officer is required to remain on the scene, but has no immediate duties to fulfill, the officer shall be taken to a quiet area away from the scene of the incident.

            d.   The supervisor should briefly meet with the involved officers and preliminary questions should be asked about the incident, but in a minimal capacity. A walk through of the incident may be conducive to understanding how the incident transpired.

            e.   The officers should be advised that a more detailed debriefing will be conducted at a later time.

            f.   The supervisor should arrange for the officers directly involved in the incident to leave the scene as soon as possible, and to be taken directly to a quiet secure setting at Central

where they will be turned over to a supervisor from the Criminal Investigation Division.

g.  Arrangements should be made for a peer counselor or other supportive friend or officer to remain with the involved officer(s). They should be advised not to discuss the incident with the officer.

2.  Whenever a firearm is used in the performance of duty, the incident will be investigated by the Captain of Criminal Investigations or his designee. The Inspector of Investigative Operations will assume this role when the Captain of Criminal Investigations is not available. The Captain of Criminal Investigations or his designee will conduct a complete investigation and report his findings directly to the Chief of Police. It shall be the duty of the Captain of Criminal Investigations or the Inspector of Investigative Operations to notify the City Solicitor and the Attorney General's Office as soon as possible. The Office of Professional Standards shall be notified whenever any shooting occurs. They will contact the Captain of Criminal Investigations or his designee and monitor the investigation being conducted by the detectives. If the Chief of Police determines that a possible violation of Departmental procedures has occurred, he shall instruct the Office of Professional Standards to conduct an investigation, which shall be coordinated with the detective's investigation. It will be the sole responsibility of the Office of Professional Standards to determine if there were violations of any Departmental procedures governing the Wilmington Department of Police.

3.  When a police officer discharges a weapon, the officer shall be temporarily assigned to duty within the confines of the police building. The officer shall remain on this assignment until all investigations are completed by Criminal Investigations Division, the Office of Professional Standards, and any other organization authorized to investigate the incident (City Solicitor's Office, Attorney General's Office, Federal Bureau of Investigation, or the appropriate courts). This does not apply to the 'Extended Range Impact Weapon', unless serious physical injury, penetration, or death occurs.

4.  When a police officer discharges a weapon and a person is

either injured or killed, that officer(s) will complete his preliminary report of the incident and then be directly placed on "Administrative Leave". This does not apply to the 'Extended Range Impact Weapon', unless serious physical injury, penetration, or death occurs.

a.   This leave shall be without loss of pay or benefits, pending the outcome of the investigation by the City Solicitor.

b.   The assignment to Administrative Leave shall not be a presumption that the officer has acted improperly.

c.   While on Administrative Leave, the officer shall remain available at all times for official departmental interviews and statements regarding the shooting incident, and shall be subject to recall to duty at any time.

d.   The officer shall remain on Administrative Leave after completing all internal investigative requirements, and until it is determined by a mental health professional that the officer is ready to return to duty.

5.   All press releases relative to the incident will only be made by the Public Information Officer, the Chief of Police, or his designee.  These releases must first be approved by the Chief of Police.

6.   The Commanding Officer of the Human Resources Division or his designee shall interview the officer involved in the shooting.   Upon completion of this interview, the Commanding Officer of the Human Resources Division shall submit a report directly to the Chief of Police including his recommendations.

7.   If the shooting investigation progresses to a point where the placing of criminal and/or departmental charges against an officer appears probable, it shall be the responsibility of the Captain of Criminal Investigations, or his designee, to immediately notify the President of Lodge #1 of the Fraternal Order of Police that an investigation is being conducted.  The Captain of Criminal Investigations will apprize the President of Lodge #1 of the Fraternal Order of Police of the nature

of the investigation, to afford the Lodge President the opportunity to determine if the officer is eligible to receive the services of a F.O.P. paid attorney.

Note: All officers should review and familiarize themselves with Title 11 Del C. 467.

8. Psychological Services For the Officer:

    a. The Commanding Officer of the Human Resources Division will ensure that the following guidelines are followed:

        1) In all cases where an officer fires on or exchanges gunfire, or any person is injured or killed as a result of firearm discharge by a police officer, that officer will be required to meet with a Department-furnished psychologist within five days of the incident. The session will remain protected by the privileged Professional Psychologist Code of Ethics.

        2) In all cases where any person has been injured or killed, as a result of a firearm discharge by a police officer, the involved officer and his family will have available to them services provided by the Employee Assistance Program. The consultation sessions will remain protected by the privileged relationship.

        3) In all cases where an officer fires or exchanges gun fire, or any person is injured or killed as a result of firearm discharge by a police officer, the involved officer will be required to re-qualify with his weapon prior to returning to on-duty status. The re-qualification shall be accomplished in the presence of a firearms training officer. THE TRAINING OFFICER WILL COORDINATE THE QUALIFICATION FIRING.

9. Records as training aids:

    a. Annually, the training officer will study all

pertinent Crime Reports and Defensive Tactics Reports.   Based on any findings thereof, a curriculum   will   be   developed   addressing specific areas which need attention.

b.    The Chief of Police or his designee shall conduct an annual review and will revise, if necessary, the Deadly Force Procedure.

NOTE: This Directive is for Departmental use only and   does   not   apply   in   any   criminal   or   civil proceeding.   The Department policy should not be construed as a creation of higher legal standard of safety or care in an evidentiary sense with respect to   third   party   claims.     Violations   of   this Directive will only form the basis for departmental administrative sanctions.

A-489

# USE OF FORCE

### A. Use of Physical Force

The use of physical force shall be restricted to the circumstances specified by Law (Title 11, Section 467) when necessary to accomplish a police task successfully.

1. Unnecessary Force resulting in "serious physical injury" as defined in Title 11, Section 222 will result in disciplinary action as specified for a class A violation.

2. Unnecessary Force will result in disciplinary action as specified for a Class "C" violation.

### B. Duty to Report Use of Physical Force

1. Whenever any member(s) is required, on duty, to use any physical force or departmental equipment against another person, the member(s) shall immediately notify their IMMEDIATE SUPERVISOR. If this is not possible, the member(s) will notify their IMMEDIATE SUPERVISOR as soon as possible following the incident. The notified supervisor will submit a Departmental Information to the Chief of Police and will cause the member(s) to cover their actions in their incident report.

2. Whenever any member(s) is required, off duty, to use or threaten the use of any physical force or use any departmental equipment against another person, the member(s) shall immediately notify their ON DUTY SUPERVISOR. If this is not possible, the member(s) will notify an ON DUTY SUPERVISOR as soon as possible following the incident. The notified supervisor will submit a Departmental Information to the chief of Police and will cause the member(s) to submit a Departmental Information report no later than the member's next work day.

VIOLATIONS OF SECTIONS B1 OR B2 WILL RESULT IN DISCIPLINARY ACTION SPECIFIED FOR A CLASS C VIOLATION.

### C. Display of Firearms

Whenever any member(s) display a firearm in the presence of a person, or directs the firearm at that person, the member(s) shall immediately notify their immediate supervisor. If this is not possible, the member(s) will notify their immediate supervisor as soon as possible following the incident.

The notified supervisor will submit a Departmental Information to the Chief of Police and will cause the member(s) to cover their actions in their incident report. Violations of Section C will result in disciplinary action as specified for a class "E" violation.

A-491

# CHAPTER VIII

# ADMINISTRATION OF DISCIPLINE

The purpose of this chapter is to ensure the integrity of the Department of Police by establishing procedures for handling complaints, either internal or external, against members of the Department. These procedures will assure the prompt and thorough investigation of alleged infractions and other reported incidents, to clear those who are not guilty, establish guilt, and facilitate suitable disciplinary action. This chapter is based on the policy that discipline is the function of command and a well-disciplined force is a force which voluntarily and ungrudgingly conforms to all rules and orders.

A.   The incidents which are to be handled, in accordance with the provisions of this chapter, are alleged or suspected violations of statutes, ordinances, and all rules, regulations, and orders of the Department of Police, by any sworn member of the Department of Police.

B.   The incidents include those alleged violations reported to supervising or commanding officers by members of the Department of Police, through personal knowledge or by written information received. All complaints originating within the Department shall be in writing and signed by the member alleging the violation(s).

   1.   All reported Equal Employment Opportunity (E.E.O.) complaints will be reported to the Commanding Officer of the Office of Professional Standards immediately. This must include any complaint concerning allegations of discrimination based upon age, race, gender, disability, or any other protected category, as well as allegations of harassment and hostile work environment.

   2.   Any personnel, *sworn or civilian*, may make a complaint/allegation with the City Department of Personnel if he/she so chooses. This would be made to the Director of Personnel, the *Commanding Officer of the Human Resources Division*, or the Employee Relations Advisor. If the complainant is an officer, he or she

will be counseled to report same to the Wilmington
Police Department, Office of Professional Standards.

C.  Anonymous information and unsworn allegations and complaints
about or against any member of the Department may be
investigated at the discretion of the Inspector of Staff
Inspections.  In the event he concludes no investigation is
warranted, he shall document such a determination.

D.  No complaint against a member of the Department of Police
will be honored after a period of three (3) years, from the
date of the alleged incident, except in extreme
circumstances.  Under no circumstances will any complaint be
honored after a period of five (5) years from the date of
the alleged incident.

E.  A range of punishment has been established for each specific
violation (see the Classification of Punishment chart in
Appendix "A").  It is important to note that the
investigating supervisor, the Division Commander, members of
the *Complaint Hearing* Board, and the members of the Appeal
Board are bound by the specified range of punishment for any
violation.

F.  Primary responsibility for discipline for minor infractions
lies with the first line supervisor.

G.  All supervisors have the authority to administer summary or
major discipline.  First line supervisors will:

1.  confer with their immediate supervisor,

2.  conduct a thorough investigation of the conduct in
question,

3.  review the incident with the *Office of Professional
Standards*,

4.  initiate the appropriate corrective measures, and

5.  inform the employee in question of the outcome.

A-493

# CLASSIFICATION OF PUNISHMENT

Directive **8.2**

A punishment classification system has been developed in an effort to standardize our disciplinary process and ensure fair, equitable and consistent punishment for violations of written departmental policies. The basic philosophy of this classification system is one of ``progressive discipline,'' and as such, officers are reminded that the primary objective is to learn from one's mistakes. However, dishonesty will not be tolerated. Violations will be placed into specific classification based on three factors: the specific charge, the reckoning period, and the date of the offense.

Within the disciplinary process, the Office of Professional Standards, as well as supervisors, can incorporate training or retraining as part of the prescribed discipline on all levels.

A.   Specified Charge

   A letter designator will appear at the end of each specified violation, noted throughout Chapter 7. The letter designator (A, B, C, D, E, or F) will indicate the severity of the violation, with class A being the most serious and class F as the lowest level of infractions.

B.   The Reckoning Period

   Designed to correct an officer's conduct, the reckoning period is that period of time within which similar offenses will be dealt with more severely. Within each classification, there is a specified reckoning period of: three (3) years for class A and B violations excluding violations of the residency requirement and dishonesty, two (2) years for class C and D violations, and one (1) year for class E and F violations. Should a similar offense occur within that reckoning period, the specified punishment for that violation will fall under the appropriate offense category (i.e., 2nd offense, 3rd offense, etc.).

C.   The Date of Offense

   The exact reckoning period is established by the date of the violation being considered. For example, to determine the punishment classification of a particular class E violation, simply review an officer's

A-494

disciplinary record for one year prior to the date of that violation. If he has no similar violation within that one-year period, then the current violation would be considered a first offense. If one similar offense to that which is being considered appears in the specified one year period, the current violation will be classified as a second offense; and so on.

D.    Penalties

| CLASS | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE |
|---|---|---|---|
| A | 15-30 days to DISMISSAL * | DISMISSAL | ******* |
| B | 5-20 days | 15-30 days | DISMISSAL |
| C | 2-10 days | 5-20 days | 15-30 days |
| D | Reprimand to 5 days | 2-10 days | 5-20 days |
| E | Reprimand to 2 days | 2-5 days | 5-10 days |
| F | Reprimand | Reprimand to 2 days | 2-5 days |

* **Violation of the residency requirement and/or dishonesty will result in dismissal upon a first offense.**

A-495

# ELEVATION OF AN OFFENSE    Directive: 8.3

In addition to the standard process of classifying an offense, certain elements may result in the elevation of an offense to a more serious violation. The elevation of an offense is dependent upon the evidence of intent, recklessness, or the fact that a member has been identified as a "habitual offender." As specified in Directive 8.6 (B.5.b.), it is the responsibility of the Internal Affairs Division to prefer charges for any elevated offense in the following manner.

A. Any officer who **intentionally** disregards the procedures set forth in this manual, the result of which brings discredit upon the department and/or any of its members, shall be subject to the punishments for a class A violation.

B. Any officer who **recklessly** disregards the procedures set forth in this manual, the result of which causes public discredit to the department, or serious public insurgence, shall be subject to the punishments of a class B violation.

C. Any officer convicted of more than three separate similar offenses or any combination of five (5) separate offenses in any class will be classified a "habitual offender." Habitual offender status mandates accelerated punishment to the next highest punishment class from the most serious violation which in no case shall be less than the punishment of a class C violation.

NOTE: For definitions of intentionally or recklessly, as they pertain to this manual, refer to Section 8.11.

A-496

# RIGHTS OF POLICE OFFICERS UNDER INVESTIGATION

<u>Directive</u>: **8.4**

The following procedures are established to ensure certain rights of police officers under investigation and shall not be construed to limit supervisory or command authority in normal operations.  In an effort to ensure that internal investigations are conducted in a manner which is conducive to good order and discipline, the following procedures are established:

A.  Every police officer shall answer questions upon the request of the officers of the Internal Affairs Division. All questions directed to the officer shall be asked by no more than two investigators.  At the request of any officer under questioning he shall have the right to be represented by counsel or other representative of his choice, who shall be present at all times during the questioning unless waived in writing by the investigated officer.  The questioning shall be suspended for a period of time if the officer requests representation until such time as the officer can obtain the representative requested if reasonably available.  Before questioning of the police officer occurs, he shall be apprised in writing of the following:

Identity of the officer in charge of the investigation, identity of the officers conducting the investigation, their names, ranks, and assignments, as well as whether the investigation is criminal in nature or departmental in nature.  The police officer shall be informed in writing of the nature of the investigation.

B.  The questioning of a police officer shall be conducted according to standard departmental procedures and practices in a non-coercive manner, without improper threat or promise of reward at a reasonable hour and preferably when the police officer is on duty, unless the urgency of the investigation requires that he be questioned while off duty.

C.  The questioning of a police officer shall be conducted at any of the following locations:

Police Headquarters, the City/County Building, the State Office Building, place where the incident occurred, or any other location relevant to the investigation as designated by the officer in charge of the investigation, unless otherwise waived by the officer being investigated.

D.  Interrogation sessions shall allow time for such personal necessities and rest periods as are reasonably necessary,

E. A complete record, either written, taped or if taped, transcribed as soon as possible, shall be kept of interviews held in connection with the administrative investigation upon notification that substantial evidence exists for seeking an administrative sanction of the law enforcement officer. A copy of the records shall be provided to the officer or his counsel at his expense upon request.

F. If the officer under interrogation is being investigated for an alleged violation of a criminal statute, he shall be completely informed of his constitutional rights, including his right to counsel and of the reasonable possibility of his arrest, prior to the commencement of the interrogation.

G. At the conclusion of the administrative investigation, the investigator shall inform in writing the officer of the investigative findings and any recommendation for further action.

H. All provisions, directives, orders, or memorandums pertinent to the internal investigation which may be inconsistent with this section shall be rendered null and void upon the effective date of this manual's issuance.

A-498

# AUTHORITY AND RESPONSIBILITIES OF INDIVIDUAL MEMBERS

Directive: **8.5**

A.  Investigative

Each member of the Department will perform the duties and assume the obligations of his rank in the investigation of complaints or allegations of misconduct against members of the Department of Police.

B.  Reporting Violations

Alleged or suspected violations will be reported to the **Office of Professional Standards** by the supervisor or the Commanding Officer who first receives information of an alleged violation.  Complaints of a minor nature should be conducted by the employee's immediate supervisor.  All reports shall be in writing and forwarded through channels established by department procedures.  The reports will be forwarded as soon as possible, but no later than the first working day following the receipt of the information.  Exceptions to these requirements are:

1.  Civilian complaints concerning the merits of criminal or traffic charges will be deferred to the court system and will not be handled by the **Officer of Professional Standards**.

2.  Complaints alleging serious violations of law or departmental rules, will be turned over immediately to the **Office of Professional Standards**.  During non-working hours, the personnel of the **Office of Professional Standards** will be called in to assume the investigation.  Responsibility of this notification will rest with the ranking officer of the division, or the Duty Officer on duty at the time the allegation is received.

NOTE:  Serious violations will include any incident where it is suspected that the accused officer is intoxicated or may have consumed any drugs or alcohol.

Directive 8.5
REVISED

1

24 August 2004

A-499

# AUTHORITY AND RESPONSIBILITIES OF THE INTERNAL AFFAIRS DIVISION

Directive: **8.6**

A. Authority

The Internal Affairs Division is a staff section which coordinates and exercises supervision over investigations and complaints or allegations of misconduct against members of the Department. Since discipline is a function of command, the responsibility for the conduct of such investigations normally rests within the chain of command. However, the Internal Affairs Division will be responsible for the following types of cases:

1. All allegations by citizens against departmental personnel.

2. All cases referred by the Chief of Police.

3. Any allegations against departmental personnel involving any violation of departmental rules, regulations, or orders, which are not suitable to the summary punishment process by nature of seriousness or other circumstantial considerations.

This section applies to those instances where a violation meets the criteria for "elevation" in the classification of punishment. (See Section 8.2.)

B. Responsibilities

The Internal Affairs Division will:

1. Upon receipt of a complaint from a citizen, fully investigate the complaint.

   a. All serious complaints will be recorded and subsequently transcribed verbatim in a standard typed form.
   b. Once the serious complaint has been transcribed, the following paragraph will be inserted at the end of the last transcribed paragraph:

      I _____,
      of _____,
      do solemnly swear/affirm that the information contained herein is accurate and true to the best of my knowledge. Further, I acknowledge receipt of a copy of this complaint.

c. The complainant will be given a copy of the complaint.

```
SEAL Signature of Complainant_____
     Signature of Witnessing Official_____
     Signature of Investigating Officer_____
     Date_____
```

2. Enter all complaints in the Internal Affairs Control Log. Spaces will be provided for control numbers, departmental case numbers where applicable; name, rank, badge number, and assignment of the alleged violator; date and time complaint was received or investigation ordered by the Chief of Police; nature of the alleged violation; name of the reporting person, (if sworn, name, rank, and badge number of reporting officer); date and time of all reports submitted relative to the complaint; if suspended, date and time; date and time case is presented to departmental Complaint Hearing Board; date and time of any appeal action on the case. In addition, the Internal Affairs Division is required to document and maintain all disciplinary action by subject matter or charge.

3. Safeguard the Internal Affairs Control Log, files, and other records of the division. Access to inactive files shall be limited to the Inspector of Staff Inspections, the Chief of Police, The Director of Public Safety, and the City Solicitor. Physical control of inactive files shall be the responsibility of the Inspector of Staff Inspections. Access to active files shall be limited to the Chief of Police, the Director of Public Safety, the Inspector of Staff Inspectors, the Commander of Internal Affairs Division, Internal Affairs investigating officers; and the City Solicitor. Other persons may be permitted access to Internal Affairs records from time to time by order of the Chief of Police upon the advice of the City Solicitor.

4. Be responsible for the expeditions and timely investigation of all complaints.

5. Assist in preliminary investigations conducted by other units of the department:

   a. Upon their justifiable request.
   b. When Inspector of Staff Inspections concludes that the circumstances warrant elevation in the classification of a violation (as per Section 8.2).

A-501

c. Conduct an investigation at the request of any member of the department, who upon showing of justification, believes he is threatened by false accusation or the complaint is contrived by ulterior motives. Such persons are permitted to report their situations directly to the Inspector of Staff Inspections, without prior knowledge or approval of their immediate superiors. Suspected criminal activity or activity contrary to the regulations so stated in this manual shall be reported in the above manner.

6. It will be the responsibility of the Commanding Officer of the Internal Affairs Division, or his designee, to notify the Chief of Police, or his designee, as soon as possible under the following circumstances:

   a. Any incident where the possibility exists that an officer may face criminal prosecution.

   b. Any police action, where there is an allegation of misconduct which may result in public dissemination of the complaint and/or the possibility of public inquiry or discredit.

7. The Commanding Officer of the Internal Affairs Division, or his designee, will inform the Chief of Police, or his designee, of all other complaints of police misconduct through the normal chain of command.

C. Review of Complaints

The Internal Affairs Division will review complaints and classify each complaint as substantiated, unsubstantiated, unfounded, *proper conduct, or policy failure* according to the following criteria:

SUBSTANTIATED: There is sufficient proof to confirm the allegation by a preponderance of the evidence. In any case where a complaint against an officer is not substantially refuted by opposing facts or testimony and the Internal Affairs investigator determines that conflicting versions of the allegations cannot be resolved without resort to the taking of live testimony to test the credibility of the witnesses, then the complaint shall be deemed substantiated for purpose of referring it to a Complaint Hearing Board for a hearing.

UNSUBSTANTIATED: There is insufficient proof to confirm the allegation.

UNFOUNDED: The allegation is either demonstrably false or there is no credible evidence to support it.

*PROPER CONDUCT:  The officer is exonerated, in that he conducted himself in the manner alleged, but was within policy guidelines.*

*POLICY FAILURE:  A review by the Internal Affairs Division will be made to determine if the policy is proper or improper, or if additional training is required.*

D. Substantiated Complaints

After a complaint has been classified as "substantiated," the Internal Affairs Division will:

1. When the action recommended to the Chief of Police falls under the provisions of the Summary Punishment Section, the Internal Affairs Division will be notified in writing, and will inform the accused. From the time of his being informed, the accused will have twenty-four (24) hours to waive or exercise his right, in writing, to a departmental hearing.

2. Upon receipt of written notice from the accused that he is requesting a Complaint Hearing Board, a report will be forwarded to the Inspector of Staff Inspections requesting the convening of a Complaint Hearing Board.

3. Upon receipt of a written notice from the accused, that he is waiving this right to departmental Complaint Hearing Board, a report will be forwarded to the Inspector of Staff Inspections, with specific recommendations, for approval or revision.  (See Summary Punishment Section 8.9)

E. All internal investigations of departmental personnel will be conducted in such a manner as to safeguard the rights of all parties involved.

F. *When an internal investigation involves administrative issues related to duty performance, the employee(s) may, or may not, be required to participate in the following:*

1. *medical or laboratory examinations*

   a. *can be administered as per the substance abuse policy (Dir. 6.43)*

2. *photographs*

   a. *if a photo identification of an officer is needed, a photo book of all members of the Department is maintained in the Internal Affairs Division*

3.    *line up*

   a.    *officers are not required to participate in a physical line-up*

4.    *financial disclosure*

   a.    *officers are not required to submit a financial disclosure statement (Police Officers Bill of Rights)*

A-504

# COMPLAINT HEARING BOARD    Directive: 8.7

A. All members of the rank of Captain or above, excluding the Chief of Police, the Inspector of Staff Inspections, and the Commanding Officer of the Internal Affairs Division, will be eligible to sit upon Complaint Hearing Boards.

B. Members of a Complaint Hearing Board will be selected the Inspector of Staff Inspections and will be responsible for obtaining thorough knowledge of all procedures concerning the conduct of the Complaint Hearing Board.

C. All Complaint Hearing Boards shall consist of three members.

D. A Complaint Hearing Board will be convened when:

   1. The complaint lodged does not fall within the Summary Punishment Process.

   2. When the accused officer requests a Complaint Hearing Board, whether falling in the Summary Punishment Process or not.

   3. Upon direct order of the Chief of Police, regardless of the nature of the infraction.

   4. When circumstances would dictate that the Complaint Hearing Board be convened to better serve the cause of fairness or justice.

E. The Commanding Officer of the Internal Affairs Division will prepare all cases for presentation before departmental Complaint Hearing Boards.  He will schedule all cases and arrange for the proper recording of all proceedings.  In the event the accused is entitled to a hearing, a hearing shall be scheduled within a reasonable time from the alleged incident, but in no event more than thirty (30) days following the conclusion of the investigation, unless waived in writing by the charged officer.

F. All Charge Papers and Complaint Hearing Board results will be written as a departmental memorandum and cataloged in the appropriate manner.  Written notice of the charge papers will be provided to the accused, specifying the time and place of the hearing, issues ( including specification of actual fact), statement of the rule violated, and the range of punishment for the specified charge.

G. The Complaint Hearing Board is to determine the guilt or innocence of the accused based on the facts placed before it.

A-505

The complaint Hearing Board is not a judicial trial and may admit any evidence pertinent to the issue. The presiding officer of the Complaint Hearing Board will be chosen by seniority to grade, or rank when applicable, and he shall oversee the conduct of the proceedings.

Members of the Complaint Hearing Board shall be administered the following oath by the prosecutor at the commencement of the hearing:

Do you solemnly swear (affirm) that you will faithfully and impartially determine, according to the evidence, the case now before the board (so help you God)?

H. All decisions of the Complaint Hearing Board will be made by vote of the majority. The accused shall be adjudged guilty of any charge upon which the Complaint Hearing Board is satisfied that guilt has been established by a preponderance of evidence.

I. The Complaint Hearing Board shall consider all relevant facts involving the matter before it, including, but not limited to the investigative reports, statements, other documents, testimony of witnesses, and, such other evidence as it deems appropriate. All records and documents offered into evidence shall be made a part of the record. The Board will hear the plea of any accused who wishes to be heard and, in its discretion, may order any member of the department to appear. On the basis of its findings, the trial board shall fashion the appropriate punishment which shall include one of the following based upon the classification system:

1. The case be remanded for further investigation with specific recommendations.

2. Dismissal of the charge.

3. Finding a charge not substantiated.

4. Finding a charge substantiated and imposing disciplinary measures as outlined for the specific violation consisting of, but not limited to, the following.

   a. Official reprimand.
   b. Suspension without pay.
   c. Demotion in rank.                              A-506
   d. Dismissal.

5. As specified, the Inspector of Staff Inspections has the responsibility to elevate an offense with regard to its classification for punishment if, and only if, the elements of intent or recklessness are present. Should the Internal Affairs Division fail to prove the

applicable state of mind in the charge conclusively, then the Trial Board or authorized prior of fact shall have the right to reduce an elevated offense to its original classification for punishment.

J. In addition to any of the above sustained actions, the Board may impose a disciplinary probation. Disciplinary probation is defined as that period of time, not to exceed twelve months, when an employee is placed on notice that his job related activity will be closely monitored in an effort to correct his performance. Probationary criteria may detail additional sanctions which have been deemed by the Complaint Hearing Board to be appropriate measures for the specified infraction(s). Disciplinary probation criteria includes (but is not limited to) the following:

1. Psychological evaluation;
2. Referral to a rehabilitation center;
3. Restricted duty (i.e., extra jobs);
4. Restitution for lost or damaged property;
5. Referral to Chief for review of promotion eligibility;
6. Administrative Leave

K. All Complaint Hearing Boards will be recorded on reproductive tapes.

L. The accused officer does not have the right of discovery regarding reports and/or statements submitted by other members of the Department or civilians relative to the incident, unless such reports are exculpatory, or are introduced as evidence into the hearing, or otherwise supplied to the Complaint Hearing Board or Appeal Board, or in the event that the officer or civilian who prepared the report or statement testifies at the Complaint Hearing Board, or Appeal Board, about subjects covered in his report or statement.

During the course of the hearing, the accused officer shall have the right of cross examination of witnesses who testify, and may submit rebuttal testimony.

The accused officer shall have the right to review and procure copies of all reports which he wrote relative to the charges at hand.

All expenses that arise as a result of the accused officer being supplied with requested reports shall be paid by said officer at the current cost per copy for the Department.

M. Prior to any person giving testimony before the Hearing Board, it will be compulsory that said person affirm or swear to the following oath:

"Do you solemnly swear/affirm that the testimony you are about to give will be the truth, the whole truth, and

nothing but the truth so help you God?"

N. Once the decision has been made by a Complaint Hearing Board, the penalty will be imposed, unless appealed, according to departmental procedure.

O. The accused will be informed in writing of the decision made by the Complaint Hearing Board members by its members at the conclusion of the hearing.

P. At no time will weapons be worn or permitted in a Complaint Hearing Board or Appeal Hearing Board. Weapons will be secured in the Office of Internal Affairs or other appropriate locations.

   1. Officers attending Family Court Hearing wherein they are either litigants or defendants will be prohibited from wearing or carrying a weapon into the Court Room.

   2. Officers attending Family Court Hearings wherein they are either litigants or defendants will wear normal street attire and at no time will they wear the official uniform of this department.

Q. The Chief of Police, or his designee, may impose suspension upon any member for a justifiable cause or in the best interest of the Department. Whenever the Chief or his designee elects to act under this subsection, a pre-suspension interview will be in order. The pre-suspension interview shall consist of a discussion between the accused officer and the Chief of Police (or his designee), at which time the accused officer will have an opportunity to refute the charges.

R. When a member of the Department of Police desires to resign or retire from the service, he shall forward his application for resignation or retirement properly completed through official channels to the Chief of Police at least ten (10) days in advance of the date requested for resignation or retirement. No resignation or retirement shall become effective until approved by the Chief of Police.

If a member of the Department of Police submits a request to resign while he is under a current investigation, one of three actions may be taken by the Chief of Police:

   1. He may accept the resignation from the officer in question;

   2. He may reject the resignation and take other appropriate action if he so deems;

A-508

   3. He may reject the resignation and order the officer dismissed from the Department of Police.

S.    In cases where termination is the result of a Complaint Hearing Board, the Internal Affairs Division will provide the following information to the terminated officer:

1.    Statement citing reason for dismissal

2.    Effective date of the dismissal

3.    Statement of the status of fringe and retirement benefits after dismissal

4.    Statement as to the content of the officer's employment record relating to the dismissal

A-509

# APPEAL BOARD                        <u>Directive</u>: **8.8**

Once a substantiated complaint reaches the appeal stage, the Internal Affairs Division will marshall facts and arguments in support of the Department's decision.

A. A departmental Appeal Board will be comprised of the following personnel:

   1. The Chief of Police, or his designated representative.

   2. The Personnel Director of the City of Wilmington, or a designated representative.

   3. A member of Lodge #1 of the Fraternal Order of Police, who is not directly connected with the prior Complaint Hearing Board procedure.

   4. In the event that the Chief of Police initiates an appeal, the Director of Public Safety or his designated representative shall sit on the Appeal Board in place of the Chief.

B. A written appeal of a departmental Complaint Hearing Board must be made within five (5) working days of the Complaint Hearing Board decision. Appeal must be based on one (1) or more of the following criteria, giving specifics of each point of the appeal:

   1. The defendant believes that he was unjustly accused in that the charges lack merit or were brought without just cause.

   2. The defendant believes that the penalty given was unjustly harsh, given the attending circumstances.

   3. The defendant believes that all evidence was not available to him at the time of the original Complaint Hearing Board, or was denied entry by the Complaint Hearing Board.

   4. The decision of Trial Board is not supported by the evidence and record.

   5. All Appeals must clearly indicate the specific area(s) to be reviewed, and why the defendant is entitled to relief.

C. The Captain of the Internal Affairs Division and/or the Chief of Police, within five (5) days of receipt of the Complaint Hearing Board's decision and recommendation, may convene an Appeal Board to consider the following:

   1. Whether the Complaint Hearing Board was not carried

out in a manner fair to both employee and to the Internal Affairs Division prosecuting the case; or

2. Whether the decision of the Complaint Hearing Board was not supported by the evidence; or

3. Whether the punishment imposed was too lenient or too harsh in view of the character of the offense. Should the Captain of the Internal Affairs Division and/or the Chief of Police decide to convene on the Appeal Board, he shall state the reasoning behind his decision in writing. A copy of this decision shall be sent to the employee.

4. Should the Captain of the Internal Affairs Division and/or the Chief of Police call for the convening of the Appeal Board, the employee shall be notified in writing and be given the opportunity to request within five (5) days whether he wishes to be present, have an attorney, and/or present testimony and evidence before the Appeal Board or just make written submissions.

D. The action that the three (3) member Appeal Board assumes is that of an administrative review of the case. The appeal shall be on the record and shall not constitute a full hearing of the facts of the case, addressing only the specifics of the appeal. The Administrative Review can, but shall not required to perform the following:

1. Review of those portions of the taped transcript designated by the original Complaint Hearing Board, in regard to the specifics of the appeal.

2. Interviewing witnesses, in regard to the specifics of the appeal.

3. Interviewing the accused (with legal counsel if the accused so desires).

4. Reviewing all pertinent information or evidence previously introduced.

5. Reviewing new evidence not available at the complaint Hearing Board, but sought by the accused to be entered on his behalf, or evidence excluded by the original Complaint Hearing Board. Where the Appeal Board finds such evidence to be pertinent to the case, or previously denied evidence was denied for insufficient reason, it shall take the appropriate action. Such action shall include but not be limited to the following:

   a. Modifying the decision of the Trial Board such that the results reflect the consideration of the

new evidence, within the classification of punishment system.

   b. Remand the case back to the Trial Board for reconsideration of the additional evidence.

   c. Determine if the additional evidence would not have effected the Trial Board decision; and, where it so finds, affirm the decision of the Trial Board.

D. The findings of the Appeal Board will be the final authority within the Department relative to disciplinary action.

E. All findings of the Appeal Board, will be published as a supplement to the memorandum assigned to the Complaint Hearing Board, and will be signed by the Chief of Police.

A-512

# SUMMARY PUNISHMENT <span>Directive: **8.9**</span>

A. The summary punishment procedure provides for more immediate disciplinary action against those members found to be in violation of departmental orders, rules, and regulations. These transgressions do require Internal Affairs numbers. Summary punishment is imposed by the commander of any unit or division. The recommendation of the commander is subject to the review and approval of the Inspector of Investigative Services. It is important to note that the specific recommended punishment must be known by the accused, prior to exercising his option to accept summary punishment.

B. The discipline imposed under the provisions of the summary punishment chapter range from, a written reprimand up to but not in excess of two (2) days (16 hours) suspension without pay.

C. When a commander recommends summary punishment for an officer, he must forward his recommendations to the Inspector of Investigative Services at the earliest possible time, but in no event shall it be more than five working days. The Inspector of Investigative Services, in turn, must respond indicating approval, disapproval, or more information is required to the recommendations within 72 hours, and forward same to the supervisor who initiated the action, who will then formally notify the accused.

D. When a greater penalty is justified, either because of circumstances, seriousness of the infraction or the member's past record, the procedures outlined in this manual for formal complaint investigations will be followed.

E. An accused officer, once notified of charges as outlined in paragraph C, has a right to refuse summary punishment and go before a Complaint Hearing Board. He must exercise this right in writing, within 24 hours of his official notification of charges.

F. Nothing contained herein is to be interpreted to take away a supervisor's prerogative of correcting, admonishing, or reprimanding a subordinate at any time.

G. If an officer chooses to accept summary punishment, he will be given a time frame within which the penalty must be completed. In any event, no officer will be permitted to work penalty time without first obtaining approval from his division commander.

A-513

# PROCEDURE FOR RECORDING AND REPORTING PENALTY TIME

Directive: **8.10**

A. An alphabetically indexed loose-leaf binder and "Penalty Time" sheets have been provided for the purpose of recording penalty time.

B. The following procedure will be used:

   1. Information regarding penalty time shall be entered in the respective columns provided for that purpose on the Penalty Time Sheets. (Use the prepared Penalty Sheets.)

   2. The Officer in charge for whom the penalized person works, shall write (NOT TYPE) his name in the column provided for that purpose.

   3. If more than one "Penalty Time" sheet is required, for any one order, then all "Penalty Time" sheets are to be numbered: e.g., Sheet No. 1, Sheet No. 2, Sheet No. 3, etc.

   4. Each specific Charge or Summary Punishment will have a separate "Penalty Sheet" placed in the Penalty book.

   5. When the total penalty time has been completed, a report to this effect shall be submitted to the Chief of Police by the Commanding Officer of the Division to which the penalized officer is assigned.

   6. When an Officer's Penalty Time has been completed, the penalty time sheet shall be removed from the loose-leaf binder and attached to the report to the Chief of Police.

C. In the case of Summary Punishment, the Sergeant or Lieutenant, or for whom the violator works, will insert the penalty sheet in the penalty book and he will also ensure that the penalty is being worked. The Sergeant or Lieutenant will, after inserting the sheet and having the penalty worked, cause the proper papers to be forwarded to the office of the Chief of Police.

D. Disciplinary Suspension                                          A-514

   All punishment will be termed "Suspension Time". Suspension time is issued by a Complaint Hearing Board or issued as Summary Punishment. The following guidelines shall be followed in this matter:

1. Suspension Time issued by a Complaint Hearing Board will be served by the Officer as suspension without pay for the entire amount of suspension time.

(Note that officer are no longer entitled the option of two days suspension per pay period.)

The remainder of the revisions date 12 May 89, as follows, remain unchanged.

2. Suspension Time issued as Summary Punishment consisting of two (2) days of less will be served as follows:

   a. The officer will be suspended without pay for the entire amount of suspension time; or
   b. The officer can request to work the suspension time as extra-duty at straight time. This time must be worked within the guidelines of F.L.S.A. and in conjunction with a broad schedule (including a completion date) developed by the officer and the Internal Affairs Division and approved by the Chief of Police. Any deviation from the approved schedule will require all remaining suspension time to be served as suspension without pay. The officer will submit a report to the Chief of Police indicating his choice (a or b of Section 2) within five days of receiving the suspension time.

A-515

# DEFINITIONS

### A. Intentionally

A person acts intentionally with respect to an element of an offense when:

1. If the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause that result; or

2. If the element involves the attendant circumstances, he is aware of the existence of such circumstances or believes or hopes that they exist.

### B. Probation

Probation is the initial period of employment covering the first 18 months, when an employee will be evaluated for suitability to such employment, or the period of time imposed as disciplinary probation. Any probationary employee can be dismissed from service. During this period of time, the employee can be dismissed by administrative hearing of the Chief of Police.

### C. Recklessly

A person acts recklessly with respect to an element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from his conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable Wilmington Police Officer would observe in the situation.

A-516

# DIVISIONAL LEVEL COUNSELING

<u>Directive</u>: **8.12**

A. The divisional level counseling procedure provides disciplinary action against those members found to be in violation of departmental orders, rules, and regulations. These transgressions do require Internal Affairs numbers.

B. When divisional level counseling is recommended by a commander, the commander is bound by the same procedures set forth in Directive 8.9 paragraphs B thru F, as they pertain to summary punishment.

C. After the incident is investigated, and is decided by the Inspector of Investigative Services that the incident warrants DLC, a written notice is sent to the officer's supervisor instructing him/her to counsel their subordinate. This same supervisor is further instructed to submit in writing to the Internal Affairs Division the date and time the counseling took place.

D. A divisional level counseling file will be maintained in the office of Internal Affairs. In January of each year, a review of this file will be conducted. Any incident older than one year will be purged. No permanent record of the DLC will be entered into the officer's file.

E. A subsequent similar violation within a one year period would be considered as a first offense. However, the DLC may be taken into consideration relative to the range of penalty for a first offense.

A-517

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALICE WALKER and | : | |
| GERALD H.E. WALKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 06-366 JJF |
| | : | |
| CITY OF WILMINGTON, CITY OF | : | |
| WILMINGTON POLICE DEPARTMENT, | : | |
| OFFICER SHAWN GORDON, | : | |
| OFFICER MICHAEL BALLARD, and | : | |
| OFFICER KAREN BUHRMAN, | : | |
| | : | |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I, Alex J. Mili, Jr., Esquire, hereby certify that on this 31st day of August, 2007, I filed the Appendix

to Defendants' Motion for Summary Judgment, Vol. II with the Clerk of Court using CM/ECF which will

send notification of such filing(s) that this document is available for viewing and downloading from CM/ECF

to the following:

Roger D. Landon, Esquire
Murphy, Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805

_____
Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
Assistant City Solicitor
City of Wilmington Law Department
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants