IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER KAREN BUHRMAN individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT,<br><br>        Defendants. | CIVIL ACTION<br><br><br><br>No. 06-366 JJF<br><br><br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S ANSWERING BRIEF TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MURPHY & LANDON
ROGER D. LANDON, No. 2460
PHILIP T. EDWARDS, No. 4393
1011 Centre Road, #210
Wilmington, DE 19805
(302) 472-8100
Attorneys for Plaintiff

DATE: October 1, 2007

146667

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ................................................1

SUMMARY OF ARGUMENT ................................................................2

STATEMENT OF FACTS ................................................................3

ARGUMENT ................................................................................9

    I.        THE SUMMARY JUDGMENT STANDARD ........................................9

    II.       THE FACTS TAKEN IN A LIGHT MOST FAVORABLE TO
            PLAINTIFF ESTABLISH MONELL LIABILITY AGAINST THE
            CITY OF WILMINGTON AND THE CITY OF WILMINGTON
            POLICE DEPARTMENT BASED ON THEIR FAILURE TO
            ADEQUATELY INVESTIGATE ALLEGATIONS OF EXCESSIVE
            FORCE AGAINST THEIR OFFICERS AND THEIR FAILURE TO
            TRAIN THEIR OFFICERS TO DEAL WITH THE MENTALLY
            ILL ................................................................................9

                a.  The City of Wilmington's and the City of Wilmington Police
                Department's custom of not adequately investigating allegations of
                excessive force against its officers amounted to deliberate indifference
                and cause the deprivation of Mr. Walker's Constitutional rights by
                Officers Ballard and Gordon ................................................9

                b.  The City of Wilmington's and the Wilmington Police
                Department's policy and/or custom not to train its officers to interact
                and/or deal with mentally ill citizens during the course and scope of
                their duties as Wilmington Police Officers amounted to deliberate
                indifference and caused the deprivation of Mr. Walker's
                Constitutional rights by Officers Ballard and Gordon ........................14

    III.     PLAINTIFF VOLUNTARILY WITHDRAWS HER CLAIMS OF
            EXCESSIVE FORCE PURSUANT TO 42 U.S.C. § 1983 AND THE
            FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED
            STATES CONSTITUTION AGAINST OFFICER KAREN
            BURHMAN ................................................................23

    IV.     PLAINTIFF VOLUNTARILY WITHDRAWS HER CLAIM FOR
            PUNITIVE DAMAGES AGAINST THE CITY OF WILMINGTON
            AND THE CITY OF WILMINGTON POLICE DEPARTMENT ........24

    CONCLUSION ................................................................25

TABLE OF CITATIONS

Cases                                                                                       Page

Anderson v. Liberty Loby, Inc., 477 U.S. 242 (1986)..................................................9

Bd. Of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397 (1997).......10

Biener v. Catlio, 361 F.3d 206 (3rd Cir. 2004).........................................................9

Calhoun v. Vicari, 2005 WL 2372870 (D.N.J.)..............................................10, 14, 15, 21

City of Canton v. Harris, 489 U.S. 378 (1989) ...............................................14, 15

Colburn v. Upper Darby Township, 946 F.2d 1017 (3rd Cir. 1991) ....................................9

Colburn v. Upper Darby Township, 838 F.2d 663 (3rd Cir. 1988) cert. denied, 489 U.S.
1065, 109 S.Ct. 1338 (1989)........................................................................10

Estate of Harry Smith, III vs. City of Wilmington, 2007 WL 879717 (D.Del.) .................14

Groman v. Township of Manalapan, 47 F.3d 628 (1995) ...................................................10

Kneipp v. Tedder, 95 F.3d 1199 (3rd Cir. 1996) ..........................................................14

Meade v. Grubbs, 841 F.2d 1512 (10th Cir. 1988).........................................................10

Monell v. New York Dept. of Soc. Servs., 436 U.S. 658 (1978) ........................................9, 10

Natale v. Camden County Correctional Facility, 318 F.3d 575 (3rd Cir. 2003)....................14, 21

Pembard v. City of Cincinnati, 485 U.S. 469 (1986)......................................................14

Polk County v. Dodson, 454 U.S. 312 (1981) .............................................................10

Reitz v. County of Bucks, 125 F.3d 139 (3rd Cir. 1997).................................................14

San Filippo v. Bongiovanni, 30 F.3d 424 (3rd Cir. 1994) ..............................................10

Whiteland Woods, L.P. v. Twp. Of West Whiteland, 193 F.3d 177 (3rd Cir. (1999)...........9

Other Sources

Fed. R. Civ. 56(c)...................................................................................9

28 U.S.C. § 1331.................................................................................................1

28 U.S.C. § 1367.................................................................................................1

28 U.S.C. § 1397.................................................................................................1

42 U.S.C. § 1983.................................................................................................1

## NATURE AND STAGE OF PROCEEDINGS

This is an action brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 and 28 U.S.C § 1367.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391, in that all Defendants are residents of this district and all acts or omissions which give rise to this cause of action occurred in this District.

Gerald H.E. Walker is subject to an involuntary commitment order by the State of Delaware as a result of him being diagnosed as a paranoid schizophrenic. Plaintiff Alice Walker, as Gerald H.E. Walker's Court appointed guardian, has filed this action on behalf of her husband.

Defendants have filed a motion for partial summary judgment to have plaintiff's Monell claims against the City of Wilmington and the Wilmington Police Department dismissed, plaintiff's claims against Officer Karen Burhman dismissed and plaintiff's punitive damages claim against the City of Wilmington and the Wilmington Police Department dismissed. Defendants have not filed for summary judgment regarding any of plaintiff's claims (including claims for punitive damages) against Officer Shawn Gordon or Officer Michael Ballard. This is plaintiff's opposition brief to defendants' motion for partial summary judgment.

## SUMMARY OF ARGUMENT

1.      Denied.  Plaintiff has established material issues of fact concerning her <u>Monell</u> claims against the City of Wilmington and the City of Wilmington Police Department.  Plaintiff has established <u>Monell</u> liability against the City of Wilmington and the City of Wilmington Police Department based on their custom of not adequately investigating allegations of excessive force by its officers, which amounted to deliberate indifference, and caused the deprivation of Mr. Walker's Constitutional rights by Officers Ballard and Gordon.  Further, plaintiff has established <u>Monell</u> liability against the City of Wilmington and the City of Wilmington Police Department based on their policies and/or custom not to train their officers to interact and/or deal with mentally ill citizens during the course and scope of their duties as Wilmington Police Officers, which amounted to deliberate indifference and caused the deprivation of Mr. Walker's Constitutional rights by Officers Ballard and Gordon.

2.      Admitted.  Plaintiff agrees to dismiss her claims of excessive force against Officer Karen Burhman.

3.      Admitted.  Plaintiff agrees to dismiss its claim for punitive damages against the City of Wilmington and the Wilmington Police Department.  Plaintiff shall still pursue her claims for punitive damages against Officer Shawn Gordon and Officer Michael Ballard individually, which have not been challenged by defendants.

## STATEMENT OF FACTS

Gerald H. E. Walker is a 61 year old African American. Mr. Walker was diagnosed with paranoid schizophrenia in the late 1980's and has received psychiatric treatment related to that diagnosis from Connections located at 500 10th West Street, Wilmington, DE 19802 and the Delaware Psychiatric Hospital. (D.I. 47, A16 –A18). Connections is an out-patient mental health facility. (B015).

Prior to July 2005, Mr. Walker was subject to an involuntary commitment order by the State of Delaware on an out-patient basis. Due to his mental illness, Mr. Walker has experienced paranoid delusions for over twenty years and has required constant mental health treatment. (D.I. 47, A15). In July 2005 Mr. Walker's mental health deteriorated. (D.I. 47, A20). Mr. Walker began having paranoid delusions that if he had sex with his granddaughter, she would have a baby that would rule the world. (D.I. 47, A20 – A22). Mr. Walker never acted on these delusions but he informed his wife, Alice Walker, about them and she immediately sought treatment for Mr. Walker. (D.I. 47, A22 – A23). On July 11, 2005, Mrs. Walker brought Mr. Walker to Connections for treatment. (D.I. 47, A23). The staff at Connections determined that Mr. Walker needed to be transferred to the Delaware Psychiatric Hospital for further in-patient treatment. (D.I. 47, A23 – A24).

In order to transfer Mr. Walker from Connections to the Delaware Psychiatric Hospital, the Connections staff followed its routine protocol and contacted the City of Wilmington Police Department to assist in the transfer. (B017, B018). In response to the transfer request from Connections, Officer Karen Burhman of the Wilmington Police Department arrived at Connections to escort Mr. Walker to the Delaware Psychiatric Hospital. (B037). Mr. Walker stated that he did not want to go to the Delaware Psychiatric Hospital and sat down in a chair.

3

(B037).  Two eyewitnesses, Gabe Hufford and Joanne Magowan, testified that Mr. Walker was

not physically threatening or violent with Officer Burhman and made no verbal threats to her.

(B019, B021, B037).  Gabe Hufford was an orderly at Connections at the time of this incident.

(B015).  Joanne Magowan is a registered nurse and was the Connections program director at the

time of this incident.  (B033).

Officer Burhman then called for back-up to assist her in the transfer.  (B019).  Shortly

thereafter, Officer Shawn Gordon and Officer Michael Ballard arrived at Connections to assist

Officer Burhman with the transfer.  (B019).  Officer Gordon and Officer Ballard requested that

Mr. Walker allow himself to be handcuffed and taken to the Delaware Psychiatric Hospital.

(B020).  Mr. Walker, now standing, once again stated he did not want to be taken to the

Delaware Psychiatric Hospital.  (D.I. 47, A53-A54).  Mr. Hufford and Ms. Magowan testified

Mr. Walker made no aggressive movements or verbal threats to the officers.  (B021, B038,

B039).  The witnesses further testified that Officer Gordon and Officer Ballard then, suddenly

and without warning, violently threw Mr. Walker to the floor causing Mr. Walker's head to slam

into a wall.  (B021, B038, B039).  The eyewitnesses' statements directly contradict the testimony

of Officer Ballard who testified that Mr. Walker placed him in a half headlock prior to being

brought to the ground.  (D.I. 48, A331).

Mr. Hufford and Ms. McGowan then testified that after being thrown to the floor by the

officers, Mr. Walker laid face down on the floor with his arms underneath his body. (D.I. 47,

A57); (B021).  Once again the eyewitness testimony in this regard directly contradicts Officer

Ballard's and Officer Gordon's testimony and defendants' statement of facts in their opening brief

that Mr. Walker had Officer Ballard in a headlock while on the ground.  (D.I. 48, A332) (D.I. 47,

A239).  While laying face down on the ground with his arms underneath his body, Mr. Walker

4

made no attempt to physically harm the officers nor did he make any verbal threats to do so. (B021, B026, B041). While Mr. Walker remained in this position, Officer Gordon and Officer Ballard began to repeatedly and violently beat Mr. Walker about the head, neck, arms and back with their fists. (B022, B023, B024, B040). During the beating, Officer Gordon hit Mr. Walker so hard in his head that the officer thought he broke his hand. (B022, B024). Officer Gordon then began to use a pair of steel handcuffs, like a pair of brass knuckles, to continue to violently beat Mr. Walker about the head, neck and back. (B022, B023, B024). As Officer Gordon continued to strike Mr. Walker about his head, neck and back, Officer Ballard inserted his thumb into a pressure point in Mr. Walker's neck and sprayed mace directly into Mr. Walker's face. (D.I. 47, A64) (B022, B024). The officers then handcuffed Mr. Walker and removed him from the Connections building. (D.I. 47, A64, A65). Officer Burhman watched the assault and did nothing to protect Mr. Walker from the attack. (D.I. 47, A62).

At no time prior to, during, or after the police beating of Mr. Walker did Mr. Walker make any aggressive or violent movements toward the police officers. (B021, B026, B038, B039) At no time prior to, during, or after the police beating of Mr. Walker did Mr. Walker make any verbal threats to the police officers. (B026, B041). The only statements made by Mr. Walker before, during, and after the beating were, "Why are you doing this to me?" and "I do not want to go to the hospital." (B041).

Mr. Walker suffered a subdural hematoma in his head during the beating. (B069 – B071). The subdural hematoma caused Mr. Walker neurological deficits that required him to undergo a craniotomy to relieve the pressure and bleeding on his brain. (B069 – B071). Dr. Townsend has provided an expert report opining that the subdural hematoma and the craniotomy were caused by the police beating. (B069 – B071).

The Wilmington Police Department has a policy in place that requires its officers to investigate all allegations of excessive force and to produce a report concerning that investigation. (D.I. 48, A405 – A406). While the policy exists, the evidence taken in a light most favorable to plaintiff establishes a Wilmington Police Department custom to violate its own policies concerning these investigations creating an atmosphere within the department whereby its officers feel they can exert excessive force on citizens with no repercussions.

Sgt. Thomas Kane testified that he did conduct an investigation into Mrs. Walker's allegations of excessive force but he determined that the officers acted properly. (D.I. 48, A409, A447, A451). But to date, Sgt. Kane has not produced his investigation report claiming it has been lost due to a new computer system having been installed. (D.I. 48, A409). Also, Sgt. Kane did not even interview the two eyewitnesses to the beating. (D.I. 47, A92); (B042). He simply relied on the statements of the officers in clearing them of any wrongdoing. (D.I. 48, A448). Further, Sgt. Kane's failures to properly investigate this incident or produce a report concerning his findings are not isolated incidents. Sgt. Kane testified he investigated Officer Gordon and Officer Ballard for allegations of excessive force prior to the incident involving Mr. Walker, but none of Sgt. Kane's investigation reports concerning those incidents have been provided to plaintiff. (D.I. 48, A421, A422). Sgt. Kane's continual failure to properly investigate and report on allegations of excessive force for the officers under his command, including Officers Gordon and Ballard, was the catalyst for these officers to beat Mr. Walker without fear of being held accountable for their actions.

Also, while the City did produce thousands of pages of documents regarding claims of excessive force against citizens by its officers, the City can only point to two instances where officers were actually disciplined for their actions. Further, when asked in discovery about its

6

internal investigations into allegations of excessive force against its officers, the City could not cite to one instance where there was an internal finding by the Wilmington Police Department that an officer engaged in excessive force.    The City admits that thousands of allegations of excessive force have been levied against its officers, yet the City can only cite to two incidents where its officers were disciplined for their actions.  Whether this extremely skewed ratio in favor of a finding that its officers did not engage in excessive force is the product of the City's officers not adequately investigating claims of excessive force or an inherent bias within the department not to find its officers engaged in excessive force, it has established a custom within the department that excessive force against a citizen is not only permitted but will be ratified by the department if an investigation is conducted.

The evidence also establishes that it was the Wilmington Police Department's official policy and/or custom not to train its officers to interact and/or deal with mentally ill citizens during the course of their official duties.  While the officers testified that they routinely have to interact with mentally ill citizens during the course of their duties as Wilmington police officers, the officers testified that they received virtually no training regarding interacting with the mentally ill during the course of their job duties.  (D.I. 47, A119 – 121, A213 – A215)(D.I. 48, A305, A306 A339 – A401).  In fact, when asked if there was difference between taking a mentally ill citizen into custody as opposed to a non-mentally ill citizen, Officer Gordon testified "no", simply "cuff them and put them into the police car." (D.I. 47, 213 – 215).  The City's failure to provide its officers with training to deal with mentally ill citizens (where the City was aware that its officers would routinely come into contact with mentally ill citizens during the course of their job duties) amounted to a conscious and deliberate indifference on the part of the City to the rights and needs of its mentally ill citizens.

In short, the facts taken in a light most favorable to plaintiff establish that a reasonable jury could find that the City's failure to properly investigate claims of excessive force and to train its officers to deal with the mentally ill establish <u>Monell</u> liability against the City of Wilmington and the Wilmington Police Department.

## ARGUMENT

### I.    THE SUMMARY JUDGMENT STANDARD.

Summary Judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. 56(c); Biener v. Catlio, 361 F.3d 206 (3rd Cir. 2004). In deciding a summary judgment motion, the Court must view all evidence and draw on all inferences in a light most favorable to the non-moving party. Whiteland Woods, L.P. v. Twp. of West Whiteland, 193 F.3d 177, 180 (3rd Cir. 1999). The trial court should only grant summary judgment where it determines that no reasonable jury could return a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### II.    THE FACTS TAKEN IN A LIGHT MOST FAVORABLE TO PLAINTIFF ESTABLISH MONELL LIABILITY AGAINST THE CITY OF WILMINGTON AND THE CITY OF WILMINGTON POLICE DEPARTMENT BASED ON THE THEIR FAILURE TO ADEQUATELY INVESTIGATE ALLEGATIONS OF EXCESSIVE FORCE AGAINST THEIR OFFICERS AND THEIR FAILURE TO TRAIN THEIR OFFICERS TO DEAL WITH THE MENTALLY ILL.

**a.    The City of Wilmington's and the City of Wilmington Police Department's custom of not adequately investigating allegations of excessive force against its officers amounted to deliberate indifference and caused the deprivation of Mr. Walker's Constitutional rights by Officers Ballard and Gordon.**

"A municipality is liable under section 1983 when a plaintiff can demonstrate that the municipality itself through the implementation of a municipal policy or custom, causes a constitutional violation." Colburn v. Upper Darby Township, 946 F.2d 1017, 1027 (3rd Cir. 1991) (citing Monell v. New York Dept. of Soc. Servs., 436 U.S. 658, 691 – 95 (1978)). "Liability will be imposed when the policy or custom itself violates the Constitution, or when the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional

tort of one of its employees." Id. (citing Polk County v. Dodson, 454 U.S. 312 (1981)). A custom is an act "that has not been formally approved by an appropriate decisionmaker", but that is "so widespread as to have the force of law." Calhoun v. Vicari, 2005 WL 2372870 (D.N.J.) (quoting Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997)). Municipalities may be held liable for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. Monell, 436 U.S. at 691. In establishing this rule of law the Court reasoned, "[d]eeply embedded traditional ways of carrying out state policy, …, are often tougher and truer law than dead words of the written text." Monell, 436 U.S. at 691.

To sustain a cause of action pursuant to § 1983 based on a municipality's failure to investigate, plaintiff must establish that defendants' failure to investigate claims of excessive force amounted to deliberate indifference. Groman v. Township of Manalapan, 47 F.3d 628 (1995) (citing San Filippo v. Bongiovanni, 30 F.3d 424, 445-46 (3rd Cir. 1994). To establish municipal liability plaintiff must show an affirmative link exists between the constitutional deprivation and the supervisor's failure to supervise and/or investigate claims of excessive force. Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988). While one incident of unconstitutional activity is not enough to establish liability under Monell, evidence that the unconstitutional activity has happened more than once will create a issue of fact to sustain a claim against a municipality under Monell. Colburn v. Upper Darby Township, 838 F.2d 663, 672 (3rd Cir. 1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338 (1989) (holding allegations of three similar incidents enough to sustain a claim where a single incident presumably would not be).

Sgt. Kane's failure to adequately investigate Officer Gordon's and Officer Ballard's brutal beating of Mr. Walker and his continual failure to investigate and produce investigation

10

reports regarding allegations of excessive force committed by Officers Gordon and Ballard

establishes a custom within the department that the exertion of unreasonable excessive force on

citizens is condoned and even ratified by the Wilmington Police Department.  Plaintiff retained

D.P. Van Blaricom (expert police practices consultant) who opined that Sgt. Kane's investigation

of this incident failed to meet a reasonable standard of care.  (B047 – B068).  Mr. Blaricom

based his opinions regarding Sgt. Kane's investigation on the following:

    a.    The incident was reported to Sergeant Kane and he was obligated to conduct a thorough investigation of their use of force;

        1)    Contrary to accepted police practices, he interviewed Officers Gordon and Ballard together, thereby enabling them to provide a common narrative,

        2)    His investigation simply relied on the officers' written reports to be factual and neither sought nor considered any information that was inconsistent therewith.

        3)    Although he was certain that he had prepared the required report of his investigation, any such report has inexplicably disappeared;

    b.    Although Joanne Magowan was a witness to the incident, she was never interviewed;

    c.    He is really too busy with other supervisory responsibilities to conduct "in depth" interviews and, although he could have turned the matter over to the Office of Professional Standards for a more thorough investigation, he did not;

    d.    He has conducted many such use of force investigations but has never found an officer to have used excessive force and, consistent with that past practice, he concluded, "The officers involved departmental policies and used proper conduct" and the Wilmington Police Department has conducted no further investigation into the incident;

    e.    Accordingly, the Wilmington Police Department has ratified the objectively unreasonable excessive force that was used against plaintiff, as previously described herein, to have been within the custom, policy and practice of the Wilmington Police Department.

(B050, B051)

Mr. Blaricom's unrebutted expert opinions alone establish material issues of fact regarding

plaintiff's <u>Monell</u> liability against the City based on the Wilmington Police Department's failure

to adequately investigate this incident, and the record further establishes that this was not an

isolated incident.

Sgt. Thomas Kane of the Wilmington Police Department testified that it is the official policy of the Wilmington Police Department that it is the responsibility of an officer's supervisor to produce a written use of force investigation report every time an officer uses force on a citizen or a citizen was injured during the course of an officer's duties as a Wilmington police officer. (D.I. 48, A405 – A406, A408).    Sgt. Kane further testified that as a supervisor he has complied with this policy and produced a written use of force investigation report for every allegation of excessive force that was his responsibility to investigate. (D.I. 48, A409).    Sgt. Kane then testified that it was his responsibility to investigate and produce a report concerning the incident involving Mr. Walker but he is unable to locate the report at the present time. (D.I. 48, A409). And, Sgt. Kane testified that on average he has conducted one to three use of force investigations a month since 1999 but has never determined that a Wilmington police officer exerted excessive force on a citizen. (D.I. 48, A408, A409). Sgt. Kane also testified that he has conducted use of force investigations regarding allegations of excessive force against Officer Shawn Gordon and Officer Michael Ballard prior to July 11, 2005. (D.I. 48, A421, A422).

But, defendants state in their responses to plaintiff's interrogatories that defendants are not in possession of any reports regarding investigations into allegations of excessive force conducted by Sgt. Kane regarding Officers Gordon or Ballard. (B001 – B010). Further, plaintiff's review of the thousands of pages of documents from the City (which admittedly is still ongoing) that were recently produced pursuant to the Court's Order has not revealed any reports by Sgt. Kane regarding prior allegations of excessive force against Officers Gordon or Ballard.

This evidence or lack of evidence (concerning Sgt. Kane's phantom reports) provided by the City establishes several things.  First, while Sgt. Kane understands that he is required to conduct a thorough investigation into allegations of excessive force and produce reports

concerning his investigations, his continual failure to follow these policies creates issues of fact as to whether or not there is a custom within the Wilmington Police Department that these policies and procedures can be ignored with no repercussions, as opined by plaintiff's expert. Second, Sgt. Kane's continual failure to follow the Wilmington Police Department's policies and procedures, created a custom within the department (and specifically for Sgt. Kane's subordinate officers) that allegations of excessive force would either not be properly investigated and/or "rubber stamped" by Sgt. Kane. In other words, Officers Gordon and Ballard knew that they could use objectively unreasonable force on Mr. Walker without worrying that an investigation would even be conducted, or in the alternative, that an investigation by Sgt. Kane would find they exerted excessive force on Mr. Walker.

Finally, defendants' failure to produce any reports concerning Sgt. Kane's investigation into Officer Gordon's and Officer Ballard's use of force on Mr. Walker or the prior allegations of excessive force against these officers will entitle plaintiff to a spoliation instruction by the Court concerning these missing reports at trial. This instruction will create further material issues of fact to be decided by the jury because plaintiff will be able to suggest to the jury that these reports contained information that is beneficial to the plaintiff (i.e. the officers did use objectively unreasonable force on Mr. Walker) yet Sgt. Kane nor the Wilmington Police Department did anything to discipline these officers.

Sgt. Kane's continual failure to adequately investigate and report on allegations of excessive force against the officers involved in this case create material issues fact that a custom existed within the Wilmington Police Department that investigations into allegations of excessive force will either not be conducted or will always result in a favorable decision for the officer. Further, this custom establishes material issues of fact concerning the Wilmington

Police Department's deliberate indifference to the rights of its citizens to be free from objectively unreasonable force by its officers and that this custom was the moving force behind Mr. Walker's beating at the hands of Officers Ballard and Gordon.

> **b.**    **The City of Wilmington's and the Wilmington Police Department's policy and/or custom not to train its officers to interact and/or deal with mentally ill citizens during the course and scope of their duties as Wilmington police officers amounted to deliberate indifference and caused the deprivation of Mr. Walker's Constitutional rights by Officers Ballard and Gordon.**

"In order to successfully prove a failure to train claim, the plaintiffs must establish that: (1) the failure to train amounts to deliberate indifference to the rights of persons with whom the municipality employees comes into contact; and (2) the training deficiency actually caused the injury." Estate of Harry Smith, III vs. City of Wilmington, 2007 WL 879717 (D. Del.)(citing Reitz v. County of Bucks, 125 F.3d 139, 145 (3rd Cir. 1997); City of Canton v. Harris, 489 U.S. 378, 388 (1989). A policy is made "when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict. Calhoun, 2005 WL at 3 (citing Kneipp v. Tedder, 95 F.3d 1199, 1212 (3rd Cir. 1996) (quoting Pembard v. City of Cincinnati, 485 U.S. 469, 481 (1986). )). A custom is an act "that has not been formally approved by an appropriate decisionmaker", but that is "so widespread as to have the force of law." Calhoun, 2005 WL at 3.

Acts of a government employee or a municipality as a whole may be deemed to be the result of a policy or custom where:

> the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policy maker can reasonably be said to have been deliberately indifferent to the need. Calhoun, 2005 WL at 3 (citing Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3rd Cir. 2003).

14

When a plaintiff seeks liability against a supervisor or municipality based on a failure to train, "the plaintiff must show that a need for more or different training or supervision is so obvious, and the inadequacy so likely to result in Constitutional violations, that the failure to train or supervise can fairly be said to represent official policy."  Calhoun, 2005 WL at 3 (citing City of Canton v. Harris, 489 U.S. 378, 388-92 (1989)).  Simply put, the issue in this case, as it relates to the City's failure to train its officers to interact and/or deal with mentally ill citizens, is whether the City of Wilmington's training program for its officers to interact and/or deal with mentally ill citizens was adequate; and if not, whether such inadequate training represents a policy or custom. Canton, 489 U.S. at 390.

Here, plaintiff has provided expert testimony from Mr. Blaricom that "the Wilmington Police Department was deliberately indifferent to training officers in how to approach the mentally ill." (B051, B052).  Mr. Blaricom based this opinion on the following:

a.   All of the officers and their sergeant have testified in their depositions:
1)   It is a commonplace duty for them to take the mentally ill into custody for psychological evaluations;
2)   They can recall no training whatsoever in how to conduct that routinely assigned task;

b.   Officer Gordon's deposition testimony is illustrative of that lack of training:
1)   When repeatedly asked how he was trained to take the mentally ill into custody, he repeatedly replied, "You put them in handcuffs and place them in the vehicle";
2)   He further explained that they went "hands on" to forcibly **take** plaintiff into custody after a "couple minutes" because, "How long is enough time to make somebody who does not want to anywhere long enough;

c.   Clearly, these officers had not received such critical training, as that provided by California's Peace Officer Standards and Training on Police Response to People with Mental Illness (2002) that appropriately instructs:
1)   "Time is on your side";
2)   "It is better to spend 15 minutes talking than 15 minutes fighting";

d.   Additionally, that same and not untypical publication notes that the American with Disabilities Act (ADA), "Requires that the safety and civil rights of people with disabilities be protected during transport and while detained";

(B051, B052).

15

Mr. Blaricom's unrebutted expert opinions alone establish material issues of fact regarding plaintiff's <u>Monell</u> liability against the City based on the Wilmington Police Department's failure to train its officers to interact and/or deal with mentally ill citizens.

It is clear from the testimony of the Wilmington Police officers who were deposed in this case that they received no training or minimal training (which they could not remember) on how to interact and/or deal with mentally ill citizens. When asked if he received any training regarding the mentally ill from the Wilmington Police Department, Sgt. Kane responded that he thought he had some in 1982 while he was at the academy:

> A.    In the academy they have someone come in. Its usually like a psychologist that works with police department comes in and gives you – I don't remember how long it was but a full day or several hours on mentally ill people. How much hours they do I am not familiar with.

> (D.I. 48, A399)

While Sgt. Kane testified that he may have received further training regarding how drugs affect mentally ill people after the academy, when asked if he remembered any of the training he supposedly received with regard to the mentally ill, he said no:

> Q.    Can you tell me when those occasions occurred and what you learned during each of those occasions?

> A.    I couldn't tell you anything specific, no, sorry.

> (D.I. 48, A441)

While Sgt. Kane (supervising officer) vaguely remembers that he may have received some training in general about the mentally ill, he does not remember it, which is tantamount to receiving no training at all.

When Officer Ballard was asked if he ever received any training with regard to the use of force in dealing with mentally ill people, he testified that he did not.

> Q.    Were you given any training on the use of force to deal with mentally ill suspects or people?
>
> A.    No.
>
> Q.    No?
>
> A.    No.
>
> Q.    Did any of your use of force training that you received in the police academy differentiate how you were supposed to deal with mentally ill people as opposed to people who were not mentally ill?
>
> A.    Specifically no, but I will tell you that one of our instructors did give an example of a person who, and it was real example, who was acting in a certain way and all the indicators were that the person was under the influence of something and was obviously not themselves, and as it turned out the individual was having a diabetic seizure, and one of the things we talked about with that is with certain reactions that the person is doing, there's also a smell that's associated with that that almost smells like – it's actually sugars in your body. It almost smells like they're under the influence, but other than that, no.

(D.I. 48, A305, A306)

Based on his testimony, it is undisputed that Officer Ballard never received any training regarding the use of force in dealing with mentally ill citizens. While Officer Ballard may remember a "war story" from an instructor about an individual having a diabetic seizure, this

does not amount to adequate training with regard to the use of force in dealing with mentally ill citizens.

Again, while Officer Karen Burhman recollects she may have received some training by the Wilmington Police Department in relation to the mentally ill, she could not remember the training and testified that she never received any training regarding the use of force in dealing with the mentally ill.

> Q.    Prior to July 11, 2005, were you ever trained by the Wilmington Police
> Department in how to deal with a mentally ill citizen who was supposed to
> be transported to a Delaware Psychiatric Hospital that didn't want to go?
>
> A.    Not that I recollect.
>
> Q.    Were you ever given any training by the Wilmington Police Department
> prior to July 11, 2005 about how to perform an involuntary commitment
> of someone who was mentally ill?
>
> A.    Did you ask me if I've had any training on that?
>
> Q.    Yes.
>
> A.    Not that I recall --.
>
> Q.    Right now can you recall any instruction that you were given about how
> you as a police officer should approach, talk to, deal with, persuade a
> mentally ill patient diagnosed with paranoid schizophrenia?
>
> A.    And were speaking specifically on training, not my actual dealings?
>
> Q.    Right.
>
> A.    I can't recollect exactly.

(D.I. 47, A119 – A121)

Officer Burhman's testimony is further undisputed evidence that the Wilmington Police Department does not provide adequate training to its police officers to interact and/or deal with mentally ill citizens.  And it is clear that whatever training she was provided, it was insufficient because she does not remember any of it, which is true of the other officers as well.

While Officers Kane, Ballard and Burhman all testified that they received no training regarding the use of force in dealing with mentally ill citizens, Officer Gordon's testimony is the most telling about how this lack of any training in dealing with the mentally ill caused the deprivation of Mr. Walker's constitutional rights.  First Officer Gordon established that transporting mentally ill patients from Connections to the Delaware Psychiatric Hospital is a routine part of a Wilmington police officer's job:

Q.    What experience, if any, did you have transporting mentally ill people from one facility to another prior to July 11 of '05?

A.    Connections calls us on a regular basis to transport people. I can't recall the number of times I've gone to Connections to transport people from that facility to another facility.  I've transported people from their houses that had mental issues, from their residences, to be evaluated at Wilmington Hospital and the same thing. "We have to go to the hospital.  You have to talk to somebody. We have to put you in our car. We have to handcuff you."

Q.    Can you give me an estimate as to how many times you've done that in your career prior to July 11, '05? Are we talking half a dozen? … or a hundred? …or something in between?

A.    Probably hundreds.  We deal with this on a regular basis in our line of work.

(D.I. 47, A217).

Officer Gordon's testimony in this regard clearly establishes that the Wilmington Police Department was aware or should have been aware that its officers were routinely interacting with mentally ill citizens during the course of their job duties, but through deliberate indifference, provided these officers with no training on how to deal with mentally ill citizens.

Officer Gordon then provided the most telling testimony about how poorly he was trained by the Wilmington Police Department to deal with the mentally ill.

> Q. Have you ever taken – have they ever given you any seminars, any hands-on training, any book training, any on-the-job training about how you as a Wilmington police officer are supposed to go about the task of transporting a mentally-handicapped individual from one facility to another?
>
> A. You put them in handcuffs and you place them in the vehicle.
>
> Q. Well, what do you recall about your Academy training in this regard?
>
> A. We go there. They have to be transported. We have to transport them. They have to be secured.
>
> Q. Did they give you any training as to any special techniques that you might think about using when trying to persuade someone with that sort of a mental disorder to allow themselves to be handcuffed and transported?
>
> A. You put the handcuffs on 'em, you put them in the car.
>
> (D.I. 47, A214, A215)

Clearly, Officer Gordon was provided no training by the Wilmington Police Department to deal with the mentally ill, or if he was provided training, it was inadequate. Officer Gordon's frightening testimony regarding how he deals with the mentally ill establishes the City's

deliberate indifference to the Constitutional rights of the mentally ill in allowing an officer such as Officer Gordon to be permitted to transport mentally ill patients "hundreds of times" without any training in how to interact and/or deal with the mentally ill.

Mentally ill individuals are arguably the most vulnerable citizens in the United States requiring society's most attention, care and protection. While they are sick, mentally ill citizens still enjoy the same rights and privileges as any other American. Many times their illness places them in a state of mind where they can be the victim of designing persons or their altered reality causes them to fear people who mean them no harm or are acting in their best interest. Given the unique set of circumstances these individuals pose to our society, it is imperative that the people who routinely care for them, transport them and/or interact with them on a daily basis understand who they are dealing with and how to properly deal with them. Further, the City's failure to provide adequate training to its officers to deal with the mentally ill (with whom they come into contact with so often) is something where the need to take some action to control the agents of the City is so obvious, and the inadequacy of existing practice is so likely to result in the violation of Constitutional rights, that the City can reasonably be said to have been deliberately indifferent to the need. Calhoun, 2005 WL at 3 (citing Natale v. Camden County Correctional Facility, 318 F.3d 575, 583-84 (3rd Cir. 2003).

The record clearly establishes that the Wilmington Police Department was aware that its officers routinely interacted with mentally ill citizens but, through deliberate indifference, did not provide its officers with adequate training to ensure the safety of its mentally ill citizens. The Wilmington Police Department's failure to provide this training to its officers caused the deprivation of Mr. Walker's Constitutional rights on July 11, 2005. Or, at the very least, the mountain of evidence in the record that the officers received virtually no training in how to

interact and/or deal with the mentally ill establishes material issues of fact preventing summary

judgment for the City of Wilmington and the Wilmington Police Department on plaintiff's

<u>Monell</u> claims.

III.   **PLAINTIFF VOLUNTARILY WITHDRAWS HER CLAIMS OF EXCESSIVE FORCE PURSUANT TO 42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AGAINST OFFICER KAREN BURHMAN.**

Plaintiff respectfully requests that all claims listed in plaintiff's complaint against Officer Karen Burhman be dismissed.

**IV.    PLAINTIFF VOLUNTARILY WITHDRAWS HER CLAIM FOR PUNITIVE DAMAGES AGAINST THE CITY OF WILMINGTON AND THE CITY OF WILMINGTON POLICE DEPARTMENT.**

Plaintiff respectfully withdraws plaintiff's claim for punitive damages against the City of Wilmington and the City of Wilmington Police Department.  Plaintiff shall still pursue her claims for punitive damages against Officer Shawn Gordon and Officer Michael Ballard individually, which have not been challenged by defendants.

## **CONCLUSION**

For the reasons set forth above, plaintiff respectfully requests that defendants' Motion for

Partial Summary Judgment as to plaintiff's Monell claims against the City of Wilmington and the

City of Wilmington Police Department be denied as outlined above.

Respectfully submitted,

/s/ Philip T. Edwards
ROGER D. LANDON, No. 2460
PHILIP T. EDWARDS, No. 4393
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100

Attorneys for Plaintiff Alice Walker

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALICE WALKER, individually | CIVIL ACTION
and as guardian, of |
her husband, GERALD H.E. |
WALKER, an incompetent person, |
|
Plaintiff, |
|
v. | No. 06-366 JJF
|
CITY OF WILMINGTON; CITY OF |
WILMINGTON POLICE DEPARTMENT; |
OFFICER SHAWN GORDON, |
individually and as agent of | JURY TRIAL DEMANDED
the CITY OF WILMINGTON POLICE |
DEPARTMENT; OFFICER MICHAEL |
BALLARD, individually and as |
agent of the CITY OF |
WILMINGTON POLICE DEPARTMENT; |
OFFICER KAREN BUHRMAN |
individually and as agent of |
the CITY OF WILMINGTON POLICE |
DEPARTMENT, |
|
Defendants. |

**APPENDIX TO PLAINTIFF'S ANSWERING BRIEF TO DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

MURPHY & LANDON
ROGER D. LANDON, No. 2460
PHILIP T. EDWARDS, No. 4393
1011 Centre Road, #210
Wilmington, DE 19805
(302) 472-8100
Attorneys for Plaintiff

DATE: October 1, 2007

146668

## TABLE OF CONTENTS

Defendants' Answer to Plaintiff's Interrogatories ................................................................B001

Statement Under Oath of Gabriel Hufford ........................................................................B012

Statement Under Oath of Joanne Magowan ......................................................................B030

Report of D.P. Van Blaricom..............................................................................................B047

Report of John B. Townsend, III, M.D. .............................................................................B069

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person,<br><br>       Plaintiff,<br><br>       v.<br><br>CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER KAREN BUHRMAN individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT,<br><br>       Defendants. | CIVIL ACTION<br><br><br><br><br><br><br>No. 06-366 JJF<br><br><br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' ANSWER TO PLAINTIFF'S INTERROGATORIES**

1.    Identify all persons who have direct knowledge of and/or were eyewitnesses to facts alleged in the Complaint, noting specifically the eyewitnesses.

**ANSWER**:

Gabe Huffard, an employee at Connections, witnessed the Defendant officers' apprehending Gerald Walker.

2.    Identify all persons who have been interviewed by you and/or persons from whom statements have been obtained with regard to the facts alleged in the

pleadings on your behalf with regard to the facts alleged in the pleadings.

**ANSWER**:

The individual defendants have been interviewed by counsel of the City of Wilmington Law Department, but the contents of such interviews are subject to the attorney client privilege and the work product doctrine.

3.      Identify all doctors' and/or hospital reports or records with regard to the injuries alleged in the Complaint in defendants' possession or that have been requested by defendants.

**ANSWER**:

Defendants do not yet have any knowledge of the identities of doctors and/or hospital reports or records at this time.  A motion to enforce a subpoena to Connections is pending.

4.      State the names, addresses and qualifications of all expert witnesses who have been consulted by you relative to this case and/or will testify in this case on your behalf and identify the subject matter and the substance of the facts and opinions as to which the expert is expected to testify and a summary of the grounds for each opinion.

**ANSWER**:

Defendants have consulted with Dr. Neil Kaye, 5301 Limestone Road, Suite 103 Wilmington, DE 19808.  He has not yet rendered any expert opinion.

5.      Identify any crimes the officers have ever pleaded guilty to or have been convicted of other than traffic violations.

**ANSWER**:

Defendant Buhrman pled guilty to underage possession of alcohol.  The other

Defendants have not been convicted or pled guilty of any crimes.

6.    Identify any discussions you had with Gerald H. E. Walker and/or Alice Walker at any time after the facts alleged in the Complaint, describe such discussion in detail.

**ANSWER:**

No discussions with the Walkers.

7.    Identify and describe any and all training provided to City of Wilmington police officers during the past ten years regarding the use of force as it pertains to interacting with citizens encountered during the course and scope of their duties as a City of Wilmington police officer.

**ANSWER:**

The individual officers have in-service day training throughout the year, which over the years has included training on the use of force continuum.

8.    Identify and describe any and all training provided to City of Wilmington police officers during the past ten years regarding the mentally ill as it pertains to interacting with mentally ill citizens encountered during the course and scope of their duties as a City of Wilmington police officer.

**ANSWER:**

Defendants have had training regarding mentally ill persons, as part of ongoing in-service training on various law enforcement topics. However, they do not know when exactly the training occurred or what specifically was covered.

9.     Identify and describe any and all training provided to City of Wilmington police officers during the past ten years regarding the mentally ill as it pertains to a City of Wilmington police officer's use of force when interacting with a mentally ill citizen encountered during the course of their duties as a City of Wilmington police officer.

**ANSWER:**

Defendants have had in-service training regarding mentally ill persons, however, Defendants do not know when exactly the training occurred or what specifically was covered.

10.     Identify and describe any and all procedures and/or protocols in place during the past ten years by which allegations of excessive force allegedly committed by a City of Wilmington police officer are investigated by the City and state the following:

a.     the date the procedure and/or protocol was instituted;

b.     describe the procedure and/or protocol;

c.     who conducts the use of force investigation;

d.     how many such use of force investigations have been conducted in the past 10 years by the City;

e.     have any use of force investigations involved the officers who are the named defendants in this case;

f.     if the answer to question (d) is yes, how many such investigations have involved the  officers who are the named defendants in this case;

g.     if the answer to question  (d) is yes, please describe the circumstances, incidents, allegations and/or complaints that resulted in such investigation(s);

h.    if the answer to question (d) is yes, please describe the result, conclusion, findings and/or sanctions imposed as a result of each such investigation(s);

i.    if the answer to question (d) is yes, please identify the individual(s) who conducted and/or were responsible for conducting each investigation;

j.    if the answer to question (d) is yes, please identify the individual(s) who made the determination(s) as to whether or not the officers had engaged in the use of excessive force for each such investigation.

**ANSWER:**

a. the procedure has been codified in the White Book over the past ten years, as amended from time to time, which is currently set forth in Directive 6.7(5);

b. officer notifies supervisor, supervisor conducts investigation, officer writes DI explaining actions, and supervisor completes his findings.

c. immediate supervisor conducts the investigation, and then the investigation is turned over to the Office of Professional Standards

d. unknown

e. No.

f. n/a

g. n/a

h. n/a

i. n/a

j. n/a

11.    Have any use of force investigations conducted by the City in the past ten years resulted in a finding and/or determination that excessive force had been used by a City of Wilmington police officer, and if so, state the following:

      a.    How many resulted in such a finding and/or determination;

      b.    describe the circumstances and/or facts that resulted in such a finding;

      c.    the result, conclusion and/or sanction regarding each such finding;

      d.    identify the individuals and/or officers involved in each such finding(s);

**ANSWER:**

**Objection.**  This interrogatory seeks information for which disclosure is prohibited by the Law Enforcement Officers Bill of Rights, 11 Del.C. § 9200(d)(2), as applied to federal civil actions in *Bailey v. City of Wilmington.* As for the named defendants in this case, there have been no such use of force investigations resulting in a finding that excessive force had been used.

12.    Have any use of force investigations conducted in the past ten years by the City resulted in the Office of Professional Standards for Internal Affairs assigning an investigator to further investigate the allegations of excessive force by a City of Wilmington police officer, and if so, please answer the following:

      a.    how many use of force investigations have resulted in the Office of Professional Standards for Internal Affairs assigning an investigator to further investigate allegations of excessive force by a City of Wilmington police officer;

      b.     identify the City of Wilmington police officers investigated by the Office of Professional Standards for Internal Affairs regarding allegations of excessive force;

      c.     what was the conclusion, determination and/or result (including any sanction or punishment imposed) of each  Office of Professional Standards for Internal Affairs investigation concerning excessive force by a City of Wilmington police officer;

      d.     how many investigations, if any, by the Office of Professional Standards for Internal Affairs involved the officers who are the named defendants in this case;

      e.     if the answer to question (d) is one or more, please describe the circumstances, incidents, allegations and/or complaints that resulted in such investigation(s) by the Office of Professional Standards for Internal Affairs;

      f.     if the answer to question (d) is one or more, what was the conclusion, determination and/or result (including any sanction or punishment imposed) by the Office of Professional Standards for Internal Affairs of its investigation;

**ANSWER:**

**Objection.**  This interrogatory seeks information for which disclosure is prohibited by the Law Enforcement Officers Bill of Rights, 11 Del.C. § 9200(d)(2), as applied to federal civil actions in *Bailey v. City of Wilmington.* As for the named defendants in this case, there have been no such use of force investigations resulting in a finding that excessive force had been used.

13.    How many use of force investigations, if any, has Sergeant Thomas Kane of the City of Wilmington Police Department conducted during his career as a City of Wilmington police office, and if the answer is one or more, please state the following:

a.    how many such investigations have resulted in a finding that a City of Wilmington police officer did and/or may have used excessive force during the course and scope of his/her duties as a City of Wilmington police officer;

b.    did any of these investigations involve any of the officers who are the named defendants in this case;

c.    if the answer to question (b) is yes, how many investigations involved the officers named as defendants in this case;

d.    if the answer to question (b) is yes, please describe the circumstances, incidents, allegations and/or complaints that resulted in each such investigation;

e.    if any of Sgt. Kane's investigations did involve any of the officers who are the named defendants in this case, what was the conclusion, determination and/or result (including any sanction or punishment imposed) of each such investigation.

**ANSWER:**

**Objection.**  This interrogatory seeks information for which disclosure is prohibited by the Law Enforcement Officers Bill of Rights, 11 Del.C. § 9200(d)(2), as applied to federal civil actions in *Bailey v. City of Wilmington.*

14.    Did the answers to each and every one of the interrogatories propounded herein include not only the information known to you or your attorney, but also the information within the possession or control of yourself or your attorney?

**ANSWER:**

No.  Some answers are recited based on memory, not necessarily information within the possession or control of answering defendants or counsel.

15.    Identify any and all allegations of the use of excessive force by a City of Wilmington police officer against a citizen reported to the City in the past ten years regardless of whether a use of force investigation was conducted by the City.

**ANSWER:**

Without waiving any objections under the Law Enforcement Officers Bill of Rights, answering defendants identify the following lawsuits:

Raymond Green v. City of Wilmington, et al. – 7/02 – Excessive Force - dismissed

Timothy Smith v. Wilmington Police Dept., - 3/99 - Excessive Force - dismissed

Salomie Cooper, et al. v. Officer Villaburdi, et al - 8/00 - Excessive Force- dismissed

Harvey Hudson v. City of Wilmington, et al. – 2/00 - Excessive Force- dismissed

Joseph Washington v. Robert Curry, et al. – 9/01 - Excessive Force - dismissed

Steven Miller v. City of Wilmington, et al. – 3/01 - Excessive Force- dismissed

Crystal Spanos v. City of Wilmington, et al. – 8/00 – Excessive Force - dismissed

Stanford Burris v. James G. Peiffer, et al. – 4/98 – Excessive Force- dismissed

Alton Cannon v.  City of Wilmington – 8/99 - Excessive Force - dismissed

Dana Williams v. Nancy Dietz, et al. - 1997 - Excessive Force - dismissed

Gerald Samuels v. Det. Cummings, et al. – 5/03 – Excessive Force - dismissed

16.   Identify any and all allegations of the use of excessive force by a City of Wilmington police officer against a mentally ill citizen reported to the City in the past ten years regardless of whether a use of force investigation was conducted by the City.

**ANSWER:**

Without waiving any objections under the Law Enforcement Officers Bill of Rights, Defendants are not aware that any of the lawsuits identified in Interrogatory response #15 involved a mentally ill patient.

_____
Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
Assistant City Solicitor
City of Wilmington Law Department
Louis L. Redding City/County Building
800 N. French Street, 9th Floor
Wilmington, DE 19801
(302) 576-2175
Attorney for Defendants City of Wilmington, Shawn Gordon, Michael Ballard and Karen Buhrman

6/1/07

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALICE WALKER and                          :
GERALD H.E. WALKER,                       :
                                          :
          Plaintiffs,                     :
                                          :
     v.                                   :     C.A. No. 06-366 JJF
                                          :
CITY OF WILMINGTON, CITY OF               :
WILMINGTON POLICE DEPARTMENT,:                  JURY TRIAL DEMANDED
OFFICER SHAWN GORDON,                     :
OFFICER MICHAEL BALLARD, and              :
OFFICER KAREN BUHRMAN,                    :
                                          :
          Defendants.                     :

## CERTIFICATE OF SERVICE

I, Alex J. Mili, Jr., Esquire, hereby certify that on this 1st day of June, 2007, I

forwarded two copies of Defendants' Answer to Plaintiffs' Interrogatories and Defendants'

Response to Plaintiffs' Request for Production to the below listed individual and notice of

said filing with the Clerk of Court using CM/ECF which will send notification of such filing(s)

that this document is available for viewing and downloading from CM/ECF to the following:

> Roger D. Landon, Esquire
> Murphy, Spadaro & Landon
> 1011 Centre Road, Suite 210
> Wilmington, DE 19805

> /s/ Alex J. Mili, Jr.
> Alex J. Mili, Jr., Esquire (DE Bar I.D. #4125)
> Assistant City Solicitor
> City of Wilmington Law Department
> Louis L. Redding City/County Building
> 800 N. French Street, 9th Floor
> Wilmington, DE 19801
> (302) 576-2175
> Attorney for Defendants City of Wilmington,
> Shawn Gordon, Michael Ballard and Karen
> Buhrman

Page 1

```
 1                    STATEMENT UNDER OATH

 2

 3

 4    IN RE:  GERALD WALKER

 5

 6

 7

 8                    STATEMENT UNDER OATH OF GABRIEL HUFFORD

 9    TAKEN PURSUANT TO NOTICE BEFORE GLORIA M. D'AMORE,

10    REGISTERED PROFESSIONAL REPORTER, IN THE LAW OFFICES OF

11    MURPHY, SPADARO & LANDON, 1011 CENTRE ROAD, SUITE 210,

12    WILMINGTON, DELAWARE, ON FRIDAY, FEBRUARY 10, 2006,

13    BEGINNING AT APPROXIMATELY 1:30 P.M., THERE BEING

14    PRESENT:

15

16    APPEARANCES:

17

18                    MURPHY, SPADARO & LANDON
                      BY:  PHILIP T. EDWARDS, ESQUIRE
19                         1011 CENTRE ROAD, SUITE 210
                           WILMINGTON, DELAWARE 19805
20                    ATTORNEY FOR GERALD WALKER
                      AND ALICE WALKER
21

22

23

24
                      CORBETT & WILCOX
```

GABRIEL HUFFORD

Page 2

1          REGISTERED PROFESSIONAL REPORTERS
2     1400 FRENCH STREET     WILMINGTON, DE 19801
              (302) 571-0510

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

1                     GABRIEL HUFFORD, HAVING FIRST BEEN DULY

2      SWORN ACCORDING TO LAW, WAS EXAMINED AND TESTIFIED AS

3      FOLLOWS:

4      BY MR. EDWARDS:

5          Q.   MR. HUFFORD, GOOD AFTERNOON.  MY NAME IS

6      PHILIP EDWARDS.  I'M AN ATTORNEY FOR GERALD AND ALICE

7      WALKER.  WE ARE HERE TODAY TO TAKE YOUR RECORDED

8      STATEMENT IN CONNECTION WITH AN INCIDENT THAT OCCURRED ON

9      JULY 11, 2005.

10                    MR. HUFFORD, YOU ARE AWARE THAT I AM AN

11     ATTORNEY FOR THE WALKERS.

12                    CORRECT?

13         A.   YES.

14         Q.   ARE YOU HERE VOLUNTARILY?

15         A.   YES.

16         Q.   WOULD YOU, PLEASE, STATE YOUR NAME AND ADDRESS

17     FOR THE RECORD?

18         A.   GABE HUFFORD.  GABRIEL HUFFORD.

19                    DO YOU WANT MY HOME ADDRESS?

20         Q.   YES.

21         A.   1704 GREEN LANE, ARDEN, DELAWARE 19810.

22         Q.   WOULD YOU STATE YOUR DATE OF BIRTH?

23         A.   8/23/76.

24         Q.   ARE YOU EMPLOYED, GABE?

GABRIEL HUFFORD

Page 4

```
 1       A.    YES.

 2       Q.    WHERE ARE YOU EMPLOYED?

 3       A.    CONNECTIONS CSP.

 4       Q.    WHAT IS CONNECTIONS CSP?

 5       A.    IT IS AN OUTPATIENT MENTAL HEALTH PROVIDER

 6  CONTRACTED THROUGH THE STATE.

 7       Q.    HOW LONG HAVE YOU BEEN AT CONNECTIONS?

 8       A.    APPROXIMATELY, FIVE YEARS.

 9       Q.    WHAT DO YOU DO AT CONNECTIONS?

10       A.    RIGHT NOW, I'M THE DIRECTOR OF THE

11  CONTINUUM -- THE CCCP.  I DIRECT THREE OF THE LONG-TERM

12  PROGRAMS.

13       Q.    WHEN YOU SAY "LONG-TERM PROGRAMS," WHAT IS A

14  LONG-TERM PROGRAM?

15       A.    IT IS THE CASE MANAGEMENT PROGRAMS.  WE TAKE

16  REFERRALS FROM THE STATE OUT OF GROUP HOMES AND OUT OF

17  THE STATE HOSPITALS FROM THE EEU, WHICH IS THE

18  ELIGIBILITY ENROLLMENT UNIT AT THE STATE.

19             PREVIOUS TO THAT, I WAS THE PROGRAM

20  DIRECTOR FOR ACT 1, ASSERTIVE COMMUNITY TREATMENT, TEAM

21  1.

22       Q.    IN YOUR ROLE AT CONNECTIONS, DID YOU COME INTO

23  CONTACT WITH AN INDIVIDUAL NAMED GERALD WALKER?

24       A.    YES.
```

Page 5

```
 1        Q.   WHEN DID YOU FIRST COME INTO CONTACT WITH

 2   MR. WALKER?

 3        A.   HE CAME TO MY TEAM WHEN I WAS A PROGRAM

 4   DIRECTOR, AS A REFERRAL.  HE WAS A PRETTY SICK GUY AT THE

 5   TIME OF HIS INTAKE.  HE HAD BEEN IN AND OUT OF THE STATE

 6   HOSPITAL AND THE ROCKFORD CENTER AND MEADOWWOOD SEVERAL

 7   TIMES.

 8        Q.   WHEN YOU SAY "SICK," WHAT DO YOU MEAN BY THAT?

 9        A.   MENTALLY ILL.

10        Q.   WHAT WAS HIS ILLNESS?

11        A.   PARANOID SCHIZOPHRENIA.

12        Q.   ON JANUARY 11, 2005, DID GERALD WALKER COME TO

13   CONNECTIONS?

14        A.   YES.

15        Q.   WHY DID HE COME THERE THAT DAY?  DO YOU KNOW?

16        A.   HE CAME INTO SEE THE DOCTOR.  HE CAME IN TO BE

17   EVALUATED.  AND WE WERE PRETTY SURE HE WAS GOING TO NEED

18   TO BE COMMITTED BACK TO THE STATE HOSPITAL.  GERALD HAD

19   SOME PRETTY SPECIFIC DELUSIONS REGARDING HIS DAUGHTER.

20        Q.   PRIOR TO JANUARY 11, 2005, HAD YOU EVER KNOWN

21   MR. WALKER TO BE VIOLENT IN ANYWAY?

22        A.   NO.  NOT AT ALL.  NOT AT ALL.  ANY OTHER TIME

23   WHEN HE NEEDED TO BE TAKEN BACK TO THE STATE HOSPITAL, OR

24   ROCKFORD CENTER, HE HAD ALWAYS GONE WILLINGLY.  HE HAD
```

GABRIEL HUFFORD

Page 6

1    NEVER BEEN VIOLENT TOWARDS ANY STAFF.

2        Q.    HAD YOU EVER HEARD ANY COMPLAINTS FROM

3    MRS. WALKER OR ANYBODY ELSE WITH REGARD TO MR. WALKER

4    BEING VIOLENT PRIOR TO JANUARY 11, 2005?

5        A.    NO.

6        Q.    ON JANUARY 11, 2005, DID YOU DECIDE TO MAKE A

7    DETERMINATION THAT MR. WALKER NEEDED TO GO BACK TO

8    DELAWARE PSYCHIATRIC CENTER ON AN INPATIENT BASIS?

9        A.    YES.   THE PSYCHIATRIST IN THE PROGRAM FILLED

10    OUT COMMITMENT PAPERS TO DETERMINE THAT HE WAS A DANGER

11    TO HIMSELF AND TO OTHERS.   HE NEEDED TO BE COMMITTED.

12        Q.    WHEN YOU SAY "DANGER TO HIMSELF AND TO

13    OTHERS," YOU DON'T MEAN PHYSICALLY, DO YOU?

14        A.    NO.   NOT PHYSICALLY.   HIS DELUSIONS WERE SUCH

15    THAT HE MIGHT HAVE BEEN A DANGER TO THE DAUGHTER, BUT NOT

16    THAT HE WOULD HURT HER.   BUT THERE MAY BE SOME KIND OF

17    SEXUAL MISCONDUCT.

18        Q.    AND WHAT IS THE PROCESS BY WHICH ANY PATIENT,

19    NOT JUST MR. WALKER, IS TRANSFERRED FROM CONNECTIONS TO

20    THE DELAWARE PSYCHIATRIC CENTER ON AN INPATIENT BASIS?

21        A.    THERE ARE TWO WAYS TO GO.   EITHER STAFF CAN

22    TAKE THEM, IF THEY ARE SAFE TO GO, OR THE POLICE WILL

23    ESCORT THEM.   THE OPTION IS USUALLY GIVEN TO THE CLIENT

24    AT THE TIME, DO YOU WANT TO RIDE WITH US, OR IF YOU

GABRIEL HUFFORD

Page 7

1    REFUSE TO RIDE WITH US, WE WILL HAVE TO CALL THE COPS TO

2    TAKE YOU.

3        Q.   ON JANUARY 11, 2005, DID YOU OFFER THAT

4    OPTION, THE OPTION OF GOING WITH CONNECTIONS PERSONNEL TO

5    TAKE HIM TO THE DELAWARE PSYCHIATRIC CENTER?

6        A.   YES.

7        Q.   WHAT HAPPENED?

8        A.   HE REFUSED.  HE SAID HE DID NOT NEED TO BE IN

9    THE HOSPITAL.  HE DID NOT WANT TO GO.

10       Q.   DID HE BECOME VIOLENT IN ANY WAY WHEN YOU TOLD

11   HIM THAT HE WAS GOING BACK TO THE HOSPITAL?

12       A.   NO.  NOT AT ALL.  HE WAS VERY CALM.  HE TOLD

13   ME THAT I WAS NOT A DOCTOR, AND THAT I WAS NOT GOING TO

14   PUT HIM IN THE HOSPITAL.  BUT HE, AT NO TIME, BECAME

15   AGGRESSIVE, OR MADE ANY KIND OF SUDDEN MOVES OR ANYTHING

16   LIKE THAT TOWARDS ME.

17       Q.   SO, THEN, FOLLOWING YOUR NORMAL PROCEDURES,

18   THE POLICE WERE CALLED TO ESCORT HIM TO THE DELAWARE

19   PSYCHIATRIC CENTER?

20       A.   YES.

21       Q.   WHAT HAPPENED WHEN THE POLICE WERE CALLED?

22       A.   THE FIRST POLICE OFFICER TO SHOW UP WAS A

23   FEMALE, A WHITE FEMALE.  I EXPLAINED THE SITUATION TO

24   HER.  SHE ASKED MR. WALKER, WOULD HE PLEASE TURN AROUND

GABRIEL HUFFORD

Page 8

1   SO SHE COULD PUT THE HANDCUFFS ON.  SHE EXPLAINED THEIR

2   POLICY OF NEEDING TO HAVE HANDCUFFS ON WHEN THEY RIDE IN

3   THE CAR.  HE REFUSED.  HE SAID HE WAS NOT, OR DID NOT GO

4   NEED TO GO TO THE HOSPITAL.  THERE WAS NOTHING WRONG WITH

5   HIM.  SHE TALKED TO HIM SEVERAL TIMES ABOUT IT, AND THEN

6   CALLED FOR BACKUP.

7        Q.   WHAT WAS THE TONE OF THAT CONVERSATION?  WAS

8   MR. WALKER ANGRY?

9        A.   HE WASN'T ANGRY.  HE WASN'T AGGRESSIVE.  HE

10  JUST SIMPLY DID NOT THINK THERE WAS ANYTHING WRONG WITH

11  HIM AND DID NOT THINK HE NEEDED TO BE IN THE HOSPITAL.

12  THE FEMALE OFFICER, YOU KNOW, DID NOT GET AGGRESSIVE WITH

13  HIM.  SHE ASKED HIM SEVERAL TIMES TO PLEASE GO WITH HER.

14       Q.   AND YOU SAID SHE ULTIMATELY CALLED FOR BACKUP?

15       A.   SHE CALLED FOR BACKUP.  SHE ACTUALLY CALLED

16  FROM HER PERSONAL CELL PHONE.

17       Q.   DID THE FEMALE OFFICER WHO FIRST ARRIVED

18  PHYSICALLY TRY TO PUT THE CUFFS ON HIM?

19       A.   NO.

20       Q.   SO, SHE CALLED FOR BACKUP.

21            WHAT HAPPENED AFTER SHE CALLED FOR

22  BACKUP?

23       A.   THERE WAS A LITTLE BIT OF A WAIT.  THEN TWO

24  MALE OFFICERS ARRIVED.

GABRIEL HUFFORD

Page 9

1        Q.    DO YOU KNOW THEIR NAMES?

2        A.    NO.  I DON'T KNOW THEIR NAMES.

3        Q.    WHAT HAPPENED WHEN THE TWO MALE OFFICERS

4    ARRIVED?

5        A.    I ADVISED THEM OF THE SITUATION.  THE FEMALE

6    OFFICER ADVISED THEM OF THE SITUATION.  THEY TALKED TO

7    MR. WALKER.  MR. WALKER, AGAIN, TOLD THEM THERE WAS

8    NOTHING WRONG WITH HIM AND HE DID NOT NEED TO GO TO THE

9    HOSPITAL.  THEY ASKED HIM TO TURN AROUND AND PUT HIS

10   HANDS BEHIND HIS BACK SO THEY CAN PUT THE HANDCUFFS ON

11   HIM.  HE REFUSED.  AND THEY, BASICALLY, GOT ON EITHER

12   SIDE OF HIM AND WERE ASKING HIM TO PUT HIS HANDS BEHIND

13   HIS BACK.  HE WAS GOING TO GO TO THE HOSPITAL WHETHER HE

14   LIKED IT OR NOT.

15       Q.    WHAT IS THE TONE OF THIS CONVERSATION RIGHT

16   NOW?

17       A.    PRETTY CALM.  PRETTY CALM.  THEY WERE, AT THIS

18   TIME, NOT AGGRESSIVE TOWARDS HIM.  HE WAS NOT AGGRESSIVE

19   TOWARDS THEM.

20       Q.    DID MR. WALKER MAKE ANY THREATS OF VIOLENCE

21   TOWARDS THEM?

22       A.    NO THREATS.  THEY --

23       Q.    I DIDN'T MEAN TO INTERRUPT YOU.  PLEASE GO ON.

24       A.    THEY WERE KIND OF PRETTY MUCH TALKING HIM DOWN

1   AT THIS TIME.  AT THIS TIME, IT WAS CLEAR TO ME, THAT MR.

2   WALKER WOULD PROBABLY NOT GO WILLINGLY OR PUT HIS HANDS

3   BEHIND HIS BACK.

4              SO, BASICALLY, TO DESCRIBE THE

5   SITUATION, ONE WAS ON THE RIGHT-HAND SIDE OF HIM, ONE WAS

6   ON THE LEFT-HAND SIDE OF HIM, IN SORT OF A CORRIDOR AREA

7   WITH A KNEE WALL.  I COULD SEE THEM INCHING TOWARDS HIM,

8   GETTING CLOSER, GETTING CLOSER.  I KNEW THEY WERE GOING

9   TO GRAB EACH AN ARM AND HANDCUFF HIM.  WHEN THEY GRABBED

10  MR. WALKER, HE FELL FORWARD, HALFWAY OVER THE KNEE WALL.

11  HE HIT HIS HEAD ON THE WALL.  THEY GOT HIM DOWN ON THE

12  GROUND.  AND MR. WALKER, AT THAT TIME, PUT BOTH HANDS

13  UNDERNEATH HIS BODY AND JUST SAID, WHY ARE THEY TRYING TO

14  TAKE ME TO THE HOSPITAL?  WHY ARE THEY ARRESTING ME?

15      Q.   MR. WALKER WAS SAYING THAT?

16      A.   WHY ARE YOU DOING THIS?  WHY ARE YOU ARRESTING

17  ME?

18      Q.   AND DID MR. WALKER AT ANY TIME PRIOR TO THAT

19  MAKE ANY AGGRESSIVE OR VIOLENT MOVES TOWARD THE POLICE

20  OFFICERS?

21      A.   NO.

22      Q.   DID HE MAKE ANY VERBAL THREATS TOWARDS THE

23  POLICE OFFICER?

24      A.   NO.

GABRIEL HUFFORD

Page 11

1       Q.    PLEASE PICK IT UP FROM THERE.    MR. WALKER IS

2   NOW LAYING WITH HIS ARMS UNDERNEATH OF HIS CHEST?

3       A.    YES.    WITH HIS ARMS UNDERNEATH OF HIS CHEST.

4   THE OFFICERS WERE TRYING TO WRESTLE HIS HANDS FREE.    THEY

5   GOT, ACTUALLY, I KNOW FOR SURE IT WAS HIS RIGHT ARM WAS

6   BEHIND HIS BACK WITH ONE HANDCUFF ON.    THEY COULD NOT GET

7   HIS LEFT ARM FREE TO PUT THE HANDCUFF ON.    THE WHITE

8   OFFICER WAS ON HIS RIGHT-HAND SIDE.    THE BLACK OFFICER

9   WAS ON HIS LEFT-HAND SIDE.    BOTH MALES.    THE FEMALE

10  OFFICER STOOD BACK THE HOLD TIME AND NEVER TOUCHED

11  MR. WALKER.

12                THE WHITE OFFICER AND THE BLACK OFFICER,

13  BOTH, HIT HIM REPEATEDLY IN HIS BACK AND IN HIS ARM.

14  THEY MACED HIM.    AND AT ONE TIME, THE WHITE OFFICER HIT

15  HIM AND THOUGHT HE HAD BROKE HIS HAND, AND PULLED OUT

16  ANOTHER SET OF HANDCUFFS AND HIT MR. WALKER IN THE BACK

17  OF THE HEAD SEVERAL TIMES.    HE STILL DID NOT LET GO OF

18  HIS ARMS.    HE KEPT HIS ONE ARM UNDERNEATH.    HIS OTHER ARM

19  WAS BEHIND HIS BACK BEING WRENCHED UP TOWARDS THE BACK OF

20  HIS NECK.    THE BLACK OFFICER TOOK HIS HAND WITH HIS

21  FINGERS OUT AND STUCK IT IN HIS -- THERE WAS A PRESSURE

22  POINT IN HIS NECK -- AND TOLD MR. WALKER HE WAS NOT GOING

23  TO LET GO UNTIL HE COULD HANDCUFF HIM.

24      Q.    LET'S GO BACK.

GABRIEL HUFFORD

Page 12

1          WHEN YOU SAY THE OFFICERS WERE HITTING

2     MR. WALKER.

3          A.    OKAY.

4          Q.    WHO WAS SPECIFICALLY HITTING HIM, AND WHERE

5     WAS HE SPECIFICALLY BEING HIT, AND WAS IT A CLOSED FIST,

6     OPEN FIST, THINGS OF THAT NATURE?

7          A.    OPEN FIST PUNCHES TOWARDS THE MIDDLE OF HIS

8     BACK.  HIS SPINE AREA.  HIS HEAD.

9          Q.    HOW MANY TIMES DID HE HIT HIM IN HIS LOWER

10    BACK?

11         A.    SEVERAL TIMES.  10 OR 15 TIMES.

12         Q.    HOW ABOUT THE BACK OF THE HEAD?

13         A.    SEVERAL TIMES, ALSO.  ABOUT 10 OR 15 TIMES.

14         Q.    JUST TO BE CLEAR.

15              WHICH OFFICER WAS THE ONE HITTING HIM?

16         A.    MAINLY, THE WHITE OFFICER.

17         Q.    SO, THIS WHOLE TIME IS MR. WALKER DOING

18    ANYTHING BESIDE LAYING THERE ON THE GROUND?

19         A.    MR. WALKER WAS SEVERAL TIMES JUST SAYING, WHY

20    ARE YOU DOING THIS?  I DID NOT DO ANYTHING WRONG.  WHY

21    ARE YOU ARRESTING ME?  STOP HITTING ME.

22         Q.    SO, YOU HAVE THE OFFICER HITTING HIM 10 TO 15

23    TIMES IN HIS LOWER BACK AND 10 TO 15 TIMES IN HIS HEAD?

24         A.    YES.  I DISTINCTLY REMEMBER HIM PULLING HIS

Page 13

1    HAND BACK AFTER HE PUNCHED IN HIS HEAD, SHAKING HIS HAND,

2    SAYING HE THOUGHT HE BROKE HIS HAND, AND THEN PULLING OUT

3    ANOTHER SET OF CUFFS AND SMACKING HIM.

4        Q.    HOW MANY TIMES DID HE SMACK HIM ON THE BACK OF

5    THE HEAD WITH THE CUFFS?

6        A.    THREE OR FOUR TIMES.

7        Q.    WHILE THE WHITE OFFICER IS PUNCHING HIM IN THE

8    BACK OF THE HEAD, WHAT IS THE BLACK POLICE OFFICER DOING?

9        A.    HE IS HOLDING THE HAND THAT IS CUFFED AND

10   TRYING TO GET THE OTHER HAND OUT.

11       Q.    WHO ELSE WAS IN THE AREA WHEN THIS HAPPENED?

12       A.    IT WAS, AT THIS TIME, IT WAS JUST ME AND

13   JOANNE MAGOWAN.

14       Q.    WHO IS JOANNE MAGOWAN?

15       A.    AT THAT TIME, SHE WAS THE NURSE FOR OUR

16   PROGRAM -- FOR ACT 1.

17       Q.    NOW, AFTER THE OFFICER IS HITTING HIM IN THE

18   HEAD WITH THE CUFFS, WHAT HAPPENS NEXT?

19       A.    MR. WALKER, BASICALLY, STARTED BLEEDING.  HE,

20   AT SOME POINT, I GUESS, COULD NOT HOLD HIS HAND ANYMORE.

21   BASICALLY, HIS HAND CAME OUT AFTER THE GUY STRUCK HIS

22   HEAD.  THE BLACK OFFICER STUCK HIS FINGERS ON THE

23   PRESSURE POINT ON HIS NECK.

24       Q.    WHERE WAS MR. WALKER BLEEDING FROM?

1        A.    FROM HIS HEAD.

2        Q.    NOW, WHEN YOU SAY THE OFFICER WAS PUNCHING HIM

3    IN THE BACK OF THE HEAD -- I'M SORRY -- PUNCHING HIM IN

4    THE HEAD AND HITTING HIM IN THE HEAD WITH THE CUFFS, WHAT

5    PART OF HIS HEAD WAS HE HITTING?

6        A.    TOWARDS THE BACK OF THE HEAD AND THE SIDE.

7    THE OFFICER THAT HIT HIM WITH THE HANDCUFFS WAS ON HIS

8    RIGHT-HAND SIDE.  SO, IT WOULD BE THE BACK TOWARDS THE

9    RIGHT.

10        Q.    WERE ALL OF THE PUNCHES TO THE HEAD,

11    BASICALLY, IN THE SAME AREA OF THE HEAD?

12        A.    YES.

13        Q.    AND THE HANDCUFFS, WERE THOSE IN THE SAME AREA

14    HE WAS BEING PUNCHED?

15        A.    SAME AREA.

16        Q.    AND EVENTUALLY, DID THEY GET MR. WALKER

17    CUFFED?

18        A.    YES.

19        Q.    WHAT HAPPENED AFTER THEY GOT HIM CUFFED?

20        A.    HE, BASICALLY, ASKED WHY THEY WERE DOING THAT.

21    THEY SAID, YOU HAVE TO GO TO THE HOSPITAL.  BUT FIRST,

22    YOU HAVE TO GO TO WILMINGTON AND GET CLEARED, GET

23    MEDICALLY CLEARED.

24        Q.    YOU SAID THEY MACED HIM, ALSO?

GABRIEL HUFFORD

Page 15

1      A.   YES.

2      Q.   WHEN DID THAT OCCUR?

3      A.   AFTER THEY WERE PUNCHING HIM, BEFORE THE

4   OFFICER STUCK HIS FINGERS IN HIS NECK.

5      Q.   AT ANY POINT DURING THIS WHOLE ALTERATION,

6   WHETHER BEFORE, DURING, OR AFTER, DID YOU SEE MR. WALKER

7   MAKE ANY AGGRESSIVE MOVEMENTS OR VIOLENT MOVEMENTS

8   TOWARDS THE POLICE OFFICER?

9      A.   NO.

10     Q.   AT ANY TIME PRIOR TO THIS EVENT, DURING, OR

11   AFTER THIS EVENT, DID YOU SEE MR. WALKER MAKE ANY, OR

12   HEAR MR. WALKER MAKE ANY VERBAL THREATS TO THE POLICE

13   OFFICERS?

14     A.   NO.

15     Q.   SO, ESSENTIALLY, IF I UNDERSTAND YOUR

16   TESTIMONY CORRECTLY, MR. WALKER WAS LAYING ON THE GROUND

17   WITH HIS ARMS UNDERNEATH HIM AND THE POLICE OFFICER DID

18   WHAT THEY DID WHILE THEY WERE LAYING THERE?

19     A.   YES.

20     Q.   DO YOU FEEL THAT BASED ON WHAT YOU SAW, THE

21   POLICE OFFICERS USED EXCESSIVE FORCE --

22     A.   YES.

23     Q.   I'M SORRY.  LET ME FINISH THAT QUESTION NOW.

24          DO YOU FEEL, AFTER SEEING WHAT YOU SAW,

GABRIEL HUFFORD

Page 16

1    DO YOU FEEL THAT THE OFFICERS USED EXCESSIVE FORCE IN

2    TRANSFERRING MR. WALKER FROM CONNECTIONS TO DELAWARE

3    PSYCHIATRIC CENTER?

4         A.    YES.

5         Q.    JUST FOR THE RECORD, FOR RECORD SAKE, THERE

6    ARE ONLY THREE PEOPLE IN ROOM RIGHT NOW, ME, MR. HUFFORD

7    AND THE COURT REPORTER.

8                   CORRECT?

9         A.    YES.

10        Q.    YOU ARE HERE OF YOUR OWN FREE WILL?

11        A.    YES.

12        Q.    YOU HAVE TAKEN AN OATH TO TELL THE TRUTH, THE

13   WHOLE TRUTH AND NOTHING BUT THE TRUTH?

14        A.    YES.

15                   MR. EDWARDS:  THANK YOU.  I HAVE NO

16   FURTHER QUESTIONS.

17                   (THE STATEMENT UNDER OATH WAS CONCLUDED

18   AT, APPROXIMATELY, 1:50 P.M.)

19

20

21

22

23

24

GABRIEL HUFFORD

Page 17

```
 1                      INDEX

 2

 3   DEPOSITION OF:  GABRIEL HUFFORD

 4

 5   EXAMINATION                           PAGE

 6

 7      EXAMINATION BY MR. EDWARDS            2

 8

 9

10

11

12        (NO EXHIBITS WERE MARKED AT THIS TIME.)

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    C E R T I F I C A T E                    Page 18

2     STATE OF DELAWARE:
                                  :
3     NEW CASTLE COUNTY:

4              I, GLORIA M. D'AMORE, A REGISTERED

5     PROFESSIONAL REPORTER, WITHIN AND FOR THE COUNTY AND

6     STATE AFORESAID, DO HEREBY CERTIFY THAT THE FOREGOING

7     STATEMENT UNDER OATH OF GABRIEL HUFFORD, WAS TAKEN BEFORE

8     ME, PURSUANT TO NOTICE, AT THE TIME AND PLACE INDICATED;

9     THAT SAID WITNESS WAS BY ME DULY SWORN TO TELL THE TRUTH,

10    THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH; THAT THE

11    TESTIMONY OF SAID WITNESS WAS CORRECTLY RECORDED IN

12    MACHINE SHORTHAND BY ME AND THEREAFTER TRANSCRIBED UNDER

13    MY SUPERVISION WITH COMPUTER-AIDED TRANSCRIPTION; THAT

14    THE STATEMENT UNDER OATH IS A TRUE RECORD OF THE

15    TESTIMONY GIVEN BY THE WITNESS; AND THAT I AM NEITHER OF

16    COUNSEL NOR KIN TO ANY PARTY IN SAID ACTION, NOR

17    INTERESTED IN THE OUTCOME THEREOF.

18              WITNESS MY HAND AND OFFICIAL SEAL THIS

19    27TH DAY OF FEBRUARY A.D. 2006.

20

21

22    GLORIA M. D'AMORE
      REGISTERED PROFESSIONAL REPORTER
23    CERTIFICATION NO. 119-PS

24

Page 1

1                    STATEMENT UNDER OATH

2

3

4    IN RE:  GERALD WALKER

5

6

7

8                    STATEMENT UNDER OATH OF JOANNE MAGOWAN

9    TAKEN PURSUANT TO NOTICE BEFORE GLORIA M. D'AMORE,

10   REGISTERED PROFESSIONAL REPORTER, IN THE LAW OFFICES OF

11   MURPHY, SPADARO & LANDON, 1011 CENTRE ROAD, SUITE 210,

12   WILMINGTON, DELAWARE, ON FRIDAY, FEBRUARY 10, 2006,

13   BEGINNING AT APPROXIMATELY 1:50 P.M., THERE BEING

14   PRESENT:

15

16   APPEARANCES:

17
                         MURPHY, SPADARO & LANDON
18                       BY:  PHILIP T. EDWARDS, ESQUIRE
                              1011 CENTRE ROAD, SUITE 210
19                            WILMINGTON, DELAWARE 19805
                         ATTORNEY FOR GERALD WALKER
20                       AND ALICE WALKER

21

22

23

24
                         CORBETT & WILCOX              B030

JOANNE MAGOWAN

Page 2

1          REGISTERED PROFESSIONAL REPORTERS
   1400 FRENCH STREET    WILMINGTON, DE 19801
2                (302) 571-0510
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                    JOANNE MAGOWAN, HAVING FIRST BEEN DULY

2      SWORN ACCORDING TO LAW, WAS EXAMINED AND TESTIFIED AS

3      FOLLOWS:

4      BY MR. EDWARDS:

5           Q.   MS. MAGOWAN, MY NAME IS PHILIP EDWARDS.  I AM

6      AN ATTORNEY FOR ALICE AND GERALD WALKER.  JUST A FEW

7      QUESTIONS HERE AT THE BEGINNING.

8                    ARE YOU HERE ON A VOLUNTARY TODAY?

9           A.   YES.

10          Q.   AND YOU ARE AWARE THAT YOU ARE HERE TO DISCUSS

11     AN INCIDENT THAT OCCURRED ON JULY 11, 2005 INVOLVING

12     GERALD WALKER AND CERTAIN MEMBERS OF THE WILMINGTON

13     POLICE DEPARTMENT?

14          A.   YES.

15          Q.   AND JUST FOR THE RECORD SAKE, IT IS ME, YOU,

16     MS. MAGOWAN, AND THE COURT REPORTER IN THE ROOM HERE

17     ALONE?

18          A.   YES.

19          Q.   YOU HAVE TAKEN AN OATH TO TELL THE TRUTH, THE

20     WHOLE TRUTH AND NOTHING BUT THE TRUTH?

21          A.   YES.

22          Q.   WOULD YOU STATE YOUR FULL NAME?

23          A.   JOANNE MAGOWAN.  515 DELAWARE AVENUE, ELKTON,

24     MARYLAND 21921.

JOANNE MAGOWAN

Page 4

```
 1        Q.    AND PLEASE STATE YOUR DATE OF BIRTH?

 2        A.    9/17/60.

 3        Q.    MS. MAGOWAN, ARE YOU EMPLOYED?

 4        A.    YES.

 5        Q.    WHERE?

 6        A.    CONNECTIONS.

 7        Q.    WHAT IS CONNECTIONS?

 8        A.    CONNECTIONS IS AN OUTPATIENT MENTAL HEALTH

 9    PROVIDER FOR MOST CHRONICALLY, MENTALLY ILL CLIENTS OR

10    PATIENTS IN NEW CASTLE COUNTY.

11        Q.    WHAT IS YOUR POSITION AT CONNECTIONS?

12        A.    I'M A PROGRAM DIRECTOR.  I'M ALSO A REGISTERED

13    NURSE.

14        Q.    HOW LONG HAVE YOU BEEN AT CONNECTIONS?

15        A.    ALMOST TWO YEARS.

16        Q.    HAVE YOU BEEN IN THAT SAME CAPACITY AT

17    CONNECTIONS YOUR WHOLE TIME THERE?

18        A.    JUST ABOUT.

19        Q.    WHAT EXACTLY DOES YOUR JOB ENTAIL AT

20    CONNECTIONS?  WHAT DO YOU DO?

21        A.    I OVERSEE TWO LICENSED PRACTICAL NURSES, AS

22    WELL AS A TEAM OF CASE MANAGERS.  WE OVERSEE, OR I

23    PERSONALLY OVERSEE 127 CLIENTS TO MAKE SURE THAT ALL OF

24    THEIR CARE IS PROVIDED FOR THEM, AS FAR AS HOUSING,
```

JOANNE MAGOWAN

Page 5

1    FINANCIAL, MEDICAL, PSYCHIATRIC, INCOME, SOCIAL, SPORTS,

2    ABILITY TO FUNCTION IN THE COMMUNITY.  WE HELP THEM TO

3    OBTAIN RESOURCES IN THE COMMUNITY, A WIDE RANGE OF

4    THINGS, AND MAKE SURE THE CASE MANAGERS ARE ACTUALLY OUT

5    THERE DOING THAT.

6         Q.   AND IN YOUR CAPACITY WORKING AT CONNECTIONS,

7    DID YOU COME TO KNOW AN INDIVIDUAL NAMED GERALD WALKER?

8         A.   YES.

9         Q.   HOW DID YOU KNOW GERALD WALKER?

10        A.   GERALD WALKER WAS ONE OF OUR CLIENTS.  WE

11   MANAGED HIM DAILY WITH MEDICATION.  MANAGED HIS

12   PSYCHIATRIC MEDS, AS WELL AS HIS MEDICAL MEDICINES, HIS

13   DIABETES, HIS HYPERTENSION.

14        Q.   WHY IS MR. WALKER A PATIENT AT CONNECTIONS?

15        A.   MR. WALKER IS A PATIENT AT CONNECTIONS BECAUSE

16   HE REQUIRES A LEVEL OF CARE, BASICALLY, HELPING TO ASSIST

17   THE FAMILY TO MAINTAIN HIM IN THE HOME AT THAT POINT.

18   AND TO MAKE SURE THAT HE STAYED PSYCHIATRICALLY STABLE

19   AND THAT HE STAYED MEDICALLY STABLE.

20        Q.   AND WHAT TYPE OF MENTAL ILLNESS DOES

21   MR. WALKER SUFFER FROM?

22        A.   I THINK IT'S PARANOID SCHIZOPHRENIA.

23        Q.   IF YOU REMEMBER, WHEN WAS THE FIRST TIME YOU

24   CAME INTO CONTACT WITH MR. WALKER?

JOANNE MAGOWAN

Page 6

1        A.    PROBABLY, JUNE OF 2004.

2        Q.    AND THE FIRST TIME YOU MET MR. WALKER, WHETHER

3    THROUGH REVIEWING HIS MEDICAL RECORDS OR OWN PERSONAL

4    EXPERIENCE WITH HIM, HAVE YOU EVER KNOWN HIM TO BE A

5    VIOLENT INDIVIDUAL?

6        A.    NO.

7        Q.    HAVE YOU EVER HEARD ANYTHING FROM ANY MEMBER

8    OF HIS FAMILY OR ANYBODY ELSE THAT MR. WALKER WAS A

9    VIOLENT PERSON OR ENGAGED IN VIOLENT ACTIVITIES?

10        A.    NO.

11        Q.    WERE YOU AT CONNECTIONS ON JULY 11, 2005?

12        A.    YES, I WAS.

13        Q.    DID MR. WALKER COME UNDER YOUR CARE, UNDER THE

14    CARE OF CONNECTIONS ON JULY 11, 2005?

15        A.    YES.

16        Q.    WHY DID HE COME UNDER YOUR CARE ON JULY 11,

17    2005?

18        A.    WE HAD A REPORT FROM HIS WIFE THAT SHE WAS

19    FEELING A LITTLE NERVOUS HAVING GERALD IN THE HOUSE.

20    THERE WERE A COUPLE OF DIFFERENT SITUATIONS THAT HAD

21    TAKEN PLACE THE NIGHT BEFORE.  SHE WANTED HIM TO BE

22    PSYCHIATRICALLY ASSESSED, SO WE HAD HIM BROUGHT INTO THE

23    OFFICE TO BE ASSESSED.

24        Q.    AND WHAT WAS THE RESULT OF THAT ASSESSMENT?

JOANNE MAGOWAN

Page 7

1          A.    THE RESULT OF THE ASSESSMENT WAS, WE MADE

2    ARRANGEMENTS FOR HIM TO BE AN INPATIENT AND THAT HE WAS

3    GOING TO HAVE TO GO BACK TO THE PSYCHIATRIC HOSPITAL.

4          Q.    CAN YOU, PLEASE, DESCRIBE, IN GENERAL, WHAT

5    THE PROCESS IS TO PUT A PATIENT, OR MAKE A PERSON GO AS

6    AN INPATIENT TO THE DELAWARE PSYCHIATRIC CENTER FROM

7    CONNECTIONS?

8          A.    THERE ARE A COUPLE OF DIFFERENT PROCESSES.

9    BUT FOR GERALD, GERALD DID NOT WANT TO GO TO THE

10   PSYCHIATRIC HOSPITAL.  HE KNEW THAT HE WAS GOING TO HAVE

11   TO GO.  HE DID NOT WANT TO GO.

12                OUR PROCEDURE, TYPICALLY, WOULD BE TO

13   CALL THE STATE OF DELAWARE, NOTIFY THEM OF WHAT THE

14   DOCTOR'S ASSESSMENT WAS -- WHAT OUR ASSESSMENT WAS.  THEY

15   WOULD THEN TELL US WHICH HOSPITAL HE WOULD HAVE TO GO TO.

16   AND FOR GERALD, IT WAS FOR THE DELAWARE PSYCHIATRIC

17   HOSPITAL.  AT THAT TIME, MY BOSS AND I, THROUGH THE

18   DOCTOR, DETERMINED THAT IT WOULD NOT BE A GOOD IDEA TO

19   PUT GERALD INTO ONE OF THE CONNECTIONS VEHICLES BECAUSE

20   HE DID NOT WANT TO GO.  SO, WHAT WE DID, WE CALL THROUGH

21   DISPATCH TO THE WILMINGTON POLICE AND ASK THEIR

22   ASSISTANCE TO GET HIM TO THE HOSPITAL.

23         Q.    YOU SAID HE DID NOT WANT TO GO.

24                DID HE EVER BECAME VIOLENT OR AGGRESSIVE

JOANNE MAGOWAN

Page 8

1    IN ANY WAY SAYING HE DID NOT WANT TO GO?

2        A.    NO.  HE JUST SAID, I DON'T WANT TO GO.

3        Q.    WHEN YOU SAY YOU HAD CONCERNS ABOUT PUTTING

4    HIM IN THE CONNECTIONS VEHICLES, WERE THOSE CONCERNS

5    ABOUT HIM BECOMING VIOLENT IN SOME WAY?

6        A.    NO.  TRYING TO GET HIM INTO THE VEHICLE.

7        Q.    SO, ULTIMATELY, THE DETERMINATION WAS MADE

8    THAT HE WAS GOING TO HAVE TO BE TAKEN TO THE DELAWARE

9    PSYCHIATRIC HOSPITAL THROUGH THE POLICE?

10       A.    YES.

11       Q.    AND WERE THE POLICE ULTIMATELY CALLED TO COME

12   TO TAKE GERALD AWAY?

13       A.    WE HAD CALLED AND A FEMALE POLICE OFFICER CAME

14   TO THE HOSPITAL.  SHE TALKED WITH GERALD.  SHE STAYED

15   WITH HIM UNTIL OTHER POLICE OFFICERS CAME.  SHE TRIED HER

16   BEST TO TRY TO VERBALLY COERCE HIM INTO GOING TO THE

17   HOSPITAL.  HE WAS NOT AN AGGRESSIVE ASSAULTIVE.  HE DID

18   NOT CURSE AT HER OR ANYTHING ELSE LIKE THAT.  BUT SHE

19   KNEW HE WAS ADAMANT AND SAT IN THE CHAIR AND DID NOT GO.

20   SHE, AT THAT TIME, CALLED FOR SOME ASSISTANCE.

21       Q.    WHAT WAS THE GENERAL TONE OF THE OFFICER AT

22   THAT POINT?  WAS SHE AGGRESSIVE OR MAKE ANY VIOLENT

23   GESTURES TOWARDS HIM?

24       A.    NO.  SHE WAS VERY CALM.  VERY NICE.  NO.  NO

JOANNE MAGOWAN

Page 9

1    AGGRESSIVE BEHAVIOR AT ALL WHATSOEVER.

2         Q.    SHE ULTIMATELY CALLED FOR BACKUP?

3         A.    YES.

4         Q.    WHAT HAPPENED WHEN SHE CALLED FOR BACKUP?

5         A.    TWO OFFICERS DID COME.  AND THEY TALKED WITH

6    GERALD.  GERALD SAID HE WAS NOT GOING TO THE HOSPITAL.

7    AT THAT TIME --

8         Q.    I'M SORRY TO CUT YOU OFF.

9               DESCRIBE THE TWO MALE OFFICERS?

10        A.    IF I'M CORRECT, ONE WAS A WHITE MALE.  THE

11   OTHER WAS A LIGHT SKIN, BLACK MALE.  BOTH OF THEM WERE

12   ABOUT THE SAME SIZE AS GERALD.

13        Q.    WHAT HAPPENED WHEN THEY GOT THERE?

14        A.    WHEN THEY GOT THERE, GERALD SAID HE WASN'T

15   GOING TO GO.  HE GOT UP AND WALKED OVER TO THE HALLWAY

16   AND SAID HE WASN'T GOING TO GO.  GERALD WAS VERY CALM.

17   THE OFFICERS KIND OF JUST LOOKED AT EACH OTHER.  THE

18   FEMALE OFFICER STAYED OFF TO THE SIDE.  AND THE TWO

19   OFFICERS, THEY LITERALLY GRABBED HIM, THREW HIM TO THE

20   GROUND, IN A VERY SMALL AREA IN A DOORWAY.  JUST THREW

21   HIM TO THE GROUND.

22        Q.    AND WHAT HAPPENED?  AND BEFORE THEY THREW HIM

23   TO THE GROUND, DID MR. WALKER MAKE ANY AGGRESSIVE OR

24   VIOLENT GESTURES TOWARDS THE POLICE OFFICERS?

JOANNE MAGOWAN

Page 10

1    A.  NO.

2    Q.  BEFORE THEY THREW HIM TO THE GROUND, DID HE

3  MAKE ANY VERBAL THREATS TO THE POLICE OFFICERS?

4    A.  NO.  HE JUST HAD A HOLD OF HIS ARMS IN FRONT

5  OF HIS CHEST.

6    Q.  SO, WHAT HAPPENED AFTER THEY THREW HIM TO THE

7  GROUND?

8    A.  THEY THREW HIM ON THE GROUND.  ONE, I THINK,

9  HAD HIS KNEE IN HIS BACK.  THE OTHER ONE HAD A KNEE UP BY

10  HIS SHOULDER.  THEY WERE TRYING TO PULL HIS ARMS OUT FROM

11  UNDERNEATH OF HIM.  THEY COULDN'T.  THEY LITERALLY JUST

12  POUNDED HIM IN HIS HEAD.  THEY WERE FISTING, PUNCHING HIM

13  IN THE HEAD.

14    Q.  WHEN YOU SAY THAT, WERE BOTH OFFICERS PUNCHING

15  HIM IN THE HEAD?

16    A.  YES.

17    Q.  LET'S START WITH THE WHITE OFFICER FIRST.

18        WHERE ON GERALD'S BODY DID THE WHITE

19  OFFICER PUNCH HIM?

20    A.  I CAN'T TELL YOU.  THEY BOTH WERE.  THERE WERE

21  USING FISTS.  EVERYTHING FROM ABOVE THE SHOULDER TO THE

22  TOP OF THE HEAD AND THE SIDE OF THE FACE.  JUST ALL

23  AROUND THE HEAD AREA HITTING HIM.

24    Q.  WHEN YOU SAY "HITTING HIM," WERE THEY HITTING

JOANNE MAGOWAN

Page 11

1    HIM WITH AN OPEN OR CLOSED FIST?

2         A.    CLOSED FIST.

3         Q.    WERE THEY HITTING HIM HARD?

4         A.    A COUPLE OF TIMES, HIS HEAD, I GUESS, AS ONE

5    WOULD HIT, IT WOULD KIND OF BOUNCE UP AND THE NEXT ONE

6    WOULD HIT, AND YOU WOULD HEAR HIS HEAD HITTING THE FLOOR

7    AND CRASHING THE FLOOR.  IT WAS TERRIBLE.

8         Q.    HOW MANY TIMES WOULD YOU SAY THE OFFICERS

9    PUNCHED HIM IN THE HEAD?

10        A.    I WOULD SAY COMBINED TOGETHER, AT LEAST, EIGHT

11   TIMES.  EIGHT OR NINE TIMES.  IT WAS REPETITION.  JUST

12   CONSTANT PUNCHING.

13        Q.    AND IS THAT ALL THEY HIT HIM WITH IS THEIR

14   FIST?

15        A.    THAT'S ALL I SAW THEM HITTING WAS WITH THE

16   FIST.  I KIND OF STARTED TO BACK AWAY A LITTLE BIT AND

17   WALKED AROUND TO THE OTHER DIRECTION JUST TO KIND OF KEEP

18   AN EYE ON GERALD TO LOOK TO SEE IF THERE WAS BLOOD OR

19   ANYTHING LIKE THAT.  THEY JUST KEPT KIND OF SHOVING HIM

20   AND STILL TRYING TO WORK HIS ARMS OUT.  EACH TIME THEY

21   TRIED TO PULL HIS ARMS OUT, THEY WOULD HIT HIM IN THE

22   HEAD AND FACE AGAIN.  AND THEN, EVENTUALLY, FINALLY, THEY

23   PULLED OUT A CAN OF MACE AND SPRAYED HIM IN THE FACE,

24   POINT BLANK, LITERALLY.

JOANNE MAGOWAN

Page 12

1      Q.   WHAT HAPPENED AFTER THEY SPRAYED HIM IN THE

2    FACE?

3      A.   AFTER THAT, I THINK ONE OF HIS HANDS, HE KIND

4    OF PULLED OUT, AND THEY WERE ABLE TO THEN GRAB HIS ARMS

5    APART AND HANDCUFF HIM.  BUT THAT WAS KIND OF AFTER

6    SHOVING HIM INTO THE WALL A COUPLE OF TIMES.  IT WAS

7    TERRIBLE.

8      Q.   SO, EVENTUALLY THEY GOT HIM CUFFED?

9      A.   YES.  EVENTUALLY THEY GOT HIM CUFFED.

10      Q.   AT ANY POINT DURING THIS ASSAULT, DID

11    MR. WALKER MAKE ANY AGGRESSIVE MOVEMENTS OR TRY TO FIGHT

12    BACK WITH THE POLICE OFFICERS?

13      A.   NO.  HE KEPT CRYING, I DON'T WANT TO GO TO THE

14    HOSPITAL.

15      Q.   AND HE DID NOT MAKE ANY AGGRESSIVE MOVEMENTS

16    TOWARD THE POLICE OFFICERS AT ALL?

17      A.   NO.

18      Q.   HE DID NOT TRY TO FIGHT THEM?

19      A.   NO.  WHY ARE YOU DOING THIS TO ME?  I DON'T

20    WANT TO GO TO THE HOSPITAL.

21      Q.   DID HE MAKE ANY VERBAL THREATS TO THE POLICE

22    OFFICER WHILE ON THE FLOOR?

23      A.   NOT AT ALL.

24      Q.   DID YOU, AT ALL, EVER SEE ANY BLOOD AS A

Page 13

1    RESULT OF THIS?

2         A.   THE ONLY THING, AND I WAS TRYING TO REMEMBER

3    BACK, WAS JUST HIS FACE, HE JUST HAD SO MUCH, I GUESS,

4    FROM BEING SPRAYED, SPIT AND SNOT.  HIS EYES WERE WATERY.

5    THERE WAS FLUID EVERYWHERE.  I DON'T RECALL HAVING SEEN

6    ANY BLOOD.  COME TO THINK, THERE WAS BLOOD ON THE FLOOR

7    AFTER THEY LEFT.  WE HAD TO CLEAN THE BLOOD.

8         Q.   BASED ON YOUR TIME AT CONNECTIONS, DO YOU FEEL

9    THAT THE POLICE OFFICERS ACTED IN AN ACCEPTABLE WAY IN

10   TAKING HIM OUT OF CONNECTIONS?

11        A.   NO.  NOT ACCEPTABLE AT ALL.

12        Q.   DO YOU FEEL THE POLICE OFFICERS USED EXCESSIVE

13   FORCE IN TRYING TO BRING MR. WALKER FROM CONNECTIONS TO

14   THE DELAWARE PSYCHIATRIC CENTER?

15        A.   VERY EXCESSIVE.

16        Q.   AFTER THE ALTERCATION OCCURRED, DID YOU SPEAK

17   WITH THE POLICE OFFICERS AT ALL?

18        A.   NO.

19        Q.   DID ANYBODY ELSE AT CONNECTIONS SPEAK WITH THE

20   POLICE OFFICERS?

21        A.   NOT THAT I RECALL.

22        Q.   WAS THERE ANYBODY ELSE THERE IN THE ROOM

23   BESIDE YOU AND THE POLICE OFFICERS AND MR. WALKER?

24        A.   I THINK IT WAS JUST MYSELF, GABRIEL HUFFORD,

JOANNE MAGOWAN

Page 14

1   THE FEMALE POLICE OFFICER AND THE TWO MALE POLICE

2   OFFICERS. I DON'T BELIEVE THERE WAS ANYBODY ELSE UP

3   THERE. BASICALLY, WE CLEARED THE AREA OUT, IF SOMEONE IS

4   GOING TO BE TAKEN OUT BY POLICE FOR THEIR EMBARRASSMENT.

5        Q.   HAD ANYBODY TOLD YOU, OR ARE YOU AWARE OF

6   ANYBODY TELLING THE POLICE OFFICER BEFORE THIS HAPPENED

7   THAT MR. WALKER WAS A VIOLENT PERSON?

8        A.   NO.

9        Q.   HAVE YOU HAD ANY OTHER ALTERCATIONS? HAVE YOU

10  EVER HAD ANY INSTANCES PRIOR TO THIS WHEN MR. WALKER HAD

11  BECAME VIOLENT UPON BEING TRANSFERRED TO THE DELAWARE

12  PSYCHIATRIC CENTER?

13       A.   NO.  WE TRANSPORTED HIM OURSELVES PREVIOUS

14  TIMES.

15       Q.   IS THIS THE FIRST TIME YOU CALLED THE POLICE

16  FOR MR. WALKER?

17       A.   YES.

18       Q.   JUST LET ME ASK YOU THIS.

19            DO YOU KNOW ANY OF THE POLICE OFFICERS'

20  NAMES THAT WERE INVOLVED IN THIS?

21       A.   NO.

22       Q.   ARE YOU SURE THEY WERE FROM THE WILMINGTON

23  POLICE DEPARTMENT?

24       A.   YES.  FROM WILMINGTON POLICE DEPARTMENT.

JOANNE MAGOWAN

Page 15

1               MR. EDWARDS:  THANK YOU VERY MUCH.

2    THAT'S ALL I NEED TO ASK YOU.

3               (THE STATEMENT UNDER OATH WAS CONCLUDED

4    AT, APPROXIMATELY, 2:00 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 16

```
 1                        INDEX

 2

 3   DEPOSITION OF:  JOANNE MAGOWAN

 4

 5   EXAMINATION                           PAGE

 6

 7      EXAMINATION BY MR. EDWARDS           2

 8

 9

10

11

12         (NO EXHIBITS WERE MARKED AT THIS TIME.)

13

14

15

16

17

18

19

20

21

22

23

24
```

JOANNE MAGOWAN

```
 1              C E R T I F I C A T E

 2    STATE OF DELAWARE:
                        :
 3    NEW CASTLE COUNTY:

 4              I, GLORIA M. D'AMORE, A REGISTERED

 5    PROFESSIONAL REPORTER, WITHIN AND FOR THE COUNTY AND

 6    STATE AFORESAID, DO HEREBY CERTIFY THAT THE FOREGOING

 7    STATEMENT UNDER OATH OF JOANNE MAGOWAN, WAS TAKEN BEFORE

 8    ME, PURSUANT TO NOTICE, AT THE TIME AND PLACE INDICATED;

 9    THAT SAID WITNESS WAS BY ME DULY SWORN TO TELL THE TRUTH,

10    THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH; THAT THE

11    TESTIMONY OF SAID WITNESS WAS CORRECTLY RECORDED IN

12    MACHINE SHORTHAND BY ME AND THEREAFTER TRANSCRIBED UNDER

13    MY SUPERVISION WITH COMPUTER-AIDED TRANSCRIPTION; THAT

14    THE STATEMENT UNDER OATH IS A TRUE RECORD OF THE

15    TESTIMONY GIVEN BY THE WITNESS; AND THAT I AM NEITHER OF

16    COUNSEL NOR KIN TO ANY PARTY IN SAID ACTION, NOR

17    INTERESTED IN THE OUTCOME THEREOF.

18              WITNESS MY HAND AND OFFICIAL SEAL THIS

19    27TH DAY OF FEBRUARY A.D. 2006.

20

21

22    GLORIA M. D'AMORE
      REGISTERED PROFESSIONAL REPORTER
23    CERTIFICATION NO. 119-PS

24
```

## D.P. VAN BLARICOM, INC.
MPA, FBI-NA, CHIEF of POLICE (Ret.)
*POLICE PRACTICES EXPERT*
835 - 91st LANE N.E.
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX 453-3263   E-Mail dvbinc@aol.com

**Federal Rule 26 (a) (2) (B)**
**REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT**
**May 14, 2007**

1. My name is D. P. Van Blaricom and I make this report on behalf of plaintiff in the matter of ***Walker, et al. v. City of Wilmington, et al.*** under my file 06-1297.

2. My law enforcement career has spanned over forty-nine years of active employment to date:

   a. Twenty-nine years of continuous police service, during which I was Chief of Police in the City of Bellevue, Washington for the last eleven of those years;

   b. Thereafter, I have been engaged as a police practices consultant for an additional twenty years.

3. A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include, but are not limited to: police use of force; police administration, policies, practices, procedures and standards of care; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defense throughout the United States.

4. I was retained by Philip T. Edwards on June 26, 2006 to review the facts and circumstances of Gerald H. E. Walker (plaintiff) having been forcibly taken into custody by City of Wilmington Police Department (WPD) Officers Shawn Gordon, Michael Ballard and Karen Buhrman on July 11, 2005. At the time of making this report I have discussed the matter with plaintiffs' counsel and I have reviewed the following documents:

   a. Amended Complaint;

   b. Answer;

   c. WPD reports 30-05-065432;

   d. Statements Under Oath:

      1) Gabriel Hufford,

      2) Joanne Magowan;

    e.  Depositions:
1) Officer Shawn Gordon,
2) Officer Michael Ballard,
3) Officer Karen Buhrman,
4) Sergeant Thomas Kane,
5) Joanne Magowan.

5. It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a police reviewing authority. In conducting that evaluation I apply:

    a.  My training and experience as a career police officer, who was required to take the mentally ill into involuntary custody for psychological evaluation and treatment in the performance of my law enforcement duties;

    b.  My training and experience as a police supervisor, who was assigned to conduct internal investigations;

    c.  My training and experience as a police supervisor and commander, who was assigned to train police officers on patrol procedures, use of force and police approach to the mentally ill;

    d.  My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

    e.  My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, terminate police officers;

    f.  My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;

    g.  My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;

    h.  My continuing education and training, as is supplemented by an ongoing review of professional publications that address contemporary developments in my areas of expertise;

    i.  Additionally, I have served as a police practices expert in 1,300+ matters of police-related litigation (see Exhibit "A"), wherein I have often testified in deposition and/or at trial (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

6. My use of certain terms (i.e. – *"reasonable suspicion", "probable cause", "objectively reasonable", "deliberately indifferent", "ratified"*, etc.) merely reflects my training, in applying reasonable standards of care to officers' conduct, and does not presume or imply a statement of any legal opinion.

7. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered opinion that the following facts are uncontroverted:

    a.  Plaintiff was mentally ill and had decompensated;

b.  Those afore going facts were known to the officers;

c.  Plaintiff had neither verbally nor physically threatened the officers;

d.  Plaintiff's only reaction, after being suddenly *"grabbed"* by Officers Gordon and Ballard, was to *"tense up and pull away"*;

e.  Plaintiff sustained serious trauma to his head.

8.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered opinion that plaintiff was subjected to objectively unreasonable excessive force by Officers Gordon and Ballard.  In reaching that conclusion, I was specifically mindful of the following information from the record:

a.  All of the information previously described herein;

b.  Officer Gordon testified in his deposition that he admittedly:

1)  Took plaintiff to the floor, "within a *"couple of minutes"* of his arrival, causing plaintiff to fall on his back and Officer Ballard on top of him,

2)  Punched plaintiff in the stomach, at least and possibly more than twice,

3)  Punched plaintiff *"once or twice"* in the face *"to get his attention"*,

4)  Sprayed plaintiff with oleoresin capsicum (aerosol pepper);

c.  Officer Ballard testified in his deposition that he admittedly:

1)  Was *"head-butting* him (plaintiff)*, at least two or three times"*,

2)  Also struck plaintiff in the face,

3)  Also sprayed plaintiff with oleoresin capsicum (aerosol pepper),

d.  Although Officer Ballard claims that plaintiff had him in a *"headlock"*, from which he was trying to extricate himself:

1)  His fellow officers, who were focused on plaintiff too, would have *"absolutely"* had to have seen such occur but did not,

2)  The reports of the incident would have *"absolutely"* had to have included any such fact but did not,

3)  In fact, being placed in a *"headlock"* by plaintiff is never raised as an issue until Officer Ballard offers that totally unsupported explanation, for at least some of his conduct, in his own defense at his deposition;

e.  Officer Ballard additionally testified in his deposition that:

1)  Officer Gordon is *"probably one of the strongest human beings I've ever met"*,

2)  Officer Gordon picked up both he and plaintiff and *"threw us"* to the floor, where plaintiff landed on his back with Officer Ballard on top of him,

f.  Officer Buhrman testified in her deposition:

1)  Her only participation was she *"restrained his* (plaintiff's) *legs"*,

2)  Officer Gordon had commented, *"We don't have all day"* and he then made physical contact with plaintiff;

g.  Officer Buhrman failed, however, to intervene in the excessive force being used against plaintiff by her fellow officers,

4

   h. Gabriel Hufford, a mental health professional (MHP) on the scene, has sworn to what he witnessed:

     1) Both Officers Gordon and Ballard *"maced him"* (plaintiff) and *"hit him repeatedly"*,

     2) The *"white officer* (Gordon) *hit him* (plaintiff) *and thought he had broke his hand, and pulled out another set of handcuffs and hit Mr. Walker in the back of the head several times"* - - this would be the equivalent of using handcuffs as brass knuckles to deliver potentially fatal head strikes and is seemingly consistent with plaintiff's head injury,

     3) Both officers, but *"mainly the white officer"* (Gordon), punched plaintiff *"10 or 15 times"* in his *"spine area"* and *"about 10 or 15 times"* to *"the back of the head"*,

     4) Plaintiff *"started bleeding ---- from his head"*,

     5) Plaintiff had never made any verbal or physical threats to the officers and repeatedly asked them, *"Why are you doing this?"*,

   i. Joanne Magowan, a MHP on the scene, has testified to what she witnessed:

     1) Plaintiff kept his arms crossed over his chest, until he was handcuffed, and never wrapped his arms around Officer Ballard or presented any other threat to the officers,

     2) Officers Gordon and Ballard *"literally grabbed him* (plaintiff), *threw him to the ground"*,

     3) Both officers *"literally just pounded him* (plaintiff) *in his head"* by punching with their fists,

     4) As the officers were repeatedly striking plaintiff, *"You would hear his head hitting the floor and crashing the floor"*,

     5) Plaintiff did not try to fight and only asked, *"Why are you doing this to me?"*,

     6) After the officers left with plaintiff, *"We had to clean the blood"* off of the floor.

  9. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered opinion that the WPD's internal investigation of this incident failed to meet a reasonable standard of care. In reaching that conclusion, I was specifically mindful of the following information from the record:

   a. The incident was reported to Sergeant Kane and he was obligated to conduct a through investigation of their use of force;

     1) Contrary to accepted police practices, he interviewed Officers Gordon and Ballard together, thereby enabling them to provide a common narrative,

     2) His investigation simply relied upon the officers' written reports to be factual and neither sought nor considered any information that was inconsistent therewith,

5

      3) Although he was certain that he had prepared the required report of his investigation, any such report has inexplicably disappeared;

  b. Although Joanne Magowan was a witness to the incident, she was never interviewed;

  c. He is really too busy with other supervisory responsibilities to conduct *"in-depth"* interviews and, although he could have turned the matter over to the Office of Professional Standards for a more thorough investigation, he did not;

  d. He has conducted many such use of force investigations but has never found an officer to have used excessive force and, consistent with that past practice, he concluded, *"The officers involved followed departmental policies and used proper conduct"* and the WPD has conducted no further investigation of this incident;

  e. Accordingly, the WPD has ratified the objectively unreasonable excessive force that was used against plaintiff, as previously described herein, to have been within the custom, policy and practice of the WPD.

10.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, the WPD was deliberately indifferent to training officers in how to approach the mentally ill. In reaching that conclusion, I was specifically mindful of the following information from the record:

  a. All of the officers and their sergeant have testified in their depositions:

      1) It is a commonplace duty for them to take the mentally ill into custody for psychological evaluations,

      2) They can recall no training whatsoever in how to conduct that routinely assigned task;

  b. Officer Gordon's deposition testimony is illustrative of that lack of training:

      1) When repeatedly asked how he was trained to take the mentally ill into custody, he repeatedly replied, *"You put them in handcuffs and place them in the vehicle"*,

      2) He further explained that they went *"hands on"* to forcibly **take** plaintiff into custody after a *"couple minutes"* because, *"How long is enough time to make somebody who does not want to go anywhere long enough?"*

  c. Clearly, these officers had not received such critical training, as that provided by California's Peace Officer Standards and Training on Police Response to People with Mental Illness (2002) that appropriately instructs:

      1) *"Time is on your side"*,

      2) *"It's better to spend 15 minutes talking than 15 minutes fighting"*;

  d. Additionally, that same and not untypical publication notes that the Americans with Disabilities Act (ADA), *"Requires that the safety and civil rights of people with disabilities be protected during transport and while detained"*;

6

e.  The failure of the WPD to provide adequate training and enable these officers to safely take a mentally ill person into custody for psychological evaluation was more probably than not a proximate cause of plaintiff's injury:

1) It is a fundamental and statutory duty of WPD officers to routinely take the mentally ill into involuntary custody and transport them for psychological evaluation,

2) As a matter of police practice, adequately trained chief policy makers of American police departments are taught and have long been well aware, *"It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"* – Canton v. Harris, 489 U.S. 378, 109 S. Ct. (1989).

11.  I am prepared to testify to these opinions in deposition or at trial if called upon to do so.

12.  If I am provided with further documentation for my review, I may have additional opinions.

D. P. VAN BLARICOM

# EXHIBIT "A"

## D. P. VAN BLARICOM, INC.
### MPA, FBI-NA, CHIEF OF POLICE (RET.)
#### *POLICE PRACTICES EXPERT*
835 91ST LANE NORTHEAST
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082  FAX (425) 453-3263  E-Mail dvbinc@aol.com

## SUMMARY of QUALIFICATIONS

A. Retained as a police practices expert by both plaintiffs and defendants in over **1,300** lawsuits alleging police liability throughout the United States: AK, AL, AZ, CA, CO, DC, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MD, ME, MI, MN, MO, MS, MT, ND, NE, NJ, NM, NV, NY, OH, OK, OR, PA, SC, SD, TX, UT, VA, WA, WI and WY.

B. Testified in several hundred depositions, federal court trials, state court trials and arbitrations.

C. Prevailing parties' police practices expert in published appellate decisions for the United States 1st, 6th, 8th, 9th and 10th Circuits; State Supreme Courts of AZ, CO, ID, MT, MS, OR and WA; Appeals Courts of AZ, CA, FL and WA.

D. Recognized as an expert on the issues of:

1. **POLICE USE of FORCE** (plaintiff's expert in leading 9th Cir. Davis v. Mason County, WA 1991, a consultant to federal prosecution task force in United States v. Koon, et al. 1993, a plaintiff's expert in Rodney King v. City of Los Angeles, CA 1994, defendants' expert in 1st Cir. Roy v. City of Lewiston, ME 1994, defendants' expert in WA App. Lee v. City of Spokane, WA 2000, plaintiff's expert in 9th Cir. Haugen v. City of Puyallup, WA 2003, plaintiff's expert in 9th Cir. Wilkins v. City of Oakland, CA 2003, plaintiff's expert 9th Cir. Marsall v. City of Portland, OR 2004, plaintiff's expert in 8th Cir. Craighead v. City of St. Paul, MN 2005 and plaintiff's expert in 9th Cir. Davis v. City of Las Vegas, NV 2007).

2. **LESS-LETHAL ALTERNATIVES to DEADLY FORCE in BOTH EQUIPMENT and TACTICS** (plaintiff's expert in the 9th Cir. Reed v. Hoy 1989 and ID S.Ct. Kessler v. Payette County and State of ID 1997);

3. **POLICE K-9s as USE of FORCE** (quoted in Deadly Force: What We Know 1992 and plaintiff's expert in FL App. Pacot v. Wheeler 2000);

4. **CONTROL of POLICE VEHICULAR PURSUIT and EMERGENCY DRIVING** (my policy was recommended by the Public Risk and Insurance Management Association of Washington, D.C. as being among the 4 best in the United States 1984, quoted by 2 CA App. Payne v. City of Perris 1993 and Berman v. City of Daly City 1993, OR S.Ct. Lowrimore v. Marion County 1990, MS S.Ct. Mosby v. Jeffries 1998 and CO S.Ct. Tidwell v. City & County of Denver 2003);

5. **POLICE ADMINISTRATION and POLICY;**

6. **POLICE PRACTICES, PROCEDURES and STANDARDS of CARE** (plaintiff's expert in 9th Cir. Gulliford v. Pierce County 1998 and defendant's expert in 6th Cir. Carter v. City of Detroit 2005);

7. **SPECIAL DUTIES to PROTECT and 911 RESPONSES** (plaintiffs' expert in WA S.Ct. Bailey v. Town of Forks 1987, Roy v. City of Everett 1992, AZ S.Ct. Hutcherson v. City of Phoenix 1998, MT S.Ct. Nelson v. Driscoll 1999, leading 9th Cir. Wood v. Ostrander 1988 and 9th Cir. Kennedy v. City of Ridgefield 2005);

8. **DOMESTIC VIOLENCE** (quoted by the National Law Enforcement Policy Center in their model policy 1991 and plaintiff's expert in 9th Cir. Beier v. City of Lewiston 2004);

9. **POLICE RESPONSE to the MENTALLY ILL** (plaintiff's expert 9th Cir. Gibson v. Washoe County 2002, US MD PA Schorr v. Borough of Lemoyne 2003 and Hererra v. City of Las Vegas 2004);

10. **CIVIL RIGHTS VIOLATIONS** (under 42 U.S.C. § 1983);

11. **RESTRAINT ASPHYXIA** (plaintiff's expert in 10th Cir. Cruz v. City of Laramie 2001 and AZ App. Oscielowski v. City of Benson 2003);

12. **POLICE INTERNAL INVESTIGATION and DISCIPLINE**;

13. **DISCRIMINATORY ENFORCEMENT or EMPLOYMENT PRACTICES**;

14. **AMERICANS with DISABILITIES ACT** (plaintiff's expert in 10th Cir. Davoll v. City of Denver 1996, 9th Cir. Cripe v. City of San Jose 2001 and US MD PA Schorr v. Borough of Lemoyne 2003);

15. **POLICE COLLECTIVE BARGAINING**;

16. **FIREARMS** (USMC trained small arms repair MOS 2111 and police firearms instructor); and

17. **PRIVATE SECURITY PRACTICES** (plaintiff's expert in US WD WA Groom v. Safeway).

E. Served 29 years in municipal policing with the last 11 as Chief of Police (until retirement and election to the City Council) in Bellevue, Washington - the State's then fourth largest and fastest growing city.

F. Directed development of a progressive police department and created several model programs, including: control of vehicular pursuits, alternatives to deadly force, fully integrated emergency response team operations, domestic violence reduction, affirmative action employment of minorities and women, comprehensive crime prevention, lateral recruitment of experienced officers, police canine operations, multi-city narcotics unit and others. Additionally, co-authored the Washington State Standards on Internal Discipline of Law Enforcement agencies.

G. Served on many professional commissions and committees, including: Washington Criminal Justice Education & Training Center Steering Committee, Bellevue Community College Local Advisory Council and Chairman Law Enforcement Program Advisory Board, Washington Attorney General's Committee on Security and Privacy, consultant to U.S. Department of Justice Community Relations Service, consultant to the National Consultation on Safety and Force, intern with 94th Congress, Governor's appointee to Community Task Force for Corrections Development, Washington State Council on Crime & Delinquency's Adult Criminal Policy Committee and Ad Hoc Committee on Board of Prison Terms/Paroles, Youth Eastside Services Board of Trustees, Eastside Community Mental Health Center Advisory Board, King County Executive's appointee to E911 Task Force, U.S. Attorney's Law Enforcement Coordinating Committee, Governor's appointee to Select Committee for Police/Fire Pension Review, IACP's

Education & Training Committee, IACP's Organized Crime Committee, Assessor Team Leader for 1 of 5 Pilot Projects of the Commission on Accreditation for Law Enforcement Agencies, Governor's appointee to the Emergency Commission on Prison Overcrowding, IACP book reviewer, Suburban Cities Association's Jail Advisory Committee, Governor's Advisory Group on Personal Harassment, Portland, Oregon Chief's Committee on Police Use of Force.  Assisted the appointing authorities at various times in selecting Chiefs of Police for Cities of Longview, Everett, Bellingham, Richland, Bremerton, Kirkland, Redmond, Clyde Hill, Kent (1991), Bellevue (1996) a Sheriff of King County and the Security Administrator of Seattle City Light (all in the State of Washington), King County Regional Justice Center Citizens Site Advisory Committee, Solutions To Tragedies of Police Pursuits Advisory Board, Superintendent of Public Instruction's Washington State Safe Schools Advisory Committee, King County Civil Rights Commission.

H. Hold a security clearance from the U. S. Government.

I. Maintain an extensive and current library of standards, policies, procedures, references, depositions and information on other experts with subscription services to update professional and legal developments in my areas of expertise.

## EDUCATION and CERTIFICATION

University of Washington - Bachelor of Arts degree with magna cum laude honors l973
Seattle University - Master of Public Administration degree 1976
**University of Washington – Certificate in Forensics 2000**
**Americans for Effective Law Enforcement – Certified Police Litigation Specialist 2003**
Graduate of the FBI's National Academy and Law Enforcement Executive Development programs

## CONTINUING TRAINING

Police Civil Liability AELE 1987, Deadly Force and the Police Officer NWU 1987, Police Liability for Policies and Practices AELE 1988, PR-24 Side Handle Baton BPD 1988, Police Civil Liability AELE 1989, Sexual Harassment and the Consequences FS 1989, Wrongful Discharge RIMS 1989, Police Practices and Use of Expert Witnesses AELE 1989, Expert Witnesses, Litigation Consultants and Attorneys NFS 1989, Police Discipline and Labor Problems AELE 1990, Assessment Center Selection Process HRA 1991, Rodney King Incident and Policing SWLEI 1992, Role of Expert Witnesses in the 1990's SEAK 1992, Critical Liability Issues AELE 1992, Pursuit Driving and Managing Use of Force ILM 1992, AFIS Live ID HP 1993, Police/Medical Investigation of Death IACP 1993, Medical Records Review for the Legal Professional PES 1994, Developing Policies, Procedures and Rules NLEPC 1994, Civil Rights Trial Advocacy ATLA 1994, Family Violence and Police Policy SLEI 1995, Investigation of Excessive Force Incidents IACP 1995, Police Civil Liability and Defense of Misconduct Complaints AELE 1996, Use of Force and Pursuit Driving Policies SLEI 1996, Critical Incident Dispatching NWU 1996, Police Officer Survival Tactics NWU 1997, Police Civil Liability AELE 1998, Criminal Justice WSBA 1999, Critical Incident Trauma and Legal Survival CP 1999, Traffic Stops and Racial Profiling PI 2001, Racial Profiling NWU 2001, Police Liability LES 2002, Cap-Stun ZARC 2002, Masters in Trial ABOTA 2002, Discipline and Internal Investigations AELE 2003, Critical Incident Response Management and Liability AELE 2003, Police Civil Liability AELE 2003, Police-Involved Shooting Reconstruction NWU 2004, Police Liability AELE 2005,

Shooting Reconstruction AAFS 2005, Police Misconduct Litigation SULS 2005, Use of Force TASER 2006, Lethal and Less-Lethal Force AELE 2006, TASER AAFS 2006, Excited Delirium SPD 2007.

## TEACHING and TRAINING EXPERIENCE

Taught law enforcement courses at the Bellevue Police Academy, Washington Criminal Justice Education and Training Center, Bellevue Community College, Seattle University, Northwestern University's Traffic Institute and International City Management Association's Training Institute. Lectured on police-related issues before the University of Washington School of Law and Graduate School of Public Affairs, Simon Fraser University, American Civil Liberties Union, Washington State Bar, Seattle-King County Bar, Washington State Court Administrators, Washington Association of Legal Secretaries, American G. I. Forum, United States Justice Department Community Relations Service, National Institute of Law Enforcement and Criminal Justice, U. S. Attorney General's Task Force on Family Violence, Montana Department of Social and Rehabilitation Services, Washington Advisory Committee to the U.S. Commission on Civil Rights, American Society of Criminology, debated California Highway Patrol Commissioner on police pursuit before National Association of Police Planners and International Association of Police Planning and Research Officers in 1990, Labor Relations Information System, City of Bellevue's Management Certificate Training Program, lectured for Association of Trial Lawyers of America's Civil Rights Section and the National College of Advocacy on excessive force from the expert's perspective in 1994 and domestic violence litigation liability arising from failure of prevention and response in 1995, lectured on loss protection civil liability to Nordstrom Washington/Alaska Region in 1997, demonstrated expert witness testimony to the American Board of Trial Advocates in 2002. Additionally, served on the Law Enforcement Education Advisory Committee to the Washington State Board for Community College Education in developing their statewide curriculum, achieved the first college accreditation of a Basic Law Enforcement Academy in the State of Washington and currently serve on the Bellevue Community College Administration of Criminal Justice Program Advisory Board, testified before the California State Senate on police vehicular pursuit in 2005, testified before the City of Oakland Citizens' Police Review Board on police vehicular pursuit policy in 2007.

## PUBLICATIONS

"Recruitment and Retention of Minority Race Persons as Police Officers" in September 1976 issue of The Police Chief magazine, "An Overview of Police Service Today" in the April 18th and May 2nd, 1978 issues of Law Enforcement News, "Kids Meet Cops Through Basketball Trading Card Program" in the July 9th, 1979 issue of Law Enforcement News, "A Police Chief's View of Deadly Force" in the National Institute of Law Enforcement & Criminal Justice January 1979 booklet on Police Use of Deadly Force, "Career Development: The Next Step to Police Professionalism" in the November 1979 issue of The Police Chief magazine, "Crime Prevention Cuts Insurance Cost" in the August 1980 issue of Center City Report, "A Sensible Alternative to Those High-Speed Chases" in the November 25, 1980 issue of The Seattle Times, "Chiefs Should Chase Sane Pursuit Driving Guidelines" in the December 22, 1980 issue of Law Enforcement News, "Commercial Crime Prevention Can Earn Discounts" in the February 1981 issue of the FBI Law Enforcement Bulletin, "Enforcing Malicious Harassment Laws" in the January 1983 edition of Washington Council on Crime and Delinquency News, "Reducing Crime, Traffic Accidents - Bellevue Shows It Can Be Done" in the

May 10, 1983 issue of <u>The Seattle Times</u> and the June 27, 1983 issue of <u>Law Enforcement News</u>, "Carrying A Gun - It Depends On You" in the February 3, 1985 issue of the <u>Journal-American</u>, "When To Use Deadly Force" in the Winter 1985 issue of the <u>Washington Law Enforcement Executive Journal</u>, "Domestic Violence - A New Approach to an Old Problem" in the June 1985 issue of <u>The Police Chief</u> magazine, "It's Time for Police To Re-Examine Their Role In Society" in the October 1, 1989 issue of <u>The Seattle Times</u>, "Shaking The Pillars of Police Tradition" in the October 31, 1989 issue of <u>Law Enforcement News</u>, "Training-The First Hundred Years" in <u>Law Enforcement In Washington State: The First Hundred Years 1889-1989</u>, "K-9 Use of Force:  A Biting Example of Questionable Policy" in the July/August 1992 issue of <u>Law Enforcement News</u>, "Police Pursuit: Uncontrolled Deadly Force" in the February 28, 1993 issue of <u>Law Enforcement News</u>, Bulletin Alert on a "Hair-raising Comb" in the June 1994 issue of the <u>FBI Law Enforcement Bulletin</u>, "Excessive Force - The Expert's Perspective" in the Association of Trial Lawyers of America July 1994 Annual Convention Reference Materials Volume I, "Domestic Violence Litigation: Liability Arising from Failure of Prevention and Response" in the Association of Trial Lawyers of America July 1995 Annual Convention Reference Materials Volume I, "Shades of Blue: What White Police Officers Can - and Must - Learn from Minority Officers" in the January/February 1996 of the Police Executive Research Forum's <u>Subject to Debate</u>, "Doing Something About Excessive Force" in the January 15, 1998 issue of <u>Law Enforcement News</u> (republished by San Diego State University 2003), "The Consistent Law Enforcement Expert" in the November/December 1998 issue of <u>The Forensic Examiner</u>, "To Pursue or Not to Pursue: THAT is the Question" in the November 1998 issue of <u>Police</u>, "Handling the Mentally Ill" in the March 2000 issue of <u>Police</u>, "Building a Bridge" in the September 30, 2000 (25th Anniversary) issue of <u>Law enforcement News</u>, "The Media: Enemies or Allies?" in the April 2001 issue of <u>The Police Chief</u>, "Control of Police Vehicular Pursuit" in the 2004 (1) issue of <u>Law Enforcement Executive Forum</u>, "Preventing Officer-Involved Deaths of the Mentally Ill" in the Third Quarter 2004 issue of <u>The Law Enforcement Trainer</u>, "Suicide-by-Cop" in the September-October 2006 issue of <u>American Cop</u>.

## NATIONAL TELEVISION and RADIO APPEARANCES

NBC Nightly News special report on the dangers of police vehicular pursuit.
NBC Today Show:
1. Personal protection against criminal attack;
2. Misuse of pepper spray to punish.
NBC *"You Be The Judge"* on the dangers of police vehicular pursuit.
NPR *"Cops and the Mentally Ill".*

## QUOTED in MAJOR NEWSPAPERS

<u>USA Today</u>, <u>Wall Street Journal</u>, <u>The New York Times</u>, <u>The Baltimore Sun</u>, <u>Los Angeles Times</u>, <u>San Francisco Chronicle</u>, <u>The Seattle Times</u>, <u>The Oregonian</u>, <u>Toronto Sun</u>, <u>The Virgin Island Daily News</u> ("Deadly Force" won ABA's 2004 Silver Gavel Award), <u>The Tennessean</u>, <u>Christian Science Monitor</u>, <u>Milwaukee Journal Sentinel</u>.

## PROFESSIONAL MEMBERSHIPS

**American Academy of Forensic Sciences (AAFS)**, International Association of Chiefs of Police (IACP) - Life Member, Americans for Effective Law Enforcement (AELE), FBI National Academy Associates, Washington Association of Sheriffs & Police Chiefs (WASPC) - Life Member, International Association of Directors of Law Enforcement Standards and Training (IADLEST), Police Marksman Association (PMA).

## AWARDS

USMC Expert Rifleman 1953-1956, FBI "Possible Club" 1970 (of the 19,130 police officers who attended the FBI National Academy during the 50 years from when it started to the year of my retirement in 1985, I was 1 of only 165/.0086% who fired a perfect score on the PPC or TRC), Appreciation from the Drug Enforcement Administration 1977, Outstanding Community Service from Bellevue Jaycees 1979, Human Rights (Implementing Law and Order with Justice) from Baha'i Communities of Bellevue and Eastside 1980, Youth Service from the Chief Seattle Council of the Boy Scouts of America 1983, Program Innovation from the King County Domestic Violence Coalition 1983, Support and Service from Bellevue Cadet Squadron Auxiliary USAF 1984, Law Enforcement Appreciation from the Puget Sound Chapter of the American Society for Industrial Security (presented by the Governor of the State of Washington) 1984, Outstanding Volunteer Service from the Salvation Army 1984, Outstanding Service as a Public Official Citizenship Award from the Bellevue Kiwanis Club 1985, Appreciation from the United States Secret Service 1986, **Award for Public Service from The U.S. Department of Justice 1986**, Recognition for 30 Years of Public Service from the City of Bellevue 1986, Recognition and Commendation Resolution by the Municipality of Metropolitan Seattle 1988, Appreciation for Service from the Woodland Park Zoo Bond Oversight Committee 1990, Appreciation for Service from the King County Executive 1992, Appreciation for Personal Contribution to Developing Bellevue Convention Center from the City of Bellevue 1993, Outstanding Support of the Arts (jointly with wife) from the City of Bellevue Arts Commission 1993, Commendation for Outstanding Service from the City of Bellevue 1997.

EXHIBIT "B"

**D.P. VAN BLARICOM, Inc.**
*POLICE PRACTICES EXPERT*
835 - 91ST LANE N.E.
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX 453-3263   E-Mail dvbinc@aol.com

_____

TAX ID 91-1437291

# SCHEDULE OF FEES FOR SERVICES

Retainer ................................................................... $ 2,000.00
Hourly....................................................................... $   295.00
Daily ........................................................................ $ 2,950.00
**Deposition: <u>MINIMUM</u>** ..................................... $ 1,500.00
**Over 4 hours @ hourly rate thereafter**
**up to 10 hours <u>INCLUDING TRAVEL</u>**
Expenses.................................................................    Actual

B059

## EXHIBIT "C"

**D. P. VAN BLARICOM, Inc.**
MPA, FBI-NA, CHIEF OF POLICE (RET.)
*POLICE PRACTICES EXPERT*
835 91st LANE NORTHEAST
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX (425) 453-3263   E-Mail dvbinc@aol.com

## COMPLIANCE WITH FEDERAL RULE OF PROCEDURE 26 (a) (2) (B) TESTIMONY AT TRIAL OR DEPOSITION FOR PRECEDING 4 YEARS

**99**-843 *Treloar v. Custer County*, 7th Judicial Circuit SD 99-016, testified at trial 6/24/03;

**00**-860 *Mendez v. Los Angeles County*, US Central District CA CV98-4047 CM (CWx), gave deposition 8/22/03 & testified at trial 10/15/03;

00-890 *Thomas v. City of Detroit*, US Eastern District MI Southern Division 00-72899, gave deposition 9/12/02;

**01**-913 *Williams v. Jerome County*, US District ID CIV 02-0375-S-EJL, gave deposition 12/4/03;

01-944 *Flanary v. City of Kelso*, US District Western WA C03-5092RBL, gave deposition 12/28/04 & testified at trial 4/27/05;

01-947 *Sonntag v. City of Spokane*, US District Eastern WA CS-01-0033-WFN, testified at trial 3/13/02;

01-953 *Beier v. City of Lewiston*, US District ID CV99-244-N-EJL, testified at trial 9/14/04;

01-959 *Carter v. City of Detroit*, US Eastern District MI Southern Division 01-71847, gave deposition 9/12/02;

01-960 *Harbin v. City of Detroit*, US Eastern District MI Southern Division 01-73259, gave deposition 9/12/02;

01-961 *Washington v. City of Detroit*, US Eastern District MI Southern Division    01-71848, gave deposition 9/12/02;

01-966 *Wilkins v. City of Oakland*, US Northern District CA C 01-1402 MMC, gave deposition 2/28/06;

**02**-971 *Holloway v. Leeper*, Sheridan County, NE CI 01-26, gave deposition 7/11/02;

02-975 *Lowery v, City of Portland*, US District OR CV 01 1014 ST, testified at trial 9/24 & 25/03;

2

02-976 *Kinkele v. City of Anacortes*, US Western District WA C03-2559L, gave deposition 4/26/04;

02-985 *Isaacson v. Pierce County*, Pierce County, WA 03 2 061986, gave deposition 2/4/04;

02-986 *Hunt v. Whitman County*, US District Eastern WA CS-03-0119-FVS, gave depositions 4/14/05 & 9/13/05;

02-990 *Brown v. City of Chicago*, US Northern District IL Eastern Division 98 C 7949, gave deposition 5/13/05;

02-993 *Bailey/Carsey* (consolidated) *v. Town of Wilkeson*, Pierce County, WA 99-2-08030-6, gave deposition 9/2/03 & testified at trial 11/6/03;

02-1001 *Parris v. State of WA*, Spokane County, WA 02-2-07367-5, gave deposition 5/27/04 & testified at trial 10/4/04;

02-1026 *Blanford v. Sacramento County*, US Eastern District CA CIV-S-01-2068 GEB GGH, gave deposition 6/30/03;

02-1030 *Yellowhair v. City of Tempe*, US District AZ CIV 00-0374-PHX-SMM, gave deposition 4/16/03;

02-1031 *Perez v. City of Long Beach*, Los Angeles County CA, gave deposition 12/2/03 & testified at trial 12/9/03;

**03**-1034 *Howard v. City of Shreveport*, US Western District LA CV-01-2303, testified at trial 5/20/04;

03-1038 *Hudgins v. City of Albany*, US District OR 02-6040-TC, testified at trial 5/9/05;

03-1039 *Kapanak v. City of Phoenix*, Maricopa County, AZ CV 2001-012136, gave deposition 8/29/03 & testified at trial 12/15-16/05;

03-1041 *Parker v. City of North Las Vegas*, US District NV CV-S-00-1118-RLH-RJJ, testified at trial 1/26/04;

03-1044 *Morgan v. King County, King County*, WA 02-2-03793-3KNT, testified at trial July 28-29, 2003;

03-1045 *Sutton v. MS Highway Patrol*, US Southern District MS 3:02CV478LN, testified at trial 2/10/04;

03-1051 *Ramirez v. City of Phoenix*, US District AZ CIV 02 1904 PHX DKD, gave deposition 9/8/03 & testified at trial 5/5/05;

03-1055 – *Kanae v. Hawaii County*, US District HI 02-00399 SOM/LEK, gave deposition & videotape trial testimony 11/13/03;

03-1061 *Bishop v. City of Inglewood*, Los Angeles County, CA YC 042754, gave deposition 6/9/03 & testify at trial 11/12/03;

B061

3

03-1063 *Gregory v. Maui County*, US District HI CV 04-0051416 SPK KSC, gave deposition 11/29/05 & 1/13/06;

03-1065 *Replinger v. Maricopa County*, Maricopa County, AZ CV2003-011295, testified at trial 8/15/05;

03-1068 *Esparza v. Los Angeles County*, Los Angeles County, CA VC 036746, gave deposition 8/22/03 & testified at trial 9/18/03;

03-1069 *Lehman v. City of Gresham*, US District of OR CV 03 327, testified at trial 3/2/05;

03-1071 *Lehman v. City of Reno*, US District NV CV-N-02-0651-ECR-RAM, gave deposition 2/25/04;

03-1079 *Fakhry v. City of Corona*, US Central District Eastern Division CA CV02-4777 JFW (Shx), gave deposition 10/24/03 & testified at trial 10/6/04;

03-1080 *Arnold/Logan v. City of Pullman*, US Eastern District WA CS-04-0214-FVS, gave deposition 1/31/06 & testified at trial 1/10/07;

03-1082 *Duran v. Town of Cicero*, US Northern District Eastern Division IL 01 C 6858, gave deposition 10/10/03;

03-1084 *Byrd v. City of Long Beach*, Los Angeles County NC 031823, gave deposition 2/23/04 & testified at trial 3/23/04;

03-1085 *Sandahl v. Klickitat County*, US Eastern District WA CY-03-3083-LRS, gave deposition 9/22/04;

03-1086 *Ashley v. City of Seattle*, King County, WA 05-2-04447-1SEA, gave deposition 8/15/06 & testified at trial 1/9/07;

03-1088 *Stuter v. Stevens County*, US Eastern District WA CS-02-0266-JLQ, gave deposition 2/5/04;

03-1090 *Gilbert v. Maui County*, US District HI CV 03-00489 HG BMK, gave deposition 6/25/04 & testified at trial (live video) 4/5/06;

03-1106 *Singleton v. Charleston County*, Charleston County, SC 2004-CP-10-678, gave deposition 8/21/05;

03-1108 *Jolley v. Town of Lovell*, US District WY 03-CV-1061B, gave deposition 8/24/04;

03-1109 *Green v. City of Cleveland*, US Northern District Eastern Division OH 1:03CV0906, gave deposition 5/6/04;

03-1111 *Reeves v. Churchich*, US Central District UT 2-01-CV 176, gave deposition 3/15/04;

4

**04**-1116 *McDaniel v. City of Aberdeen*, US Western District WA C03-5306RJB, gave deposition 4/6/04;

O4-1118 *Waterman v. State of WA*, Snohomish County, WA 04-2-09517-2, gave deposition 10/11/05 & testified at trial 11/9/05;

04-1119 *Bledsoe v. Jefferson County*, US Western District WA CV 03-5002 RJB, gave deposition 6/23/04;

04-1124 *Boyer v. City of Albuquerque*, US District of NM CV 03-997 JB/WDS, gave deposition 4/1/05;

04-1126 *Gutierrez v. City of Tolleson*, US District AZ CIV 03-1808-PHX-RHC, gave deposition 9/20/04;

04-1127 *Venturelli v. Anaconda-Deer Lodge County*, Anaconda-Deer Lodge County DV-02-69, gave deposition 9/23/04;

04-1128 *Laedeke v. City of Billings*, US District MT CV 02-85-BLG-RWA, testified at trial 12/14/05;

04-1129 *Drypen v. Oakland County*, US Eastern District MI Southern Division 03-74161, gave deposition 1/5/05;

04-1132 *Kembel v. City of Kent*, King County, WA 03-2-24712-O KNT, gave deposition 12/6/04 & testified at trial 6/14/05;

04-1133 *Bucher v. Toole County*, Butte-Silver Bow County, MT DV-03-129, gave deposition 1/19/05;

04-1136 *Porter v. City of Auburn*, US Western District WA C03-2662, gave deposition 7/13/04;

04-1137 *Shellbe v. City of West Linn*, US District OR 03-CV-274-RE, testified at trial 10/12/04;

04-1138 *Hepner v. Washoe County, NV*, US District NV, CV-N-03-0618-ECR-RAM, gave deposition 5/1/07;

04-1139 *Kerns v. USA*, US District AZ CV'04 1937 NVW, testified at trial (by video) 12/12/06;

04-1140 *Oziwo v. Town of Paradise Valley*, US District AZ CV-03-1793 PHX MHM, gave deposition 8/17/04;

04-1143 *Pickens v. City of Austin*, US Western District TX A-04-CA-340-LY, gave deposition 12/1/05 & testified at trial 1/25/06;

04-1146 *Curtis v. Pima County*, Pima County, AZ C2004-4354, gave deposition 3/9/06 - 6/5/06 & testified at trial 8/17/06;

B063

5

04-1147 *Ali v. City of Louisville*, US Western District KY 3:03CV-427-R, gave deposition 2/11/05;

04-1148 *Berry v. City of Antioch*, US District Northern CA C02-3862CW, gave deposition 9/17/04;

04-1150 *Caudillo v. City of Phoenix*, Maricopa County, AZ CV 2002-004519, gave deposition 1/27/05 & testified at trial 5/24/05;

04-1153 *Ross v. Los Angeles County*, Los Angeles County TC 016365, gave deposition 9/21/04 & testified at trial 10/19/04, 10/21/04 & 3/16/05;

04-1155 *Johnson v. Pierce County*, Pierce County, WA 06-2-06365-7, gave deposition 2/26/07;

04-1156 *Brooks v. City of Washougal*, Clark County, WA 03-2-03935-1, gave depositions 9/16/05 & 4/14/06;

04-1157 *Weigel v. State of WY*, US District WY 04-CV-00355-J, gave deposition 6/16/05;

04-1160 *Mueller v. City of Tacoma*, Pierce County, WA 03-2-03603-5, gave deposition April 20, 2005;

04-1161 *Gardner v. City of Durango*, US District CO 03-F-1662 (BNB), gave deposition 12/3/04;

04-1162 *Vasquez v. City of Phoenix*, US District AZ CIV-04-0481-PHX-EHC/05-608-PHX-ROS, gave deposition 8/23/05 & testified at trial 11/3/06;

04-1163 *Adams v. City of Mission*, US Southern District TX M-03-092, testified at trial 1/25/05;

04-1165 *Ellis v. Snohomish County*, Snohomish County 03-2-12986-9, gave deposition 8/18/05;

04-1166 *Burke v. City & County of San Francisco*, San Francisco County, CA C-02-4311, gave deposition 9/17/04 & testified at trial 4/11/05;

04-1168 *Tangaro v. County of Hawaii*, US District HI 03-00211 DAE/LEK, gave 2 depositions 5/2/05 & testified at trial in *State v. Tangaro*, 3rd Circuit, HI 5/11/06;

04-1171 *Miller v. City of Sparks*, US District NV CV-N-03-0678-ECR-VPC, testified at trial 2/8/06;

04-1174 *English v. City of Casper*, US District WY 04-CV-176D, gave deposition 4/12/05 & testified at trial 11/2/05;

04-1175 *Thurman v. Kent County*, US Western District MI, 1:05-CV-0177, gave deposition 3/6/06;

6

04-1178 *Randle v. Klickitat County*, Klickitat County, WA 02-2-00065-2, gave deposition 2/9/05

04-1180 *Critchett v. City of Chandler*, Maricopa County, AZ CV2004-004389, gave deposition 7/19/06;

04-1181 *Murry v. Tiki Bob's*, King County, WA 05-2-05966-4SEA, gave deposition 1/18/07;

<u>05</u>-1188 *Scissons v. USA*, US District ID 03-0531-S-EJL, gave deposition 9/19/05 & testified at trial 10/19/06;

05-1189 *Byther v. City of Mobile*, US Southern District AL 04-0404-CG-B, gave deposition 4/25/05;

05-1190 *OCC v. Nelson*, City & County of San Francisco, CA Office of Citizen Complaints, testified at hearing 3/8/05;

05-1191 *Loomis v. City of Puyallup*, US Western District WA C02-5417 RJB, gave deposition 3/14/05;

05-1193 *Volk v. Pierce County*, US District Western WA C04-55315 RBL, gave deposition 6/2/05;

05-1197 *Kaina v. County of Maui*, US District HI, CV 04-00608 DAE/LEK, gave deposition 1/12/06;

05-1199 *Ballard v. State of Oregon*, Linn County 001570, testified at trial 3/17/05;

05-1201 *Police Pursuits*, CA State Senate, testified at hearing 3/9/05;

05-1202 *Harrington v. City of Napa*, US Northern District CA C04 0958 JSW, gave deposition 4/21/05 & testified at trial 8/16/05;

05-1203 *Mehlberg v. City of Henderson*, US District NV CV-S-04-0837-HDM-RJJ, gave deposition 5/20/05;

05-1204 *Garcia v. City of Las Vegas*, US District NV CV-S-03-1247 RLH-PAL, gave deposition 6/3/05;

05-1206 *Pipkin v. Burlington Northern & Santa Fe Railway*, US District Western WA C04-5591 RJB, gave deposition 8/9/05;

05-1207 *Rohm v. State of MI*, US District Western MI 1:04-CV-552, gave deposition 10/13/05;

05-1208 *Armstrong v. Kitsap County*, US District Western WA 04-5461 RBL, gave deposition 7/31/06;

05-1213 *Buchanan v. Walla Walla County*, US District Eastern WA CV 04-5136-AAM, gave deposition 9/27/05;

7

05-1214 *Nawrocki v. City of Dearborn Heights*, US Eastern District MI 04-CV-74869-DT, gave deposition 8/29/05;

05-1217 *Aderele v. City of Culver City*, Los Angeles County, CA BC320803, gave deposition December 9, 2005;

05-1218 *Bolio v. City of Phoenix*, Maricopa County, AZ CV2002-024936, gave deposition May 4, 2006;

05-1221 *Simpson v. City of Orting*, US District Western WA C04-5302FDB, gave deposition 8/8/05;

05-1222 *Gonzalez v. Pierce County*, US District Western WA C04-5303 RJB, gave deposition 5/20/05;

05-1223 *Bundy v. City of Tacoma*, US District Western WA C04-5535 FDB, gave deposition 7/18/05;

05-1226 *Yellow Boy v. City of Rapid City*, 7th Circuit of SD 01-832, gave deposition 8/5/05 & testified at trial 9/20/05;

05-1229 *Patric v. City of Austin*, US Western District TX A-05-CA-022LY, gave deposition 11/30/05 & testified at trial 2/15/06;

05-1230 *Knight v. City of Phoenix*, Maricopa County, AZ CV 2004-007325, gave deposition 8/24/05;

05-1231 *Glassburn v. Thurston County*, Mason County, WA 05-2-00293-3, gave deposition 7/13/06;

05-1236 *Gagner v. Lamb Estate*, Thurston County, WA 04-2-01994-7, gave deposition 9/8/05;

05-1240 *Thornton v. State of MI*, Lenawee County, MI 04-1749-NZ, gave deposition 6/2/06;

05-1243 *Howell v. City of Prescott*, US District AZ CIV-04 2280 PCT FJM, testified at trial 4/26/06;

05-1246 *Reed v. City of Long Beach*, Los Angeles County, CA NC 036292, gave deposition 9/29/05 & testified at trial 10/5/05;

05-1252 *Castaneda v. Douglas County*, US District NV CV-N-05-0283-HDM-RAM, gave deposition 3/10/06;

05-1253 *Stiffarm v. City of Pullman*, US Eastern District WA CV 044-0414-EFS, gave deposition 12/22/05;

05-1258 *Hayden v. City of Lake Oswego*, US District OR 05-00460-PA, testified at trial 12/7/05;

8

05-1263 *Butler v. Thurston County*, Mason County, WA 04-2-01099-7, gave deposition 2/11/06;

05-1264 *Butler v. Vermilion County*, US Central District IL 04-CV-2048, gave deposition 3/16/06;

05-1266 *Larrigan v. City of Glendale*, Los Angeles County, CA EC038890, gave deposition 1/10/06;

**06**-1268 *Tubar v. City o Kent*, US District Western WA C05-1154 JCC, gave deposition 7/6/06;

06-1271 *Beaupre v. Pierce County*, King County, WA 04-2-23610-0 SEA, gave deposition 3/8/06;

06-1276 *Akpik v. North Slope Borough*, AK 2nd Judicial District Barrow, gave deposition 6/9/06;

06-1282 *Brown v. Carson City*, US District NV at Reno CV-N-04-0109-LRH-VPC, testified at trial 3/30/06;

06-1283 *Coffelt v. City of Glendale*, US District AZ CV 04-1384-PHX-JWS, gave deposition 1/24/07;

06-1289 *Marino v. Santa Clara County*, Santa Clara County, CA 1-05-CV-038539, gave deposition 3/7/07;

06-1290 *Wilder v. Black Hawk County*, Black Hawk County, IA LACV095184, gave deposition 6/15/06;

06-1295 *Yanez v. City of Bullhead City*, US District AZ CV 05-4180-PCT-MHM, gave deposition 12/11/06;

06-1304 *Gibbons v. Las Vegas Metro*, US District NV CV-S-05-0728-RCJ-RJJ, gave deposition 12/1/06;

06-1312 *Cain v. City of St. Johns*, US District AZ CIV-05-1659-PCT-SMM, gave deposition 11/27/06;

06-1317 *Passmore v. City of Spokane*, Spokane County, WA 06-2-00775-6, testified at trial 2/28/07;

06-1325 *Grundhauser v. Lewis*, US District WY 06-CV-118-J, gave deposition 4/25/07;

06-1326 *Parris v. City of Kansas City*, US Western District MO 4:06-cv-00097-SWH, gave deposition 1/19/06;

06-1332 *Martinez v. City of Oxnard*, US Central District CA CV 98-9313, gave deposition 3/23/07 & testified at trial 4/11/07;

07-1334 *Howard v. City of Winslow*, Navajo County, AZ CV20050533, gave deposition 4/19/07;

B067

9

<u>07</u>-1339 *Beardsley v. City of North Las Vegas*, US District NV CV-S-05-0549-RLH-LRL, gave deposition 3/5/07;

07-1341 *Kinkle v. Marshall County, MS*, US northern District MS 3:06CV73-B-A, gave deposition 4/30/07.

## TOTAL TESTIMONY
## 4 Years Preceding May 14, 2007

**NEUROLOGY ASSOCIATES, P.A.**
774 Christiana Road
Suite 201
Newark, DE 19713
(302) 731-3017

May 30, 2007

Roger Landon, Esquire
1011 Centre Rd. Suite 210
Wilmington, DE 19805

RE:   GERALD WALKER
DOB:  05/09/1946
ACCT #: 11560

Dear Mr. Landon:

I reviewed records regarding Gerald Walker at your request. The following summary includes notes from Delaware Psychiatric Center, Christiana Emergency Department, Wilmington Hospital, Dr. Villars, Dr. Sugarman, social worker notes, nursing notes, notes from Dr. Yalamanchili, and a variety of imaging studies.

**REVIEW OF RECORDS:** The patient was evaluated 7/11/05 at Christiana Emergency Department. The patient was noted to be agitated. He had been transferred by the police department. He apparently had been stunned. Witnesses at the time noted that the patient was at Connections, an outpatient Psychiatric Facility and it was determined that the patient had to be sent to Delaware Psychiatric Hospital (DPC). The patient had to be transported by the police as per protocol but Mr. Walker refused to go and sat down in a chair. The officer called for back up and two officers arrived at Connections and asked Mr. Walker to allow himself to be handcuffed. The patient stood and was thrown down to the floor by the policemen. Mr. Walker's head hit the wall on the way to the floor. The patient continued to resist by putting his hands underneath him and the officers were said to have struck the patient repeatedly in the head and arms and back with their fists. Apparently Mr. Walker was also hit with a pair of steel handcuffs. Mr. Walker was also sprayed with mace. His initial ER assessment showed a contusion on his left cheek. His Glasgow Coma Score was 15. He complained of pain at a 10 out of 10.

The patient was subsequently transferred DPC 7/11/05. The admission sheet noted that the patient had a bruised left eye and a mark on his left shoulder. His chief complaint was that somebody put "the computer in his head to destroy it". He was noted to have very slurred speech and was difficult to understand. He was noted to have been preoccupied with a computer in his head and his granddaughter. He was noted to be pacing and delusional and said "the computer was sending messages". He stated that he resisted arrest by the police because he thought he was not mentally ill. His medications at the time included Abilify, Isoptin, Lasix, Cogentin, and Zyprexa. The patient was noted to have a past medical history of hypertension, diabetes, peripheral vascular disease, and orthostatic hypotension. Physical examination revealed a small cut on the left shoulder and left periorbital swelling. The patient stated that "the computer was trying to get him in trouble" and could read his mind. He was brought to the Delaware Psychiatric Center in handcuffs. The patient was evaluated by the nurse 7/12/05 and the patient was noted to be irritable in the morning and sleeping during the day. The patient was seen by the resident at this facility 7/13/05 and his speech was said to be not understandable at times. The patient was sent for an x-ray of the orbits 7/13/05. It shows slight swelling of the left maxillary soft tissue but no fracture.

The patient's blood pressure was up the same day 200/94-96 and he was given clonidine orally. As of 7/18/05 the resident noted that the patient is feeling better but still hearing the computer. A 7/20/05 psychiatry note that the patient was still at risk of acting on his delusion and harming his granddaughter. A 7/21/05 social worker note suggested that the patient was supposed to be transferred. The patient was angry and refused his as-needed medication. His speech was slurred again. The patient stated that the staff was trying to take his house and came to the hospital permanently. The patient was evaluated by the resident 7/22/05. The patient had not eaten or had his medications because people were "trying to steal his house and the computer was telling him that his wife was trying to steal his house". The psychiatrist evaluated the patient 7/26/05 and started the patient on IM Haldol. The patient was seen by the medical service 7/28/05. The patient was feeling dizzy getting out of bed that morning and was told to sit for five minutes before standing. Nursing notes from 7/30/05 suggested that the patient was irritable and paranoid with pacing and he was checking doors and refused to eat. He also refused medication and blood pressure checks.

The medical notes 8/1/05 suggested that the patient was not being cooperative. He stated that he could not move his legs. The patient had a court date 8/3/05 and his commitment was continued. The patient continued to refuse his medication and had another episode of agitation pacing 8/6/05. He was very agitated 8/8/05. The patient complained of numbness and heaviness in his right foot. The patient was transferred to Wilmington Hospital 8/8/05 and he had an imaging study that showed a large frontoparietal subdural hematoma with left-sided mass-effect and subfalcine shift. The hematoma had mixed density suggesting an acute subdural on top of a chronic subdural hematoma. The patient was refusing his vitals in the hospital but was dragging his right foot. The day shift and the wife reported at 7:25 in the evening that her husband had right-sided weakness and diminished right-sided grip with moderate right leg weakness. The patient complained of numbness in his right knee down to his foot. Dr. Sugarman saw the patient 8/11/05 and stated that a CT scan showed a left-sided subdural hematoma with midline shift. He drained the subdural. The fluid that was removed showed a dark motor oil fluid with old clot. Dr. Villars saw the patient 8/12/05 and noted that the patient had mild upgaze paresis and that the patient or his wife could give a history of head trauma. The patient was on Abilify and Zyprexa. The patient required a VP shunt and it was followed by neurosurgery. The patient had elevated blood sugars and blood pressure while in the hospital. A social worker saw the patient 8/16/05. There was a note that the patient had been involved in an altercation with police during a transfer from home and had bruising of his face and later was seen in the emergency department. The patient was transferred back to Delaware Psychiatric Center 8/17/05. The patient continued to be treated with medications by psychiatry and they continue to have some difficulty controlling his blood pressure. On 8/24/05 the patient's mother visited him the Psychiatric Center and the patient became agitated because his mother told to take his medications and eat. The nurses' notes from 8/24/05 suggested that the patient's mother noted that the place head hit the patient and that someone needed to look into it. The patient's wife stated that the patient's anger was coming from being beaten by the police. The patient had a new delusion that they went into his head to his knowledge. The patient refused medication periodically during the admission.

The patient was transferred to Wilmington Hospital Emergency Department 8/25/05 with altered mental status. The patient was increasingly aggressive and was acting out. His blood pressure and blood sugar were elevated. The patient was reevaluated by social service 8/31/05. The patient at that time had delusions that he had $1 million in DC and he told his wife he was not sure if they were married. The patient's mother accused Delaware Psychiatric Center of injuring the patient and stated he would die if he had to stay there. The patient did have some complaints of orthostasis in September of 2005. He was seen back in Christian Hospital Emergency Department on 9/8/05 but refused labs. He complained of transient dizziness. A CT scan of the head showed a left subdural hematoma with mass effect in the left frontal region. A 9/10/05 CT scan showed increased size of the left frontal parietal bleed. The patient was admitted by Dr. Amato who noted that the patient was brought to the emergency room 9/8/05 for lower extremity weakness, incoherent speech, and drooling. Dr. Yalamanchili saw the patient 9/10/05

and noted the patient had a small residual subdural hematoma.  The patient did have an EEG that showed generalized paroxysmal bursts of slow activity in the left hemisphere but no spikes.

**IMPRESSION**:  It is my opinion that the patient likely developed a small subdural hematoma as a result of his head trauma 7/11/05 when he was subdued by the policemen at Connections. The patient was said to have struck his head on the wall and was apparently struck on the head with fists and handcuffs. A small subdural hematoma will have often few effects other that confusion and if there is enough brain atrophy the blood will not immediately cause mass effect. Subdurals frequently re-bleed in a delayed fashion and it is likely that this was the scenario in this case. The mixed density blood on the CT scan and the findings at surgery of old clot and "dark motor oil" suggest a subacute subdural which would make the head trauma of 7/11/05 the most likely time that this subdural would have developed. The force of the head striking the wall and the head trauma received likely caused the rupture of one of the subdural bridging veins that lead to accumulation of blood in the space between the brain and the subdural space. This may accumulate slowly until symptoms are produced or may re-bleed intermittently. This results in neurological symptoms (slurred speech, headache, confusion, weakness, seizures) which generally bring attention of the patient of their family or in this case the medical staff at DPC.  Subdural blood may reaccumulate even after a clot has been surgically removed, which can produce ongoing symptoms.

I hope that this answers your questions regarding Mr. Walker. All opinions have been stated to a reasonable degree of medical probability.

Sincerely,

John B. Townsend III, M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER KAREN BUHRMAN individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT,<br><br>Defendants. | CIVIL ACTION<br><br><br><br><br><br>No. 06-366 JJF<br><br><br><br>JURY TRIAL DEMANDED |

## CERTIFICATE OF SERVICE

I, Philip T. Edwards, Esq., do hereby certify that on this 1st day of October, 2007 a copy of the foregoing APPENDIX TO PLAINTIFF'S ANSWERING BRIEF TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT was e-filed and served upon the following individual(s):

Alex J. Mili, Jr., Esq.
City of Wilmington Law Department
City/County Building, 9th Floor
800 North French Street
Wilmington, DE  19801

146676

MURPHY & LANDON

_/s/ Philip T. Edwards_
ROGER D. LANDON, No. 2460
PHILIP T. EDWARDS, No. 4393
1011 Centre Road, #210
Wilmington, DE  19805
(302) 472-8112
Attorneys for Plaintiff

146676