IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT.<br><br>Defendants. | CIVIL ACTION<br><br><br><br>No. 06-366 JJF<br><br><br><br>JURY TRIAL DEMANDED |

### PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY CONCERNING GERALD H.E. WALKER'S PARANOID DELUSION INVOLVING HIS GRANDDAUGHTER

Plaintiff moves this Honorable Court to exclude any evidence at trial pertaining to Mr. Walker's paranoid delusion involving his granddaughter that necessitated him being brought to Connections and resulted in him being committed to the Delaware Psychiatric Hospital on an inpatient basis.

1.     In the late 1980's Gerald H. E. Walker was diagnosed as a paranoid schizophrenic. Ex. A. (Alice Walker's Deposition) at 5, 6. In early July 2005 Mr. Walker's mental health deteriorated to the point where began having paranoid delusions that if he had sex with his granddaughter (Kevonia) she would have a baby that would rule the world. Ex. A. at 9 – 11. Immediately upon learning of Mr. Walker's delusion, Mrs. Walker had Mr. Walker brought to Connections. Ex. A. at 12. At Connections the decision was made to have Mr.

Walker committed to Delaware the Psychiatric Hospital on an in-patient basis. Ex. A. at 12, 13. It was during his transfer from Connections to the Delaware Psychiatric Hospital that Mr. Walker was brutally beaten by Officer Shawn Gordon and Officer Michael Ballard of the Wilmington Police Department. Ex. A. at 14, 15.

    2.    "Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. 401; Hurley v. Atlantic City Police Department, 174 F.3d 95 (3rd Cir. 1999). Evidence is irrelevant when it has no tendency to prove or disprove a fact at issue in the case. Failla v. City of Passaic, 146 F.3d 149 (3rd Cir. 1998).

    3.    Mr. Walker's paranoid delusions involving his granddaughter are irrelevant to the instant action. The facts at issue in this case solely involve whether or not Officer Gordon and Officer Ballard exerted objectively unreasonable force on Mr. Walker in violation of his constitutional rights and whether or not the City had a policy/custom of not investigating claims of excessive force against its officers and not training its officers to deal with mentally ill citizens during the course and scope of their job duties as Wilmington Police Officers.

    4.    Evidence of Mr. Walker's prior paranoid delusions involving his granddaughter (or any of Mr. Walker's delusions) will not prove or disprove any facts at issue in this case. The fact that Mr. Walker suffered from these delusions will in no way justify defendants' actions or disprove plaintiff's claims against defendants. This evidence will only serve to prejudice the jury against plaintiff by painting Mr. Walker as a potential child molester.

    5.    If the evidence is somehow deemed to relevant pursuant to F.R.E. 401, the evidence is still inadmissible pursuant to F.R.E. 404(b). "Rule 404(b) is one of the rules limiting the admissibility of otherwise relevant evidence." Becker v. ARCO Chemical Company, 207

F.3d 176, 189 (3rd Cr. 2000). Rule 404(b) precludes the admission of evidence of other crimes, wrongs or acts to prove a person's character. Id. at 189 (citing United States v. Sriyuth, 98 F.3d 739 (3rd Cir. 1996)); United States v. Johnson, 199 F.3d 123, 128 (3rd Cir. 1999).

6. Evidence shall not be admitted into evidence if its only relevance is to show a mere propensity or disposition on the part of an individual to commit a crime. Johnson, 199 F.3d at 128. The Court has developed a four-prong test to determine the admissibility of Rule 404(b) evidence: "(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant pursuant to Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the district court must charge the jury to consider the evidence only for the limited purpose for which it was admitted." ARCO, 207 F.3d at 189 (citations omitted).

7. First, evidence of Mr. Walker's prior paranoid delusions involving his granddaughter does not have a proper purpose under Rule 404(b). A proper purpose for otherwise inadmissible evidence pursuant to Rule 404(b) would be proof of "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident …" Whittaker v. Fayette County, 2003 WL 1827098 (3rd Cir. 2003). Clearly, Mr. Walker's paranoid delusions do not fall under any of these "proper purposes" pursuant to Rule 404(b). As such, the evidence is inadmissible.

8. Second, the evidence of Mr. Walker's prior paranoid delusion is irrelevant pursuant to Rule 402 because this evidence does not have any tendency to prove a fact at issue in this case more or less likely. In short, this evidence has no bearing on whether or not the police exerted objectively unreasonable force on Mr. Walker and has nothing to do with the City's policies and/or customs in investigating or training its officers.

9.   Third, evidence of Mr. Walker's prior paranoid delusions has no probative value and is highly prejudicial.  Rule 403 shall exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury …"  <u>Hurley v. Atlantic City Police Department</u>, 174 F.3d 95 (3rd Cir. 1999).  This evidence has absolutely no probative value, while it shall be extremely prejudicial to plaintiff, confuse the issues and will mislead the jury.

10.  Defendants shall seek to admit this evidence for the sole purpose of portraying Mr. Walker to the jury as a child molester who got what he deserved from Officer Gordon and Officer Ballard, while nothing could be further from the truth.  This evidence shall deflect the jury's attention from the real issues in this case (i.e. defendants' acts and omissions) and put plaintiff's mental health status on trial.  The lack of any probative value of this evidence versus the high amount of prejudice it will cause plaintiff makes this evidence inadmissible.

11.  Defendants have no other reason to seek the admission of Mr. Walker's prior paranoid delusions involving his granddaughter than to create a bias against Mr. Walker within the jury.  This evidence has no tendency to prove or disprove any fact at issue in this case.  Therefore, the evidence is inadmissible pursuant to F.R.E. 401, 404(b) and 403.

Wherefore, plaintiff respectfully requests evidence of Mr. Walker's paranoid delusions involving his granddaughter be excluded from being presented to the jury at trial.

        MURPHY & LANDON
        */s/ Philip T. Edwards*
        ROGER D. LANDON, No. 2460
        PHILIP T. EDWARDS, No. 4393
        1011 Centre Road, #210
        Wilmington, DE  19805
        (302) 472-8112
        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALICE WALKER, individually and as guardian, of her husband, GERALD H.E. WALKER, an incompetent person,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF WILMINGTON; CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER SHAWN GORDON, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER MICHAEL BALLARD, individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT; OFFICER KAREN BUHRMAN individually and as agent of the CITY OF WILMINGTON POLICE DEPARTMENT,<br><br>　　　　　　Defendants. | CIVIL ACTION<br><br><br><br><br><br><br>No. 06-366 JJF<br><br><br><br>JURY TRIAL DEMANDED |

## **CERTIFICATE OF SERVICE**

　　I, Philip T. Edwards, Esq., do hereby certify that on this 10th day of October, 2007 a copy of the foregoing PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY CONCERNING GERALD H.E. WALKER'S PARANOID DELUSION INVOLVING HIS GRANDDAUGHTER was e-filed and served upon the following individual(s):

　　　　　　Alex J. Mili, Jr., Esq.
　　　　　City of Wilmington Law Department
　　　　　　City/County Building, 9th Floor
　　　　　　　800 North French Street
　　　　　　　Wilmington, DE  19801

        MURPHY & LANDON

        */s/ Philip T. Edwards*
        ROGER D. LANDON, No. 2460
        PHILIP T. EDWARDS, No. 4393
        1011 Centre Road, #210
        Wilmington, DE  19805
        (302) 472-8112
        Attorneys for Plaintiff

# EXHIBIT A

```
              IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF DELAWARE

ALICE WALKER and GERALD H. E.      )
WALKER,                            )
                                   )
              Plaintiffs,          )
                                   )   Civil Action
         vs.                       )   No. 06-366 JJF
                                   )
CITY OF WILMINGTON, CITY OF        )
WILMINGTON POLICE DEPARTMENT,      )
OFFICER SHAWN GORDON, OFFICER      )
MICHAEL BALLARD, and OFFICER KAREN )
BUHRMAN,                           )
                                   )
              Defendants           )
```

       Deposition of ALICE WALKER taken pursuant to
notice at the law offices of the City of Wilmington Law
Department, City/County Building, 9th Floor, 800 N. French
Street, Wilmington, Delaware, beginning at 10:05 a.m., on
Wednesday, June 27, 2007, before Allen S. Blank, Registered
Merit Reporter and Notary Public.


APPEARANCES:

         PHILIP T. EDWARDS, ESQUIRE
         MURPHY & LANDON
         1101 Centre Road
         Wilmington, DE 19805

              For - Plaintiffs

         ALEX J. MILI, JR., ESQUIRE
         CITY OF WILMINGTON LAW DEPARTMENT
         City/County Building, 9th Floor
         800 N. French Street
         Wilmington, DE 19801

              For - Defendants

                    WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
                     www.wilfet.com





```
 1    A    Dr. DeHart.
 2    Q    And when was this diagnosis made?
 3    A    I think in '89.  In '89.  He came out of work in
 4   '89.
 5    Q    What was his specific diagnosis?
 6    A    Paranoia.
 7    Q    Was he eventually diagnosed with schizophrenia?
 8    A    Yes.
 9    Q    When?
10    A    I'm not sure.
11    Q    By whom?
12    A    Probably by Dr., if I'm not mistaken, Alator.
13    Q    I know you said you don't know when he was diagnosed
14   with schizophrenia.  Do you know if it was before 2004?
15    A    Yes.  Um-hmm.
16    Q    Do you know if it was before 2000?
17    A    Yes.
18    Q    Do you know if it was before 1997?  Can you
19   appreciate what I'm doing?  I'm trying to narrow it down.
20    A    I'm not sure.
21    Q    So you know it was before 2000 but you're not sure
22   how soon before 2000?
23    A    No.  In '89.  I know he was diagnosed as
24   schizophrenia in '89.
```

1  Q    Okay. That's when he was diagnosed with
2  schizophrenia, in '89?
3  A    Yes.
4  Q    Okay. Is that the reason why he was no longer able
5  to work after '89?
6  A    Yes.
7  Q    Was he treated at the Rockford Center at some point?
8  A    Yes.
9  Q    When?
10 A    The dates, I can't recall.
11 Q    What is the Rockford Center?
12 A    The Rockford Center is an institution for the
13 evaluation where you freely sign in of your own will. You
14 can sign your own self in. If you can sign your own self
15 in, you can go to Rockford Center.
16 Q    Did Mr. Walker sign himself into Rockford Center?
17 A    At some time, yes.
18 Q    Did you ever have to sign him into Rockford Center?
19 A    I think so, yes.
20 Q    What did the Rockford Center do for Mr. Walker?
21 A    Evaluate him, stabilize him by medication.
22 Q    Do you know what medication?
23 A    Not all the medication, no.
24 Q    Some of the medication?

1   Q    Is this prior to July of 2005?

2   A    Yeah, he was always a home body. He didn't want to
3   go out.

4   Q    And do you believe that was due to mental health
5   issues that he had?

6   A    Yeah. Because he was like a loaner. He was just
7   like a family man. He didn't want to -- he didn't want to
8   be around other people.

9   Q    In July of 2005, did his mental health issues get to
10  a certain point that you sought some more intervention from
11  Connections?

12  A    Yes.

13  Q    And what happened around July of '05?

14  A    Well, he had had a dream. He said he had a dream.
15  And he went in the baby's room. She is our granddaughter.
16  But my granddaughter. But he is by marriage. He went in
17  her room. When he went in her room -- he got up to go to
18  the bathroom. So it was a long period in between he went to
19  the bathroom. So I went to the bathroom. I went to the
20  hallway to see if he was in the bathroom but he was in the
21  baby's room on his knees by her bed. And I asked him why
22  was he in there. And he said he had a dream. So I said,
23  okay, what kind of dream did you have? He said he couldn't
24  tell me the dream. So I said, all right, come on, let's go

1  back to bed.  I asked him the dream.  He still wouldn't tell
2  me.
3           So I guess two days later, he woke me up in the
4  morning, 6:00 o'clock in the morning.  And he said, I got
5  something to ask you but I don't think you agree with it.  I
6  said, well, honey, I said, you always ask me questions, we
7  always agree on things, you know.  So he said, but you won't
8  agree with me on this.  I said, well, what is it?
9           He said, can I go with Kevonia.  I said, what
10 did you say?  He said, can I go with Kevonia?  I said, what
11 do you mean can you go with Kevonia?  He said, can I go with
12 her?  I said, go with her where, to school or where?  He
13 said, no.
14          I said, okay, let's go back to sleep and we'll
15 wake up in the morning and then you tell me.
16          So when I got up -- I got up and I got the baby
17 dressed and I told her, I said, go downstairs and wait for
18 me and then when I tell you to come upstairs, you come
19 upstairs.  But we were going to go out.
20          So I got up, fed him and she was outside
21 waiting for me in the car.  I fed him, gave him his
22 medication.  And he was sitting in the front room and I
23 said, what did you mean when you said, can you go with
24 Kevonia?  He said, can I go with Kevonia?  I said, what do

1   you mean?  He said, if I go with Kevonia, she will have a
2   baby and she won't want for anything.  I said, what are you
3   talking about?
4           He said, well, can't nobody stop me.  I said,
5   well you can't go with Kevonia.
6           So I said, okay.  Then that's when I went to
7   Connections.
8   Q   Okay.  Can you explain to me what is meant by going
9   with Kevonia?
10  A   He wanted to have sex with Kevonia and have a baby
11  by Kevonia.
12  Q   Kevonia is the baby that you're referring to?
13  A   Yes.  Um-hmm.
14  Q   And how old was she at the time?
15  A   I think she was about probably ten.
16  Q   And she is your granddaughter?
17  A   Um-hmm.
18  Q   Who are her parents?
19  A   Michelle Roberts and Kevin Price.
20  Q   Did Kevonia live with you personally at that time?
21  A   Yes.
22  Q   Is there a reason why she wasn't living with her
23  parents?
24  A   I had her since she was five days old.

1  Q    This conversation that you just told me about with
2  Mr. Walker, how soon did that occur before he was taken to
3  Connections again?
4  A    It was the same day.
5  Q    Was it July 11, 2005?
6  A    Yes.  They came.  I was there.  I went to
7  Connections and I stayed at Connections and they went to the
8  house and picked him up.  So when they came back, they told
9  me, he said the same thing.  He told them the same thing he
10 told me.
11 Q    You went to Connections by yourself on July 11,
12 2005?
13 A    Yes.  Me and Kevonia.
14 Q    And you reported this incident to --
15 A    Connections.
16 Q    Where was Mr. Walker by this time?
17 A    He was home.
18 Q    How did he eventually get to Connections?
19 A    They went to pick him up.
20 Q    Who went to pick him up?
21 A    I'm not sure.  It had to be probably Gabe and -- I'm
22 not sure.  Somebody else.  I don't know.
23 Q    At some point, was a decision made to have
24 Mr. Walker involuntarily committed to the state hospital?

1  A   Yes. They wanted to take him -- I talked to the
2  doctor. He talked to the doctor. And then it was suggested
3  that he be taken back down to state hospital.
4  Q   Who made that suggestion?
5  A   The doctor.
6  Q   Which doctor?
7  A   I can't remember. What is his name? Dr. --
8  Q   That's fine. I'm not going to make you sit here all
9  day.
10 A   I know him when I see him.
11 Q   Were you still at Connections at this time when this
12 decision was made?
13 A   Yes.
14 Q   Where in the building were you at that time?
15 A   In the lobby.
16 Q   Where was Mr. Walker?
17 A   I'm not sure if he was in the doctor's office or the
18 sitting room. I'm not sure. Okay. This is the sitting
19 room. The doctor's office is here. And I don't know if he
20 was in the doctor's room or in the lobby. Because Gabe
21 said -- told me that I could leave and that he would call me
22 when they took him back down to the state hospital.
23 Q   And after Gabe said can you leave, did you, in fact,
24 leave?

1   A   I didn't want to.  He said, yeah, you can leave.
2   And then he said, I'll call you when they took him down to
3   the state hospital.
4   Q   And at some point, he was transported to the state
5   hospital, right?
6   A   Yes.
7   Q   Do you know by whom?
8   A   No.  But they said that, when I -- after, when I
9   found out about it, they said the police took him down.
10  Q   Who said?
11  A   Gabe and Ms. Joanne.
12  Q   When did they tell you the police took him down?
13  A   Well, they didn't call me that day.  I went to see
14  him.  Because they didn't call me.  So when I went to see
15  him, when I seen him, he was -- he was mad.  He was upset.
16  His eye was red.  His arms was -- his wrist and stuff was
17  red.  I mean he was really upset.  And I asked him what
18  happened.  And he said the police beat him up.
19  Q   And did you believe him when he --
20  A   Yes, I believed him.
21  Q   How soon after July 11th did you have this
22  conversation with him?
23  A   After July 11th?
24  Q   My original question was, when did you have this

```
 1  conversation with him?
 2    A    The next day when I went to go see him.
 3    Q    It was on July 12th that he told you that the
 4  police -- well, what did he tell you?
 5    A    The 12th or the 13th.  That the police beat him up.
 6    Q    What did he say the police did to him?
 7    A    He just said they beat him up and they hit him.  I
 8  didn't want to really go through it more until afterward
 9  because when I seen him, it was just -- he was mad at me,
10  too.  So it was just like I said, okay, I'll just find out
11  when I go back to Connections and ask Connections.
12    Q    Did he have bruises on his head?
13    A    I don't know if he had bruises on his head.  But
14  when I seen his face, it was swollen and his eye was -- I
15  mean his eye was real red.  His eye was really bleeding at
16  first.  So I didn't even want to look at him.  I said, I'm
17  going to go find out.
18    Q    Did he have any cuts on his face or on his head?
19    A    I just don't remember.  Because his face was
20  swollen.  And his eye was black and red.  I didn't stay that
21  long because I didn't want him to see me cry.
22    Q    And you said somebody wanted to go to find out.
23  What did you do to find out?
24    A    I went to Connections.
```