IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALICE WALKER and | : | |
| GERALD H.E. WALKER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 06-366-JJF |
| | : | |
| CITY OF WILMINGTON, CITY OF | : | |
| WILMINGTON POLICE DEPARTMENT, | : | |
| OFFICER SHAWN GORDON, | : | |
| OFFICER MICHAEL BALLARD, and | : | |
| OFFICER KAREN BUHRMAN | : | |
| | : | |
| Defendants. | : | |

Roger D. Landon, Esquire, and Philip T. Edwards, Esquire, MURPHY
& LANDON, Wilmington, Delaware.
Attorneys for Plaintiffs.

Alex J. Mili, Junior, Esquire, Senior Assistant City Solicitor,
Wilmington, Delaware.
Attorney for Defendants.

**MEMORANDUM OPINION**

November 2, 2007
Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court are Defendants' Motion for Summary
Judgment (D.I. 45) and Plaintiffs' Motion in Limine (D.I. 55).
For the reasons discussed, the Court will grant Defendants'
Motion, and deny Plaintiffs' Motion.

**Background**

### I.   Procedural Background

Plaintiffs, Gerald E.H. Walker ("Mr. Walker") and Alice
Walker ("Mrs. Walker"), filed this lawsuit pursuant to 42 U.S.C.
§ 1983.  On June 20, 2006, Plaintiffs filed an Amended Complaint
(D.I. 5), in which they alleged that Defendants, Wilmington
Police Officers Shawn Gordon, Michael Ballard, and Karen
Buhrmann, used excessive force when transporting Mr. Walker from
Connections Community Support Programs, Inc. to the Delaware
Psychiatric Center on July 11, 2005, violating Mr. Walker's
rights under the Fourth and Fourteenth Amendment.  Plaintiffs
also filed a claim against the City of Wilmington and the City of
Wilmington Police Department (the "Police Department," and
collectively, "the City"), alleging that the City's failure to
adequately train its officers in the proper procedures to employ
when interacting with mentally ill citizens, and the City's
failure to adequately investigate and discipline claims of
excessive force proximately caused Mr. Walker's injuries pursuant
to Monell v. New York City Dept. of Social Services, 436 U.S. 658

(1978).  Because Mr. Walker is currently subject to an
involuntary commitment order by the state of Delaware, Mrs.
Walker, Mr. Walker's Court appointed guardian and wife, filed
this action on his behalf.

On August 31, 2007, Defendants filed a motion for summary
judgment on (1) the Plaintiffs' Monell claims against the City of
Wilmington and the City of Wilmington Police Department; (2)
Plaintiffs' claims against Police Officer Karen Burhmann; and (3)
Plaintiffs' punitive damages claims against the City of
Wilmington and the Police Department. (D.I. 45.)  In response to
Defendants' motion, Plaintiffs agreed to dismiss their claims
against Police Officer Karen Burhmann and their claim for
punitive damages against the City.

On October 10, 2007, Plaintiffs filed a Motion in Limine to
exclude at trial evidence pertaining to Mr. Walker's paranoid
delusion involving his granddaughter.  (D.I. 55.)

## II.  Factual Background

Plaintiffs' claims relate to an encounter between Defendant
Police Officers and Mr. Walker which occurred at Connections
Community Support Programs, Inc. ("Connections") in the city of
Wilmington on July 11, 2006.

Mr. Walker was diagnosed with paranoid schizophrenia in the
late 1980s, and has received psychiatric treatment related to
that diagnosis from Connections, and the Delaware Psychiatric

3

Center ("DPC"). (D.I. 53 at 3.) As a result of his mental illness, for over twenty years, Mr. Walker has experienced paranoid delusions, and has required mental health treatment. (Id.) Prior to July 2005, Mr. Walker was subject to an involuntary commitment order by the State of Delaware on an out-patient basis. (Id.)

In July 2005, Plaintiff's mental health deteriorated, and he began having paranoid delusions that "if he had sex with his granddaughter, she would have a baby that would rule the world." (Id.) Mr. Walker informed his wife that he was having these delusions, and accordingly, on July 11, 2005, Mrs. Walker contacted Connections. Connections staff brought Mr. Walker to Connections for evaluation by Doctor Gerald Mehalik ("Doctor Mehalik"). (Id.; D.I. 46 at 3.) Connections Nurse Joanne McGowan ("Nurse McGowan"), the Connections program director at the time of the incident, also participated in Mr. Walker's evaluation. (D.I. 47 at A-48.)

The Connections staff determined that Mr. Walker needed in-patient care, and should be transferred to the DPC for further treatment. (D.I. 53 at 3.) Mr. Walker stated, however, that he would not go to the hospital, and, once it became apparent that Mr. Walker "was not going to get into a Connections vehicle to go ...to the hospital," Connections contacted the Wilmington Police Department to conduct the transfer. (D.I. 47 at A-59-50.) In

4

response to Connections' transfer request, Officer Karen Buhrmann ("Officer Buhrmann") arrived at Connections, and introduced herself to Gabe Hufford ("Mr. Hufford"), an orderly at Connections at the time of the incident.  Mr. Hufford informed Officer Buhrmann that Mr. Walker had been committed to the DPC, presented her with a copy of Mr. Walker's commitment papers, and directed Officer Buhrmann to Mr. Walker, who was sitting in the waiting area.

Officer Buhrmann sat down next to Walker and explained that he would be transported to the hospital, and that, because it was police policy to handcuff anyone transported in a police vehicle, he would be handcuffed.  (D.I. 46 at 4.)  Officer Burhmann spent between fifteen to twenty minutes talking with Mr. Walker, attempting to convince him to go with her to the DPC.  (D.I. 47 at A-51.)  Mr. Walker was not physically or verbally threatening towards Officer Burhmann.  (D.I. 53 at 4.)  However, despite Officer Burhmann's efforts, Mr. Walker refused to leave Connections.  (D.I. 47 at A-155.)  Officer Burhmann asked Mr. Hufford whether Mr. Walker would fight an attempt to handcuff him.  (D.I. 47 at A-158.)  Mr. Hufford responded that Mr. Walker would fight.  Because Mr. Walker was substantially larger than Officer Buhrmann, she called for additional officers to assist her in the transfer.  (D.I. 48 at A-158.)

Officer Shawn Gordon ("Officer Gordon") and Officer Michael

Ballard ("Officer Ballard") arrived at Connections in response to Officer Buhrmann's request for assistance. Officer Ballard informed Mr. Walker that they would be taking him to the hospital, and requested that he allow himself to be handcuffed. (D.I. 48 at A-329-330; D.I. 47 at A-167.) Mr. Walker, now standing, responded that he did not want to be taken to the DPC. (Id. at A-330; A-167.) The parties dispute the events that followed.

According to Defendants, Officers Gordon and Ballard spent approximately five minutes attempting to convince Mr. Walker to go with them, to which Mr. Walker responded, "You have to make me go [to the DPC]." (D.I. at 5.) In light of Mr. Walker's refusal to voluntarily go to the DPC, Officers Gordon and Ballard each grabbed one of Mr. Walker's arms to handcuff him. As the officers grabbed Mr. Walker's arms, he folded them across his chest. (D.I. at 5.) Officer Gordon then lifted Mr. Walker's leg, and Mr. Walker fell to the ground. Mr. Walker landed on his back, with his arms wrapped around Officer Ballard's head in a "bear hug." Attempting to free himself, Officer Ballard head-butted Mr. Walker while Officer Gordon struck Mr. Walker in the stomach, and punched him in the face and chest. After warning Mr. Walker that, if he did not release his grip on Officer Ballard, the officers would use pepper spray, Officers Gordon and Ballard sprayed Mr. Walker with pepper spray in an effort to free Officer

6

Ballard's head.  Mr. Walker then released his right arm, and the
officers were able to handcuff him.  Officers Gordon and Ballard
lifted Mr. Walker to his feet and escorted him to the police
vehicle.

According to the Plaintiffs, Mr. Walker made no aggressive
movements or verbal threats to the officers, and did not place
Officer Ballard in a headlock.  According to Plaintiffs, after
Mr. Walker stated that he did not want to be taken to the DPC,
Officers Gordon and Ballard, "suddenly and without warning,"
threw Mr. Walker to the floor, which caused Mr. Walker's head to
slam into a wall. After being thrown to the floor, Mr. Walker
laid face-down with his arms underneath his body, and made no
attempts or verbal threats to physically harm the officers.
Plaintiffs contend that Officers Gordon and Ballard then
repeatedly beat Mr. Walker on the head, neck, arms and back with
their fists. Plaintiffs contend that Officer Gordon hit Mr.
Walker with so much force, Officer Gordon thought he broke his
hand, and began to use his steel handcuffs like a pair of brass
knuckles to beat Mr. Walker.  Plaintiffs further contend that
while Officer Gordon struck Mr. Walker, Officer Ballard inserted
his thumb into a pressure point in Mr. Walker's neck, and sprayed
pepper spray into his face.  Plaintiffs contend that, before,
during and after the incident, the only statements made by Mr.
Walker were, "Why are you doing this to me?" and "I do not want

7

to go to the hospital."

After placing Mr. Walker in the police vehicle, Officers Gordon and Ballard took him to Wilmington Hospital before taking him to the DPC because the officers had used pepper spray on Mr. Walker. Also, because the officers had used force on Mr. Walker, they contacted their supervisor, Sergeant Tom Kane ("Sergeant Kane"), who came to the Wilmington Hospital to investigate the use of force. Officer Gordon described their encounter with Mr. Walker at Connections to Sergeant Kane. Because Officer Ballard's neck had been injured from the incident, Sergeant Kane also gathered information regarding Officer Ballard's injury. Sergeant Kane then questioned Mr. Walker about the incident. Mr. Walker told Sergeant Kane that "he had not wanted to go to the hospital, and that he was held down and punched in the face." (D.I. 46 at 6.)

After Mr. Walker was examined by a doctor, he was released from the Wilmington Hospital, and transported to the DPC without further incident.

Sergeant Kane next went to Connections to interview any witnesses to the incident. At Connections, Sergeant Kane interviewed Mr. Hufford, the staff member who called the police to transport Mr. Walker. Mr. Hufford told Sergeant Kane that Officers Ballard and Gordon had attempted to handcuff Mr. Walker, but Mr. Walker resisted and had his hands beneath his body. Mr.

Hufford did not direct Sergeant Kane to any other witnesses, or provide any further information.

Once Officers Gordon and Buhrmann completed their reports of the incident, Sergeant Kane reviewed their reports, and concluded that "the officer's use of force was not excessive based on Walker's active resistence." (D.I. 46 at 7.) Sergeant Kane's written report of his investigation has been lost; however, Sergeant Kane testified at deposition to his investigation and the contents of his report. (D.I. 46 at 7; D.I. 48 at A-449-451.)

On August 9, 2005, Mr. Walker underwent a craniotomy to relieve pressure and bleeding on his brain caused by a subdural hematoma. Plaintiffs contend that Mr. Walker suffered the subdural hematoma during the July 11, 2005 incident.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   Standards of Law

#### A.   Summary Judgment

In pertinent part, Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In

9

determining whether there is a triable dispute of material fact,
a court must review all of the evidence and construe all
inferences in the light most favorable to the non-moving party.
Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 200 (3d Cir.
1995).

However, a court should not make credibility determinations
or weigh the evidence.  Reeves v. Sanderson Plumbing Prods.,
Inc., 530 U.S. 133, 150 (2000).  To properly consider all of the
evidence without making credibility determinations or weighing
the evidence, a "court should give credence to the evidence
favoring the nonmovant as well as that evidence supporting the
moving party that is uncontradicted and unimpeached, at least to
the extent that that evidence comes from disinterested
witnesses."  Id. at 151 (internal citations omitted).

To defeat a motion for summary judgment, the non-moving
party must "do more than simply show that there is some
metaphysical doubt as to the material facts. . . .  In the
language of the Rule, the non-moving party must come forward with
specific facts showing that there is a genuine issue for trial."
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.
574, 586-87 (1986)(internal citations omitted).  However, the
mere existence of some evidence in support of the nonmovant will
not be sufficient to support a denial of a motion for summary
judgment; there must be enough evidence to enable a jury to

10

reasonably find for the nonmovant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id.

B.    Lawsuits Brought Pursuant to 42 U.S.C. § 1983

In order to establish a claim pursuant to Section 1983, a plaintiff must show: (1) the conduct complained of was committed by a person acting under color of state law and (2) the conduct deprived the plaintiff of a federally secured right. Davidson v. Dixon, 386 F. Supp. 482, 487 (D.Del. 1974), aff'd, 529 F.2d 511 (3d Cir. 1975). Pursuant to Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978), when a suit against a municipality is based on Section 1983, "liability may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Bievelicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Municipal liability "attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Id. (quoting Monell, 436 U.S. at 694).

II.    Discussion

By their motion, Defendants contend that they are entitled to judgment as a matter of law because Plaintiffs have not

11

established <u>Monell</u> liability against the City. As the bases for

their <u>Monell</u> claims, the Plaintiffs have alleged: (1) the City

fails to properly investigate and discipline the use of excessive

force by its police officers, (2) the City has failed to

adequately train its officers to interact and/or deal with

mentally ill citizens.

A.    The City of Wilmington's and the Wilmington Police
      Department's Failure to Investigate and Discipline
      Allegations of Excessive Force

      1.    Parties Contentions

Defendants contend that the City's formal policies on the

appropriate use of force, prohibition of the use of excessive

force, and governing the administration of discipline for police

officers who violate these polices are constitutional. Defendants

further contend that, since the City's policies are

constitutional, Plaintiffs cannot establish the requisite fault

on the part of the City, or a causal connection between the

City's policies and the alleged constitutional deprivation.

Defendants contend that the record evidence establishes that the

City has a well-documented practice of consistently enforcing its

policies by thoroughly investigating each use of force, and

imposing discipline when force is excessive.

Plaintiffs admit that the City's policies are

constitutional.  However, Plaintiffs contend that the evidence,

taken in the light most favorable to the Plaintiffs, establishes

a Police Department custom to violate these policies, which creates an atmosphere where police officers "feel they can exert excessive force on citizens without repercussion." (D.I. 53 at 6.)  In support of this contention, Plaintiffs allege that Sergeant Kane failed to properly investigate and report the use of excessive force by police officers under his command, as characterized by his inadequate investigation of Officers Ballard and Gordon's use of force on Mr. Walker, and the Defendants' inability to produce the report of this investigation, or any other use of force report prepared by Sergeant Kane regarding Officers Ballard and Gordon.  Plaintiffs have retained an expert witness, D.P. Van Blaricom ("Mr. Blaricom"), a police practices consultant, who opined that Sergeant Kane's investigation of the Walker incident "failed to meet a reasonable standard of care." (D.I. 53 at B050.) Mr. Blaricom further opined that, since Sergeant Kane has conducted many use of force investigations, and has never found an officer to have used excessive force, the police department "has ratified the objectively unreasonable excessive force that was used against plaintiff." (Id. at B051.)

As further evidence of the police departments' failure to meaningfully investigate the use of force by its officers, Plaintiffs allege that, despite the City's admission that "thousands of allegations of excessive force have been levied against its officers," "the City can only cite to two incidents

where its officers were disciplined for their actions." (D.I. 53 at 7.)

In response, Defendants contend that Sergeant Kane's investigation into Officers Gordon and Ballard's use of force was adequate. However, Defendants contend, even if Sergeant Kane's investigation was inadequate, a single investigation is not enough to impute Monell liability to the City.

2. Analysis

Plaintiffs do not argue that the City's policies are unconstitutional, but instead that the police department's investigations conducted in violation of these policies have led to an atmosphere where officers believe they can use excessive force with impunity. (D.I. 53 at 6-7.) To establish custom, Plaintiffs must have sufficient evidence that, "though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law. Custom...may also be established by evidence of knowledge and acquiescence." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)(internal citations omitted).

To sustain a Section 1983 claim based on a municipality's failure to investigate, Plaintiffs must establish that Defendants' failure to investigate claims of excessive force amounted to deliberate indifference. Groman v. Township of Manalapan, 47 F.3d 628, 637(1995). In Beck, 89 F.3d at 974, the

14

Third Circuit held that the mere existence of procedures to
receive and investigate citizens' complaints against police
officers will not insulate a municipality from liability.  The
process for reviewing citizens' complaints "must have some teeth
...The mere fact of investigation for the sake of investigation
does not fulfil a city's obligations."  Id.

Pursuant to Wilmington Police Department, White Book
Directive 7.9, "whenever any member(s) is required, on duty, to
use any physical force or departmental equipment against another
person, the member(s) shall immediately notify their IMMEDIATE
SUPERVISOR." The supervisor is then responsible for responding to
that notification, for interviewing the officers and the citizen
involved, and for locating and interviewing potential witnesses
to the incident.  (D.I. 48 at A-405.) The supervisor should
review the officers' reports of the incident, and then create a
"use of force report" that details the findings of the
investigation, as well as the supervisor's conclusions.  (Id. at
A-406; A-499.) Should a supervisor determine that officers used
excessive force, the officer is notified, and the Office of
Professional Standards for Internal Affairs ("OPS") assigns a
staff member to further investigate.  (Id. at A-407; 499.) Also,
if a supervisor determines that the use of force was appropriate,
and subsequently, a complaint is filed by the civilian with the
City regarding that instance, OPS will assign a staff member to

further investigate .[1] (Id. at A-414; A-500) Following the OPS
investigation, if necessary, a Complaint Hearing Board is
convened, which consists of three Captains from the Police
Department. (Id. At A-414; A-505.)

The Court concludes that Sergeant Kane's investigation into
this incident was reasonable and complied with the City's
policies, and therefore is not evidence of a well-settled and
permanent practice of inadequate investigations into the use of
force by police officers.[2] Sergeant Kane interviewed Officers
Gordon, Ballard, and, separately, Officer Buhrmann, as well as
Mr. Walker, shortly after the incident.[3] (D.I. 48 at A-430.)
Sergeant Kane spent between five and ten minutes interviewing Mr.
Walker while Officers Ballard and Gordon were out of the room,
and took several notes during his interview. (Id. at A-437; D.I.
47 at 220.) At Connections, Sergeant Kane interviewed Mr.
Hufford, an eyewitness to the incident. (D.I. 47 at A-441-444.)

---

[1]Plaintiffs did not file a complaint with the City.

[2]Plaintiffs' expert report is not sufficient evidence to
establish an issue of material fact as to whether Sergeant Kane's
investigation complied with the City's procedures and polices on
use of force investigations, since the report fails to provide
any analysis whatsoever as to how Sergeant Kane's investigation
failed to comply with the City's constitutional policies.

[3]While Plaintiffs contend that Sergeant Kane should have
interviewed Officers Ballard and Gordon separately, Sergeant
Kane, who has been trained by the City on conducting a use of
force investigation, stated that he is not required to do so.
(D.I. 48 at A-431.)

16

Based on his interviews and the police reports of Officers Buhrmann and Gordon, Sergeant Kane concluded that the use of force by the officers was appropriate, and drafted and submitted his report. (Id. at A-448-452.)[4]

Even if this Court were to conclude that Sergeant Kane's investigation into the Walker incident was superficial and failed to comply with the City's policies, this single incident would not be sufficient to establish liability under Monell. "[W]here the policy relied upon itself is not itself unconstitutional, considerably more proof than the single incident will be necessary...to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation." Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985). As further evidence, Plaintiffs allege that the fact that so many use of force reports have been filed, and so few have resulted in findings of excessive force necessarily means that the City is not complying with their policy. However, the determination as to whether claims are being adequately investigated is not quantitative, but instead qualitative and functional. Plaintiffs have not developed the record as it applies to the other use of force reports, and do

---

[4]Plaintiffs make much of the fact that Defendants have been unable to produce Sergeant Kane's report, but Sergeant Kane testified to its content and format during deposition. (D.I. 47 at A-449-551.)

17

not present any evidence that tends to show that investigations conducted by the City have resulted in unjust findings regarding the use of force. In the Court's view, the use of force reports in the record establish the City's thorough investigation of its officers' use of force, or, in other words, that the City's process for reviewing and investigating officers' use of force "has teeth." Beck, 89 F.3d at 974. Since Plaintiffs have presented no further evidentiary support for their allegations, the Court concludes that they have failed to establish a triable issue of material fact.

B.    Plaintiffs' Failure to Train Claim

1.    *Parties' Contentions*

Plaintiffs contend that the evidence establishes that it was the Wilmington Police Department's official policy or custom not to train, or to inadequately train, its officers to interact and/or deal with mentally ill citizens during the course of their official duties, and that the City's failure to provide its officers with this training amounted to a "conscious and deliberate indifference on the part of the City to the rights and needs of its mentally ill citizens." (D.I. at 7.) Defendants contend that the evidence, specifically Sergeant Kane's deposition, establishes that the City of Wilmington does provide its officers with training on interacting and/or dealing with mentally ill citizens.

18

## 2. Analysis

Inadequacy of police training may serve as the basis for Section 1983 liability only where "the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact. For a failure-to-train charge to be considered a policy or custom actionable under [S]ection 1983, the municipality must make a conscious or deliberate choice not to train its officers." House v. New Castle County, 824 F.Supp. 477, 485 (D.Del. 1993) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989).

The City has presented evidence, in the form of deposition testimony from Officers Gordon, Ballard, and Buhrmann and Sergeant Kane, that clearly establishes that the City provides training for its police officers on interacting and dealing with mentally ill citizens:

- Officer Gordon stated, "[as] far as dealing with mentally-handicapped individuals, there [were] topics in the [Wilmington Police] Academy class dealing with what to expect from, you know, mentally-handicapped individuals." (D.I. 47 at A-214.)

- Officer Buhrmann stated, "I do recall [recently] we had some mental health professionals come in and speak to us about dealing with mentally ill people." (D.I. 47 at A-117.) She further stated, "I'm sure that we have had training prior to the training I just mentioned, I'm sure we have had training along the course of my career for mental illnesses, but specifically I can't recall exactly when or what or any of that right now." (D.I. 47 at A-121.)

- Officer Ballard stated, regarding his training at the City of Wilmington Police Academy, "We met with

19

> representatives from the State and some private
> organizations that deal with the mentally ill.  There
> was some role playing, movies.  That block of
> instruction just like every other block we were tested
> on.  At the end of the week we received a test...I seem
> to recall in addition to that, Dr. Susan Edgar who
> works or is a consultant for the City came in to deal
> with mental illness itself aside from that specific
> block.  We had representatives from those different
> organizations coming in." (D.I. 47 at A-305.)

- Sergeant Kane stated, "In the [Wilmington Police]
  Academy, they have someone come in.  It's usually like
  a psychologist that works with the police department
  come in and gives you...a full day or several hours on
  mentally ill people." (D.I. 47 at A-399.)

The City also provides its officers with extensive training on

the use of force. [D.I. 47 at A-130; D.I. 48 at A-291-295, A-399-

400, A-476-491.]  Plaintiffs' claims of inadequate training are

based on the following: (1) the deposed officers were unable to

clearly recall specifics of the training they received; (2) the

City does not provide police officers with specific training

regarding the use of force when dealing with the mentally ill, or

procedures for the transport of the mentally ill from one

facility to another; and (3) Officer Gordon's cursory summary of

his training with regard to the mentally ill: "You put the

handcuffs on 'em, you put them in the car." However, in City of

Canton v. Harris, 489 U.S. 378, 390-391 (1989), the Supreme Court

stated:

> That a particular officer may be unsatisfactorily
> trained will not alone suffice to fasten liability
> on the city, for the officer's shortcomings may
> have resulted from factors other than a faulty
> training program. It may be, for example, that an

> otherwise sound program has occasionally been
> negligently administered. Neither will it suffice
> to prove that an injury or accident could have been
> avoided if an officer had had better or more
> training, sufficient to equip him to avoid the
> particular injury-causing conduct. Such a claim
> could be made about almost any encounter resulting
> in injury, yet not condemn the adequacy of the
> program to enable officers to respond properly to
> the usual and recurring situations with which they
> must deal. And plainly, adequately trained
> officers occasionally make mistakes; the fact that
> they do says little about the training program or
> the legal basis for holding the city liable.

Thus, under City of Canton, Plaintiffs' allegations are not
sufficient to establish Section 1983 liability.

Further, Plaintiffs have failed to present evidence of a
pattern of constitutional violations; specifically, Plaintiffs
have presented no evidence of other mentally ill individuals who
have resisted police officers' attempts to transfer them, and
whose resistence ultimately led to the use of excessive force by
the officers. The absence of this evidence is not dispositive,
however, as a "single constitutional violation can still provide
the basis for municipal liability for failure to train, but only
where 'the need for more or different training is so obvious, and
the inadequacy so likely to result in the violation of
constitutional rights' that the policymaker's inaction amounts to
deliberate indifference." Christopher v. Nestlerode, Nos. 03-
3516, 05-3837, 2007 WL 1839822, at *7 (3rd Cir. 2007)(citing Bd.
of County Comm'rs v. Brown, 520 U.S. 397, 407-09 (1997) and
quoting Canton, 489 U.S. at 391). However, Plaintiffs have not

provided sufficient evidence establishing that the need for more or different training was obvious. In fact, the evidence in the record suggests otherwise, that is, police transfers of mentally ill patients normally proceed smoothly. For example, Officer Gordon testified that, throughout his career, he has transported mentally ill individuals "probably hundreds" of times, and could not recall any other time physical force was necessary to complete these transfers. (D.I. 47 at A-218.) Officer Ballard testified that he had been called to transfer mentally ill individuals approximately "20 to 30 times" over a six month period, and recalled only three instances where an individual had resisted police attempts. (D.I. 48 at A-309-313.) In those instances where the individual resisted transfer, the officers were able to convince the individual to comply with the transfer orders without the use of force. (Id.) Nurse McGowan stated: "In all honesty, I was pretty surprised that [Mr. Walker] didn't just give in and just go right to the hospital. Most of our clients will take one look at an officer and ask to be cuffed in the front. That's typically what our clients do." (D.I. 47 at A-82.)

Because the record does not create a reasonable inference that the City's training for police officers, or lack thereof, with respect to the mentally ill, amounts to deliberate

22

indifference,[5] the Court concludes that Plaintiffs have failed to establish a genuine issue of material fact as to the City's liability under Section 1983. Accordingly, the Court will grant the Defendants' Motion for Summary Judgment on the Plaintiffs' Monell claims against the City of Wilmington and the City of Wilmington Police Department.

## PLAINTIFFS' MOTION IN LIMINE

Plaintiffs' Motion in Limine requests the Court exclude at trial any evidence pertaining to Mr. Walker's paranoid delusion involving his granddaughter. (D.I. 55.) In support of this motion, Plaintiffs contend that this evidence is irrelevant to the instant action under Federal Rule of Evidence 401, since Mr. Walker's delusions are irrelevant as to whether Officers Gordon and Ballard did use excessive force. Plaintiffs contend that the fact that Mr. Walker suffered these delusions will not justify

_____

[5] Mr. Blaricom's expert report opines that the City was "deliberately indifferent to training officers in how to approach the mentally ill." (D.I. 54 at B051.) However, Mr. Blaricom presents no evidence that the City knew about the California Peace Officer Standards and Training on Police Response to People with Mental Illness, and made a deliberate choice not to meet this standard. See Owaki v. City of Miami, 491 F.Supp.2d 1140, 1162 (S.D.Fla. 2007). Further, Mr. Blaricom points to no concrete deficiencies in the City's current training program, but instead reaches his conclusions based on the inability of the officers deposed to recall specific training on how to transport mentally ill individuals, as well as Officer Gordon's statements during deposition, which, as discussed supra, will not suffice to establish liability under Monell. (D.I. 54 at B051.)

defendants' actions, or disprove the Walker's claims against the Defendants. Plaintiffs further contend that, even if the evidence were relevant under Rule 401, this evidence is inadmissible under Federal Rule of Evidence 404(b), which precludes the admission of evidence of other crimes, wrongs or acts to prove a person's character.

Defendants contend that this evidence should be admitted because it is probative of: (1) the need to use force when carrying out Mr. Walker's involuntary commitment, and (2) the futility of verbally coaxing Mr. Walker from Connections. (D.I. 58 at 1.) According to Defendants, Mr. Walker's delusions are probative of "whether [Mr.] Walker was a danger to his family and others when the police came to transport him against his will." (Id. at 2.)

The Court will deny Plaintiffs' Motion in Limine. Mr. Walker's paranoid delusion regarding his granddaughter prompted Mrs. Walker to bring Mr. Walker to Connections initially, which resulted in the determination that Mr. Walker required in-patient care, and would need to be transferred from Connections to the DPC. Mr. Walker's refusal led to Connections' request for police assistance, and, ultimately, to the Walker's claims that Officers Gordon and Ballard used excessive force when they transported Mr. Walker to the DPC, in response to Connections' request. Thus, the Court concludes that this evidence is relevant and admissible

under Fed. R. Evid. 401.[6]

## CONCLUSION

For the reasons discussed, Defendants' Motion For Summary Judgment (D.I. 45) will be granted, and Plaintiffs' Motion in Limine (D.I. 55) will be denied.

An appropriate Order will be entered.

---

[6]This evidence is probative of Mr. Walker's mental condition and state of mind at the time of the incident, and, accordingly, relevant to the circumstances under which Connections requested police assistance and the officers acted.